DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Plaintiffs
I.A., C.S. and DENISE HENDERSON

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.A. and C.S., the minor children of YUVETTE HENDERSON, deceased, by CRAIG SALMOND, as guardian ad litem, and DENISE HENDERSON,<br><br>                Plaintiffs,<br><br>      vs.<br><br>CITY OF EMERYVILLE; MICHELLE SHEPHERD, individually and in her official capacity as a police officer for the City of Emeryville; and WARREN WILLIAMS, individually and in his official capacity as a police officer for the City of Emeryville; JACORA HENDERSON,<br><br>            Defendants. | Case No. 4:15-cv-04973-DMR<br><br>**DECLARATION OF EMILYROSE JOHNS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Donna M. Ryu<br><br>**Date:** February 23, 2017<br>**Time:** 11:00 a.m.<br>**Location:** Oakland Courthouse, Courtroom 4 – 3rd Floor,<br>1301 Clay Street, Oakland, CA 94612 |

I, EmilyRose Johns, declare as follows:

      1.     I am currently employed as an Associate in the law firm Siegel & Yee. I am one of the attorneys for the plaintiffs I.A., C.S., and Denise Henderson. This declaration is based upon my personal knowledge. I am competent to testify with respect to the matters stated herein.

      2.     Attached hereto as **Exhibit A** are true and correct copies of certain pages from the District Attorney's Report on the February 3, 2015, Officer Involved Shooting of Yuvette

Henderson, produced by Defendants in discovery.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the Incident Report of Oakland Police Department Crime Scene Technician Tye Kushner.

4.      Attached hereto as **Exhibit C** are true and correct copies of select photographs taken pursuant to the Incident Report of Crime Scene Technician Tye Kushner, referenced in Exhibit B.

5.      Attached hereto as **Exhibit D** are true and correct copies of certain pages of Officer Michelle Shepherd's deposition, taken on August 25, 2016.

6.      Attached hereto as **Exhibit E** is a true and correct copy of the Emeryville Police Department Narrative Report of Officer M. Castillo, produced by Defendants in discovery.

7.      Attached hereto as **Exhibit F** are true and correct copies of certain pages of the transcript of the Emeryville Administrative Investigation Interview with Officer Michelle Shepherd, conducted on April 15, 2015, produced by Defendants in discovery.

8.      Attached hereto as **Exhibit G** are true and correct copies of certain pages of the transcript of the Oakland Police Department Interview with Officer Michelle Shepherd, conducted on February 3, 2015, produced by Defendants in discovery.

9.      Attached hereto as **Exhibit H** are true and correct copies of certain pages of Officer Warren Williams' deposition, taken on August 26, 2016.

10.     Attached hereto as **Exhibit I**. are true and correct copies of certain pages of the transcript of the Oakland Police Department Interview with Officer Warren Williams, conducted on February 3, 2015, produced by Defendants in discovery.

11.     Attached hereto as **Exhibit J** are true and correct copies of certain pages of Oakland Police Department Crime Report dated February 3, 2015, produced by Defendants in discovery.

12.     Attached hereto as **Exhibit K** are true and correct copies of Recorded Witness Interviews for witnesses Lesea Benitez and John Reible, produced by Defendants in discovery. The physical copy of the DVD is filed in person.

13.     Attached hereto as **Exhibit L** is a true and correct copy of the Incident Report of Oakland Police Department Crime Scene Technician Candice Keas.

14.     Attached hereto as **Exhibit M** is a true and correct copy of the February 3, 2015, Surveillance Video from 3421 Hollis St, Oakland, California, obtained pursuant to the Incident

1  Report of Crime Scene Technician Candice Keas, referenced in Exhibit L. The physical copy of

2  the DVD is filed in person.

3        15.     Attached hereto as **Exhibit N** is a true and correct copy of Plaintiffs' Federal

4  Rules of Civil Procedure Rule 26 Disclosure.

5        16.     Attached hereto as **Exhibit O** is a true and correct copy of Roger Clark's Expert

6  Report disclosed pursuant to Plaintiffs' Federal Rules of Civil Procedure Rule 26 Disclosure,
   included as Exhibit M.

7        17.     Attached hereto as **Exhibit P** are true and correct copies of certain pages of Roger

8  Clark's deposition, taken January 11, 2017.

9        18.     Attached hereto as **Exhibit Q** are true and correct copies of certain pages of Dr.

10 Paul Herrmann's Deposition, taken on January 12, 2017.

11       19.     Attached hereto as **Exhibit R** is a true and correct copy of Defendants' Federal

12 Rules of Civil Procedure Rule 26 Disclosure.

13       20.     Attached hereto as **Exhibit S** is a true and correct copy of Steve Papenfuhs'

14 Expert Report disclosed pursuant to Defendants' Federal Rules of Civil Procedure Rule 26

15 Disclosure, included as Exhibit R.

16       21.     Attached hereto as **Exhibit T** is a true and correct copy of Jason Alexander's

17 Expert Report disclosed pursuant to Defendants' Federal Rules of Civil Procedure Rule 26

18 Disclosure, included as Exhibit R.

19
         I declare under penalty of perjury under the laws of the State of California that the

20 foregoing is true and correct. Executed on February 2, 2017, at Oakland, California.

21

22

23                                                        EmilyRose Johns, Esq

24

25

26

27

28

---

*I.A. v. City of Emeryville,* No. 4:15-cv-04973-DMR
Declaration of EmilyRose Johns in Support of Plaintiffs' Opposition to Defendants' Motion for
Summary Judgment - 3

# EXHIBIT A

# DISTRICT ATTORNEY'S REPORT

# ON THE FEBRUARY 3, 2015

# OFFICER INVOLVED SHOOTING OF

# YUVETTE HENDERSON

By:                    **Tim Wellman**
                       **Deputy District Attorney**

                       **Peter Carlson**
                       **Inspector III**

Approved By:           **Nancy E. O'Malley**
                       **District Attorney**

Dated:                 **October 29, 2015**

**COE (Henderson) 000547**

placing the items into her tote bag. Ms. Henderson was next observed by store security selecting a mirror hook and placing the item into the tote bag. Todd Freeman, an asset protection specialist for Home Depot, also observed items being placed inside a bag, which he noticed was a Toys-R-Us bag.

Ms. Henderson and Mr. Graham then left the appliance department and walked to what Home Depot security described as the tool department. Home Depot employee Jorge Figueroa, an asset protection specialist, observed Ms. Henderson selecting two Gerber multi-tool knives. Mr. Graham selected a Milwaukee knife and handed the knife to Ms. Henderson. Both Mr. Figueroa and Mr. Gutierrez observed this conduct. According to Mr. Figueroa's employee report, Ms. Henderson placed the two Gerber multi-tool knives and the Milwaukee knife under her purse, which was placed in the child seat area of the shopping cart. According to Mr. Gutierrez's employee report, Ms. Henderson placed the three items under her "sweater," which was in the shopping cart. According to Joshua Duke, a Home Depot employee who was outside when Ms. Henderson and Mr. Graham were later stopped by asset protection specialists, Ms. Henderson had a purse and jacket in the cart, along with a Toys-R-Us bag.

Ms. Henderson and Mr. Graham left the tool department and walked toward a register where a sales associate had placed the freezer that had been selected. The freezer was on a flat cart. Ms. Henderson's purse was in the child seat area of the shopping cart. Ms. Henderson paid for the freezer, a two-year replacement plan for the freezer, and two cleaning supplies with the store credit card that had been obtained from the earlier return. The Home Depot receipt indicated that the transaction cost $97.01 and was conducted at 12:27 p.m., leaving a balance on the store credit card of $20.45. After the transaction, Ms. Henderson and Mr. Graham exited the area of the cash registers and headed to the store exit without making any attempt to pay for the concealed items that were in the shopping cart. Mr. Graham was pushing the flat cart that contained the freezer. Ms. Henderson was pushing the shopping cart that contained the concealed and unpaid-for merchandise. According to the video surveillance footage entitled "Contractor Exit Out," Ms. Henderson and Mr. Graham left the store at about 12:32 p.m. per the timestamp.

Home Depot store asset protection specialists contacted Ms. Henderson and Mr. Graham near the exit after the pair left the store. Home Depot asset protection specialists Jorge Figueroa and Todd Freeman approached from the front and identified themselves as asset protection employees. Antonio Gutierrez approached from the rear and also identified himself as an asset protection employee. Mr. Figueroa asked Ms. Henderson to re-enter the building. According to Mr. Gutierrez's written employee statement, Ms. Henderson claimed that "I paid for everything." At that point, Mr. Figueroa pointed out items that had not been paid for. Mr. Figueroa took hold of Ms. Henderson's right arm to escort her back into the building. According to Mr. Gutierrez's written employee statement, Ms. Henderson quickly moved to get free of his grip and, in the process, fell to the ground. According to Mr. Figueroa's written employee statement, Ms. Henderson was uncooperative and he stepped in front of her as she reached for her purse, which was in the shopping cart, and, as she attempted to run, she lost her balance and fell. Mr. Figueroa also fell to the ground as he attempted to grab Ms. Henderson. Ms. Henderson complained that she had bumped her head on the ground and asked for an ambulance.

5

**COE (Henderson) 000551**

After making contact with Ms. Henderson, Mr. Figueroa called EPD with a cell phone to ask for assistance. According to the EPD dispatch records, a call from Mr. Figueroa was placed to EPD at approximately 12:35 p.m. The call was recorded. Mr. Figueroa stated "I'm security for Home Depot. I have a female shoplifter, she is being uncooperative and doesn't want to come in." The dispatcher asked "she is being combative?" Mr. Figueroa responded "yes." The dispatcher asked if Mr. Figueroa had "any of her information" and Mr. Figueroa replied "no, she's not cooperating." A female voice, presumably belonging to Ms. Henderson, can be heard in the background saying "I am cooperating, I'm right here." Mr. Figueroa responded "go in the store, that's cooperating." Mr. Figueroa was asked by the dispatcher to stay on the line. The dispatch notes reflect "a combative shoplifter" who was "uncooperative" at approximately 12:35 p.m. Shortly thereafter, the dispatcher confirmed that Mr. Figueroa was still on the line and that the shoplifter was still with him. Mr. Figueroa responded "yeah, she's still here" and "she also wants to request an ambulance, she says she hit her head when she fell to the ground." The dispatcher stated that an ambulance will be requested and asked Mr. Figueroa to stay on the line. The dispatch notes reflect that the "subj [subject] requests medical, says she hit her head" at approximately 12:37 p.m. The dispatch notes further reflect that medical was "enroute" as of approximately 12:38 p.m.

According to Mr. Figueroa's employee report, Ms. Henderson had her hand in her purse and he requested that she remove her hand from the purse. She refused and Mr. Graham walked to her and attempted to have her "cooperate," per Mr. Figueroa's employee report. Mr. Graham helped Ms. Henderson to her feet. According to Mr. Gutierrez's written employee report, he explained to Ms. Henderson that Home Depot needed her information and then she could be on her way. According to both Mr. Figueroa and Mr. Gutierrez, Ms. Henderson told Mr. Graham to leave, handed him car keys, and whispered something to Mr. Graham. Mr. Graham then left with the freezer.[6]

---

[6]   The surveillance camera view from the "VexacqVision" footage showing the parking lot in front of the store depicts a portion of the Home Depot parking lot, with the store to the left and Hollis Street to the top. This camera angle, and the footage provided (from approximately 12:00 p.m. to 1:14 p.m. on February 3, 2015), was insufficient to reflect exactly what was happening when asset protection specialists for Home Depot stopped Ms. Henderson outside near the store exit. This footage does, however, show the following relevant events (all times are approximate per the Home Depot video timestamp):

   (1)  12:35:45 p.m. to 12:36:20 p.m.: Mr. Graham is seen pushing a freezer from the area just outside the Home Depot exit across the parking lot before leaving camera view;
   (2)  12:36:22 p.m.: Ms. Henderson is seen leaving the area just outside the Home Depot exit; she is seen jogging toward Hollis Street;
   (3)  12:36:30 p.m.: Ms. Henderson is seen, before reaching Hollis Street, looking back toward the area of the Home Depot exit; she is then seen walking to Hollis Street;
   (4)  12:36:45 p.m.: A fire engine is seen turning left from Hollis Street into the Home Depot parking lot; the fire engine leaves camera view at about 12:37:31 p.m.;
   (5)  12:36:47 p.m.: Ms. Henderson is seen heading southbound on the east sidewalk of Hollis Street, leaving camera view;
   (6)  12:37:02 p.m. to 12:37:15 p.m.: An EPD SUV patrol vehicle is seen traveling southbound on Hollis Street before leaving camera view;

COE (Henderson) 000552

The dispatcher returned to the call with Mr. Figueroa, obtaining Mr. Figueroa's first name and phone number.  As the dispatcher confirmed that the shoplifter was still uncooperative and was detained outside in front of Home Depot, a female voice, presumably belonging to Ms. Henderson, can be heard in the background saying "get your motherfucking hands off."  Mr. Figueroa then told the dispatcher "I need an officer over here now."  The dispatcher informed Mr. Figueroa that officers were on the way and asked Mr. Figueroa for a description of the woman.  As Mr. Figueroa was responding he informed the dispatcher "she pulled out a gun, sir. She just pulled out a gun."  The dispatcher asked "she pulled out a gun?"  Mr. Figueroa replied "yeah, she just pulled out a gun, she's running, are you going to send somebody over here, she pulled out a gun on us."  Mr. Figueroa told the dispatcher that the shoplifter was "running toward the street."  When asked what direction the woman was going, Mr. Figueroa responded "she's on Hollis" and added "she's on foot, running toward under, the underpass."  The dispatch notes reflect that the "Rp [reporting party] reports the subj just pulled out a gun" at approximately 12:41 p.m.[7]

Mr. Figueroa, in his employee report, indicated that he took Ms. Henderson "by her right arm in [an] attempt to physically direct her in to the store.  The female shrugged my arm off of her.  [Mr.] Gutierrez grabbed the female from the left arm.  The female quickly reached in to her purse that was over her shoulder and pulled out an object wrapped in a towel.  The female subject moved the gun in [a] circular motion until the towel fell, revealing a Faded black Revolver Gun.  The female stated 'Get the fuck away from me, I'll shoot you.'"  Mr. Gutierrez, in his employee report, indicated that after Mr. Graham left with the freezer, "I grabbed the Female subject by the left arm and [Mr.] Figueroa grabs her by the right arm and instructed the Female subject to follow me.  At this point she was able to reach into her shoulder bag and pull out a small black revolver.  The Female subject said, 'Let me go [I']ll fucken shot [sic] you.'"[8]  Mr. Freeman in a written statement to OPD stated that Ms. Henderson pointed the gun at "all 3 of us.  Then she started backing up towards the street area while still pointing the gun at us.  I

---

(7) 12:37:55 p.m. to 12:37:59 p.m.:  An EPD patrol vehicle is seen traveling southbound on Hollis Street before leaving camera view;

(8) 12:37:54 p.m. to 12:38:13 p.m.:  An AC Transit bus is seen traveling northbound on Hollis Street before leaving camera view.

[7]    Mr. Figueroa, who remained on the line, described Ms. Henderson's flight southbound on the east sidewalk of Hollis Street.  He further noted that he observed an officer and that Ms. Henderson tried to get on a bus.  After that he stated that he could not see what was going on, but that "she has the gun out."  He told the dispatcher that the gun was a "black revolver."  He went on to tell the dispatcher that "she made a left at the street behind the freeway."

[8]    In his statement to OPD, Mr. Gutierrez said that Ms. Henderson pointed the gun at Mr. Figueroa and said "back off or I'll shoot."  In his statement to OPD, Mr. Figueroa said that Ms. Henderson said "get off me or I'll fucking shoot you."

7

**COE (Henderson) 000553**

feared for our lives."[9]  Carlos Malave, a Home Depot forklift operator who was outside at the time, observed Ms. Henderson pull out a revolver "from somewhere, I believe her purse," and point the gun at "Jorge's [Figueroa] chest with her right hand. She then said 'don't fucking touch me, I'm a shoot yo ass.'"  Robert Limahecu, a Home Depot employee who was outside the store on his lunch break, observed Ms. Henderson "reach into her purse with her right hand and pull out a dark color handgun" and point the gun in the air as "the loss prevention officers backed away."  Nickolaus Messina, another Home Depot employee who was outside the store on his lunch break, noticed asset protection specialists scattering and he "looked and could see" a female "holding a black handgun in her right hand."  He stated that the female "yelled out, 'I'll shoot you motherfuckers!' or 'I'll kill you motherfuckers!'"[10]  Kim Towers, a Home Depot employee posted at an exit door to check receipts, wrote in her employee report that she observed Ms. Henderson "pulling an object that appeared to be a gun [from her purse] then took off running."  Benjamin Richardson, a Home Depot employee who was in front of the store taking a break, wrote in his employee report that Ms. Henderson "searches threw [sic] her purse and pulls out a gun.  I back up and the lady was screaming at the AP [asset protection] guy saying I should shoot you.  The lady makes the guy back up and she takes off running around the corner."[11]

        After brandishing the firearm, Ms. Henderson, who had her purse with her, made her way out of the Home Depot parking lot toward Hollis Street.  Mr. Gutierrez noted in his employee statement that, before reaching Hollis Street, Ms. Henderson pointed the gun at him and Mr. Figueroa.  Mr. Figueroa, in his employee statement, said that Ms. Henderson turned and said "get the fuck away, I'll shoot."[12]  Mr. Malave heard Ms. Henderson say, as she left, "don't follow me or I'll shoot you."  As Ms. Henderson left Home Depot, she left behind a jacket, the Toys-R-Us tote bag, and the merchandise that had not been paid for.  Home Depot later calculated the total amount of the eight unpaid items to be $130.29.  The merchandise that was not paid for, along with the Toys-R-Us bag and jacket, were recovered and photographed.

        After Ms. Henderson reached Hollis Street, she turned left and headed southbound on the east sidewalk of Hollis Street.  In this area, Hollis Street runs north to south, with 40th Street to the north in Emeryville and 34th Street to the south in Oakland.  Interstate 580 crosses over

---

[9]       Home Depot employee Joshua Duke heard Ms. Henderson threaten "don't touch me or I'll shoot you" and, later, "don't follow me or I'll shoot you," but, from his location, did not personally see the gun.

[10]      After the shooting, Mr. Messina returned to the shopping cart Ms. Henderson had been pushing and observed a jacket that was inside the shopping cart which, when lifted, revealed a Milwaukee knife and a Gerber multi-use tool knife inside the cart.  All of the recovered merchandise was later photographed, which included two Gerber knives and one Milwaukee knife.

[11]      Mr. Richardson later heard gunshots, but did not witness the shooting per his report.

[12]      In his statement to OPD, Mr. Figueroa said that Ms. Henderson pointed the gun at him and said "back the fuck off me."

COE (Henderson) 000554

After running behind the bus, Ms. Henderson approached a bright green automobile that was heading northbound on Hollis Street directly behind the AC Transit bus. The vehicle, a Nissan Versa, was driven by John Marlette. Mr. Marlette observed Ms. Henderson traveling by foot southbound on Hollis Street. He thought Ms. Henderson was trying to catch the bus. He then observed Ms. Henderson run in his direction yelling "hey, hey." Mr. Marlette told police that he initially thought she was going to ask for money. Mr. Marlette said that Ms. Henderson then moved in front of his car and approached his driver's side door. Mr. Marlette stated that Ms. Henderson said something to him, but he did not know what she said "because I was busy saying no to her." As Ms. Henderson was at his driver' side door, Mr. Marlette stated, per his written statement:

> I saw her point a dark (black or brown) short barrel revolver at me. When she did that, I thought she was going to shoot me and that I was going to die. At that time I realized that she was targeting me. I was scared for my life. I also thought in my mind that she was either crazy or trying to rob me. She may have touched my car, but I'm not sure. I saw a female Emeryville police officer driving an SUV-type vehicle traveling south on Hollis St. The police car was within 8 [feet] of my car when the lady was pointing the gun at me. The lady with the gun then began running southbound on Hollis St. in the middle of the street. The lady still had the gun in her right hand when she ran away. She was really running away, not jogging. As soon as the lady ran south, the Emeryville officer drove south.[13]

Mr. Marlette's statement is corroborated by the AC Transit bus video footage, Camera 7, which showed Ms. Henderson approaching Mr. Marlette's vehicle and brandishing an object at Mr. Marlette that she is holding in her right hand. After pointing the object at Mr. Marlette, the video footage showed Ms. Henderson running southbound on Hollis Street, behind Mr. Marlette's vehicle, running to the east sidewalk as she continued running south.

Officer Sheppard observed Ms. Henderson approach Mr. Marlette's green car. She saw that the woman was yelling at the driver of the car and was holding a black revolver in her hand. Officer Sheppard believed that the suspect was attempting to carjack the green car. After the suspect ran away from Mr. Marlette's car, running southbound on Hollis Street, Officer Sheppard pulled her SUV patrol vehicle over to the west curb of Hollis Street, quickly exited her vehicle, and retrieved her gun. This was observed by John Reible, who was driving southbound on Hollis Street behind Officer Sheppard. He also observed a woman running south on Hollis Street.

Around this time, EPD Officer Warren Williams arrived near Officer Sheppard's location on Hollis Street. He had responded as Officer Sheppard's cover unit for an uncooperative female shoplifting suspect at Home Depot. He was driving a marked EPD Ford Crown Victoria patrol vehicle. While on his way to the scene, Officer Williams heard over dispatch that the suspect was armed with a gun. As he approached Officer Sheppard's location on Hollis Street, Officer Sheppard pointed out the female suspect to Officer Williams. By this point, Ms. Henderson was

---

[13]     Mr. Marlette drove northbound on Hollis Street. He later heard gunshots, but stated he did not see the shooting.

COE (Henderson) 000556

farther south on Hollis Street near a storage company.  Both Officers Sheppard and Williams drove south on Hollis Street toward Ms. Henderson's location.

As Ms. Henderson ran southbound on the east sidewalk of Hollis Street, she passed ExtraSpace Storage, a storage company located at 3406 Hollis Street in Oakland, just south of the Emeryville border.  She approached a GMC pick-up truck that was parked diagonally at the south edge of the storage company across the east sidewalk of Hollis Street.  Eric Clausen was seated in the driver's seat of the truck.  Mr. Clausen told police that he had been helping his friend Russell Whitehead move some items into storage at ExtraSpace Storage.  Mr. Whitehead had pulled into a parking space in the carport area of the storage facility.  As Mr. Clausen was waiting for Mr. Whitehead to get out of his car, Ms. Henderson approached him,[14] speaking fast and excitedly.  He told police that he could not understand what Ms. Henderson was saying.  He said that she had a "frantic" look on her face.  He thought she might be either "nuts" or on drugs.  He stated that Ms. Henderson then went south on Hollis Street, but soon returned to his truck, on the passenger side,[15] as he noticed "police lights coming toward me."  Mr. Clausen stated in his written statement to police that he could not tell what Ms. Henderson was saying, but saw that she had "a gun in her right hand, which she seemed to be trying to conceal with clothing.  It was a revolver and I saw the end of the barrel because she was pointing it at me."  In his recorded statement, Mr. Clausen also told police that Ms. Henderson was holding a gun and had it pointed at him.  He described the gun as a revolver.  He stated that she was yelling at him, but again he said he could not understand a word she was saying.  He said that he thought the female suspect wanted to get into his vehicle, but he was not sure.  He told police he was scared for his life.  Mr. Clausen stated that "she became very frantic as two police cars were driving toward us.  She began to run towards the building, to the pillar where Russ [Whitehead] had parked his car."  He did not believe that Mr. Whitehead had any idea as to what was going on.  Mr. Clausen told police that after seeing officers get out of their cars with guns drawn, "I got out of my truck and ran behind it."  He said he did this because he did not want to get shot.  Mr. Clausen stated that he did not see what Ms. Henderson did once she got inside the carport and stated that he did not see the shooting, though he did hear the gunshots.

Officer Sheppard drove her vehicle south on Hollis Street and parked her vehicle near the suspect.  She was south of the suspect.  Officer Williams drove his vehicle south on Hollis Street and parked his vehicle near the suspect north of Officer Sheppard's location.  Both officers exited their vehicles.  Ms. Henderson ran from the passenger side of Mr. Clausen's pick-up truck into the carport area of the storage company, with the gun still in her hand.  Officer Sheppard exited her vehicle with her service handgun drawn.  Officer Williams exited his vehicle with his service rifle deployed.

Surveillance video footage from 3421 Hollis Street showed Mr. Clausen's pick-up truck and the portion of Hollis Street near where the truck was parked.  The video footage showed Ms.

---

[14]   Mr. Clausen told police that Ms. Henderson approached him on the driver's side of his truck.  However, surveillance video footage from 3421 Hollis Streets showed Ms. Henderson approaching the passenger side, not driver's side, of Mr. Clausen's pick-up truck.

[15]   Surveillance video footage from 3421 Hollis Street confirmed that Ms. Henderson was on the passenger side of Mr. Clausen's pick-up truck.

11

COE (Henderson) 000557

.38 caliber revolver was found next to Ms. Henderson after the shooting and that she had a bag of additional .38 caliber ammunition for the revolver with her.  In addition, Ms. Henderson's DNA was found on the recovered revolver.

Despite being ordered by both Officer Williams and Officer Sheppard to "get on the ground" and "drop the gun," Ms. Henderson ignored all police commands.  She did not get on the ground and she did not drop the gun.  Instead, Ms. Henderson pointed her gun at Officer Williams.  This was observed not only by Officer Sheppard and Officer Williams, but was also observed by Nicole Phavisith.  All three observed Ms. Henderson point her gun at Officer Williams.  The gun, a black revolver, was recovered next to Ms. Henderson after the shooting.  Ms. Henderson's revolver was loaded and she had additional ammunition in her possession.

Ms. Henderson ignored all police commands and pointed her gun at Officer Williams.  Officer Williams reasonably feared for his life when she did this.  Officer Sheppard reasonably feared for Officer Williams's life when Ms. Henderson pointed her gun at Officer Williams.  Ms. Henderson had fled from police, had ignored police commands, had refused to drop her gun, had refused to get on the ground, had refused to surrender, and pointed her gun at police.

Based on Ms. Henderson's conduct, it appeared to both Officer Williams and Officer Sheppard that Ms. Henderson was planning to shoot Officer Williams.  Officer Williams stated that he believed his life was in danger.  Officer Sheppard stated that she believed Officer Williams's life was in danger.  These beliefs were not unreasonable given the facts in this case.  All gunshots were fired in relatively rapid succession in less than seven seconds.

Given the totality of the circumstances, it appears that Officer Williams and Officer Sheppard reasonably believed that Officer Williams was in imminent danger of great bodily injury or death when they shot at Ms. Henderson.  Further, there is no evidence upon which this office could rely to disprove Officer Williams's and Officer Sheppard's stated beliefs that they feared for Officer Williams's safety.

Accordingly, in applying the California District Attorney's Uniform Crime Charging Standards to the present case, there is insufficient evidence to support a criminal prosecution against Officer Williams or Officer Sheppard and this office contemplates no further action in this case.

By:         Tim Wellman
            Deputy District Attorney

Approved By: Nancy E. O'Malley
             District Attorney

Dated:      October 29, 2015

COE (Henderson) 000579

# EXHIBIT B

Re: I.A. et al. v. City of Emeryville, et al.                    SDT Log # 10-458-16
Action:  4:15-CV-04973-DMR

# DECLARATION

I, the undersigned, being the duly authorized custodian of records on file in the Oakland Police Department
Records Section, and having the authority to certify such records, declare under penalty of perjury that the
records being provided are all true copies of the original records that were prepared or entered by personnel
of the Oakland Police Department in the ordinary course of business at or near the time of the incident to
which they pertain.

## CERTIFICATION OF RECORDS

____X_ Copies of all the records described in the Subpoena duces Tecum or Court Order are provided.
        Any redactions made to the documents are pursuant to the exemptions allowed under the California
        Public Records Act, 6254(f) California Government Code. RD# 15-006467 was provided

## CERTIFICATION OF PARTIAL, OR NO RECORDS

_____ Please note that only service by personal delivery or 1st Class Mail will be accepted unless
        agreed upon in advance.

A thorough search of the records on file in the Oakland Police Department Records Section:

_____ Revealed only a portion of the records described in the Subpoena duces Tecum. RD# -- is
        unable to load unto the microfiche machine (the film is damaged) and is not able to be produced.

_____ RD# are privileged and confidential and are exempt from release under
        Evidence Code 1040 because the scope of the records requested pertain to a case that is showing it is
        still open for Investigation by Oakland Police Department. Accordingly, the Oakland Police
        Department is unable to produce any records as specified in the Subpoena at this time.

_____ The records described in the Subpoena duces Tecum are exempted from release pursuant to the
        California Penal Code 11167.5. Please provide a signed Court Order with an attached Protective
        Orders for any additional minors in the report. RD# -- requires a JV575/828 Petition with
        Protective Orders.

Executed on Monday the 5th day of December, 2016 at Oakland, California

Cassandra Lane -- Police Records Specialist
For: Roland Holmgren – Lieutenant of Police, Homicide Division
Custodian of Homicide Records
Oakland Police Department

REC'D OCT 2 8 2016

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
Northern District of California ▾

|  |  |
|---|---|
| I.A. et al. | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:15-cv-04973-DMR |
| City of Emeryville et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:        Cynthia Vela
           455 7th St, 3rd Floor, Oakland, CA 94607

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The complete investigation file for the investigation conducted by Oakland Police Department of the Emeryville Police Department officer-involved shooting of Yuvette Henderson on February 3, 2015.

| Place:    499 14th st, Suite 300, Oakland, CA 94612 | Date and Time: |
|---|---|
|  | 11/08/2016 1:28 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
|  |  |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    10/25/2016

CLERK OF COURT

                                                     OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                      *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  I.A., C.S., and Denise Henderson                                                     , who issues or requests this subpoena, are:
EmilyRose Johns, 499 14th St, Suite 300, Oakland, CA 94612; emilyrose@siegelyee.com; 510.839.1200

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

1

**PROOF OF SERVICE**

2

I, PAUL KELLEY, declare as follows:

3

I am over 18 years of age and I am a resident of the State of California.  I am not

4

a party to the within action.  My business address is 499 14th Street, Suite 300,
Oakland, CA, 94612.

5

6

On October 28, 2016, I served copies of the following documents:

7

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OBJECTS,
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

8

9

on the entity from which documents are sought by personal service to:

10

Cynthia Vela
Police Administration Building

11

455 7th st 3rd floor
Oakland, CA 94607

12

13

I declare under penalty of perjury that the foregoing is true and correct.
Executed on October 28, 2016, at Oakland, California.

14

15

16

_____

Paul Kelley

17

18

19

20

21

22

23

24

25

26

27

28

---

*I.A., et al. v. City of Emeryville, et al.* No. 4:15-cv-04973-DMR
Proof of Service - 1

**Printed by:** ocl4353
**Printed date/time:** 11/30/16 20:07

# Incident Report

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

SUBPOENAS – COURT ORDER

**Incident Number: 15-006467-027**

## Incident Summary

| | |
|---|---|
| Incident Type: | **Report Type:** INCIDENT REPORT |
| **Inc Occurred Address:** 3406 HOLLIS ST, OAKLAND, CALIFORNIA 94608 | **Sector/Beat:** CCD3/07X |
| **Inc Occurred Start:** 02/03/2015 13:15   **Inc Occurred End:** 02/03/2015 19:08 | **Report Taken:** |
| **Bias Motivation:**   **Gang Related:** U | **Substance:** U |
| **Contact Nature:** | **Reported Date/Time:** 02/05/2015 09:59 |
| **Reporting Officer:** KUSHNER, TYE   **Primary Assigned Officer:** | |
| **Case Status:**   **Disposition:** | **Disposition Date:** |

**Incident Report**

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

Incident Number: 15-006467-027

## Narratives

ENTERED DATE/TIME: 2/5/2015 09:59:00
SUBJECT:  FBR NARRATIVE
AUTHOR:  KUSHNER, TYE

EVIDENCE:

1. CARTRIDGE CASE WIN 40 S&W SILVER
2. CARTRIDGE CASE WINCHESTER .223 REM
3. CARTRIDGE CASE WINCHESTER .223 REM
4. CARTRIDGE CASE WINCHESTER .223 REM
5. CARTRIDGE CASE WINCHESTER .223 REM
6. CARTRIDGE CASE WINCHESTER .223 REM
7. CARTRIDGE CASE WINCHESTER .223 REM
8. ONE TIED PLASTIC BAG CONTAINING FIVE HORNADY 38 SPL AND ONE R-P 38 SPL
   CARTRIDGES
9. REVOLVER, RG40, 6 SHOT, MOD RG40, RG IND, MIAMI FLA, CAL 38 SPECIAL, BLK WITH WOOD  COLOR
   GRIPS, SER# ████████
10. SIX CARTRIDGES, HORNADY, 38 SPL ( FROM ITEM 9)
11. SIDE VIEW MIRROR PART ( PHOTOGRAPHED AND PLACARD AS NUMBER 10 AT SCENE)_
12. GSR KIT FROM HENDERSON
13. GLASSES, BLU W/ PATTERN, FOSTER GRANT
14. FRAGMENTS FROM WINE STOPPER BOX , UNIT 107
15. FRAGMENT FROM SHIRT- UNIT 107
16. FRAGMENT FROM BOX OF LANYARDS - UNIT 107
17. FIVE MISC ID/DL IN VARIOUS NAMES FROM PURSE
18. TEN MISC MC/VISA IN VARIOUS NAMES FROM PURSE
19. TWELVE MISC STORE AND GIFT CARDS FROM PURSE
20. PAPERWORK- MAIL, CHECKS AND OTHER MISC PAPERS FROM PURSE
21. FOUR SS CARDS IN VARIOUS NAMES ████████████████████████████████
    ███████████████████
22. CELL PHONE, BLK, KYOCERA, BAR TYPE
23. CELL PHONE, SMART PHONE, KYOCERA, MODEL C5170
24. CELL PHONE, SMART PHONE, METRO PCS MODEL N9120
25. CELL PHONE, SMART PHONE, SAMSUNG MODEL SCH-S738C
26. MISC CARDS - BUSINESS, HEALTH, ACCESS AND TRANSPORTATION
27. MISC RECEIPTS
28. EYE GLASS CASE CONTAINING A BLU GLASS PIPE
29. MISC KEYS
30. FOLDING KNIFE
31. PURSE BLK AND BRO, MARK FISHER CONTAINING A PINK HANDBOOK, WHI CLOTH, NOTE    PAD,
    TWEEZERS, PENS, FOREIGN COINS, CIGARETTES, LIGHTER, EMPTY BERNOMATIC

SUBPOENAS – COURT ORDER

**Incident Report**

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

Incident Number: 15-006467-027

TORCH, BLK BAG, NAIL POLISH, LOTION, OINTMENT, BOOST MANUAL ECT.
32.FAT BOOK NOTE BOOK WITH MISC NOTES AND NUMBERS
33.BOTTLE OF COKE, 20 OZ, 1/5TH FULL
34.EARRINGS, GOLD COLOR SPIRAL
35.NECKLACE WITH CIRCLE PENDENT WITH WHITE/CLEAR STONES
36.NECKLACE GOLD IN COLOR WITH SMALL ROUND PENDENT WITH MULTI WHI/CLR STONES
37.NECKLACE WITH HORSE SHOE PENDENT GOLD IN COLOR WITH CLR STONES
38.GOLD COLOR PENDENT NECKLACE WITH GOLD COLOR PENDENT AND CLR STONES
39.EARRING, STUDS, SLIVER IN COLOR WITH BLU STONE SURROUNDED BY CLR STONES
40.WATCH ANN KLEIN SIL IN COLOR
41.US CURRENCY $18.39
42.US CURRENCY 80 CENTS

LIFTS:
NONE

STRIKE MARKS/ BULLET HOLES

ALL THE BELOW OCCURRED IN THE ROLL UP DOOR ON UNIT 107 AT 3406 HOLLIS ST AND MEASURED
WITH A 12 FOOT METAL TAPE MEASURE

FROM BOTTOM OF DOORFROM RIGHT SIDE OF DOOR

| | |
|---|---|
| A6 '8" | 1'6" |
| B2'6" | 5'2" |
| C2'7" | 8' 1/4" |
| D2'3.5" | 2' |
| E2'1" | 2'4.5" |
| F1'4" | 5'3" |
| G1'1" | 4'11.5" |
| H2'5" | 5'4" |
| I10" | 2'2.5" |
| J3"3'4'0.5" | |

ON 3 FEB 2015 I WAS WORKING 1L61 WHEN I RESPONDED TO 34TH STREET AND HOLLIS ST ON A
POSSIBLE OFFICER INVOLVED SHOOTING. I RESPONDED AT ABOUT 1305 HRS AND ARRIVED AT
ABOUT 1315 HRS.  ON ARRIVAL, THE AREA WAS SECURED WITH CRIME SCENE TAPE AND
NUMEROUS OFFICERS WERE ON SCENE.

I MET WITH PET POTTER WHO WAS ON SCENE AND HAD TAKEN SOME INITIAL PHOTOS.  SHE
WALKED ME THROUGH THE SCENE.

SUBPOENAS – COURT ORDER

Printed by:  ocl4353
Printed date/time:  11/30/16 20:07

# Incident Report

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

Incident Number: 15-006467-027

SCENE:

THE INCIDENT OCCURRED IN THE PARKING AREA OF 3406 HOLLIS ST WHICH IS EXTRA SPACE
STORAGE COMPANY.  AT THE NORTH END OF THE PARKING LOT IS THE OFFICE, WHILE FACING THE
BUILDING THERE ARE TWO GLASS SLIDING DOORS AT THE FAR LEFT.  THERE ARE THEN A SERIES
OF STORAGE UNITS WITH ROLL UP DOORS WHICH CAN BE ACCESSED FROM THE PARKING LOT.
THE DOORS ARE APPROX 8' X 8'.  THERE IS A DOOR NEXT TO THE FAR LEFT SLIDING GLASS DOORS
WHICH IS NOT MARKED.  THE OTHER DOORS GOING LEFT TO RIGHT ARE NUMBERED 106-111.  AFTER
UNIT 111 ON THE FAR RIGHT IS ANOTHER SET OF SLIDING GLASS DOORS.



PARKED IFO THE FAR RIGHT SET OF SLIDING GLASS DOORS IS A GRN PICKUP TRUCK LIC.
IFO THE PICKUP TRUCK IS ANOTHER VEHICLE A TOYOTA LIC            BEHIND THE TOYOTA LIC
             IS A GMC Z71 LIC        THE GMC TRUCK WAS LOADED WITH BOXES AND IS PARKED IN
THE SOUTH DRIVEWAY OF THE BUSINESS.

PARKED IFO UNIT 110 IS A BLK FORD EXP LIC          IFO UNIT 108 IS A 03 FORD FOCUS 4D SILIVER
LIC           .  THE VEHICLE AS A SHATTERED FRONT PASSENGER WINDOW, A BULLET HOLE IN THE
WINDSHIELD GOING FROM INSIDE TO OUTSIDE, A SHATTERED FRONT DRIVERS WINDOW AND A
BROKEN DRIVERS SIDE MIRROR.

TO THE LEFT OF THE VEHICLE IS THE BODY OF A FEMALE BLACK LATER IDENTIFIED AS HENDERSON.
THERE IS A LARGE AMOUNT OF BLOOD COMING FROM THE HEAD AREA.  SHE IS LAYING ON HER
RIGHT SIDE WITH HER HEAD FACING WEST TOWARD THE STREET.  BETWEEN HER FEET IS A
BROWN/ BLACK PURSE CONTAINS A NUMBER OF ITEMS (EVIDENCE ITEMS 17-12).  THE FEMALE
BLACKS FEET ARE AT THE DRIVERS SIDE FRONT TIRE OF THE 03 FORD FOCUS. AT HER FEET IS A
BAG CONTAINING SIX 38 CAL CARTRIDGES (ITEM 8). ON THE GROUND AROUND THE FEMALE BLACK IS
A LARGE AMOUNT OF GLASS AND A PART TO A VEHICLE MIRROR (MARKED AND PHOTOGRAPHED AS
ITEM 10 AND TURNED IN UNDER EVIDENCE ITEM 11).  ALSO NEAR THE FEMALE BLACKS BODY
APPROX 6 FEET TO THE NORTH AND ABOUT IN LINE WITH HER TORSO IS A REVOLVER.  THE
REVOLVER IS POINTING SOUTH AND THE CYLINDER IS CLOSED.  ONE CAN ALSO SEE THAT THE GUN
IS LOADED. THE GUN IS IN AN EMPTY PARKING SPACE IFO UNIT 107 BLOCKING THE VICTIM FROM
VIEW IS A BLUE TARP SHIELD AND A YELLOW CLOTH.

UNIT 107 IS LOCKED WITH A PAD LOCK.  THERE ARE A NUMBER OF BULLET HOLES AND STRIKE
MARKS IN THE DOOR OF THE UNIT.   JUST ABOVE UNIT 107 IS A SECURITY CAMERA.  THERE IS ALSO
A SECURITY CAMERA NEAR THE OFFICE IFO THE LEFT SLIDING DOOR.

IN THE PARKING LOT THERE ARE SEVEN CARTRIDGE CASINGS, ONE 40 CAL ( ITEM 1) LOCATED JUST
WEST OF THE PARKING SLOT IFO UNIT 111,  THERE ARE THREE .233 CARTRIDGE CASES (ITEMS 2-4)
BEHIND THE VEHICLE PARKED IFO UNIT 110 IS A BLK FORD EXP LIC          APPROX HALF WAY

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

SUBPOENAS – COURT ORDER

**Incident Number: 15-006467-027**

BETWEEN THE SIDEWALK AND THE PARKING OVERHANG.  NEXT TO THE DRIVER SIDE REAR
QUARTER PANEL OF THE BLK FORD EXP LIC ▮▮▮▮▮ IS A PILLAR.  JUST NORTH, APPROX 1-2 FEET,
FROM THE PILLAR ARE AN ADDITIONAL THREE TWO .233 CARTRIDGE CASES ( ITEMS 5-7).
PARKED JUST NORTH OF THE SCENE IFO UNIT 106 IS A GRY VW LIC▮▮▮▮▮▮▮

IN THE STREET IFO 3406 HOLLIS ST ARE TWO EMERYVILLE POLICE VEHICLES. VEHICLE 1254 IS
PARKED FACING SOUTHBOUND IN THE NORTHBOUND LANE.  THE VEHICLES REAR IS OPEN AND A
BLACK BAG WITH HELMET IS ON THE GROUND.  JUST NORTH OF VEHICLE 1254 IS VEHICLE 1253
WHICH HAS ITS REAR DOOR OPEN.

SUMMARY CONT:

WHILE I REMAINED ON SCENE PET POTTER RELOCATED TO EMERYVILLE PD TO PHOTOGRAPH THE
OFFICERS INVOLVED AND THE REVOLVER ANY EVIDENCE.

I TOOK PHOTOS OF THE SCENE WITH AND WITHOUT EVIDENCE MARKERS.

AT ABOUT 1250, I WAS WITH INVESTIGATOR OFC P TRAN AS HE WAS WALKING THROUGH THE
SCENE.  HE ASKED IF THE REVOLVER WAS LOADED.  AT THIS POINT I OPENED THE CYLINDER AND
FOUND THE REVOLVER FULLY LOADED WITH SIX CARTRIDGES ( EVIDENCE ITEM 10).  ALL OF THE
CARTRIDGES WERE LIVE.  I PHOTOGRAPHED THE REVOLVER WITH THE CYLINDER OPEN AND
PLACED THE REVOLVED BACK NEXT TO THE PLACARD ( 9).
I USED MARKERS A-J TO MARK THE HOLE AND STRIKE LOCATIONS TO THE ROLL UP DOOR TO UNIT
107 AND TOOK PHOTOS.

TECH POTTER RETURNED AND WE OBTAINED PERMISSION VIA THE MANAGER OF THE STORAGE
UNITS TO ENTER UNIT 107 TO SEARCH FOR ANY EVIDENCE.  THE PERMISSION WAS DOCUMENTED
BY OFFICER MOORE ON HIS PDRD.  AT ABOUT 1430 WE ENTERED THE UNIT.  I NOTICED THAT THE
UNIT WAS CLEAN AND CONTAINED A NUMBER OF BOXES FOR WINE DISPLAYS ( GLASSES, TENTS,
PROMOTIONAL ITEMS, ECT)  WHEN SEARCHING THE UNIT I NOTICES SMALL PIECES OF CINDER
BLOCK ON THE FLOOR.  AT THE REAR OF THE UNIT ABOUT 12 FEET ABOVE THE GROUND AT THE
NORTH WEST CORNED WAS WHAT APPEARED TO BE A STRIKE MARK.  ON THE FLOOR NEAR THE
REAR OF THE UNIT WAS A BOX OF BLOODY MARY MIX WHICH APPEARED TO HAVE SOME BULLET
HOLES IN IT.  UPON OPENING THE BOX THE BOTTLES WERE BROKEN.  I SEARCHED THE BOX AND
THE MIX WITH NEG RESULTS.  AFTER SEARCHING A NUMBER OF BOXES TWO SMALL FRAGMENTS
( ITEM 14) WAS FOUND IN A BOX OF WINE STOPPERS, A FRAGMENT ( ITEM16)  WAS FOUND IN A BOX
OF LANYARDS AND A FRAGMENT ( ITEM 15) WAS FOUND IN A SHIRT NEAR THE FRONT OF THE UNIT) .
AT ABOUT 1624 HRS ALCO CORONER ARRIVED TO TAKE CUSTODY OF THE BODY.  I ASKED
PERMISSION OF DEPUTY FRAZER TO TAKE A GSR TEST( ITEM 12) FROM FEMALE BLACK.  HE
ALLOWED ME TO AND COLLECTED THE GSR TEST AT 1639 HRS. I FIRST DID THE RIGHT HAND AND

Printed by: ocl4353
Printed date/time: 11/30/16 20:07

# Incident Report

OAKLAND POLICE DEPARTMENT
455 7TH STREET
OAKLAND, CALIFORNIA 94607
(510) 238-3021

**Incident Number: 15-006467-027**

THEN THE LEFT.

I TOOK ADDITIONAL PHOTOS OF THE BODY. UNDER THE BODY WAS A PAIR OF GLASSES ( ITEM 13) WHICH I TOOK CUSTODY OF.

I PICKED UP THE EVIDENCE AND SECURED IT IN MY PATROL VEHICLE. THE CORONER LEFT AT ABOUT 1700 HRS.

TRAFFIC INVESTIGATORS ARRIVED AND USING THE TOTAL STATION MAPPED THE LOCATION. SEE THERE MAP FOR ITEM MEASURMENTS.

WHILE WAITING FOR THE OWNER OF THE 03 FORD FOCUS 4D SILVER LIC ▓▓▓▓ TO RETURN I LEARNED THAT THE SUSPECT MAY HAVE TRIED TO ENTER THE TRUCK BLOCKING THE DRIVEWAY BY THE PASSENGER DOOR. I PRINTED THE VEHICLE WITH NEG RESULTS.
AFTER THE BODY WAS REMOVED I MADE CONTACT WITH ▓▓▓▓▓▓▓▓ WHO WAS THE OWNER OF THE 03 FORD FOCUS 4D SILVER LIC ▓▓▓▓ HE GAVE ME PERMISSION THE SEARCH HIS VEHICLE WHILE HE WAS PRESENT. I DID SO LOOKING FOR ANY BULLETS, FRAGMENTS OR ANY OTHER EVIDENCE WITH NEGATIVE RESULTS.

I CLEARED THE SCENE AT ABOUT 1800 HRS AND WENT TO EASTMONT MALL. I THEN WENT TO THE PAB AND ARRIVED AT ABOUT 1908 HRS. I SECURED THE EVIDENCE IN MY LOCKER AND WENT HOME. ON 4 FEB 15 AT ABOUT 0600 I RETURNED TO WORK AND FOUND THE EVIDENCE AS I HAD LEFT IT. AFTER LINE-UP I WENT TO EASTMONT MALL. AT EASTMONT MALL I TOOK ADDITIONAL PHOTOGRAPHS OF SOME OF THE EVIDENCE. I PACKAGED ALL OF THE EVIDENCE AND COMPLETED THE NECESSARY PAPERWORK. I THEN TRANSPORTED THE EVIDENCE TO THE AB PROPERTY AND EVIDENCE SECTION AT TURNED IT IN AT ABOUT 1500 HRS.

AFTER TURNING IN THE EVIDENCE I WENT OFF DUTY.

I RETURNED TO WORK ON 5 FEB 15 AT 0600 AND UPLOADED MY PHOTOS TO THE PHOTO SERVER AND COMPLETED THIS REPORT.

# EXHIBIT C



COE (Henderson) 003685



COE (Henderson) 003678



COE (Henderson) 003804

COE (Henderson) 003621





COE (Henderson) 003626

# EXHIBIT D

**In the Matter Of:**

I.A. and C.S. vs. CITY OF EMERYVILLE, et al.,

**MICHELLE SHEPHERD**

*August 25, 2016*

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ◆ San Francisco ◆ San Jose ◆ Los Angeles**

877.451.1580

www.aikenwelch.com



1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4    I.A. and C.S., the minor
     children of YUVETTE HENDERSON,
5    deceased, by CRAIG SALMOND, as
     guardian ad litem, and DENISE
6    HENDERSON,

7         Plaintiffs,
     vs.                              No. 4:15-cv-04973-DMR
8
     CITY OF EMERYVILLE; MICHELLE
9    SHEPHERD, individually and in
     her official capacity as police
10   officer for the City of
     Emeryville; and WARREN WILLIAMS,
11   individually and in his
     capacity as a police officer for
12   the City of Emeryville; JACORA
     HENDERSON,
13
          Defendants.
14   _____/

15

16           DEPOSITION OF MICHELLE SHEPHERD

17

18           Taken before Kimberly L. Avery

19                  CSR No. 5074

20                August 25, 2016

21

22
                 Aiken Welch Court Reporters
23               One Kaiser Plaza, Suite 250
                 Oakland, California 94612
24            (510) 451-1580/(877) 451-1580
                   Fax (510) 451-3797
25                  www.aikenwelch.com

1        Q.   Besides your service weapon, was there a rifle

2   in your car?

3        A.   Yes, there was.

4        Q.   Was that an AR-15?

5        A.   Yes.

6        Q.   And where was it located?

7        A.   In the gun rack next to me.

8        Q.   Okay.  Was there also a shotgun in the car?

9        A.   Yes.

10       Q.   Where was that?

11       A.   Right next to the rifle.

12       Q.   So they are both there in the rack in the

13   center console?

14       A.   Yes.

15       Q.   This incident that we're concerned about today

16   begins at the Home Depot; is that right?

17       A.   Yes.

18       Q.   How did you first learn that there was an

19   incident at the Home Depot?

20       A.   Dispatch called me for a theft at Home Depot.

21       Q.   And do you recall approximately what time that

22   was?

23       A.   Around midday.

24       Q.   Somewhere between 12:00 and 1:00?

25       A.   I think so.

1    about past experience at the Home Depot.  Was there

2    something about past experience at Home Depot that you

3    thought about in terms of people being armed with guns?

4         A.   Typically when suspects are detained, they

5    don't want to be, so they try to leave and do whatever

6    they can to leave.

7         Q.   Okay.  Including threatening security personnel

8    with firearms?

9         A.   Yes.

10        Q.   So what did you do immediately after Jorge kind

11   of signaled the direction in which the suspect was

12   proceeding?

13        A.   I updated her description on the radio.

14        Q.   Okay.  And then what?

15        A.   And then I saw that she was running towards a

16   bus.

17        Q.   You saw her?

18        A.   Yes.

19        Q.   Okay.  And as best you can recall, where were

20   you when you actually saw her?

21        A.   I was in the southbound Hollis lane, and she

22   was on the east curb line running southbound.

23        Q.   Okay.  And vis-a-vis the freeway, the 580

24   overpass, where were you in relation to that overpass?

25        A.   About half a block.

1       Q.   Half a block north?

2       A.   Correct.

3       Q.   Okay.   And where was she vis-a-vis the

4   overpass?

5       A.   40 feet -- I'm trying to think of the

6   measurement.

7            Maybe three-fourths of half a block.

8       Q.   North of the overpass?

9       A.   Yes.

10      Q.   She hadn't yet proceeded under the overpass?

11      A.   Correct.

12      Q.   And she was, you said, on the sidewalk, the

13  eastern sidewalk?

14      A.   Correct.

15      Q.   Okay.   She was to your left and in front of

16  you?

17      A.   Yes.

18      Q.   And at that point, could you see that she was

19  armed?

20      A.   At that moment, no.

21      Q.   Okay.   And was it then that something happened

22  with your gun?

23      A.   Yes.

24      Q.   Reading the reports, I was confused about what

25  happened with your gun.   What happened with it?

1       A.   Responding to an armed suspect, I removed my

2   gun from my holster as I was driving, and I was also

3   taking off my seatbelt.

4       Q.   Okay.

5       A.   Wished I had one more hand, because I also need

6   to get on the radio.

7       Q.   Okay.

8       A.   And as I was approaching the suspect, I had to

9   put my brakes on, because she was -- she stopped

10   running and was headed towards the bus.

11       Q.   Okay.

12       A.   So as I put my brakes on the vehicle, my

13   handgun slipped out of my hand onto the passenger

14   floorboard.

15       Q.   Okay.  So you gestured a little bit with your

16   right hand.  Did you remove your firearm from its

17   holster with your right hand?

18       A.   Yes.

19       Q.   Okay.  And your holster was on your right hip?

20       A.   Correct.

21       Q.   And when you removed the gun from your holster,

22   what did you do with it?

23       A.   I was -- I had it in my hand, and it was -- I

24   used the passenger seat to level -- to keep it up, to

25   steady it.

```
1          A.   At that moment, I don't remember.

2          Q.   Okay.   And are you still north of the overpass?

3          A.   Yes.

4          Q.   And is she still north of the overpass?

5          A.   Yes.

6          Q.   And what did you observe in terms of the

7     interaction between her and the taxi driver?

8          A.   She was frantically pounding on her window.

9          Q.   Okay.

10          A.   And he kept shaking his head.

11          Q.   Do you recall whether she pointed the gun at

12     the taxi driver?

13          A.   I don't remember her pointing the gun at him,

14     but it was definitely in her hand.  She was

15     aggressively shaking it in front of him.

16          Q.   Was she also waving it around?

17          A.   Yes.

18          Q.   Kind of pointing it up in the air as well as

19     towards the car?

20          A.   Yes.

21          Q.   Was she kind of pointing it in a lot of

22     different directions when she was waving it around?

23          A.   Yes, but more towards him.

24          Q.   And what's your best estimate as to how much

25     time she spent with the taxi driver with the taxi?
```

```
 1          A.   Probably around five seconds.

 2          Q.   And then what happened?

 3          A.   And then she was -- then she got back onto the

 4   east curb line and started running southbound

 5   underneath the overpass.

 6          Q.   Okay.  And did the taxi then proceed north, as

 7   far as you could tell?

 8          A.   I believe she took off north.

 9          Q.   Was the bus already gone?

10          A.   I believe so.  My focus was on her.

11          Q.   Okay.  Do you know whether she ran around the

12   back of the taxi or the front of the taxi to get back

13   on the sidewalk?

14          A.   I think the back of the taxi.

15          Q.   Okay.  And what did you do?

16          A.   At that moment I didn't see anybody on the

17   sidewalk or on the street or any vehicles coming our

18   way.  So I took this opportunity to retrieve my gun.

19          Q.   And how did you do that?

20          A.   Just before the overpass I parked my car, got

21   out, got it out of the floorboard, about to get back in

22   my car.

23          Q.   Did you pull over to the curb?

24          A.   I think I did.

25          Q.   And where was your gun?
```

```
 1          A.   On the passenger floorboard.
 2          Q.   So did you open the front passenger side door
 3     to do that?
 4          A.   Yes.
 5          Q.   There's something confusing in the reports.  Do
 6     you recall either reading or saying that you opened the
 7     rear door of your vehicle?
 8          A.   No.
 9          Q.   Okay.  So you have a clear recollection it was
10     in the front?
11          A.   Definitely.
12          Q.   Okay.  So you pulled over, got out of the car,
13     ran around to the passenger side, opened the door and
14     retrieved your weapon?
15          A.   Yes.
16          Q.   Okay.  And at that time, what did you do with
17     the weapon?
18          A.   I put it back in my holster.
19          Q.   Okay.  And during the time you were doing this,
20     were you attempting to keep the suspect in sight?
21          A.   Yes.
22          Q.   And what did you see her doing?
23          A.   Continued to run southbound Hollis with the gun
24     in her hand, and I updated dispatch of her direction.
25          Q.   Okay.  And did you see her go under the freeway
```

```
 1   overpass?

 2        A.  Yes.

 3        Q.  And what did you do?

 4        A.  I was about to get back in my vehicle, and

 5   Officer Williams drove up.

 6        Q.  Okay.  And from what direction was Officer

 7   Williams coming?

 8        A.  He was coming southbound Hollis.

 9        Q.  Okay.  Same way that you were headed?

10        A.  Yes.

11        Q.  And did you have any conversation with him?

12        A.  I think this was all through the windshield.  I

13   pointed towards the suspect and yelled out she was

14   still running southbound.

15        Q.  You could see her?

16        A.  Yes.

17        Q.  And did you have your window down on the

18   driver's side?

19        A.  I was still out of my vehicle.

20        Q.  So when Officer Williams pulled up, did he pull

21   up next to your vehicle?

22        A.  It was a little diagonal.

23        Q.  Okay.  Was he in front or behind?

24        A.  At that moment, he was slightly behind.

25        Q.  Behind your vehicle?
```

1      A.  Uh-huh.

2      Q.  And headed southbound?

3      A.  Correct.

4      Q.  Was he in the southbound lane or the northbound

5  lane?

6      A.  Southbound.

7      Q.  So you were both in the southbound lane at this

8  point?

9      A.  Yes.

10     Q.  Do you recall whether there was other traffic

11  on Hollis Street close to your location?

12     A.  I didn't notice any at the time.

13     Q.  Okay.  All right.  So when Officer Williams

14  came up and you had some communication with him, was

15  that kind of hand signal-type communication or verbal

16  communication?

17     A.  Mixture of both.

18     Q.  Mixture of both.  Okay.

19         And what do you recall saying to him?

20     A.  I recall pointing towards her and saying that

21  she's running southbound.

22     Q.  And did he indicate to you that he understood

23  what you were saying?

24     A.  Yes.

25     Q.  And what did you do next?

1      A.   After I had that moment with Officer Williams,

2   he drove in front of me.  I got back into my car and

3   followed.

4      Q.   Okay.  And at that point, are your two

5   vehicles, yours and Officer Williams' vehicles, in the

6   southbound lane?

7      A.   Yes.

8      Q.   Okay.  And is she, the suspect, now past the

9   underpass?

10     A.   Yes.

11     Q.   Okay.  And where you pulled over, were you

12   under the underpass or were you still north of it?

13     A.   I think I just came under the overpass.

14     Q.   Okay.  And did you see what Officer Williams

15   did after he proceeded in front of you?

16     A.   He eventually parked around the storage unit.

17     Q.   Around the storage unit.  Okay.  And the

18   storage unit was on the east side of Hollis?

19     A.   Yes.

20     Q.   And do you recall where it was that he parked

21   his vehicle?

22     A.   As I was driving, he was in front of me.  The

23   exact location of exactly where he parked, I can't

24   recall.

25     Q.   Okay.  Did he park on the west side or the east

1        Q.  Okay.  And at the time you stopped, where was

2    the suspect?

3        A.  She was about -- she was going to continue to

4    run south.  I believe she saw me and ran back into the

5    parking stalls.

6        Q.  From what you say, it doesn't sound that you

7    were physically blocking her from proceeding south?

8        A.  No.

9        Q.  But it's your recollection or perception that

10    she saw you?

11        A.  Yes.

12        Q.  Okay.  And instead of proceeding south, she

13    headed east into the parking stalls?

14        A.  Yes.

15        Q.  Okay.  Now, when you say "parking stalls," do

16    you mean the area of the storage facility that is

17    actually under the building?

18        A.  Yes.

19        Q.  And you -- is that what you described as a

20    "sally port"?

21        A.  Yes.

22        Q.  It's not really a sally port, is it?

23        A.  I don't think so.  It's just something we use

24    in the PD.

25        Q.  There are several parking stalls there; is that

```
 1    right?
 2         A.  Yes.
 3         Q.  And do you know whether -- at the point that
 4    she ran into the area, whether that was at the --
 5    closer to the south end or the north end of the row of
 6    parking stalls?
 7         A.  Could you rephrase the question?
 8         Q.  Sure.  The parking stalls are kind of arranged
 9    from south to north, correct?
10         A.  Correct.
11         Q.  The southernmost one is closest to 34th Street?
12         A.  Correct.
13         Q.  And so do you recall whether at the time she
14    ran into the parking area she was closer to the south
15    end or the north end of the row of parking stalls?
16         A.  When I first saw her run in she was closer to
17    the south part.
18         Q.  Okay.  And did she run directly east, or did
19    she also move north?
20         A.  I believe she moved north.
21         Q.  Okay.  Were there any vehicles in the parking
22    stalls?
23         A.  Yes.
24         Q.  How many?
25         A.  I do not recall.
```

1     Q.   And over the microphone you advised or

2     commanded the suspect to do what?

3     A.   To drop the weapon.

4     Q.   Okay.  And what did she do?

5     A.   She did not drop the weapon.  She continued to

6     hold it.

7     Q.   Okay.  Do you know if she heard you?

8     A.   I can't say for sure.

9     Q.   Did she indicate that she was aware of your

10    presence?

11    A.   When she was -- when I first initially saw her

12    by Home Depot, she turned back, I think, and she began

13    running faster once she knew I was in the area.

14    Q.   Okay.  And you said she indicated that she was

15    aware of your presence when you proceeded south on

16    Hollis to get past her?

17    A.   Yes.

18    Q.   Okay.  So after you got out of your vehicle,

19    what did you do?

20    A.   I ran up, put out commands, updated dispatch.

21    And I saw her try to -- it looked like she ran towards

22    the rear of the parking area, like towards the wall.  I

23    believe there was a door there.  So my initial feeling

24    was she was trying to get into the building.

25    Q.   Okay.  Okay.  And was she in the vicinity of a

```
 1   vehicle that was parked in the storage area?
 2        A.  Yes, at that time she was near a silver
 3   vehicle.
 4        Q.  Okay.  Was that vehicle kind of parked in a --
 5   heading towards the doors to the storage area?
 6        A.  Yes.
 7        Q.  Okay.  The doors there are kind of metal
 8   roll-down doors; is that right?
 9        A.  I believe so.
10        Q.  And do you recall how close that vehicle was to
11   one of the doors?
12        A.  10 feet.
13        Q.  So your recollection is there's 10 feet between
14   the front of the vehicle and the door?
15        A.  Around 10 to 15 feet.
16        Q.  Okay.  Was the vehicle completely under the
17   overhang of the building?
18        A.  Yes.
19        Q.  Okay.  All right.  What did you do?
20        A.  I see her, I believe, try to get into a door.
21   It was locked.  So she was looking around for another
22   way to leave.  At that point, I got cover by a pillar
23   that was next to a silver vehicle.
24        Q.  Okay.  All right.  And she is at that point in
25   front of the vehicle?
```

1      A.  Yes.

2      Q.  And when you say you saw her try to get into

3   one of the doors, what is it that you noticed her

4   doing?

5      A.  I think she was trying to open a door, trying

6   different ways to get inside.

7      Q.  Was she attempting to lift the door up?

8      A.  I think there was an actual door, I think.

9      Q.  Not one of the garage doors?

10     A.  No.

11     Q.  A regular door with a door handle?

12     A.  Correct.

13     Q.  And did you see her trying to pull on it?

14     A.  I believe so.

15     Q.  All right.  And do you recall what hand she was

16   using to do that?

17     A.  I can't recall.

18     Q.  Did she still -- could you see that she still

19   had the gun?

20     A.  She never -- she never dropped the gun.

21     Q.  And did she still have her purse?

22     A.  Yes.

23     Q.  Okay.  Do you recall if they were in the same

24   hand at that point?

25     A.  I could never recall if they were in the same

Case 4:15-cv-04973-DMR   Document 72   Filed 02/03/17   Page 48 of 267

Page 52

```
 1    hand.
 2         Q.  All right.  What's the next thing you recall?
 3         A.  I recall her standing by the driver's side
 4    wheel well.  I recall Officer Williams yelling out
 5    something, and...
 6         Q.  That's what you recall?
 7         A.  That's what I recall at that moment.
 8         Q.  So at that point you are at or near the pillar
 9    that is just south of the silver vehicle?
10         A.  Yes.
11         Q.  Okay.  And she is on the other side of the
12    vehicle, on the north side of the vehicle?
13         A.  Yes.
14         Q.  The wheel well on the driver's side?
15         A.  Yes.
16         Q.  Okay.  And at that point did you perceive that
17    Officer Williams was there?
18         A.  I knew he was somewhere on my left-hand side.
19         Q.  Okay.  And south of the vehicle?
20         A.  I believe so.
21         Q.  Okay.
22         A.  I was south of the vehicle.  He was somewhere
23    north of the vehicle.
24         Q.  I'm sorry.  You were south of the vehicle.  He
25    was somewhere north of the vehicle?
```

877.451.1580                                        www.aikenwelch.com

MICHELLE SHEPHERD      08/25/2016

```
 1         A.  Yes.

 2         Q.  Okay.  And do you know if he was close to the

 3   vehicle?

 4         A.  I don't know.  I knew there was a lot of -- I

 5   didn't think he had as much cover as I did.

 6         Q.  Okay.

 7         A.  So I definitely was very worried about it.

 8         Q.  Okay.  Okay.  Do you know whether he had left

 9   his patrol vehicle?

10         A.  Yes, because the sounds I heard him make, the

11   yelling, he was definitely on foot somewhere to my

12   left.

13         Q.  Okay.  And you didn't see him; you just heard

14   him?

15         A.  I could see his lights on his patrol car, but I

16   couldn't see him.  I could hear him.

17         Q.  Okay.

18         A.  I was focused on her.

19         Q.  Okay.  Did you have a sense that he had crossed

20   Hollis Street?

21         A.  Yes.

22         Q.  Okay.

23         A.  He was somewhere on the property of the Public

24   Storage.

25         Q.  Okay.  Then what's the next thing you recall?
```

1        A.   Again, tons of commands, and I heard a shot.

2        Q.   Okay.  One shot?

3        A.   Yes.

4        Q.   When you say "tons of commands," those are your

5    commands?

6        A.   Those were my commands.

7        Q.   And do you still have your microphone

8    activated?

9        A.   No.

10       Q.   So you let go of the button on your microphone?

11       A.   Yes.

12       Q.   And at some point did you unholster your

13   weapon?

14       A.   Yes.  It was unholstered when I exited my

15   vehicle.

16       Q.   So you left your vehicle.  You went across the

17   street with your gun in your right hand?

18       A.   Yes.

19       Q.   And your left hand on the microphone?

20       A.   Yes.

21       Q.   Okay.  And you heard a shot?

22       A.   Yes.

23       Q.   You heard a shot from your left?

24       A.   It was somewhere on my left.

25       Q.   Okay.  And did you know whose shot it was?

```
1        Q.   Okay.   So even today, if you had your back
2   turned to someone who was firing an AR-15, you would
3   not be able to distinguish that sound from the sound of
4   a pistol being discharged?
5        A.   I couldn't say.
6        Q.   Couldn't say.   Okay.   All right.
7             So you heard the shot, and what did you do?
8        A.   Fearing that she had just shot my partner, I
9   took a shot towards her, because I knew she was still
10  armed, and if she was still pointing the weapon towards
11  him.
12       Q.   So at that point you are looking at her?
13       A.   Yes.
14       Q.   And what is your line of sight towards her?
15       A.   I am diagonally across from her.
16       Q.   Okay.
17       A.   And I have the vehicle in between us, and I'm
18  looking through the windows of the vehicle and kind of
19  over the top.
20       Q.   Okay.   So diagonally she's at the left front
21  and you are closest to the right rear; is that right?
22       A.   Yes.
23       Q.   Okay.   And still adjacent to the pillar?
24       A.   That pillar was my friend.   I never left it.
25       Q.   Okay.   Okay.
```

```
 1            And did you -- was the pillar -- was the pillar
 2    still between you and the suspect at the time you took
 3    the shot?
 4        A.  I believe at that moment I was a little east of
 5    the pillar, because I wanted to have as clear a shot as
 6    I could.
 7        Q.  So you were east of the pillar, meaning the
 8    pillar was slightly to your left?
 9        A.  Yes.
10        Q.  And you came around the east side of the pillar
11    with your pistol in your right hand?
12        A.  I believe so, yes.
13        Q.  And took a shot at the suspect?
14        A.  Yes.
15        Q.  Okay.  Did you line up that shot?
16        A.  I tried to do my best.
17        Q.  Is it your understanding that your shot went
18    through the vehicle?
19        A.  I have no idea where my shot went.
20        Q.  Okay.  So you don't know whether your shot went
21    through the vehicle or not?
22        A.  I don't know.
23        Q.  Do you know whether you hit her?
24        A.  I don't.
25        Q.  You still don't know?
```

1        A.   I'm sorry.   I assume -- I haven't looked at

2   anything, so I don't know, actually.   I don't believe

3   so.

4        Q.   Did you aim at a particular part of her body?

5        A.   Her left shoulder area.

6        Q.   Okay.   And could you see her -- so at that

7   point, was she looking towards the west?

8        A.   She was looking directly towards Officer

9   Williams.

10        Q.   How do you know that?

11        A.   Because I could hear -- I could hear him, and I

12   know that she was facing that direction.

13        Q.   Okay.   And do you recall whether her direction

14   was more to the west or more to the north, or a

15   combination of both?

16        A.   Her view?

17        Q.   You say she was facing Officer Williams when

18   you took the shot at her.

19        A.   Uh-huh.

20        Q.   And so in my mind's eye, I'm not sure whether

21   she's looking west or looking north or northwest?

22        A.   More northwest.

23        Q.   Okay.   All right.   And did you see any reaction

24   on her part to your shot?

25        A.   It didn't change.   It didn't change her

```
1    actions.  She still had the gun and she was still
2    pointing it towards the northwest direction.
3         Q.  And she was still standing?
4         A.  Yes.
5         Q.  And before your shot -- is it your recollection
6    that you heard just one shot, or did you hear multiple
7    shots?
8         A.  I believe it was one.
9         Q.  Just one.  Okay.
10            And I take it you didn't see any reaction of
11   hers to that shot?
12        A.  She didn't seem to change.
13        Q.  Okay.  What do you recall happening directly
14   after you took your shot?
15        A.  As soon as I took my shot, I saw a shadow in
16   that silver vehicle in the driver's seat.  So seeing
17   that, I assessed the situation and didn't want to put
18   that person in jeopardy.
19        Q.  Okay.
20        A.  So I relocated.
21        Q.  Where did you relocated to?
22        A.  I went back around the pillar to the rear of
23   the vehicle.
24        Q.  Okay.  What did you see then?
25        A.  I saw Officer Williams to the area where I
```

```
 1    thought he was originally, and he had his rifle with
 2    him, and I saw him take a shot.
 3         Q.  And when you say you relocated to the rear of
 4    the vehicle, how close to the vehicle were you?
 5         A.  I was alongside it.
 6         Q.  On the passenger side or the driver's side?
 7         A.  I originally was on the passenger side.  I went
 8    to the rear of it, on the passenger side, rear
 9    passenger, and I ended up being at the rear left side,
10    the rear left side of the bumper.
11         Q.  Okay.  So the driver's side?
12         A.  Yes.
13         Q.  Okay.  And at that point, you could see Officer
14    Williams?
15         A.  Yes.
16         Q.  Okay.  And where was he?
17         A.  Where I thought he was, northwest area.
18         Q.  Okay.  On the property of the storage area?
19         A.  Yes.
20         Q.  How close to the vehicle?
21         A.  Perhaps around 15 feet.
22         Q.  Okay.  All right.  So maybe about halfway
23    between Hollis Street, the curb of Hollis Street and
24    the pillars?
25         A.  I believe so.
```

1        Q.   Okay.  I don't want to put words in your mouth.

2    I mean, is that...?

3        A.   He's on property.  He's north of me, maybe by

4    15-ish feet.

5        Q.   Okay.  And there are pillars -- there was the

6    pillar that you were standing near, and there's another

7    pillar north of where the silver vehicle was, correct?

8        A.   I'm unaware of this pillar.

9        Q.   Okay.

10           MR. ALLEN:  When you have an appropriate break,

11   could we take one so I could use the restroom?

12           MR. SIEGEL:  Sure.  Why don't we do that now.

13           MR. ALLEN:  Okay.

14           (Break taken.)

15   BY MR. SIEGEL:

16       Q.   Going back just a second, when you heard the

17   first shot, the first shot that you heard, did you have

18   your eyes on the suspect?

19       A.   Yes.

20       Q.   Okay.  And were you able to see her gun at that

21   point?

22       A.   It was always moving.  So, yes, but it was

23   always moving.

24       Q.   Her gun was always moving?

25       A.   Yes.

1      Q.  Can you describe how it was moving?

2      A.  It was at an angle, and she was moving it up,

3  down, left, right.

4      Q.  Okay.  Just kind of waving it around, sort of?

5      A.  Yes, but she kept it chest height.

6      Q.  Okay.

7      A.  With her elbow bent.

8      Q.  Did you see a muzzle flash at the time you

9  heard the shot?

10      A.  I don't believe so.

11      Q.  Would you have expected to see a muzzle flash

12  if she had fired the gun?

13      A.  I can't recall ever looking at guns in that

14  angle; so it didn't occur to me then.

15      Q.  Okay.  Okay.  Can you give an estimate as to

16  the amount of time that passed between the time you got

17  out of your vehicle and took the shot that you took at

18  her?

19      A.  Approximately eight seconds.

20      Q.  And your reason for taking the shot was what?

21      A.  She had a firearm in her hand, and she was

22  waving it around in the direction of where I believe

23  Officer Williams to be.  And the shot that I heard I

24  believe came from her.

25      Q.  So you took a shot to try to protect Officer

```
 1    Williams?
 2         A.  Yes.
 3         Q.  Do you remember making a decision regarding
 4    which of your weapons to take with you when you left
 5    your vehicle to pursue the suspect?
 6         A.  Once I dropped -- once my handgun fell from the
 7    passenger -- on the passenger floor, that was the only
 8    weapon in my mind.  My focus was on my handgun.  It
 9    didn't even occur to me that I had other guns in the
10    vehicle.
11         Q.  Do you understand why you had that focus
12    instead of thinking, Well, one is on the floor, I
13    should grab one of the others?
14         A.  Once you are in the situation where you are in
15    proximity of someone that's armed and your handgun fell
16    within feet from you, but you can't get it, the only
17    thing in the world was just me retrieving my handgun.
18    And I didn't want to let go of it ever again.
19         Q.  Okay.  So fair to say, then, you didn't make a
20    tactical decision as to which of your weapons would be
21    most helpful to you in this situation?
22         A.  No, it was a -- I feel comfortable with both my
23    handgun and any of the firearms in the car, but my
24    handgun was my priority at the time.
25         Q.  And your recollection is that you have no
```

1    recollection as to whether you fired through the silver

2    vehicle or over it when you took your shot at the

3    suspect?

4         A.   I can't say for sure.   However, I do remember

5    glass breaking; so I'm assuming it went through glass

6    at some point.

7         Q.   Okay.   And prior to taking the shot, you didn't

8    notice any person in the silver vehicle?

9         A.   Prior to the shot?

10        Q.   Yes.

11        A.   No, I did not.

12        Q.   Is that because your attention was on the

13   suspect?

14        A.   That's correct.

15        Q.   We're talking this happened essentially midday,

16   correct?

17        A.   Yes.

18        Q.   And the person you noticed in the silver

19   vehicle, when you did notice that person, was on the

20   driver's side?

21        A.   Yes.

22        Q.   Was the driver's door open?

23        A.   I don't believe so.

24        Q.   And is it true that the first time that you

25   were aware that Officer Williams was firing his weapon

```
1    was when you went to the rear of the silver vehicle?
2         A.  Yes, that's when I realized.
3         Q.  And you could see him somewhere on the property
4    of the parking facility, right?
5         A.  Right.
6         Q.  Somewhere between the curb, Hollis Street curb
7    and the overhang of the building?
8         A.  Yes.
9         Q.  And again, I don't want to put words in your
10   mouth, but what's your best recollection of his
11   location, using the benchmarks of the edge of the
12   overhang and the curb of Hollis Street?
13             Earlier I asked a question, as to whether he
14   was midway, but those are my words, not yours, and I
15   wanted to make sure I had your best recollection.
16        A.  I would say, to the best of my recollection,
17   that he was just west of the overhang.
18        Q.  Okay.  Okay.  After you heard -- after you
19   heard the second shot you heard, okay, and I'm using
20   that to mean the first shot that you weren't sure
21   whether it was hers or his, and then the second shot
22   that you heard when you were near the rear of the
23   vehicle, what's the next thing you observed?
24        A.  As I was -- to back up slightly, as I was
25   repositioning myself to the rear of the vehicle, I
```

1  heard, I think, another shot as I was in movement.  And

2  then once I got to the bumper, I saw -- I saw a shot.

3  So I guess that would have been my second or my third

4  shot I've heard.

5       Q.  Third shot you heard.  And you saw Officer

6  Williams fire that shot?

7       A.  Yes.

8       Q.  Okay.  And he was in the location you've

9  mentioned, west of -- just west of the overhang?

10      A.  Yes.

11      Q.  And then what happened?

12      A.  And I tried to get a better angle on the

13  suspect, and I saw she was on the ground.

14      Q.  When you say you tried to get a better angle,

15  where did you go?

16      A.  Since my shot had a citizen in between it, I

17  had to relocate, try to get an angle that wouldn't

18  endanger an innocent bystander.  So once I got to the

19  back of the car, I saw that she was on the ground and

20  she was no longer a threat.

21      Q.  Okay.  All right.  And did you remain, then,

22  behind the car?

23      A.  Once she was on the ground, I saw her gun was

24  out of her hand.  I believe I stayed there for a

25  moment.

1        Q.  Did you see her fall at the time of the third

2   shot that you heard?

3        A.  No.

4        Q.  Why is that?

5        A.  I think because I was relocating towards --

6   while moving in the back of the vehicle and looking at

7   Officer Williams, I was -- I think I -- I looked at him

8   for a little longer than I should have, because I was

9   happy he was okay.  And then once I -- once I refocused

10  back on her, she was already on the ground.

11       Q.  Were you aware of any shots being taken at her

12  while she was on the ground?

13       A.  I'm not, no.

14       Q.  You didn't see that?

15       A.  While on the ground, no, I did not see that.

16       Q.  Did you see her after she hit the ground

17  attempt to get up or rise up?

18       A.  No.

19       Q.  When you were towards the rear of the vehicle,

20  did you have to be careful to remain out of Officer

21  Williams' line of fire?

22       A.  I did not feel like I was in danger of his line

23  of fire.  I definitely was cognizant of how far I

24  needed to move.

25       Q.  Okay.  Do you have a sense of how far you would

1    have had to move north from the rear of the vehicle to

2    put yourself in danger from Officer Williams' line of

3    fire?

4         A.   I'd probably get nervous around 10 feet.

5         Q.   Okay.  So the angle was such that you would

6    have had to move 10 feet in order to endanger yourself?

7         A.   I believe so.

8         Q.   Okay.  And you've testified that you heard

9    three shots; is that right, putting aside the shot that

10   you made?

11        A.   I believe so, about three volleys.  It was

12   really loud.  It was hard to count.

13        Q.   Okay.  Fair enough.

14             If I were to tell you that the evidence seems

15   to suggest that Officer Williams fired six shots, are

16   you able to recall six shots?

17        A.   No.

18        Q.   But you are able to recall three volleys?

19        A.   Yes.

20        Q.   Including the one that you thought might have

21   been the suspect?

22        A.   Correct.

23        Q.   And you say the last shot or last volley you

24   heard, you were in a position to actually watch Officer

25   Williams as he fired off that shot?

```
 1        A.   Yes.
 2        Q.   And how far from him were you?
 3        A.   About 15 feet.
 4        Q.   And you were still adjacent to the rear of the
 5   vehicle?
 6        A.   Yes.
 7        Q.   Were you touching the rear of the vehicle?
 8        A.   I don't recall.
 9        Q.   Do you recall if you were close enough to be
10   touching it?
11        A.   Probably could.
12        Q.   Do you recall the next police officer or
13   official who you saw at the location after you heard
14   the final shot?
15        A.   I believe it was Sergeant Hanin (phonetic).
16        Q.   When was the last time prior to February 3,
17   2015 that you had fired a service weapon for the
18   Emeryville Police Department?
19        A.   I can't remember the exact date, but I believe
20   it was within three months of the incident.
21        Q.   Okay.  And what were the circumstances of that?
22        A.   Department range training.
23        Q.   Okay.  Putting aside training, how about in the
24   course of your duties to apprehend or deal with
25   suspects?
```

1                    REPORTER'S CERTIFICATE

2

3          I, KIMBERLY L. AVERY, do hereby certify:

4          That MICHELLE SHEPHERD, in the foregoing

5     deposition named, was present and by me sworn as a

6     witness in the above-entitled action at the time and

7     place therein specified;

8          That said deposition was taken before me at said

9     time and place, and was taken down in shorthand by me,

10    a Certified Shorthand Reporter of the State of

11    California, and was thereafter transcribed into

12    typewriting, and that the foregoing transcript

13    constitutes a full, true and correct report of said

14    deposition and of the proceedings that took place;

15         That before completion of the proceedings, review

16    of the transcript was requested.

17         IN WITNESS WHEREOF, I have hereunder subscribed my

18    hand this 8th of September 2016.

19

20

21

22

23    _____

      KIMBERLY L. AVERY, CSR No. 5074

24    State of California

25

# EXHIBIT E

# Emeryville Police Department

2449 Powell Street
CA0010400

| | | | CASE # |
|---|---|---|---|
| Arrest | ☐ | | 1502-0259 |
| Crime | ☒ | | |
| Non-Criminal | ☐ | | |

## Narrative Report

Page 1 of 3

| OFFENSE(S) | OFFENSE(S) cont'd |
|---|---|
| 211 PC; Robbery; Fel. | |
| :17 (A)(2) PC; Exhibit Firearm; Misd. | |

| DATE, TIME AND DAY OF OCCURENCE | DATE AND TIME REPORTED |
|---|---|
| 02/03/15 12:36 Tuesday | 02/03/15 12:36 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 3838 Hollis St, Emeryville | Home Depot | | | |

**NARRATIVE**

On 2/3/15 at 1236 hours dispatch advised that Home Depot employees were trying to detain an uncooperative shoplifter. The subject was described as a black female adult with a ponytail and wearing blue jeans. While units were enroute, dispatch advised that the subject was requesting medical attention because she hit her head. Approximately 2 minutes later, dispatch advised that the subject pulled out a gun and was now running towards Hollis Street.

Officers Williams #346 and Shepherd #351 were in the area and subsequently located & confronted the suspect in the 3400 block of Hollis Street. The Officers advised that shots had been fired and requested code 3 medical to the scene. Upon my arrival at the scene, I was directed by Sergeant Hannon to provide scene security IFO US Self Storage at 3406 Hollis Street. I was positioned immediately adjacent to suspect/Henderson's body and and a black revolver Refer to OPD case #15-006467 regarding the shooting.

After clearing the 3400 block of Hollis Street, I responded to Home Depot and met with Home Depot Asset Protection Officers Jorge Figueroa, Antonio Gutierrez and multiple Oakland PD Officers. Figueroa and Gutierrez provided the following details.

At 1128 hours, Figueroa was on the sales floor when he observed the suspect, later identified as Yuvette Henderson along with a male black adult, later identified as Lee James Graham returning merchandise at the returns counter. In order to complete the return, Graham was required by Home Depot to present his CDL or CA ID card. He presented CAID #F8338012, which was subsequently used to confirm his identity. After the transaction was complete, the two walked to the appliance section and selected a small refrigerator/freezer for purchase. The two then went to the hardware department and selected the three listed knives. Henderson concealed the knives under her purse and jacket which were in a shopping cart that Henderson was pushing. Henderson also selected the other listed miscellaneous merchandise and concealed it in a tote bag she was carrying. The two subjects walked to the self checkout where Graham paid for the freezer. However, Henderson failed to pay for her merchandise and kept it concealed as they exit the store at 1232 hours.

IFO the store, Figueroa and Gutierrez and a third AP Officer, Todd Freeman approached Henderson to detain her and asked her about the merchandise she did not pay for. Henderson denied stealing anything as she grabbed her purse from the shopping cart and

## ADMINISTRATION

| ·FICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| M. Costello  261 | 02/09/2015 11:03 | Joel Hannon  254 | 02/09/15 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | CASE STATUS |
| | | | Active |

**COE (Henderson) 000010**

# Emeryville Police Department

2449 Powell Street
CA0010400

**Narrative Report**

| | | | | | CASE # |
|---|---|---|---|---|---|
| Arrest | ☐ | | | | 1502-0259 |
| Crime | ☒ | | | | |
| Non-Criminal | ☐ | | | | Page 2 of 3 |

| OFFENSE(S) | OFFENSE(S) cont'd |
|---|---|
| 211 PC; Robbery; Fel. | |
| 17 (A)(2) PC; Exhibit Firearm; Misd. | |

| DATE, TIME AND DAY OF OCCURENCE | DATE AND TIME REPORTED |
|---|---|
| 02/03/15 12:36 Tuesday | 02/03/15 12:36 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 3838 Hollis St, Emeryville | Home Depot | | | |

NARRATIVE

tried to step around Figueroa. In doing so, Henderson lost her balance and fell to the ground. Figueroa tried to reach out and help Henderson break her fall resulting in Figueroa falling as well. As Henderson was on the ground. she started saying she hurt her head and needed an ambulance. Henderson dropped & left the stolen items on the ground after falling down. Figueroa and Gutierrez recovered the merchandise from that location IFO the store.

Figueroa called EPD and said Henderson was requesting an ambulance. Figueroa watched as she handed a set of car keys to Graham and told him to leave. Henderson got up and tried to walk away from Figueroa, Gutierrez and Freeman. In order to prevent Henderson from walking away, Figueroa grabbed Henderson's right arm and Gutierrez grabbed her left. Henderson pulled away from them, reached into her purse with her right hand and pulled out an object that was covered by a white towel or rag. Henderson started waving her right hand around in an apparent attempt to discard the towel and unveil the object she was holding. When the towel fell to the ground, Figueroa, Gutierrez and Freeman could see Henderson was pointing a black revolver at them. Henderson said, "Get off me or I'll fucking shoot you". Fearing for their safety, Figueroa, Gutierrez and Freeman stepped back away from Henderson. Figueroa advised dispatch that Henderson had a gun and that she was now running towards Hollis Street. As Figueroa was on the phone with dispatch, Henderson turned back around, pointed the gun at Figueroa again and said, " Back the fuck off me". Henderson then turned and ran S/B Hollis Street.

Figueroa walked to the driveway that leads on to Hollis Street and he could see Henderson running south with the gun still in her hand. Officers Shepherd and Williams, driving their respective patrol vehicles, approached on Hollis Street, driving S/B from 40th Street. Figueroa pointed S/B at the suspect. Figueroa could see Henderson running along side and/or behind an AC Transit bus that was stopped in the N/B lane. The suspect then ran out of Figueroa's view just prior to Williams and Shepherd exiting their vehicles. After several seconds, Figueroa said he heard some gun shots.

Their internal reports and police statements are attached. A picture of the stolen & recovered merchandise is attached to their reports. Figueroa provided the 2 security camera CD-Rs. The video depicts the theft and the confrontation IFO the store. I booked one copy into evidence locker E-9 and I gave the second copy to CIS. Upon their return to the front of the

| ADMINISTRATION | | | |
|---|---|---|---|
| OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
| M. Costello 261 | 02/09/2015 11:03 | Joel Hannon 254 | 02/09/15 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | CASE STATUS |
| | | | Active |

**COE (Henderson) 000011**

| Arrest | ☐ | **Emerryville Police Department** | CASE # |
|---|---|---|---|
| Crime | ☒ | 2449 Powell Street | 1502-0259 |
| Non-Criminal | ☐ | CA0010400 | |

**Narrative Report** — Page 3 of 3

| OFFENSE(S) | OFFENSE(S) cont'd |
|---|---|
| 211 PC; Robbery; Fel. | |
| 17 (A)(2) PC; Exhibit Firearm; Misd. | |

| DATE, TIME AND DAY OF OCCURENCE | DATE AND TIME REPORTED |
|---|---|
| 02/03/15 12:36 Tuesday | 02/03/15 12:36 |

| LOCATION OF OCCURENCE | LOCATION NAME | TYPE OF LOCATION | BEAT | SECTOR |
|---|---|---|---|---|
| 3838 Hollis St, Emeryville | Home Depot | | | |

NARRATIVE

store, Figueroa and Gutierrez could not locate the white towel Henderson used to conceal the gun when she pulled it out of her purse. It is not known who collected the towel or what they did with it.

OPD Officers were able to obtain statements from the 4 listed witnesses who are all Home Depot employees. With the exception of witness #3, Joshua Duke, all the witnesses gave similar statements in regards to seeing Henderson pull a gun from her purse and point it at Figueroa, Gutierrez and Freeman. Similar to the other 3 witnesses, Duke was IFO the store at the time, but was not in a position to actually see the gun. All four witness statements are attached.

**ADMINISTRATION**

| OFFICER | DATE/TIME | APPROVED BY | DATE APPROVED |
|---|---|---|---|
| M. Costello 261 | 02/09/2015 11:03 | Joel Hannon 254 | 02/09/15 |
| OFFICER | UNIT/SHIFT | ASSIGNED TO | CASE STATUS |
| | | | Active |

CR-1 Coste/261 Entered by: Michael Costello    Page 3 of 3

**COE (Henderson) 000012**

# EXHIBIT F

1
2
3
4
5
6
7            **INTERVIEW WITH MICHELLE SHEPHERD**
8                   **Q=Mike Fraser**
9              **Q1=Cmdr. Jeannie Quan**
10            **A=Michelle Shepherd**
11             **A1=(Stephen) Betz**
12
13
14 Q:      So today's date is April 15, 2015, the time is approximately about 8:58 in the
15           morning. My name's (Michael) Fraser, spelled F-R-A-S-E-R. I have been
16           hired by the City of Emeryville to conduct an administrative investigation into
17           the circumstances and facts of the o- officer-involved shooting that occurred
18           on February 3, 2015, in which Officer Shepherd was involved. Present for the
19           interview is Officer Michelle Shepherd. Officer Shepherd, this interview is
20           being audio-recorded. You have the access - you will have access to a copy of
21           the recording if any further proceedings are contemplated or prior to any
22           further interview at subs- subsequent time. You have the right to use your own
23           recording device and record any and all aspects of the of the inf- of this
24           interview. Um, and do you understand that?
25
26 A:      Yes.
27
28 Q:      Okay. So Officer Shepherd, would you please spell your, uh, name for the
29           record?
30
31 A:      Michelle, M-I-C-H-E-L-L-E, Shepherd, S-H-E-P-H-E-R-D.
32
33 Q:      Thank you. And representing Officer Shepherd is Mr. (Stephen) Betz. Mr.
34           Betts, would you please introduce yourself?
35
36 A1:     Sure. Uh, (Stephen) Betz from (Rains Lucia Stern). I'm here to represent, um,
37           Officer Shepherd. And my last name is spelled B-E-T-Z.
38
39 Q:      Thank you, sir.
40
41 A1:     Yep.
42
43 Q:      Per the Emeryville Police Department, policy 310 -- officer-involved
4           shooting, uh, the department is required to conduct an administrative
5           investigation into such incidents, uh, to determine if there were any violations

**COE (Henderson) 000264**

INTERVIEW WITH MICHELLE SHEPHERD
Interviewer: Mike Fraser
04-15-15/8:58 am
Case # 15-01
Page 6 of 22

| | | |
|---|---|---|
| 226 | | directly behind the bus. And she tried to, uh, speak to the driver. |
| 227 | | |
| 228 | Q: | Okay. Was the bus a - was it a AC Transit bus do you recall? |
| 229 | | |
| 230 | A: | I couldn't say 100%, but I would assume so. |
| 231 | | |
| 232 | Q: | Assume that? So you said that she, uh, approached the taxi behind the - the |
| 233 | | bus? |
| 234 | | |
| 235 | A: | Correct. |
| 236 | | |
| 237 | Q: | So the bus had driven off? |
| 238 | | |
| 239 | A: | Yes. |
| 240 | | |
| 241 | Q: | And so she - and did - and you saw her run towards the rear of the bus? |
| 242 | | |
| 243 | A: | Correct. |
| 244 | | |
| 245 | Q: | And then came - did you say that... |
| 246 | | |
| 247 | A: | She kind of did a J-turn and just kind of, uh, turned - went around the bus, um, |
| 248 | | to approach the driver's side of the taxi. |
| 249 | | |
| 250 | Q: | Okay. And as she approached, um, what did you see her do? |
| 251 | | |
| 252 | A: | She was more aggravated this time. I saw her pounding on the - the driver |
| 253 | | door, her gun still in her hand. She's still moving her hand every which way. |
| 254 | | Um, and I could just tell she really wanted to either get in the - get in the taxi |
| 255 | | or get his attention or something. And I could tell he was looking at her, uh, |
| 256 | | with a scared look. |
| 257 | | |
| 258 | Q: | He had a scared look on his face? You were - how - how far away were you |
| 259 | | from the taxi? |
| 260 | | |
| 261 | A: | At that point maybe 30, 40 feet. |
| 262 | | |
| 263 | Q: | Okay. Did - so you said that she was kind of flailing her arms around a- and |
| 264 | | appeared, uh, very excitable? And, um, did - did - at any point did you see her |
| 265 | | point her weapon th- at th- or towards the taxi driver? |
| 266 | | |
| 267 | A: | I did not. |
| 268 | | |
| 269 | Q: | Do you happen to recall what company the cab was from or what color the car |
| 270 | | was? |

**COE (Henderson) 000269**

| | | |
|---|---|---|
| 946 | | representative. Following - a failure to follow this order could result in |
| 947 | | disciplinary action. Do you understand that order? |
| 948 | | |
| 949 | A: | Yes. |
| 950 | | |
| 951 | Q: | Okay, I'm gonna ask you, uh, um, to review this real quick and sign it if you |
| 952 | | would. Um, this interview's concluded at 9:38 in the morning, and, um, I will |
| 953 | | terminate the recording. |
| 954 | | |
| 955 | | |
| 956 | The transcript has been reviewed with the audio recording submitted and it is an accurate | |
| 957 | transcription. | |
| 958 | Signed_____ | |

COE (Henderson) 000285

# EXHIBIT G

INTERVIEW WITH OFC. MICHELLE SHEPHERD
Interviewer: Sgt. Caesar Basa
02-03-15/10:15 PM
Case # 15-01
Page 1 of 68

|    |     |                                                                                                  |
|----|-----|--------------------------------------------------------------------------------------------------|
| 1  |     |                                                                                                  |
| 2  |     |                                                                                                  |
| 3  |     |                                                                                                  |
| 4  |     |                                                                                                  |
| 5  |     |                                                                                                  |
| 6  |     |                                                                                                  |
| 7  |     | **INTERVIEW WITH OFC. MICHELLE SHEPHERD**                                                        |
| 8  |     | **Q=Sgt. Caesar Basa**                                                                           |
| 9  |     | **Q1=Ofc. Phong Tran**                                                                           |
| 10 |     | **Q2=Lt. Roland Holmgren**                                                                       |
| 11 |     | **Q3=Sgt. Jason Bosetti**                                                                        |
| 12 |     | **Q4=Steven Betz**                                                                               |
| 13 |     | **Q5=Cpt. Dante Diotalevi**                                                                      |
| 14 |     | **Q6=DA Tim Wellman**                                                                            |
| 15 |     | **Q7=DA Pete Carlson**                                                                           |
| 16 |     | **A=Ofc. Michelle Shepherd**                                                                     |
| 17 |     |                                                                                                  |
| 18 |     |                                                                                                  |

19  Q:     All right.  Uh, today is, uh, February 3, uh, 2015.  It's, uh, 2215 hours, and
20         that's 10:15 pm.  Um, we're in the, uh, Emeryville PD conference room.  I'm
21         Sergeant Basa with Oakland Homicide.  Um, we're gonna go ahead and do
22         introductions starting, uh, with the person on my left.  And we're not gonna
23         spell out names since we did that earlier today with the first interview.  I think
24         we pretty much know how to spell everybody's name.  So we're starting with
25         the person to my left.  Go ahead and introduce yourself, sir.
26
27  Q1:    Officer Phong Tran.
28
29  Q2:    I'm Lieutenant Roland Holmgren, OPD Homicide.
30
31  Q3:    Sergeant Jason Bosetti, Emeryville PD.
32
33  A:     Officer Michelle Shepherd, Emeryville PD.
34
35  Q4:    Steven Betz from Rains Lucia Stern here.  I represent Officer Shepherd.
36
37  Q5:    Dante Diotalevi, Emeryville PD Captain.
38
39  Q6:    Tim Wellman, Deputy District Attorney, Alameda County DA's office.
40
41  Q7:    Uh, Pete Carlson, Supervising Inspector with Alameda County DA's office.
42
43  Q:     All right.  Uh, before we went on tape, uh, I kinda went over to how this
4          interview's gonna go; right?  And, um, I provided you and your, uh, counsel,
45         um, Officer Shepherd, with an abridged Miranda.  And, uh, you and your

**COE (Henderson) 000191**

| | | |
|---|---|---|
| 720 | Q: | Why is that? |
| 721 | | |
| 722 | A: | I wouldn't make contact with her unless, um, I was able to protect myself. |
| 723 | | |
| 724 | Q: | Okay. |
| 725 | | |
| 726 | A: | Um, I didn't feel protected without my handgun. |
| 727 | | |
| 728 | Q: | Mm-hm. |
| 729 | | |
| 730 | A: | Um, and I had the best view of her at this time. |
| 731 | | |
| 732 | Q: | Mm-hm. |
| 733 | | |
| 734 | A: | And I wanted to keep updating my units that were coming, um, with |
| 735 | | information.  I didn't want to act alone. |
| 736 | | |
| 737 | Q: | Okay.  So it's clear in my mind, which - were you southbound lane or |
| 738 | | northbound lane driving southbound? |
| 739 | | |
| 740 | A: | During what time? |
| 1 | | |
| 742 | Q: | At the time when you saw the bus thing. |
| 743 | | |
| 744 | A: | During the bus thing I drove onto the s- northbound lane facing southbound. |
| 745 | | |
| 746 | Q: | Okay.  Lights and siren on? |
| 747 | | |
| 748 | A: | I believe so.  I'm not 100 percent sure. |
| 749 | | |
| 750 | Q: | Okay.  Did you provide any information over the radio in regards to the bus |
| 751 | | incident? |
| 752 | | |
| 753 | A: | I don't think so. |
| 754 | | |
| 755 | Q: | Okay. |
| 756 | | |
| 757 | A: | I was really focused on getting my gun. |
| 758 | | |
| 759 | Q: | And how about during the taxi incident?  Did you provide any information out |
| 760 | | on the radio? |
| 761 | | |
| 762 | A: | I don't think so. |
| 3 | | |
| 764 | Q: | Okay.  So then she disengages with the taxi.  The taxi drove away; correct? |

INTERVIEW WITH OFC. MICHELLE SHEPHERD
Interviewer: Sgt. Caesar Basa
02-03-15/10:15 PM
Case # 15-01
Page 30 of 68

| | | |
|---|---|---|
| 1303 | | |
| 1304 | A: | Yes. |
| 1305 | | |
| 1306 | Q: | Okay.  And, uh, you said she moved in that direction.  Did she move directly, |
| 1307 | | like, did she go inside the sally port and move while inside the sally port or |
| 1308 | | wh- did she move towards that direction while she was outside of the sally |
| 1309 | | port on either the asphalt or the sidewalk?  Do you understand the question? |
| 1310 | | |
| 1311 | A: | I believe so.  Um, I think it was - she kind of just - I think she wanted to go |
| 1312 | | inside the building.  And there was a door... |
| 1313 | | |
| 1314 | Q: | Mm-hm. |
| 1315 | | |
| 1316 | A: | ...right here. |
| 1317 | | |
| 1318 | Q: | Mm-hm. |
| 1319 | | |
| 1320 | A: | So I think she ran kind of directly towards that wall and tried - I don't know if |
| 1321 | | she tried the door , but my idea was she was trying to get inside the building. |
| 1322 | | um, so she ran into the sally port. |
| 1323 | | |
| 24. | Q: | Okay.  Did she run behind the p- pillars inside the sally port or did she run |
| 1325 | | outside of the pillars right here on the asphalt area -- or the sidewalk -- when |
| 1326 | | she went towards this vehicle? |
| 1327 | | |
| 1328 | A: | I can't recall. |
| 1329 | | |
| 1330 | Q: | Okay.  And, uh, what would you say the distance is between you and her, if |
| 1331 | | she moved towards that - that vehicle parked in that sally port? |
| 1332 | | |
| 1333 | A: | As she's moving, I'm - I'm approaching, um, the distance, uh, as she's right in |
| 1334 | | this area... |
| 1335 | | |
| 1336 | Q: | Mm-hm. |
| 1337 | | |
| 1338 | A: | ...would you say? |
| 1339 | | |
| 1340 | Q: | Mm-hm. |
| 1341 | | |
| 1342 | A: | Maybe 30 feet. |
| 1343 | | |
| 1344 | Q: | Were you closing the distance? |
| 1345 | | |
| 5 | A: | Yes. |
| 1347 | | |

**COE (Henderson) 000220**

INTERVIEW WITH OFC. MICHELLE SHEPHERD
Interviewer: Sgt. Caesar Basa
02-03-15/10:15 PM
Case # 15-01
Page 33 of 68

| | | |
|---|---|---|
| 1437 | A: | She didn't look at me at all. |
| 1438 | | |
| 1439 | Q: | Mm-hm. |
| 1440 | | |
| 1441 | A: | Um, she was facing Officer Williams the entire time. |
| 1442 | | |
| 1443 | Q: | Mm-hm. |
| 1444 | | |
| 1445 | A: | Um, she - her hands were always to the front of her body. |
| 1446 | | |
| 1447 | Q: | Mm-hm. |
| 1448 | | |
| 1449 | A: | The gun was always, uh, waving in his area. |
| 1450 | | |
| 1451 | Q: | Mm-hm. |
| 1452 | | |
| 1453 | A: | Um, and, uh, she wasn't listening to anything we were saying. |
| 1454 | | |
| 1455 | Q: | Okay.  So what were you looking at when you heard the gunshot?  Were you |
| 1456 | | looking at her back, her side, her front? |
| 1457 | | |
| 1458 | A: | I was looking at her - her kind of side frontal profile. |
| 1459 | | |
| 1460 | Q: | So her - your left side or right side? |
| 1461 | | |
| 1462 | A: | Her - her - this - they would be this side.  So front. |
| 1463 | | |
| 1464 | Q: | Left side? |
| 1465 | | |
| 1466 | A: | Yeah, left side. |
| 1467 | | |
| 1468 | Q: | When you say front, kind of por- partially or fully or... |
| 1469 | | |
| 1470 | A: | Uh, partial. |
| 1471 | | |
| 1472 | Q: | Okay.  And the way she held that gun when you heard the gunshot, where was |
| 1473 | | it pointing? |
| 1474 | | |
| 1475 | A: | Towards Officer Williams. |
| 1476 | | |
| 1477 | Q: | Was it - can you show me the way it was pointed at Officer Williams? |
| 1478 | | |
| 1479 | A: | It... |
| 1480 | | |
| 1481 | Q: | Okay. |

**COE (Henderson) 000223**

INTERVIEW ... H OFC. MICHELLE SHEPHERD
Interviewer: Sgt. Caesar Basa
02-03-15/10:15 PM
Case # 15-01
Page 34 of 68

| | | |
|---|---|---|
| 1482 | | |
| 1483 | A: | ...it kept moving. |
| 1484 | | |
| 1485 | Q: | Okay. |
| 1486 | | |
| 1487 | A: | She was very - she was never still. |
| 1488 | | |
| 1489 | Q: | Okay. |
| 1490 | | |
| 1491 | A: | Just always moving. |
| 1492 | | |
| 1493 | Q: | So for the purposes of the tape, you had the gun at - slightly at a 45-degree |
| 1494 | | angle, maybe even less.  And you were waving it forward, back and forth, top |
| 1495 | | to bottom.  And, um, and, uh, it's about a good, what, three feet from your |
| 1496 | | body; is that correct? |
| 1497 | | |
| 1498 | A: | Yes. |
| 1499 | | |
| 1500 | Q: | Okay.  Um, and the manner which - which she was facing; right?  You said |
| 1501 | | she was facing Officer Williams.  Did you know where Officer Williams was |
| 1502 | | at that time? |
| 3 | | |
| 1504 | A: | I knew he was to the left of me... |
| 1505 | | |
| 1506 | Q: | Uh-huh. |
| 1507 | | |
| 1508 | A: | ...and I knew he was nearby. |
| 1509 | | |
| 1510 | Q: | How are you certain that she's facing or pointing the gun at Officer Williams |
| 1511 | | at that point? |
| 1512 | | |
| 1513 | A: | 'Cause I could hear him... |
| 1514 | | |
| 1515 | Q: | Mm-hm. |
| 1516 | | |
| 1517 | A: | ...and I could slightly see him in my peripheral. |
| 1518 | | |
| 1519 | Q: | Okay.  And when you heard him, what is it that he was - was it something that |
| 1520 | | he said?  Something that... |
| 1521 | | |
| 1522 | A: | I just heard him yelling. |
| 1523 | | |
| 1524 | Q: | And you know what?  Do you know what he was yelling? |
| 5 | | |
| 1526 | A: | Uh, for sure he - he at least said, "Drop the weapon" or "Drop the gun." |

COE (Henderson) 000224

3008
3009    A:          I believe to, uh, Captain and then to, uh, Commander (Quan).
3010
3011    Q:          Okay.  Is there anything else that we need to know or we failed to ask in
3012                regards to this incident?
3013
3014    A:          No.
3015
3016    Q:          You have any questions?
3017
3018    A:          No.
3019
3020    Q:          All right.  Does anybody else have anything?  In that case we're gonna go
3021                ahead and complete this interview.  And it's, uh, 2350 hours.  We're gonna go
3022                off tape.
3023
3024
3025    The transcript has been reviewed with the audio recording submitted and it is an accurate
3026    transcription.
3027    Signed_____

# EXHIBIT H

**In the Matter Of:**

I.A. and C.S. vs. CITY OF EMERYVILLE, et al.,

**WARREN WILLIAMS**

*August 26, 2016*

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ⬧ San Francisco ⬧ San Jose ⬧ Los Angeles**

**877.451.1580**

**www.aikenwelch.com**



1              UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4  I.A. and C.S., the minor
   children of YUVETTE HENDERSON,
5  deceased, by CRAIG SALMOND, as
   guardian ad litem, and DENISE
6  HENDERSON,

7       Plaintiffs,
   vs.                          No. 4:15-cv-04973-DMR
8
   CITY OF EMERYVILLE; MICHELLE
9  SHEPHERD, individually and in
   her official capacity as police
10 officer for the City of
   Emeryville; and WARREN WILLIAMS,
11 individually and in his
   capacity as a police officer for
12 the City of Emeryville; JACORA
   HENDERSON,
13
        Defendants.
14      _____/

15

16          DEPOSITION OF WARREN WILLIAMS

17

18         Taken before Kimberly L. Avery

19              CSR No. 5074

20            August 26, 2016

21

22
            Aiken Welch Court Reporters
23          One Kaiser Plaza, Suite 250
            Oakland, California 94612
24      (510) 451-1580/(877) 451-1580
                Fax (510) 451-3797
25              www.aikenwelch.com

1          A.   I did.

2          Q.   Was that the first time you had fired it except

3    during training?

4          A.   Yes.

5          Q.   Was it the first time you had deployed it

6    outside of training?

7          A.   You mean taking it out of the rack?

8          Q.   Yes.

9          A.   No.

10         Q.   How many times prior to February 3, 2015 had

11   you taken it out of the rack?

12         A.   I don't recall exactly.  Maybe -- maybe two or

13   three dozen times over, I guess that was about a

14   seven-and-a-half-year period.  I don't keep a log.

15         Q.   Okay.  But on February 3, 2015 was the first

16   time you had fired it?

17         A.   Correct.

18         Q.   Would you describe the AR-15 as your firearm of

19   choice when responding to crime scenes?

20         A.   No.

21         Q.   What was it that first brought your attention

22   to the situation that led you to use the AR-15 on

23   February 3, 2015?

24         A.   I responded as a cover unit for, I think they

25   described her as an uncooperative or -- I think it was

1    an uncooperative, was the word they used, theft suspect
2    at Home Depot.
3        Q.  And was that based on a dispatch report that
4    you heard?
5        A.  Correct.  That's the radio traffic.
6        Q.  Do you know why it was that you responded
7    versus another officer who was on duty?
8        A.  I was just the one that answered up.
9        Q.  I see.
10       A.  Yeah.  There's a call rotation, and so someone
11   will be dispatched, and then whoever else will just
12   answer to cover.
13       Q.  And where were you when you began to respond to
14   that call?
15       A.  At the department.
16       Q.  Inside the building?
17       A.  Yeah.  It was either the locker room or lineup,
18   one or the other.
19       Q.  And then you proceeded to your vehicle and to
20   move to the scene?
21       A.  Correct.
22       Q.  Was the vehicle that you used one that was
23   typically assigned to you?
24       A.  No.  Vehicles aren't assigned.  You take them
25   as they are available.

```
 1          Q.   And what information was that?

 2          A.   Dispatch advised the suspect was armed with a

 3   revolver.

 4          Q.   And was there any further description of the

 5   suspect?

 6          A.   Not from dispatch that I can recall.

 7          Q.   Okay.   So at the time that you were en route,

 8   you had not been advised that the suspect was a woman?

 9          A.   Yes.   Yeah.   I think we knew it was a woman,

10   and I think we had her physical descriptors, probably

11   clothing descriptors.   I'm not sure if we had a name.

12   I don't remember that.

13          Q.   Did the description include her race?

14          A.   Yes.

15          Q.   Was there something that occurred that led you

16   not to actually go to the Home Depot store itself?

17          A.   Yeah.

18          Q.   And what was that?

19          A.   Well, I think -- I think they may have said she

20   was going southbound on Hollis, that she was running

21   that way.

22          Q.   Okay.

23          A.   Officer Shepherd was ahead of me.   She arrived

24   on scene first, and she gave an additional update of

25   where the suspect was, what she looked like, what she
```

1    was wearing.  Based on the description she was giving,

2    I could tell she was on scene giving those, because it

3    just -- it seemed like she was seeing her and relaying

4    and not like it was secondhand.  That's how I

5    interpreted her radio traffic.

6         Q.  So upon hearing what Officer Shepherd said, did

7    you make a decision as to how to proceed?

8         A.  I was already going Code 3.  Once dispatch said

9    the suspect was armed with a revolver, I advised I was

10   responding Code 3.

11        Q.  Does that mean lights and sirens?

12        A.  It does.

13        Q.  And do you recall where you were when you

14   decided to go Code 3?

15        A.  Somewhere between the 40th Street overpass and

16   Babies "R" Us, I believe.

17        Q.  Okay.

18        A.  I think that street there is Overland.

19        Q.  Okay.

20        A.  Somewhere around there.

21        Q.  All right.  And then did you proceed from

22   there, as you said, to Hollis Street?

23        A.  Correct.

24        Q.  And did you encounter any of the

25   loss-prevention agents for Home Depot as you proceeded

```
 1    she kind of gestured, That's the lady.  So I continued

 2    to go towards the suspect.

 3         Q.  Okay.  And did you pass Officer Shepherd's car?

 4         A.  I think I did.  I think I did.

 5         Q.  And were you in the southbound lane or the

 6    northbound lane?

 7         A.  I was going southbound in the northbound lane,

 8    because there's just too much traffic on the southbound

 9    side of the street.  I would have just been kind of

10    parked if I stayed there.

11         Q.  Okay.  And where did you proceed to after you

12    passed Officer Shepherd's vehicle?

13         A.  To the front of the storage facility.

14         Q.  And when you say "front," where do you mean?

15         A.  There's a carport in front of the storage

16    facility, in that approximate area, still kind of in

17    the southbound lane of Hollis.

18         Q.  At that point what was your intention?

19         A.  To perform a felony stop.

20         Q.  And how did you intend to carry that out?

21         A.  To order her to get on the ground at gunpoint.

22         Q.  Did you see that the suspect was armed?

23         A.  While I was still in the car, no, I didn't.

24         Q.  Did you -- did you stop your car?

25         A.  I did.
```

1       Q.   And where did you stop it?

2       A.   Kind of in the middle of the northbound side of

3    the street, yeah.

4       Q.   Okay.

5       A.   Kind of at an angle.

6       Q.   At an angle towards the storage facility?

7       A.   Yeah, kind of by our directions that would be

8    kind of southeast.  So almost 45-degree angle.

9       Q.   And with respect to the storage facility, can

10   you say where the vehicle, your vehicle was stopped?

11   And if it helps, my reference is, correct me if I'm

12   wrong, that the most northern part of the storage

13   facility is kind of an office, and then after that

14   there's a series of automobile bays, maybe five or six?

15      A.   Yes, like parking spots.

16      Q.   Right.

17      A.   I kind of used landmarks, too.  I remember over

18   one of those parking stalls there's a camera, and I

19   think I was about maybe just a little north of that

20   camera; if not, right over it or, you know,

21   perpendicular to it almost.

22      Q.   Okay.  And do you recall which stall that is?

23   Again, thinking of the stalls from north to south.

24      A.   I think it was kind of in the middle.  I

25   don't -- I didn't count the stalls out, so I can't give

```
1    southbound on the east side of Hollis Street along the

2    sidewalk?

3         A.  Yes, she was like jog-walking down that east

4    curb line.

5         Q.  And did she at some point turn to her left into

6    the carport area?

7         A.  She did.

8         Q.  Do you know why she did that?

9         A.  I got out of my car, and I was prepping my

10   rifle as I yelled, "Get on the ground.  Get on the

11   ground."  She immediately turned around and pulled out

12   what I later learned was a loaded 38 revolver that

13   matched the description given by dispatch, and she

14   started immediately going eastbound while drawing down

15   on me with the gun.

16        Q.  Okay.  So I take it from what you are saying is

17   that you have no recollection of Officer Shepherd

18   proceeding southbound past the suspect prior to the

19   suspect turning east into the area of the parking area

20   of the storage area?

21        A.  I didn't see Officer Shepherd --

22        Q.  Okay.

23        A.  -- until all the shots were done.  I heard a

24   shot that I know wasn't mine, and it came -- it sounded

25   like it came from an area southwest of my position.
```

```
1    pillar on its north, and there was -- again, I'm using
2    a landmark because I don't have the stall's number, but
3    there was a camera right there, like mounted above it,
4    like in the eastern top corner of the carport.
5         Q.  Okay.  And with all that in mind, where would
6    you place the suspect the first time you saw her after
7    you got out of your vehicle?
8         A.  When I got out, I told her, "Get on the ground.
9    Get on the ground."  She pulled out her revolver and
10   started drawing down on me while running into the
11   carport.
12        Q.  And was she running -- was she running
13   backwards?
14        A.  No, kind of -- kind of diagonally, drawing down
15   on me like this (indicating).
16        Q.  So you demonstrated that she was running and
17   pointing her -- she had her weapon in her right hand?
18        A.  Correct.
19        Q.  And she was pointing the weapon at you over her
20   left shoulder?
21        A.  She was lowering the weapon towards my
22   position, and then that's when I fired at her.
23        Q.  Okay.  And where was she when you fired at her?
24        A.  Somewhere between the asphalt area and, like I
25   said, it would be the front passenger corner of that
```

1    gray vehicle.  She was -- she was running across my

2    sights.  So it was somewhere in that -- in that

3    triangle.

4         Q.  Okay.  And you fired at her?

5         A.  Correct.

6         Q.  How many rounds did you fire?

7         A.  I remember firing two to three.

8         Q.  And how does the trigger on the AR-15 work in

9    terms of what you need to do to fire multiple bullets?

10        A.  Well, first you have to chamber a round when

11   you get out of the car.  You have to take the safety

12   off.  You have to make sure that the lens on your

13   optics is down so you can see through it, and you have

14   to get the harness out of the way.  And then you just

15   pull the trigger and it fires a single shot.

16        Q.  And to fire multiple rounds, you have to pull

17   the trigger multiple times?

18        A.  One round is fired for each trigger pull.

19        Q.  And initially, in that initial encounter you

20   don't recall whether you fired two or three times or

21   one, two or three times?

22        A.  I remember firing two or three, two or three

23   rounds.

24        Q.  Okay.

25        A.  I lost -- I wasn't counting very well.  I just

1    remember two or three rounds.

2         Q.  And what did the suspect do after you fired

3    those first two or three rounds?

4         A.  She kept running.  I think I completely missed.

5    Or if I did hit her, it had no effect.  She ran to the

6    front of -- she ran to the front of the gray vehicle.

7         Q.  All right.  After you fired those initial

8    rounds?

9         A.  Correct.

10        Q.  And is that when you heard another shot?

11        A.  I heard a shot that wasn't mine during my

12   shots.  And I know it wasn't mine because it wasn't --

13   it wasn't in time with my trigger pull, if that makes

14   sense.  If it were a drum, it was an offbeat drum.  It

15   wasn't my -- it wasn't my beat.

16        Q.  Okay.  Okay.  And did you notice that the

17   suspect reacted at all to that shot that wasn't yours?

18        A.  I can't tell which of the shots she did or did

19   not react to.  When I told her to get on the ground,

20   she turned, ran eastbound while pulling out her gun and

21   drawing down on me (indicating).

22        Q.  So she was drawing down on you while she was

23   running eastbound?

24        A.  Correct.  Correct.

25        Q.  Okay.  And again, your gesture is that she was

1      A.   Correct.

2      Q.   How long did you speak with Mr. Betz?

3      A.   He was in the room with me for, I don't know, I

4  guess 30, 45 minutes, something like that.

5      Q.   Okay.  How far was the suspect from the gray

6  vehicle at the time you fired your first round at her?

7      A.   I don't know exactly.  It was -- it was

8  somewhere in that triangle from when I saw her like

9  near the sidewalk asphalt by that cement wall to the

10  front right corner of that gray vehicle.  It was

11  somewhere in that -- in that area.

12      Q.   Is there any reason why you did not use your

13  vehicle as cover when you called to the suspect to hit

14  the ground?

15      A.   Well, I kind of did.  I had my car parked at a

16  45-degree angle.  It was my cover, and she ran me out

17  of it.  When she ran eastbound, she was flanking me.

18      Q.   Your car was kind of pointed in a southeast

19  direction?

20      A.   Correct.

21      Q.   And when you got out, you got out the driver's

22  side?

23      A.   I did.

24      Q.   Did you go around to the other side at all?

25      A.   To the passenger side?

```
 1        A.  No.
 2        Q.  When did you fire your second round?
 3        A.  When she came around the driver's side corner
 4   of that car.
 5        Q.  Okay.  And what did she do then?
 6        A.  The same thing she did before.  She came around
 7   the car, and with her weapon she was drawing down on me
 8   again, but this time, instead of crossing me, she was
 9   coming westbound towards me.
10        Q.  Okay.  And had you moved from your vehicle at
11   that point?
12        A.  I believe I had.
13        Q.  And where had you moved to?
14        A.  Kind of in a -- like probably a northwest-type
15   direction.
16        Q.  And why were you doing that?
17        A.  So I don't make myself a fixed target.
18        Q.  Were you able to use the pillar as a blockade?
19        A.  I was not.
20        Q.  Why not?
21        A.  Well, the way I remember it, the pillar was
22   just north of her, the closest pillar was just north of
23   her and I.  And this pillar is the one that's on the
24   driver's side of the gray car.
25        Q.  Okay.  Okay.  When did you fire your second
```

```
 1   volley of shots?
 2        A.  When she came around the driver's side fender
 3   of the car and started coming towards me.
 4        Q.  And how many shots did you fire in that volley?
 5        A.  Two or three.
 6        Q.  Did you hit her?
 7        A.  I think I did.
 8        Q.  And why do you think you did?
 9        A.  Because she fell.
10        Q.  And where -- where were you standing when you
11   fired that second volley?
12        A.  West of the gray vehicle.
13        Q.  How far west?
14        A.  I don't recall exactly.
15        Q.  Had you moved at all from the time of your
16   first volley to the second volley?
17        A.  I had moved -- from the time I got out of the
18   car, I believe I moved kind of in a northwest
19   direction.
20        Q.  Okay.  And what happened after she fell?
21        A.  Well, when she came around the car, she was
22   lowering the weapon again, and I fired.  She fell --
23   she fell forward, and she fell to the ground.  And then
24   while she was on the ground, it looked like she was
25   trying to get up or look around to find her weapon,
```

1  because her gun fell three to five feet from her.  It

2  was like she kept coming.  She just -- all she had to

3  do was just get on the ground, but she wouldn't stop.

4  And now it's like she's trying to get up and rearm

5  herself, so I shot again.  It was one or two shots, and

6  then she stopped moving.

7      Q.  In that last round, you shot her in the head?

8      A.  I don't know where it hit her.  One of the

9  rounds ultimately hit her in the head.  I don't know

10  which one.

11      Q.  Do you think it was one of the shots in the

12  third volley that hit her in the head?

13      A.  I think -- I think it was probably one of the

14  final shots, because after the -- after the final

15  volley, it was like -- it was paradoxical.  It went

16  from like eight seconds of chaos to everything was

17  still, and she wasn't moving at all.

18      Q.  After the second volley, did you have the

19  opportunity to get to her weapon before she could?

20      A.  No.

21      Q.  Why not?

22      A.  I was too far.  I couldn't -- I'm not going to

23  risk my life any more than I already have.  She's

24  already tried to kill me twice.  I'm not going to --

25  and she's exposed me from my cover.  I'm not going to

```
 1   weapon, looking at me as she's running that way.
 2        Q.  And she's somewhat south, and when she's
 3   running, she's running north and east?
 4        A.  She kind of runs, kind of like a button hook
 5   pattern, she kind of curls -- starts off east and kind
 6   of curls towards the car.
 7        Q.  And was she pointing the gun straight at you?
 8        A.  She was lowering the gun.  I didn't wait to see
 9   the full circumference of her barrel, but it was
10   lowering, and it was almost level by the time I got my
11   rifle up.
12        Q.  Were you surprised that she didn't shoot?
13        A.  Yeah.  Very.
14        Q.  She runs around the front of the car.  Did you
15   see the gun while she's running around the front of the
16   car?
17        A.  No.  The roof of the car, and there might have
18   been something in there, or maybe there was a glare.  I
19   couldn't really see through, all the way through the
20   car to where she was.  I could just kind of see her
21   head kind of going across the front of the car.
22        Q.  And as she comes around the front, then she
23   again points the gun at you?
24        A.  She again starts lowering the gun at me.
25        Q.  So does she have it pointed up and then
```

1    lowering it down?

2        A.  I remember her lowering it at me like this

3    while looking at me.  So her gun was coming down at me

4    like this (indicating).

5        Q.  And when you fired the second round and she

6    fell, I think you said she fell forward?

7        A.  She did.

8        Q.  And do you recall whether she landed on her --

9    flat down on her chest and stomach, or did she land on

10   her side?

11       A.  I remember her kind of landing on her -- I

12   think it was her right side, with her arm still kind of

13   stretched out.

14       Q.  And the gun was further to her right?

15       A.  I think it was maybe just north of her.

16       Q.  And do you recall what she looked like when she

17   was attempting to get up?

18       A.  It seemed like she was trying to pop her head

19   up to look.  It looked like she was looking for her

20   gun, like she was trying to rearm herself.

21       Q.  Did you see what part of her body, if any, got

22   up off the ground besides her head?

23       A.  No.  I kind of remember -- I think maybe it was

24   her left arm.  I think her right arm was still

25   stretched out, but it seemed like she kind of popped

1    her head up and maybe put her -- she may have put her

2    left hand down, but it looked like she was popping her

3    head up to look for where her gun fell, like she was

4    still coming.  She still -- she still was coming for

5    me.

6         Q.  That was your perception of what was happening?

7         A.  Yes.

8         Q.  I asked you earlier if you had fired the rifle

9    in a non-training situation.  Had you fired your

10   handgun in a non-training situation before this

11   incident?

12        A.  No.

13        Q.  So this was the first time you had fired a

14   firearm while on duty with the Emeryville Police

15   Department?

16        A.  No.

17        Q.  It wasn't the first time?

18        A.  No.

19        Q.  When was the first time?

20        A.  I accidentally discharged my shotgun maybe two

21   or three years prior, trying to clear a jam.

22        Q.  Did you hit anyone?

23        A.  No.

24        Q.  Was that while you were involved in trying to

25   arrest someone?

```
 1                    REPORTER'S CERTIFICATE

 2

 3        I, KIMBERLY L. AVERY, do hereby certify:

 4        That WARREN WILLIAMS, in the foregoing deposition

 5   named, was present and by me sworn as a witness in the

 6   above-entitled action at the time and place therein

 7   specified;

 8        That said deposition was taken before me at said

 9   time and place, and was taken down in shorthand by me,

10   a Certified Shorthand Reporter of the State of

11   California, and was thereafter transcribed into

12   typewriting, and that the foregoing transcript

13   constitutes a full, true and correct report of said

14   deposition and of the proceedings that took place;

15        That before completion of the proceedings, review

16   of the transcript was not requested.

17        IN WITNESS WHEREOF, I have hereunder subscribed my

18   hand this 8th of September 2016.

19

20

21

22

23   _____
     KIMBERLY L. AVERY, CSR No. 5074
24   State of California

25
```

# EXHIBIT I

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18

**INTERVIEW WITH OFC. WARREN WILLIAMS**
**Q=Sgt.. Ceasar Basa**
**Q1=Ofc. Phong Tran**
**Q2=Lt. Roland Hogrin**
**Q3=Sgt. Jason Bosetti**
**Q4=Steven Betz**
**Q5=Cpt. Dante Diotalevi**
**Q6=Tim Wellman**
**Q7=Pete Carlson**
**A=Ofc. Warren Williams**

19   Q:        You asked for that, uh, (unintelligible). So, let me just explain the process.
20             How this is gonna work is that, um - uh, we're gonna do an introductions -
21             everybody in the room, uh, around the table. And then, um - um, we're gonna
22             ask you - basically what happened. Just what happened. I'm gonna read this,
23             of course. Uh, you can go ahead and read it and sign it before we go on tape
24             so we don't have to do it out on tape.
25
26   A:        All right.
27
28   Q:        And while I'm tape I'm gonna say, "Hey, you know, you read this, you
29             understood it, you signed it." And I'm gonna read it, and then, um,
30             everybody's, uh, introductions. And after the introductions, uh, we're just
31             basically gonna ask you what happened.
32
33   A:        All right.
34
35   Q:        Now, from the time that, uh, that you were made aware of the incident. And
36             you can use these two photographs right here, and a piece of paper. I'm gonna
37             give you a piece of paper that you could use...
38
39   A:        Okay.
40
41   Q:        ...as reference. So if you wanna draw anything, you can draw, you know,
42             whatever to help you with your memory. And use reference points.
43
44   A:        Okay.
.5

**COE (Henderson) 000289**

| | | |
|---|---|---|
| 586 587 588 | Q: | Okay. What were those - can you tell me the specific words or specific things that are... |
| 589 590 | A: | Dispatch said... |
| 591 592 | Q: | ...specifically? |
| 593 594 | A: | ...Loss Prevention was reporting the suspect was armed with a revolver. |
| 595 596 | Q: | Mm-hm. |
| 597 598 599 600 | A: | Um, and the lady had a - she had a revolver, it was like black steel with a - a wood - a textured wood stock. Like, a worn wood stock, a - or handle, I should say. Um, yeah. The suspect had a revolver. |
| 601 602 603 | Q: | Mm-kay. Now, was that something that Dispatch said, or was that something that you (unintelligible). |
| 604 605 | A: | No, Dispatch said we have a quote, "Revolver." |
| 606 07 | Q: | Okay. But it - no description of, like, the handle being? |
| 08 609 | A: | No. |
| 610 611 | Q: | Okay. |
| 612 613 | A: | No, that's what I saw... |
| 614 615 | Q: | Okay. |
| 616 617 | A: | ....when I was on scene. |
| 618 619 620 621 | Q: | So let's - let's just talk about what Dispatch had provided you - information that provided you while you were en route. Says that, uh, the suspect was armed with a revolver? |
| 622 623 | A: | Correct. |
| 624 625 626 | Q: | And did Dispatch say whether the gun was being pointed at anybody? Or w- she was just armed with a revolver? |
| 627 628 | A: | I just remember, "Armed with a revolver." |
| 29 0 | Q: | Okay. And, in your mind, what did you take that to be? |

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 37 of 86

| 1618 | A: | Um, but she was kinda movin' - she was kinda facin' me and movin' laterally |
| 1619 | | and it's - she was movin', like, perpendicular to me. |
| 1620 | | |
| 1621 | Q: | Mm-hm. |
| 1622 | | |
| 1623 | A: | So if I'm facin' this way. She was kinda goin' that way, and it was just kinda |
| 1624 | | hard to, uh, sight her in. Um, but then when she came around, um, the guy was |
| 1625 | | gettin' outta the car, and then he dove back in. And then she kinda came |
| 1626 | | westbound for a moment, and it was - it was more silhouette-like, it was - she |
| 1627 | | wasn't - I - she didn't have the lateral movements, and it was easier to get |
| 1628 | | sighted in. |
| 1629 | | |
| 1630 | Q: | Mm-hm. |
| 1631 | | |
| 1632 | A: | Um, so I - I think I fired, uh, two or three more shots there, and then she fell. |
| 1633 | | Um, and the gun fell, like, right by her. Uh, but she was still, like, tryin' to |
| 1634 | | move and I was worried she was gonna grab the gun and shoot me, or him, or |
| 1635 | | someone in one of the cars on Hollis Street. Uh, so I fired one or two more |
| 1636 | | rounds. And then she stopped - th- she stopped movin' after that. And then I |
| 1637 | | went up, uh, to check on her, and she didn't have a pulse, and. And. |
| 1638 | | |
| 1639 | Q: | All right. So it's - it's straight in my mind. As you were walkin' up to her, she |
| 1640 | | has her back to you, correct? Initially? |
| 1641 | | |
| 1642 | A: | Correct. |
| 1643 | | |
| 1644 | Q: | And then she pulled a gun out... |
| 1645 | | |
| 1646 | A: | Correct. |
| 1647 | | |
| 1648 | Q: | ...correct? And then you said she continued to move forward, correct? |
| 1649 | | |
| 1650 | A: | She's continued to move - she started goin' into the car port. |
| 1651 | | |
| 1652 | Q: | Uh-huh. So. |
| 1653 | | |
| 1654 | A: | After I - after I told her to get on the ground. |
| 1655 | | |
| 1656 | Q: | So which part of her body is presented to you at that point? Was it her side? |
| 1657 | | Left side, right side? Or is it just... |
| 1658 | | |
| 1659 | A: | Well, kinda, like... |
| 1660 | | |
| 1661 | Q: | ...her back? |
| 1662 | | |

COE (Henderson) 000325

| 1663 | A: | ...her left side. So. |
| 1664 | | |
| 1665 | Q: | Left side? |
| 1666 | | |
| 1667 | A: | So, if I were the screen? |
| 1668 | | |
| 1669 | Q: | Uh-huh... |
| 1670 | | |
| 1671 | A: | If I were standing where the screen was, and I'm her, she was kinda goin' like |
| 1672 | | this - walkin' this way, kind of like... |
| 1673 | | |
| 1674 | Q: | Mm-hm. |
| 1675 | | |
| 1676 | A: | ...east and then northbound around the car. So, like, east and then northbound |
| 1677 | | around the car. |
| 1678 | | |
| 1679 | Q: | Okay. For the purposes of the tape, um, it appears to me that you were turning |
| 1680 | | your body to the left. Where the left side of your body is presented towards, |
| 1681 | | uh, - you - you made references to you - the screen. Correct? |
| 1682 | | |
| 1683 | A: | Yes. |
| 1684 | | |
| 1685 | Q: | Correct? Okay. Just for the purposes of the tape. And, uh, so when you fired |
| 1686 | | your first, shot, right? Your first volley of shot, how many times did you |
| 1687 | | shoot? |
| 1688 | | |
| 1689 | A: | I think... |
| 1690 | | |
| 1691 | Q: | Your first volley of shots? |
| 1692 | | |
| 1693 | A: | ...I think it was - I think it was two or three. |
| 1694 | | |
| 1695 | Q: | Two or three? Okay. Those two or three shots, which part of her body was |
| 1696 | | presented to you? |
| 1697 | | |
| 1698 | A: | Um, her - her chest and shoulders. 'Cause she was comin' around, like - well, |
| 1699 | | she was in here, and she was makin' around the car like this. So she was. |
| 1700 | | |
| 1701 | Q: | She was turning? |
| 1702 | | |
| 1703 | A: | Yeah. |
| 1704 | | |
| 1705 | Q: | To her left? |
| 1706 | | |
| 1707 | A: | She was turnin' to her left... |

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 44 of 86

1932

1933    Q:              Uh-huh...

1934

1935    A:              And then he dives back in.

1936

1937    Q:              Okay.

1938

1939    A:              And, uh, I think his door was still open. And as she comes around here, I - I

1940                    think I came back over this way, and had two - two to three more shots.

1941

1942    Q:              Okay.

1943

1944    A:              Um...

1945

1946    Q:              And she's over here?

1947

1948    A:              Yeah. And then she kind of fell, um, kinda like that. Kinda facin' in a

1949                    northwest...

1950

1951    Q:              Okay.

1952

1953    A:              ...type direction, uh...

1954

1955    Q:              What's the distance between you and her? With the first three shots?

1956

1957    A:              I'd say...

1958

1959    Q:              Approximately.

1960

1961    A:              ...thirty - thirty yards, maybe.

1962

1963    Q:              Thirty yards?

1964

1965    A:              Yeah, like from the - from the middle of, uh, - uh, from the middle of

1966                    northbound Hollis...

1967

1968    Q:              Mm-hm.

1969

1970    Q:              ...to, you know, a little bit in front of - of the garage doors.

1971

1972    Q:              Okay.

1973

1974    A:              Or the - the storage unit doors.

1975

1976    Q:              All right. And then she said - she came around there, right?

**COE (Henderson) 000332**

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 45 of 86

1977
1978    A:         Yeah.
1979
1980    Q:         And over here? And you fired how many rounds?
1981
1982    A:         Two to three.
1983
1984    Q:         Two to three. And what's that distance?
1985
1986    A:         It was closer, um, I - 'cause I think I was - I think at this time I'd kinda
1987                moved, like - like, up onto the sidewalk. So...
1988
1989    Q:         Mm-hm.
1990
1991    A:         ...if that was the sidewalk and this is the street, I think I started - I think I
1992                started in the street, but then I kinda came in diagonally like this.
1993
1994    Q:         Mm-kay.
1995
1996    A:         So I think I was - I - I think I was somewhere in, uh, - and that one doesn't
1997                show it very well. But I think I was somewhere around here.
1998
1999    Q:         Okay.
2000
2001    A:         Um...
2002
2003    Q:         And what is the distance there?
2004
2005    A:         I think I was on the asphalt area. Um, maybe twelve yards?
2006
2007    Q:         Okay. And you said you fired two rounds?
2008
2009    A:         Two to three rounds.
2010
2011    Q:         'Kay. Why did you fire those two to three rounds?
2012
2013    A:         'Cause she was walking towards me. She came around the car and was comin'
2014                this way. And at this point the gun was gettin' lower, and this guy was in - in
2015                the - he dove back in the car. I didn't know if she was gonna try to carjack
2016                him, take him hostage, shoot him, shoot at me. Um, but the gun was, it - it was
2017                lowering so I - I fired two to three more. Um, and she fell. And, uh, after she
2018                fell, she started the - the gun didn't fall far from her. And I was worried she
2019                was gonna reach for the gun and, uh, continue to pose a threat. So I fired one
2020                to two more.
2021

**COE (Henderson) 000333**

| 2067 | A: | She was walkin' towards... |
| 2068 | | |
| 2069 | Q: | Not her intent... |
| 2070 | | |
| 2071 | A: | ...me. She was walkin'.... |
| 2072 | | |
| 2073 | Q: | ...not what she could or could not do. |
| 2074 | | |
| 2075 | A: | ...towards me and her weapon was lowering. And it was... |
| 2076 | | |
| 2077 | Q: | Okay. |
| 2078 | | |
| 2079 | A: | ...pointing towards my direction. |
| 2080 | | |
| 2081 | Q: | Okay. All right. |
| 2082 | | |
| 2083 | A: | Uh, yeah, I mean, I... |
| 2084 | | |
| 2085 | Q: | Can you show me? |
| 2086 | | |
| 2087 | A: | She's walkin' towards me... |
| 2088 | | |
| 2089 | Q: | Mm-hm. |
| 2090 | | |
| 2091 | A: | ...and goin' like this. |
| 2092 | | |
| 2093 | Q: | Okay. |
| 2094 | | |
| 2095 | A: | Her arm's coming down. Um... |
| 2096 | | |
| 2097 | Q: | So for the purposes of the tape, uh, you had your arms raised above your head, |
| 2098 | | and you were lowering it. |
| 2099 | | |
| 2100 | A: | And it's lowering down. |
| 2101 | | |
| 2102 | Q: | Forward, towards me. Towards the person... |
| 2103 | | |
| 2104 | A: | As she's also... |
| 2105 | | |
| 2106 | Q: | ...I'm pointing at. |
| 2107 | | |
| 2108 | A: | ...coming - walking towards me. |
| 2109 | | |
| 2110 | Q: | Okay. Did you say any commands at that point? Make any commands, or? |
| 2111 | | |

COE (Henderson) 000335

| | | |
|---|---|---|
| 2337 | Q: | Okay. |
| 2338 | | |
| 2339 | A: | Um, no not getting up, but, like, it seemed like she was tryin' to get up, and I |
| 2340 | | don't know. I just - I thought she was gonna go for the gun again. |
| 2341 | | |
| 2342 | Q: | All right. And you discharged one or two, uh... |
| 2343 | | |
| 2344 | A: | One or two rounds. |
| 2345 | | |
| 2346 | Q: | Rounds? From a distance of what? |
| 2347 | | |
| 2348 | A: | I don't know - I - I - I think it was, uh, twenty to, twenty to thirty five feet, I |
| 2349 | | guess. |
| 2350 | | |
| 2351 | Q: | Okay. |
| 2352 | | |
| 2353 | A: | Um, she was still kinda by the front of the car, and I think I was still behind it. |
| 2354 | | Um, kind of in the same - same position. |
| 2355 | | |
| 2356 | Q: | And you said you might have been kneeling? |
| 2357 | | |
| 2358 | A: | Yeah. |
| 2359 | | |
| 2360 | Q: | But you're not sure? |
| 2361 | | |
| 2362 | A: | I'm - I'm not - I'm not sure. |
| 2363 | | |
| 2364 | Q: | All right. So what was the effect of those two to three rounds on the suspect? |
| 2365 | | |
| 2366 | A: | She stopped moving. |
| 2367 | | |
| 2368 | Q: | Mm-hm. |
| 2369 | | |
| 2370 | A: | Um, there was - she wasn't threatening... |
| 2371 | | |
| 2372 | Q: | Mm-hm. |
| 2373 | | |
| 2374 | A: | ...anymore. |
| 2375 | | |
| 2376 | Q: | Mm-hm. |
| 2377 | | |
| 2378 | A: | Um, and I didn't believe, after those last one to two rounds, that she would |
| 2379 | | reach for the gun or - or be able to reach for the gun. Um, so I - I moved in |
| 2380 | | closer, and, um, she - she seemed to be unresponsive. But some point I |

COE (Henderson) 000341

2426

2427    Q:        "Get down on the ground? (Unintelligible)."
2428
2429    A:        "Get on the ground. Get on the ground."
2430
2431    Q:        Okay. How much time lapsed from the time you gave those commands to
2432              when you discharged your service r-, uh, rifle?
2433
2434    A:        Seconds. I don't - two, three seconds.
2435
2436    Q:        Okay.
2437
2438    A:        Um, just enough time for her to stop, you know, to just go into the car port.
2439              Um, yeah. The whole thing was - I don't know. I'm thinkin' the whole thing
2440              was less than eight to ten seconds.
2441
2442    Q:        Okay. From the first to the second volley, how much time would you say
2443              lapsed?
2444
2445    A:        Mm. Maybe three or four?
2446
2447    Q:        Okay. And from the second to the third?
2448
2449    A:        Maybe another three or four?
2450
2451    Q:        Another three or four? And you're saying this happened - total about eight
2452              seconds?
2453
2454    A:        Eight to ten seconds.
2455
2456    Q:        Okay. Did she - the suspect - um, did she fire a round?
2457
2458    A:        I don't think she did.
2459
2460    Q:        Let's talk about officer, uh, Shepherd. 'Kay? Could you tell me where she
2461              was?
2462
2463    A:        I...
2464
2465    Q:        During the course of this incident, if you could?
2466
2467    A:        ...I - I don't remember seeing her. I - I remember hearing, uh, a shot that
2468              wasn't mine.
2469
2470    Q:        Mm-hm.

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 65 of 86

| | | |
|---|---|---|
| 2871<br>2872<br>2873<br>2874 | A: | Um, naw. I think it was - yeah. I think it was - so like if this is the car, I believe it was as she was approaching, like, the, uh, the - the passenger side fender. |
| 2875<br>2876<br>2877<br>2878 | Q6: | Okay. You're pointing toward the, um, hand-drawn diagram, and are showing sort of what would be the front, uh, right, or front passenger area of the vehicle? |
| 2879<br>2880 | A: | Correct. |
| 2881<br>2882 | Q6: | Okay. And as she's making that turn, um, was she looking back at you? |
| 2883<br>2884 | A: | Yes. |
| 2885<br>2886<br>2887<br>2888 | Q6: | And, it - um, I think you demonstrated before that she had the gun, sort of with her right, um, arm at say roughly a ninety degree angle with the gun in her hand? |
| 2889<br>2890 | A: | She had it up, and it was gradually coming down. |
| 2891<br>2892 | Q6: | Okay. And is that, uh, when you fired the first volley? |
| 2893<br>2894<br>2895 | A: | Um, correct. As she was approaching the, uh, the front passenger fender of the small gray car. |
| 2896<br>2897 | Q6: | At that point, did you know there was anyone inside the small gray car? |
| 2898<br>2899<br>2900<br>2901<br>2902<br>2903 | A: | I could see somethin' kinda moving, um, but I still was kinda focused in on her. Uh, as she got to the front of the car, like more away from the fender and more in front of the hood, he was popping out of the - the driver's side door. And then he dove back in as she was comin' around the, uh - uh, to the, uh, front driver's side... |
| 2904<br>2905 | Q6: | Did the man... |
| 2906<br>2907 | A: | ...(unintelligible). |
| 2908<br>2909<br>2910 | Q6: | ...pop out between the first and second volley? Or betwe- or before the first volley, if you remember? |
| 2911<br>2912 | A: | Uh, between the - after the first, uh, and before the second. |
| 2913<br>2914<br>2915 | Q6: | Okay. So at the point of that - the f- time that you first fired your rifle. If you remember, were you on the street? On the sidewalk? In the carport area? Or somewhere different? |

COE (Henderson) 000353

| | | |
|---|---|---|
| 3273<br>3274<br>3275 | Q1: | Until after the incident? It wasn't on - wasn't - did you ever have it on (unintelligible)? |
| 3276<br>3277 | A: | I turned it on while I was on scene here. |
| 3278<br>3279 | Q1: | Okay. |
| 3280<br>3281 | A: | But after - after the third volley. |
| 3282<br>3283 | Q1: | Yeah. But that was the first time, all day long - you had it on? |
| 3284<br>3285 | A: | Yeah. |
| 3286<br>3287 | Q1: | Okay. |
| 3288<br>3289 | A: | Yeah. |
| 3290<br>3291 | Q1: | Okay. |
| 3292<br>3293<br>3294<br>3295<br>3296<br>3297 | Q: | All right. Just one last thing, man, some people that are gonna review this, is gonna say that - or could say that you placed yourself in a position of danger, right? Like, goin' up there. Uh, you coulda taken cover, you coulda ran away, you coulda done somethin' else besides engaging the suspect. What would your response be? |
| 3298<br>3299 | A: | They have a luxury of criticizing me in hindsight. |
| 3300<br>3301 | Q: | Mm-hm. |
| 3302<br>3303 | A: | I don't. |
| 3304<br>3305 | Q: | All right. Counsel? |
| 3306<br>3307<br>3308<br>3309 | Q4: | Just one thing, uh, how much time -- if you can remember, I know it's hard to remember this kinda stuff, but -- how much time do you think passed between the last shot of the first volley and the first shot of the second volley? |
| 3310<br>3311 | A: | The last shot of the first volley, and the first shot of the second volley? |
| 3312<br>3313 | Q4: | Right. |
| 3314<br>3315 | A: | Um, I don't know, maybe three to five seconds? Three to four seconds. |
| 3316<br>3317 | Q4: | And the same question between two and three? Second volley, that is, and third volley? |

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 75 of 86

| | | |
|---|---|---|
| 3318 | | |
| 3319 | A: | Um, maybe three. |
| 3320 | | |
| 3321 | Q4: | 'Kay. That's all. |
| 3322 | | |
| 3323 | Q: | Okay. If, uh, nobody else has anything, all that remains is some administrative |
| 3324 | | questions. So I'm gonna post, uh, to you, uh, Counsel whether you guys |
| 3325 | | wanna take a break and come back and do the admin questions or do you |
| 3326 | | wanna continue? |
| 3327 | | |
| 3328 | Q4: | H- how do you feel, do you wanna? |
| 3329 | | |
| 3330 | A: | I'd rather just - let's just power through. |
| 3331 | | |
| 3332 | Q: | Okay. So if you'd do me a favor, just go ahead and uh, write down the |
| 3333 | | response for me, I'd appreciate it, Officer Tran. So these are uh - uh, |
| 3334 | | background questions, all right? Administrative questions to determine your |
| 3335 | | state of being at the - the time of this incident. And what is your name and |
| 3336 | | serial number? |
| 3337 | | |
| 3338 | A: | Warren Williams, badge number 346. |
| 3339 | | |
| 3340 | Q: | And how old are you? |
| 3341 | | |
| 3342 | A: | 43. |
| 3343 | | |
| 3344 | Q: | And when were you sworn? |
| 3345 | | |
| 3346 | A: | July 27, 2007. |
| 3347 | | |
| 3348 | Q: | And do you have any other law enforcement experience? |
| 3349 | | |
| 3350 | A: | No, I do not. |
| 3351 | | |
| 3352 | Q: | And what is your current assignment? |
| 3353 | | |
| 3354 | A: | Patrol and school resource officer. |
| 3355 | | |
| 3356 | Q: | And what are your normal days off? |
| 3357 | | |
| 3358 | A: | Uh, Saturday, Sunday, Monday. |
| 3359 | | |
| 3360 | Q: | And what is your normal shift hours? |
| 3361 | | |
| 3362 | A: | Uh, 0600 to 1600. |

INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 76 of 86

| | | |
|---|---|---|
| 3363 | | |
| 3364 | Q: | What is your normal beat assignment? |
| 3365 | | |
| 3366 | A: | The city, and the schools. |
| 3367 | | |
| 3368 | Q: | 'Kay. Do you have a normal - or do you have a designated call sign that you |
| 3369 | | use all the time? |
| 3370 | | |
| 3371 | A: | 346. |
| 3372 | | |
| 3373 | Q: | Assigned to you? |
| 3374 | | |
| 3375 | A: | 346. |
| 3376 | | |
| 3377 | Q: | And were you workin' alone or with a partner? |
| 3378 | | |
| 3379 | A: | Uh... |
| 3380 | | |
| 3381 | Q: | D- d- d- at the time of this incident? |
| 3382 | | |
| 3383 | A: | I was the only officer in my vehicle. |
| 4 | | |
| 3385 | Q: | Okay. Uh, could you tell me the duty hours of your shift at the time of this |
| 3386 | | incident? |
| 3387 | | |
| 3388 | A: | The - you mean what time did it occur? |
| 3389 | | |
| 3390 | Q: | No. Your duty hours, uh, the day of this incident, what are your duty hours? |
| 3391 | | |
| 3392 | A: | I started at 0200. |
| 3393 | | |
| 3394 | Q: | Are those your normal duty hours? |
| 3395 | | |
| 3396 | A: | No. My normal duty hours are 0600 to 1600. |
| 3397 | | |
| 3398 | Q: | So why did you start at 0200? |
| 3399 | | |
| 3400 | A: | Because we're short. |
| 3401 | | |
| 3402 | Q: | Overtime? |
| 3403 | | |
| 3404 | A: | Because we're short people. |
| 3405 | | |
| 06 | Q: | Okay. And who was your supervisor at the time of the incident? |
| 3407 | | |

**COE (Henderson) 000364**

Case 4:15-cv-04973-DMR   Document 72   Filed 02/03/17   Page 116 of 267
INTERVIEW WITH OFC. WARREN ILLIAMS
Interviewer Sgt. Caesar Basa
02-03-15/7:41 pm
Case # 15-01
Page 78 of 86

| | | |
|---|---|---|
| 3452 | A: | Uh, I think it was - I think it's called Rhinocort. It's like a - a nasal spray. |
| 3453 | | And, uh, Patanase, it's another nasal spray. |
| 3454 | | |
| 3455 | Q: | Okay. |
| 3456 | | |
| 3457 | A: | And, uh, a Tylenol PM. |
| 3458 | | |
| 3459 | Q: | Did you consume any alcoholic beverages in the past 24 hours? |
| 3460 | | |
| 3461 | A: | I had a beer at dinner last night. |
| 3462 | | |
| 3463 | Q: | You have any medical condition that might have impacted your judgment or |
| 3464 | | physical abilities? |
| 3465 | | |
| 3466 | A: | Um, just allergies. |
| 3467 | | |
| 3468 | Q: | When was the last time you slept, and how many hours did you sleep? |
| 3469 | | |
| 3470 | A: | I went to bed at 8:30, and then I was called at 0930. I'm sorry - I went to bed |
| 3471 | | at 2030 last night, and I was called at 2130, told to start at 0200. So, hour and |
| 3472 | | a half, 2 hours. |
| ˜ ˜3 | | |
| 3˜74 | Q: | 'Kay. Were you injured as a result of this incident? |
| 3475 | | |
| 3476 | A: | Um, my lip and my knee. My left knee. |
| 3477 | | |
| 3478 | Q: | Were photographs taken of your injuries? |
| 3479 | | |
| 3480 | A: | Uh, they were. |
| 3481 | | |
| 3482 | Q: | Were photographs taken of you in general? |
| 3483 | | |
| 3484 | A: | They were. |
| 3485 | | |
| 3486 | Q: | Do you need to be evaluated for your injuries by a medical professional? |
| 3487 | | |
| 3488 | A: | No. I'll just walk it off. |
| 3489 | | |
| 3490 | Q: | Do you wear any corrective lenses? |
| 3491 | | |
| 3492 | A: | I do not. |
| 3493 | | |
| 3494 | Q: | Glasses or contacts? We're gonna talk about your uniform and equipment, |
| ˜ ˜5 | | okay? |
| 3˜76 | | |

COE (Henderson) 000366

3812
3813    Q:              Okay? So we're gonna...
3814
3815
3816    The transcript has been reviewed with the audio recording submitted and it is an accurate
3817    transcription.
3818    Signed_____

# EXHIBIT J

**STATEMENT**
Oakland Police Department

| 1. Complainant | Offense/Crime | |
|---|---|---|
| OFFICERS M. SHEPHERD & W. WILLIAMS | PC 215(A) / PC 417(C) | 15-006467 |

| 3. Name of Person Giving Statement | Sex/Race/DOB | ☐ Complainant ☐ Suspect ☐ Driver |
|---|---|---|
| BENITEZ, LESEA DENYSE | F/H/08/11/1963 | ☐ Reporting Person ☒ Witness |

| Residence Address ☐ Oakland | City/Zip | Phone |
|---|---|---|
| 2020 SANTA CLARA AVE APT 203, ALAMEDA 94501 | | 510-205-8523 |

5. Employment (Name, Address, Phone, Occupation, Work Hours, Days Off) or Supplemental Information if Unemployed or Transient
EXTRA SPACE STORAGE, 3406 HOLLIS ST., EMERYVILLE, CA 94501    510-450-0730

| 6. Statement Taken By | Serial No. | Date | Time Started - Completed |
|---|---|---|---|
| S. KONG    9331 | | 3 FEB 15 | 1340 - 1420 |

| 7. Location Where Statement Taken | Names, Addresses of Persons Present During Statement |
|---|---|
| 3406 HOLLIS ST | |

## FOR VEHICLE COLLISIONS ONLY

| 8. License No. | State | Veh Yr. | Make | Model | Type | Color(s) | Drivers License No. | State |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | C1774386 | |

| 9. Registered Owner | Address | City/Zip | Residence/Business Phone |
|---|---|---|---|
| | | | |

**ADMONITION:** You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford a lawyer, one will be appointed to represent you before any questioning if you wish one.

*Subject's Initials*

**WAIVER:** Do you understand each of these rights I have explained to you? _____    _____

**CITIZEN'S ARREST:** Defendant _____ DOB _____ Arrest Charge _____

I hereby arrest the above-named defendant on the charge indicated and request that a Peace Officer take him/her into custody. I will appear when notified to sign a complaint against the person I have arrested.

X_____

**Statement**

MY NAME IS LESEA BENITEZ AND I AM THE ASSISTANT MANAGER AT EXTRA SPACE STORAGE LOCATED AT 3406 HOLLIS ST. ON FEB. 3rd 2015, AT ABOUT 12:45 PM, I WAS STANDING BEHIND THE COUNTER IN THE FRONT OFFICE. I SAW A WOMAN WALKING SOUTHBOUND ON HOLLIS ST TOWARDS 34TH ST. ON THE EAST SIDEWALK. THE WOMAN LOOKED BEHIND HER, TURNED AND RAN INTO THE SECOND DRIVEWAY OF OUR FACILITY. THE WOMAN ~~TURNED~~ RAN IN BETWEEN TWO CARS AND I SAW TWO POLICE OFFICERS APPROACHED HER FROM THE STREET. THE WOMAN TURNED TOWARDS THE TWO OFFICERS. ONE POLICE OFFICER WAS HOLDING A LONG GUN, THE OTHER POLICE OFFICER WAS HOLDING A HANDGUN. THE OFFICERS WERE YELLING COMMANDS AT THE WOMAN. IT LOOKED LIKE THE WOMAN WAS YELLING

**STATEMENT CONTINUATION**
Oakland Police Department          536-200-2 (4/13)          Page 2 of 2

| 1. Complainant OFF. SGT M. SHEPHERD (& WILLIAMS) | Offense/Crime PC 215(A) / PC 417(C) | 2. Report No. 15 006467 |
| 3. Name of Person Giving Statement BENITEZ, LESEA DENYSE | Sex/Race/DOB F/H/08/11/1963 | ☐ Complainant  ☐ Suspect  ☐ Driver ☐ Reporting Person  ☑ Witness |

Statement Continued

BACK AT THE OFFICERS. THE OFFICERS FIRED THEIR WEAPONS AT THE WOMAN. I HEARD ABOUT THREE SHOTS BEING FIRED. MY MANAGER, NICOLE, TOLD ME TO GET DOWN. I SAID TO NICOLE, "THEY SHOT HER! THEY SHOT HER!" NICOLE TOLD ME "SHE TURNED AROUND AND POINTED A GUN AT THE OFFICERS!" AFTER THE SHOOTING, OTHER OFFICERS, FIREFIGHTERS, AND PARAMEDICS CAME TO THE SCENE. THIS IS A TRUE STATEMENT. ⌐

*[signature] Lesea Benitez    2/3/15*

# EXHIBIT K

DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Plaintiffs
I.A., C.S. and DENISE HENDERSON

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.A. and C.S., the minor children of YUVETTE HENDERSON, deceased, by CRAIG SALMOND, as guardian ad litem, and DENISE HENDERSON, | Case No. 4:15-cv-04973-DMR |
| | **NOTICE OF MANUAL FILING/LODGING** |
| Plaintiffs, | Hon. Donna M. Ryu |
| vs. | **Date:** February 23, 2017 **Time:** 11:00 a.m. |
| CITY OF EMERYVILLE; MICHELLE SHEPHERD, individually and in her official capacity as a police officer for the City of Emeryville; and WARREN WILLIAMS, individually and in his official capacity as a police officer for the City of Emeryville; JACORA HENDERSON, | **Location:** Oakland Courthouse, Courtroom 4 – 3rd Floor 1301 Clay Street, Oakland, CA 94612 |
| Defendants. | |

## NOTICE OF MANUAL FILING/LODGING

Regarding: Exhibits K and M to the Declaration of EmilyRose Johns in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

This ECF filing is in physical form only, in place of Exhibits K and M to the declaration noted above and is being maintained in the case file in the Clerk's office. All parties will be served a copy of the audio being filed.

*I.A. et al. v. City of Emeryville,* No. 4:15-cv-04973-DMR
Notice of Manual Filing/Lodging - 1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

This filing was not e-filed for the following reasons:

Non Graphical/Textual Computer File (audio, video) on CD or other media: One DVD containing two witness interviews and one DVD containing a surveillance video.

Dated: February 2, 2017

Respectfully submitted,
SIEGEL & YEE

By:   */s/ EmilyRose Johns*
            EMILYROSE JOHNS
            Attorneys for Plaintiffs
            I.A., C.S., and DENISE HENDERSON

# EXHIBIT L

Re: I.A. et al. v. City of Emeryville, et al.                    SDT Log # 10-458-16
Action:  4:15-CV-04973-DMR

# DECLARATION

I, the undersigned, being the duly authorized custodian of records on file in the Oakland Police Department Records Section, and having the authority to certify such records, declare under penalty of perjury that the records being provided are all true copies of the original records that were prepared or entered by personnel of the Oakland Police Department in the ordinary course of business at or near the time of the incident to which they pertain.

## CERTIFICATION OF RECORDS

___X_ Copies of all the records described in the Subpoena duces Tecum or Court Order are provided. Any  redactions made to the documents are pursuant to the exemptions allowed under the California Public Records Act, 6254(f) California Government Code. RD# 15-006467 was provided

## CERTIFICATION OF PARTIAL, OR NO RECORDS

_____ Please note that only service by personal delivery or 1st Class Mail will be accepted unless agreed upon in advance.

A thorough search of the records on file in the Oakland Police Department Records Section:

_____ Revealed only a portion of the records described in the Subpoena duces Tecum. RD# -- is unable to load unto the microfiche machine (the film is damaged) and is not able to be produced.

_____ RD# are privileged and confidential and are exempt from release under Evidence Code 1040 because the scope of the records requested pertain to a case that is showing it is still open for Investigation by Oakland Police Department. Accordingly, the Oakland Police Department is unable to produce any records as specified in the Subpoena at this  time.

_____ The records described in the Subpoena duces Tecum are exempted from release pursuant to the California Penal Code 11167.5.  Please provide a signed Court Order with an attached Protective Orders for any additional minors in the report. RD# --  requires a JV575/828  Petition with Protective Orders.

Executed on Monday the 5th day of December, 2016  at Oakland, California

Cassandra Lane -- Police Records Specialist
For: Roland Holmgren -- Lieutenant of Police, Homicide Division
Custodian of Homicide Records
Oakland Police Department

REC'D OCT 2 8 2016

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California ▾

| | |
|---|---|
| I.A. et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 4:15-cv-04973-DMR |
| City of Emeryville et al. | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Cynthia Vela
455 7th St, 3rd Floor, Oakland, CA 94607

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: The complete investigation file for the investigation conducted by Oakland Police Department of the Emeryville Police Department officer-involved shooting of Yuvette Henderson on February 3, 2015.

| Place: 499 14th st, Suite 300, Oakland, CA 94612 | Date and Time: 11/08/2016 1:28 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  10/25/2016

CLERK OF COURT

OR

_____          _____
_Signature of Clerk or Deputy Clerk_                    _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_ I.A., C.S., and Denise Henderson _____, who issues or requests this subpoena, are:
EmilyRose Johns, 499 14th St, Suite 300, Oakland, CA 94612; emilyrose@siegelyee.com; 510.839.1200

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**PROOF OF SERVICE**

I, PAUL KELLEY, declare as follows:

I am over 18 years of age and I am a resident of the State of California. I am not a party to the within action. My business address is 499 14th Street, Suite 300, Oakland, CA, 94612.

On October 28, 2016, I served copies of the following documents:

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OBJECTS, OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

on the entity from which documents are sought by personal service to:

Cynthia Vela
Police Administration Building
455 7th st 3rd floor
Oakland, CA 94607

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2016, at Oakland, California.

Paul Kelley

# Incident Report

**OAKLAND POLICE DEPARTMENT**
**455 7TH STREET**
**OAKLAND, CALIFORNIA 94607**
**(510) 238-3021**

**Incident Number: 15-006467-001**

## Incident Summary

| | |
|---|---|
| Incident Type: | Report Type:   INCIDENT REPORT |
| Inc Occurred Address:     3421 HOLLIS ST, OAKLAND, CALIFORNIA 94608 | Sector/Beat:   CCD3/07X |
| Inc Occurred Start:   02/03/2015 16:28       Inc Occurred End:   02/03/2015 16:28 | Report Taken: |
| Bias Motivation:                   Gang Related:   U | Substance:   U |
| Contact Nature:   NO | Reported Date/Time:   02/03/2015 16:28 |
| Reporting Officer:   KEAS, CANDACE | |
| | Primary Assigned Officer: |
| Case Status:             Disposition: | Disposition Date: |

## Property Involved

**Property #   0001**                                    Evidence:   No
Event Assoc/Orig status:     EVIDENCE            Original Status Date:   2/3/2015 17:06:00      Original Value:
Current Status:   EVIDENCE                       Current Status Date:   2/3/2015 17:06:00      Current Value:
Property Type:
Description:   DVD
Make/Brand:   NONE                               Model:   NONE
Color: WHITE                                     Quantity:   1
Serial/Lot#:                                     Owner Applied#:
NCIC Date:                                       NCIC Reported By:
NCIC#:                                           NCIC Cancelled:

SUBPOENAS – COURT ORDER

Printed by:  ocl4353                                                              Page 2 of 2
Printed date/time:  11/30/16 19:58          **Incident Report**

**OAKLAND POLICE DEPARTMENT**
**455 7TH STREET**
**OAKLAND, CALIFORNIA 94607**
**(510) 238-3021**                                    Incident Number: 15-006467-001

---

## Narratives

ENTERED DATE/TIME: 2/3/2015 16:28:00
SUBJECT:  SYNOPSIS
AUTHOR:  KEAS, CANDACE

SUBPOENAS – COURT ORDER

VIDEO SUPP

---

ENTERED DATE/TIME: 2/3/2015 16:28:00
SUBJECT:  FBR NARRATIVE
AUTHOR:  KEAS, CANDACE

SUMMARY:

On 03 February 15, I responded to 3421 Hollis Street to retrieve security video on a DVR at the location. A tenant on scene ████████████ advised he was able to grant me access to the DVR for the surveillance video at the location. While accessing the DVR system it should be noted the DVR's recording time is an hour behind real time. Video download for this location was started at 1140 hours to 1200 hours. I downloaded all the camera video for the time frame occurrence. Along with the original downloaded files, I burned all files to a DVD and turned one (1) DVD into Property and Evidence Section and one (1) copy to the Homicide division. I took no further action.

---

# EXHIBIT M

DAN SIEGEL, SBN 56400
EMILYROSE JOHNS, SBN 294319
SIEGEL & YEE
499 14th Street, Suite 300
Oakland, California 94612
Telephone: (510) 839-1200
Facsimile: (510) 444-6698

Attorneys for Plaintiffs
I.A., C.S. and DENISE HENDERSON

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.A. and C.S., the minor children of YUVETTE HENDERSON, deceased, by CRAIG SALMOND, as guardian ad litem, and DENISE HENDERSON, | Case No. 4:15-cv-04973-DMR |
| | **NOTICE OF MANUAL FILING/LODGING** |
| Plaintiffs, | |
| | Hon. Donna M. Ryu |
| vs. | |
| | **Date:** February 23, 2017 |
| CITY OF EMERYVILLE; MICHELLE SHEPHERD, individually and in her official capacity as a police officer for the City of Emeryville; and WARREN WILLIAMS, individually and in his official capacity as a police officer for the City of Emeryville; JACORA HENDERSON, | **Time:** 11:00 a.m. |
| | **Location:** Oakland Courthouse, Courtroom 4 – 3rd Floor |
| | 1301 Clay Street, Oakland, CA 94612 |
| Defendants. | |

## NOTICE OF MANUAL FILING/LODGING

Regarding: Exhibits K and M to the Declaration of EmilyRose Johns in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment.

This ECF filing is in physical form only, in place of Exhibits K and M to the declaration noted above and is being maintained in the case file in the Clerk's office. All parties will be served a copy of the audio being filed.

1       This filing was not e-filed for the following reasons:

2       Non Graphical/Textual Computer File (audio, video) on CD or other media: One DVD

3   containing two witness interviews and one DVD containing a surveillance video.

4

5   Dated: February 2, 2017

                    Respectfully submitted,
                    SIEGEL & YEE

6

7                       By:   */s/ EmilyRose Johns*

8                             EMILYROSE JOHNS
                          Attorneys for Plaintiffs

9                             I.A., C.S., and DENISE HENDERSON

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT N

1  DAN SIEGEL, SBN 56400
2  EMILYROSE JOHNS, SBN 294319
   SIEGEL & YEE
3  499 14th Street, Suite 300
   Oakland, California 94612
4  Telephone: (510) 839-1200
   Facsimile: (510) 444-6698
5
6  Attorneys for Plaintiffs
   I.A., C.S. and DENISE HENDERSON
7
8              UNITED STATES DISTRICT COURT
9         FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11 I.A. and C.S., the minor children of    ) Case No. 4:15-cv-04973-DMR
12 YUVETTE HENDERSON, deceased, by          )
   CRAIG SALMOND, as guardian ad litem,     ) **PLAINTIFFS' DISCLOSURE OF**
13 and DENISE HENDERSON,                     ) **EXPERT WITNESSES PURSUANT**
                                             ) **TO FEDERAL RULE OF CIVIL**
14            Plaintiffs,                     ) **PROCEDURE 26(a)(2)**
                                             )
15      vs.                                   ) Judge: Donna M. Ryu
                                             )
16 CITY OF EMERYVILLE; MICHELLE              ) Case Filed: October 29, 2015
17 SHEPHERD, individually and in her         )
   official capacity as a police officer for the ) Trial Date: May 15, 2017
18 City of Emeryville; and WARREN           )
   WILLIAMS, individually and in his         )
19 official capacity as a police officer for the )
20 City of Emeryville; JACORA               )
   HENDERSON,                                )
21                                           )
22            Defendants.                    )

23        Pursuant to Federal Rule of Civil Procedure 26(a)(2), Plaintiffs I.A., C.S., and
24
25 DENISE HENDERSON hereby disclose the following retained and non-retained expert
26 witnesses:
27      **Retained Experts**
28      1.      Roger Clark, Police Practices Expert, 10207 Molino Road, Santee, CA

92071. 208.351.2458.

1    All documents required to be disclosed under Federal Rule of Civil Procedure

2    26(a)(2)(B) are attached.

3    **<u>Non-retained Experts</u>**

4    1.    Dr. Paul W. Herrmann, Alameda County Coroner's Pathologist, 480 4th

5

6    Street, Oakland, CA 94607, 510.268.7300.

7    Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B), Plaintiffs provide the

8    following information: Dr. Hermann is expected to testify as a pathologist, on the

9    subject of the death of the subject-decedent YUVETTE HENDERSON. A summary of his

10   facts and opinions may be found in the coroner's investigation report, previously

11   provided as Bates Stamp HENDERSON1-22.

12

13

14

15   Dated: December 27 2016

16                                SIEGEL & YEE

17

18                                By:   /s/ EmilyRose Johns
                                         EmilyRose Johns
19
                                  Attorneys for Plaintiffs
20                                I.A., C.S. and DENISE HENDERSON

21

22

23

24

25

26

27

28

# EXHIBIT O

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

December 23, 2016

Ms. EmilyRose Johns, Esq.
Associate, Siegel & Yee
499 14th Street, Suite 300
Oakland, CA  94612

**Regarding:   I.A. and C.S., et al., vs.  City of Emeryville, et al., Case No.: 4:15-cv-04973-DMR.**

Dear Counsel:

Thank you for retaining me to render opinions regarding the February 3, 2015, shooting death of Ms. Yuvette Henderson (Ms. Henderson) by Emeryville Police Department (EPD) Officers Michelle Shepard (Officer Shepherd) and Warren Williams (Officer Williams).  Pursuant to the requirements of Rule 26, I have reviewed the reports, interviews, photographs, video recordings, deposition transcripts, EPD policies, training documents and other material (as listed below) provided to me thus far regarding this case.  Please be advised that if any additional data is provided, a supplementary report may be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions.  That is, where there are differences in the events proffered by the Defendant officers present versus those proffered by witnesses and other evidence, I do not opine for the trier of fact regarding who are the more believable witnesses.  The resolution of any such conflicts are obviously within the purview of a jury to decide.

## Material Reviewed Thus Far:

1.     First Amended Complaint for Damages.

2.      EPD Case Details, Bate Stamped HOD000001-HOD000005.

3.      Alameda County Sheriff's Coroner's Investigation, Bate Stamped
        Henderson 1- Henderson 22.

4.      Juvenile Dependency, Bate Stamped Henderson 23- Henderson 26.

5.      Oakland Police Department, Laboratory Report, February 3, 2015.

6.      Emeryville Police Department Administrative Investigation (EPD IA
        15-001), Bate Stamped, COE (Henderson) 000001 - COE
        (Henderson) 000579.

7.      State of California Department of Justice Course Roster, Bate
        Stamped COE (Henderson) 000592-COE (Henderson) 000668.

8.      Office of Chief of Police Emeryville Police Department, Affected
        Sworn Personnel, Bate Stamped COE (Henderson) 000669 - COE
        (Henderson) 000715.

9.      Office of Chief of Police Emeryville Police Department Training
        Order No. 12-04, Bate Stamped, COE (Henderson) 000716) - COE
        (Henderson) 000720.

10.     Memorandum, Bate Stamped COE (Henderson) 000721- COE
        (Henderson) 000797.

11.     Emeryville Police Department Chabot Gun Club Correspondence,
        Bate Stamped COE (Henderson) 000798 - COE (Henderson)
        000817.

12.     Emeryville Police Department, Use of Force Policy, Bate Stamped,
        COE (Henderson) 000818- COE (Henderson) 000829.

13.     Emeryville Police Department Press Releases, Bate Stamped COE
        (Henderson) 000832 - COE (Henderson) 000851.

14.     Emeryville Police Department Media Statement, COE (Henderson)
        000852 - COE (Henderson) 003013.

15. Response of Defendant City of National City to Request for Production of Documents Propounded by Plaintiff Jesus Flores (Set Two).

16. Response of Defendant City of National City to Request for Production of Documents Propounded by Plaintiff Jesus Flores (Set Three).

17. Photographs (((Bate Stamped, COE (Henderson)003150-COE (Henderson) 003992))):
   a. Scene.
   b. Ms. Henderson's fatal gunshot wounds.
   c. Defendant Officer's weapons.

18. Audio recordings:
   a. Interview of Conrad Dunton, February 3, 2015.
   b. Interview of Erica Mendez, February 3, 2015 (1 & 2).
   c. Interview of Edgar Paez, February 3, 2015 (1 & 2).
   d. 9-1-1 Call.
   e. Interview Officer Warren Williams, February 3, 2015.
   f. Administrative Interview Officer Michelle Shepherd, April 15, 2015.
   g. Administrative Interview Officer Warren Williams, April 15, 2015.

19. Video recordings (Bate Stamped COE Henderson 000580-000591):
   a. Closed Circuit Security Video Front (Home Depot).
   b. Closed Circuit Security Video Back (Home Depot).
   c. Bus Closed Circuit Security Video.
   d. Officer Williams' Lapel Video Recording.
   e. Home Depot Closed Circuit Surveillance Video.
   f. Video Interview of Eric Clausen.
   g. Video Interview of Lesea Benitez.
   h. Video Interview of Nicole Phavisth.
   I. Video Interview of John Rieble.
   j. Scene Walk-through, EPD.

20. Deposition Transcripts:
   a. Officer Michelle Shepherd, August 25, 2016.
   b. Officer Warren Williams, August 26, 2016.

21.    California POST Basic Learning Domains as Follows:
     a.     #1:  "Leadership, Professionalism & Ethics."
     b.     #2:  "Criminal Justice System."
     c.     #3:  "Policing in the Community."
     d.     #5:  "Introduction to Criminal Law."
     e.     #15: "Laws of Arrest."
     f.     #16: "Search and Seizure."
     g.     #20: "Use of Force."
     h.     #21: "Patrol Techniques."
     I.     #23: "Crimes in Progress."
     j.     #33: "Arrest Methods/Defensive Tactics."
     k.     #35: "Firearms/Chemical Agents."
     l.     #36: "Information Systems."

22.    Stipulated Protective Order.

23.    Overview of the incident scene via the internet.

**Uncontested Facts:**

There are a number of significant apparent uncontested facts evident in the material submitted for my review.  They include:

1.    Ms. Henderson never fired a single round at anyone, including Officers Shepherd and Williams.

2.    Neither Officer Williams nor Officer Shepherd knew of anyone at the scene that Ms. Henderson had threatened.

3.    Ms. Henderson sustained a head injury, which was reported during the 9-1-1 call.

4.    Officer Williams was not behind cover when he shot Ms. Henderson.

5.    Officer Williams and Officer Shepherd did not communicate with each other when they arrived at the Extra Space Storage.

6.      8 to 12 seconds elapsed from Officer Williams' arrival to his fatal
        shot that killed Ms. Henderson.

7.      Officers did not give a warning that deadly force would be used.

8.      No officer or bystander was injured by Ms. Henderson during the
        incident.

9.      The final (and fatal) shot inflicted on Ms. Henderson, was a gunshot
        into her head, while she was unarmed on the ground and not
        reaching for the gun (which was not in her possession at that time).


**Brief Overview of Events and Commentary:**

***Incident***:

Ms. Henderson was a 38-year-old mother who resided in Oakland, California. Ms. Henderson was not on probation or parole; and, was not, prior to this incident, wanted for questioning in connection with any crime.

On February 3, 2015, at approximately 12:35 p.m., Ms. Henderson was shopping at The Home Depot, located at 3838 Hollis Street, Emeryville.  While Ms. Henderson was shopping, a Home Depot security guard detained her on suspicion of shoplifting.

The security guard called 9-1-1 while Ms. Henderson waited on the sidewalk outside the store.  He reported that a crime might have been committed and requested police assistance.  During her detention, Ms. Henderson was taken down by Home Depot security guards.  She hit her head on the cement.

She requested medical attention after her fall, and the security guard on the phone with the dispatcher relayed the request.  Accordingly, the emergency dispatcher also dispatched a medical response to assist Ms. Henderson.

However, Ms. Henderson did not wait for the police/medical response, and left the area on foot.  The Home Depot security guard reported to the emergency dispatcher that Ms. Henderson had a gun, which he described as a "black revolver."

Ms. Henderson walked west to Hollis Street and then south along Hollis Street.  Ms Henderson attempted to flag down a bus and when she was unsuccessful she approached

a car behind the bus.  She pulled out an object from her purse or clothing that appeared to be a small gun.  The car drove away without any incident.  Ms. Henderson continued walking south on Hollis Street until she reached the Extra Space Storage facility located at 3406 Hollis Street, Emeryville.

Officers Shepherd and Williams were dispatched to the Home Depot, but were notified that Ms. Henderson had left the area.

Officer Shepherd arrived on scene and observed Ms. Henderson at the time  she encountered the bus.  Officer Williams arrives shortly thereafter.  They followed Ms. Henderson to the Extra Space Storage.

When they finally encountered Ms. Henderson, she was in a car port at the Extra Space Storage.

Officer Shepherd took cover behind a cement pillar.  Officer Williams attempted to take cover behind his car door.  Upon encountering Ms. Henderson, Officers Shepherd and Williams raised their service-issued firearms, including an AR-15 assault rifle, and aimed them at Ms. Henderson.

They gave brief commands including ordering Ms. Henderson to drop the gun and get on the ground.  Within seconds Officers Shepherd and Williams fired their guns at Ms. Henderson.  Ms. Henderson fell to the ground wounded, and the gun she had in her hand fell some distance away (according to reports, a distance of 6 feet), and out of her immediate reach.  Approximately 8 to 12 seconds occurred between the time they got out of their vehicles and fired the final shots.

It must be stated here that in this incident, prudence, training and policy required that EPD Officers locate and stand behind "cover" (this would include their patrol vehicles, if available), so as to protect themselves, provide the time to assess a continuing threat  and not place themselves in a position where they would "have" to fire their weapons.

However, after a brief interaction, Officers Shepherd and Williams fired multiple shots at Ms. Henderson.  She was struck in multiple locations, including her head and back.  Ms. Henderson was not facing the officers nor did she have a weapon aimed at them when Officers Williams and Shepherd discharged their firearms.

Officer Williams has stated that he fired his AR-15 rifle at Ms. Henderson while she was unarmed and face down on the ground.  Officer Williams justified his actions by saying that Ms. Henderson was moving her head (and not her hands) while on the ground and he

feared that she would reach for the handgun (which was measured to be 6feet away from her).

Ms. Henderson was pronounced dead at 12:41 p.m. The Alameda County Coroner determined her manner and cause of death to be homicide by multiple bullet wounds.

### *EPD Officer Warren Williams*:

EPD Officer Warren Williams was interviewed in a conference room at EPD on February 3, 2015, starting at approximately 7:40 p.m., by OPD Sergeant Caesar Basa, OPD Lieutenant Roland Holmgren, OPD Officer Phong Tran, EPD Sergeant Jason Bosetti, EPD Captain Dante Diotalevi, DA Inspector Peter Carlson, and DDA Tim Wellman.

Officer Williams was represented by legal defense fund ("LDF") attorney Steven Betz. The interview, which lasted approximately two hours and ten minutes, was audio recorded.

Officer Williams, who stated that he was sworn in as a police officer in July 2007, was advised of his Miranda rights. Officer Williams and his attorney signed a Miranda form, which read:  "Officer Williams, you are represented here at this interview by your attorney, Steven Betz.  You are not in custody and you are free to conclude the interview at any time.  You are not obligated to answer any questions.  Any answers you do give may be used in a court of law.  Having this in mind, do you wish to voluntarily proceed with the interview?" Officer Williams agreed to proceed with the interview and answered all questions asked of him.

Officer Williams stated that he was on duty as a patrol officer for the Emeryville Police Department on the afternoon of February 3, 2015.  He said that he normally works day shift, from 6:00 a.m. to 4:00 p.m., but was called into work and had started at 2:00 a.m. on February 3,2015.

He stated that he was at the Emeryville Police Department at about 12:30 p.m. or so when he heard that Officer Shepherd was dispatched to Home Depot concerning an uncooperative female adult theft suspect.  He stated that he responded as a cover unit for Officer Shepherd, driving by himself in a fully marked EPD Ford Crown Victoria patrol vehicle.

While on his way, Officer Williams stated that dispatch advised that Home Depot loss prevention advised EPD that the suspect was armed with a gun, which was described as a revolver.

Officer Williams stated that he then responded "Code 3."  He stated that Officer Shepherd arrived on scene first and gave the suspect's description and direction of flight.  He said that he heard that the suspect was heading southbound on Hollis Street toward a public storage facility.  He stated that when he was at Yerba Buena Avenue and Hollis Street he saw two males on the "island," whom he believed were Home Depot loss prevention agents, who were pointing or gesturing southbound on Hollis Street.  He stated that there was traffic on southbound Hollis Street, but that he was able to catch up to Officer Shepherd's vehicle.

He said that for part of his southbound drive on Hollis Street he had to drive south on the northbound side of the street because of traffic.  When he arrived at Officer Shepherd's location, Officer Williams said that Officer Shepherd told him "there's the lady" or "that's her," pointing and referring to a woman who was walking southbound on Hollis Street in front of the storage facility.  He thought that Officer Shepherd was out of her car when she told him this.

Officer Williams stated that he saw the suspect and that he drove southbound on Hollis Street to her location.  Although he acknowledged that estimating time and distance was difficult given how quickly everything happened and the nature of the event, he estimated that when he first saw the suspect she was on the east curb line of Hollis Street about 100 to 120 yards south of his location.  He said that he drove south on Hollis Street and pulled up near her location. He said that he stopped his patrol vehicle in the middle of the street and exited his car with his service rifle deployed.

He stated that he had to take his eyes off the suspect momentarily while he obtained his rifle from the vehicle.  He said that he chose the rifle to give him a tactical advantage for distance and accuracy.  He said that he deployed his rifle because of the report that the suspect (Ms. Henderson) was armed with a firearm.

He said that as soon as he exited his patrol vehicle he immediately yelled at Ms. Henderson to "get on the ground, get on the ground."  Officer Williams stated that Ms. Henderson did not comply with his request, but instead started walking away from Officer Williams into the carport area of the storage company toward a parked gray car.

As Ms. Henderson was going into the carport Officer Williams said he observed her holding a gun with her right hand.  He saw that the gun was a revolver.  He said that at first she was holding the gun with the barrel pointed up, as Officer Williams described Ms. Henderson's arm at about a 90 degree angle.  He stated that as she walked to the gray car, Ms. Henderson's arm holding the gun moved as she started to level the gun at him.

Officer Williams said Ms. Henderson was moving around the car, facing Officer Williams, and he said he was afraid that she was going to shoot him as she started to point the gun in his direction.  He said he was afraid that he would be killed.  As a result, Officer Williams said that as Ms. Henderson came around the parked car toward him and lowered the gun toward him he fired two or three shots using his department-issued Colt AR-15 .223 caliber rifle her in rapid succession.

He stated that Ms. Henderson posed a lethal threat and that he was afraid of being shot and killed.  He said that he remembered hearing a shot that was not in sequence with his trigger pull and the gunfire that he heard sounded like it came from south of his location.  He said he did not see Officer Shepherd fire her gun, but the sound he heard was consistent with coming from where he believed Officer Shepherd was located.  He did not observe any of these shots having any effect on Ms. Henderson.  He stated that he believed that he had missed her.

Officer Williams described that after he fired at Ms. Henderson, she was still moving around the front of the gray car toward the driver's side of the vehicle.  He said that Ms. Henderson did nothing to surrender.  He stated that he saw a man inside the car start to get out of the car and then duck or dive back inside the car.  He had seen some sort of movement in the car beforehand, but was not sure what it was until after he fired his first shots.

He thought that the driver's side door of the gray car was open.  He said as Ms. Henderson came west around the car, advancing toward him, he fired two or three more shots.  He stated that Ms. Henderson was coming toward him, she had lowered her gun, and he was afraid that she would shoot and kill him or the man in the car or anyone else in the area.  He said that he did not know what Ms. Henderson was going to do - whether it was to try to carjack the person in the car or take the person hostage or shoot and kill someone.

Officer Williams noted that he was closer to the suspect for these shots as she was moving toward him and he had moved toward her.

Officer Williams stated that after these shots Ms. Henderson fell to the ground towards him and that her gun fell next to her.  He said he stopped shooting because she had fallen.  He estimated that the gun was within three to five feet of her.  He stated that she started to move, as if trying to get up, and still posed a threat.  He explained that he was afraid that she would grab the gun and shoot him or the man in the gray car or someone on Hollis Street so he fired one or two more shots.  He said she stopped moving and he did not fire any additional shots.

Officer Williams said after the shooting he went up to check on Ms. Henderson.  He said he checked the woman's pulse, but could not feel any pulse.  He stated that "Code 3 medical" was requested.  Officer Williams noted that after the shooting the man inside the gray car went to a nearby truck, which he described as a GMC or Chevy truck, and got inside the truck.

Officer Williams estimated that he fired seven or eight shots in total.  He estimated that the total time of the gunshots, from start to finish, was about eight to ten seconds.  He stated that at some point he may have fired from a kneeling position because he said at one point he "whacked" his knee and that he ended up with a bruised left knee and "kind of a busted lip" (i.e.,bit lip).  He believed that he kneeled during the second "volley" of gunshots that he fired.  He said that kneeling made him a smaller target, was a form of concealment, and made for a "more stable shooting platform."

He did not believe that Ms. Henderson ever fired her gun.  Officer Williams believed that there were people in their cars on Hollis Street who may have recorded what happened with cell phones?

Officer Williams had a body camera on his person, but stated that he did not turn on the camera until after the shooting.  Officer Williams stated that he had not reviewed anything before the interview and stated that he had not talked about the details of the incident with anyone before the interview.


### *EPD Officer Michelle Shepherd*

Officer M. Shepherd #351 was interviewed second on 2/3/15 at about 2215 hours at the Emeryville Police Department.  The following is a brief synopsis of her recorded interview.

Officer Shepherd was dispatched to Home Depot for a female petty theft suspect who was being uncooperative.  While en route Officer Shepherd was advised by dispatch the female suspect was requesting medical do to injuring her head.

Officer Shepherd approved medical to respond.  Officer Shepherd was on 40th Street approaching Hollis Street when dispatch advised her that the female suspect, later identified as Yuvette Henderson, had a gun and was running away from the Loss Prevention agents.

When Officer Shepherd turned south on to Hollis Street from 40th Street she could see the Loss Prevention Officer, Jorge Figueroa, standing on the corner of the entrance of Home Depot and Hollis Street, pointing south at Ms. Henderson who was running south on the east sidewalk of Hollis Street approaching the I.S. 580/80 overpass.

Officer Shepherd asked Jorge if Ms. Henderson was the suspect running away and Jorge said yes.  Officer Shepherd advised over the radio Henderson's description and location. Officer Shepherd said right before the overpass an Ale Transit bus had stopped and Henderson was trying to flag the bus down.

Because it was reported that Ms. Henderson had a gun, Officer Shepherd drew her handgun and then tried to radio that Ms. Henderson was attempting to get on the bus. Officer Shepherd set her handgun on the seat to use the radio, and she applied her vehicle's brakes and her handgun fell to the passenger side floorboard.  Officer Shepherd saw that the bus driver does not allow Henderson to get on the bus, so Ms. Henderson continued running south bound to a green taxi that was stopped directly behind the bus.

Ms. Henderson approached the driver's window and started yelling at the driver of the taxi.  Officer Shepherd saw that Ms. Henderson was holding a gun and pointing it at the taxi driver and attempting to take the car from the driver.  Officer Shepherd's handgun was still on the floorboard so she did not feel safe to engage Ms. Henderson at this time.

Ms. Henderson apparently saw Officer Shepherd and continued running south bound on Hollis Street.  Officer Shepherd pulled her patrol vehicle to the side of Hollis Street and got out of her patrol vehicle to retrieve her handgun from the passengers floorboard.

Officer Shepherd saw Officer Williams approaching south bound on Hollis Street.  She yelled to Officer Williams that Henderson was the suspect and she had a gun in her hand.

Officer Shepherd broadcast over the radio Ms. Henderson's location and she had a gun in her hand.  Officer Shepherd drove past Officer Williams who had stopped his patrol vehicle in the middle of Hollis street and in front of the 3406 Hollis Street where Ms. Henderson was.  Officer Shepherd wanted to get south of Ms. Henderson to try and keep Ms. Henderson from running further south and possibly injuring someone.

Officer Shepherd exited her patrol vehicle and saw Ms. Henderson run into the parking lot of the storage facility with the gun in her hand.  Henderson ran in front of the cars that were parked in the lot and she still had the gun in her hand.

Officer Shepherd had her service handgun in her hand and was repeatedly ordering Ms. Henderson to drop the gun.  Ms. Henderson ran towards the left front area of a small grey car and Officer Shepherd used one of the pillars as cover.  Officer Shepherd could see Ms. Henderson still holding the gun and pointing in all directions.

Officer Shepherd said she could see Ms. Henderson's attention was drawn towards the street and this is the area where Officer Shepherd believed Officer Williams was.  Because the car was in between Officer Shepherd and Ms. Henderson, Officer Shepherd could only see Ms. Henderson looking towards the street and pointing the gun in that direction.

Officer Shepherd heard a shot and was not sure if Henderson just shot at Officer Williams or Officer Williams had shot.  Officer Shepherd could see Ms. Henderson was still standing and believed Ms. Henderson had shot Officer Williams so Officer Shepherd shot one round at Ms. Henderson.  After Officer Shepherd shot she saw a subject moving in the grey car next to where Ms. Henderson was standing.  Officer Shepherd could still see Ms. Henderson had the gun and was still standing next to the grey car.  Officer Shepherd changed her location because there was a subject in the car between her and Ms. Henderson and Officer Shepherd did not want to jeopardize their safety.  While moving locations Officer Shepherd heard another shot and when she got around a parked vehicle she saw Officer Williams and could see Henderson was down on the ground next to the grey vehicle.  Officer Shepherd advised shots had been fired and medical was needed. (Refer to Officer Shepherd's recorded statement.)


**Opinions Thus Far:**

> 1.     It is uncontested that Ms. Henderson did not shoot at or have her gun aimed at either officer or a bystander when she was shot at by Officer Williams and Officer Shepherd.  And she had no gun in hand when she was fatally shot by Officer Williams.  Officers Williams and Shepherd should not have fired their weapons, because the Officers were not confronted with an immediate defense of life situation.  Therefore, absent a credible lethal threat, they (Officers Williams and Shepherd) should not have fired their weapons under well established police practice principles, which are adapted from decisions of the Supreme Court and as taught by POST to all officers.

Page 12 of  23

2.     Officer Williams and Shepherd did not act reasonably when they did not give any warning that deadly force would be used if Ms. Henderson did not comply with their orders.  They further did not act reasonably when they did not give her sufficient time to comply with their shouts to drop the gun and get on the ground.  Officer Williams did not give additional warnings when Ms. Henderson was on the ground, wounded, before he fired the fatal shot.  Officer Williams' failure in this regard was a violation of policy, training and law (as taught to all POST certified officers).

3.     Officers are trained that they are accountable for their tactical decisions when they resort to the use of lethal force.  Accordingly, the reasonableness of an officer's use of deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use of deadly force.  There are significant obvious and avoidable tactical blunders that occurred in this shooting incident that, if followed, would have prevented the use of lethal force that occurred.  In particular, they included Officer Williams' failure to hold his fire after Ms. Henderson lay wounded and helpless on the ground.  Officer Williams should had used the obvious cover provided by his police unit and/or to tactically move/reposition if necessary.  Officer Williams cannot be excused for his deliberate firing of his rifle into Ms Henderson's head when she no longer posed a credible threat to him or anyone else.

4.     In my opinion there were fundamental tactical errors and a gross lack of situational awareness in this incident.  In my experience, a significant number of civilian deaths involving police result from a series of cascading departures from expected and required tactics and deliberate departures from training.  This appears as a key factor in the downward spiral of events resulting in the shooting death of Ms. Henderson.  They include:
  •     Their failure to communicate with each other.
  •     Officer Shepherd's loss of her handgun while in her vehicle.
  •     Officer Shepherd's gross inaccuracy when her bullets hit an occupied vehicle.
  •     Officer Williams' failure to maintain a position of cover.
  •     Officer Williams' failure to assess the existence (or lack thereof) of a credible threat as the incident unfolded.

5.      Officers Williams and Shepherd had several less-lethal options available, including O/C spray, Taser weapons, and bean bag guns.  Officer Shepherd testified that she witnessed Ms. Henderson confront a taxi driver and bus driver, with gun in hand, and testified that Ms. Henderson did not fire her weapon during either of those encounters.  Therefore, given the totality of circumstances, Officers Williams and Shepherd should have known that Ms. Henderson was not a lethal threat and should have used a commensurate weapon for the level of threat - non-lethal in this incident was sufficient.

6.      The Emeryville Police Department (EPD), through its chain of command, appears to have endorsed the dangerous and out-of-policy tactics that are connected to this incident.  Even to the point of awarding them with the medal of valor.  As such, their collective approval of these tactics puts the communities they serve at unnecessary future risk of death and/or injury from Officers Williams and Shepherd and others on the department who have been, or are now, similarly trained and/or supervised.

**The Basic Rules Regarding the Use of Deadly Force:**

Peace officers are trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life.  Firing a firearm at a human being is different from all other police uses of force.  While there are other police tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the officer's firearm.  Accordingly, officers are trained that they can only use firearms under the most extreme circumstances.  These situations are very rare.  In fact, studies indicate that only a very few police officers in the United States ever fire their weapons in the field during their entire careers.

Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added):

"A *reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20: "Introduction to the Use of Force," page 1-4.)

Further, POST teaches early on in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

> "The criminal justice system gives law enforcement two extraordinary powers:
>
> > 1.    The power of arrest and
> > 2.    The power to use deadly force.
> >
> > "The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint*.  This is why it is important to emphasize that *peace officers do not confer "police powers" on themselves*.  These powers come to the criminal justice system from the people they serve." (Learning Domain #2: "Criminal Justice System," page 1-4. Emphasis added.)

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."  (Learning Domain # 20 "Use of Force," Chapter 2.).

POST training specifies that the use of force under the "totality of circumstances" is only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *"A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances."*  POST defines "Unreasonable Fear" as: *"Generated in the officers's mind with no direct correlation to facts and situations."*  (Learning Domain # 20, Chapter 5.  Emphasis added.).  Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective") "reasonable necessity" of action to "imminent danger." (Learning Domain # 20, Chapter 3).

A great deal of emphasis is placed on tried and proven tactics at the POST Basic Academy with the strong message in almost every germane training domain that

incompetent tactics will invariably lead to unnecessary injury and/or death.  As stated above, the training domains in this regard have even given this type of reckless and dangerous behavior a specific name: *Tombstone Courage."*  POST has also given a specific name to tactical mistakes that are likely to lead to injury or death: *"Fatal Error."*

**Professional Standards Regarding the Use of Force:**

Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."  In view of this incident nothing other than "Officer Presence" and "Verbal Instruction" were justified in this case.  The standards in this regard  are as follows (reference: POST LD # 20: "Use of Force."  Page 2-5.):

POST defines four categories of behavior and a range of appropriate officer responses to gain control compliance.  They are:

| | |
|---|---|
| Cooperative | All that is required here is officer presence and verbal instruction. |
| Resistive (passive and active) | Firm grip, Control holds and low levels of pain compliance. |
| Combative | Officers have the right to self defense and can use necessary tools (baton, OC spray, taser, etc.) |
| Life-threatening | Officers have the right to self defense and can respond with lethal force. |

Competent police officers are also trained at the POST Basic Academy that the "totality of the circumstances" are an important aspect in the decision to use force and that the law requires that the use of force must meet an "Objectively Reasonable" standard.  The following quotes typify the training:

"A reasonable officer is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner."  "Unreasonable force occurs when the type, degree and duration of force employed was not necessary or appropriate."(Learning Domain #20: "Introduction to the Use of Force," page 1-4.)

Additionally, an entire chapter in POST Learning Domain #20 is devoted to the "Consequences of Unreasonable Force."  Cruelty and malicious assaults are absolutely forbidden:

"**Unreasonable force** occurs when the type, degree and duration of force employed was not necessary or appropriate."

POST requires officers to constantly assess their selection of force.  This is known as "Constant Reevaluation."  (Learning Domain #20, Chapter 2, pages 7-8.)  This means that if a situation that previously calls for lethal force, now has evolved to a situation that calls for less-lethal force (or no further force), the officer is not reasonable in using lethal force.  This is further illustrated in an example given in Learning Domain #20, Chapter 3, page 8, wherein an officer is shot at, the suspect throws down his gun and is no longer armed.  The officer in that example was not authorized to use lethal force against the suspect when he was no longer armed.  In this case Ms. Henderson, who had never fired her gun at any time, and was clearly no longer armed when she is fatally shot to death.


**<u>My Qualifications to Review this Case:</u>**

My opinions are based in part on my training, professional experience and education.  I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD).  I was hired on December 1, 1965, and I retired from active service on March 31, 1993.  My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant.  I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties.  Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and

administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals.  I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption.  The majority of our cases were homicide cases, including the murder of police officers.  Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings.  We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations.  These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations.  In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1450 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents.  From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous.  Some were apprehended during the course of their crimes and were very prone to use firearms to

escape apprehension.  This record of excellence was accomplished through the use of proper tactics,

management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, and New York.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Idaho, Montana, North Carolina, Oregon, Kentucky and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my exv. Cpert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael*

*Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.*  No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court.  My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna, et al.*  No. 14-15098 (for publication)

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006).  The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography).  On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certification as an expert in the general use and deployment of the TASER

weapon occurred in San Francisco, California on January 29, 2015 in *Andre Little, an Individual, v. City of Richmond, et al.*, Case No: CV-1302067-JSC.  There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct.  Executed December 23, 2016 at Santee, CA.

Roger A. Clark

Page 23 of  23

# EXHIBIT P

**In the Matter Of:**

I.A. and C.S. vs. CITY OF EMERYVILLE, et al.,

**ROGER CLARK**

*January 11, 2017*

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland** ✦ **San Francisco** ✦ **San Jose** ✦ **Los Angeles**

877.451.1580

www.aikenwelch.com



```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3                            ---oOo---

 4   I.A. and C.S., the minor
     children of YUVETTE HENDERSON,
 5   deceased, by CRAIG SALMOND, as
     guardian ad litem, and DENISE
 6   HENDERSON,

 7        Plaintiffs,

 8   vs.                              No. 4:15-cv-04973-DMR

 9   CITY OF EMERYVILLE; MICHELLE
     SHEPHERD, individually and in
10   her official capacity as police
     officer for the City of
11   Emeryville; and WARREN WILLIAMS,
     individually and in his
12   capacity as a police officer for
     the City of Emeryville; JACORA
13   HENDERSON,

14        Defendants.
     _____/
15

16                 DEPOSITION OF ROGER CLARK

17

18

19        Taken before Catherine M. Meyer, RPR, CSR

20                     CSR No. 11596

21                   January 11, 2017

22

23              Aiken Welch Court Reporters
                One Kaiser Plaza, Suite 250
                Oakland, California 94612
24           (510) 451-1580/(877) 451-1580
                  Fax:  (510) 451-3797
25                 www.aikenwelch.com
```

1    someone who has a gun in their hand?

2        A.  Well, that's exactly why they're trained about

3    tactics and cover because you don't want to give up that

4    kind of an advantage.  So we are trained and have been

5    trained ever since I can remember about what's called --

6    in my day it's called lag time, L-A-G time.

7        Q.  The fact -- the second point that you raise as

8    a bases, "The fact that Ms. Henderson had not fired her

9    gun at anyone or harmed anybody with the gun up until

10   the time the officers decided to use lethal force," was

11   that something that's taught in the police academy under

12   the learning domains or in any advanced officer best

13   practices courses that there must be a victim of a

14   violent crime before an officer can take or use lethal

15   force?

16       A.  Not per se, but it looms large in the totality

17   of the circumstances and is part of what the officer

18   would be reacting to.  And my training and what I

19   consider to be correct is an officer coming to someone

20   with a gun, the very first thing is have any shots been

21   fired, is anybody hurt.

22       Q.  I understand.  Can you cite to any best

23   practices courses either through IACP or under POST or

24   any cases you've been cited to in case authority as an

25   expert where an officer may not use lethal force against

1    someone in the absence of a victim existing where lethal

2    force was used against the victim by the suspect?

3        A.  It's answered, as I understand your question,

4    in something around page 3 of chapter three where it

5    says that the use of lethal force is the most serious

6    decision an officer could make in his career, the

7    expression my words, and that it's only in the direst of

8    circumstances, and that's a quote from POST, and only

9    absent obvious reasonable alternatives.  So that's the

10   way I would answer your question as you put it to me.

11       Q.  They did not shoot at her when she was fleeing;

12   do you agree or disagree with that?

13       A.  I agree.  When she was running down Hollis

14   Street?

15       Q.  Right.

16       A.  No, they didn't shoot at her.

17       Q.  And you're speculating that her intent was only

18   to flee based upon the fact that she was running away

19   from Home Depot and away from the officers; is that

20   correct?

21       A.  It's not speculation.  It's what her body was

22   doing.  That's what she was doing.  She was avoiding the

23   officers and trying to get away from the scene.

24       Q.  Would you agree that you have been as a police

25   officer, as a detective, as a supervisor and in your

1  did not give additional warnings when Ms. Henderson was

2  on the ground wounded before he fired the fatal shot.

3  Officer Williams' failure in this regard was a violation

4  of policy, training and law as taught to all POST

5  certified officers."

6            So going back, we've discussed what, if any,

7  warning when feasible was given and to what extent a

8  warning or shouts were directed at Ms. Henderson.  What

9  I am curious about here, and see if you can answer this

10  question, when you say they further did not act

11  reasonably when they did not give her sufficient time to

12  comply with their shots to drop the gun and get on the

13  ground, are you distinguishing that the time allowed or

14  if we take the eight to 12 seconds timeline that Officer

15  Williams as he described it coupled with the ShotSpotter

16  of approximately six and a half, could have been longer,

17  could have been shorter I suppose because it was

18  marginalized, from that first shot there was not enough

19  time then rendered to her to give up by dropping the

20  gun, to put her hands in the air and dropping the gun

21  and getting on the ground?

22       A.  It was not enough time.  Well, here's the

23  fundamental purpose for the number two is a warning or

24  an order given that is not -- does not give time to

25  comply is tantamount to no warning.

```
 1                  REPORTER'S CERTIFICATE

 2

 3

 4          I, CATHERINE M. MEYER, a Shorthand Reporter,

 5   State of California, do hereby certify:

 6          That ROGER CLARK, in the foregoing deposition

 7   named, was present and by me sworn as a witness in the

 8   above-entitled action at the time and place therein

 9   specified;

10          That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and

14   that the foregoing transcript constitutes a full, true

15   and correct report of said deposition and of the

16   proceedings that took place;

17          That before completion of the proceedings,

18   review of the transcript [^ ] was [ X ] was not

19   requested.

20          IN WITNESS WHEREOF, I have hereunder subscribed

21   my hand this 13th day of January 2017.

22

23   _____

24          CATHERINE M. MEYER, CSR NO. 11596
            State of California

25
```

# EXHIBIT Q

# In the Matter Of:

## I.A. and C.S. vs. CITY OF EMERYVILLE, et al.,

---

# PAUL HERRMANN, M.D.

*January 12, 2017*

---

**Court Reporters, Videography, Trial Preparation**

**Videoconference Center**

**Oakland ◆ San Francisco ◆ San Jose ◆ Los Angeles**

**877.451.1580**

**www.aikenwelch.com**



1              UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                      ---o0o---

4   I.A. and C.S., the minor
    Children of YUVETTE HENDERSON,
5   Deceased, by CRAIG SALMOND, as
    Guardian Ad Litem, and DENISE
6   HENDERSON,

7           Plaintiffs,

8   vs.                           No. 4:15-cv-04973-DMR

9   CITY OF EMERYVILLE; MICHELLE
    SHEPHERD, individually and in
10  her official capacity as police
    Officer for the City of
11  Emeryville; and WARREN WILLIAMS,
    individually and in his
12  capacity as a police officer for
    the City of Emeryville; JACORA
13  HENDERSON,

14          Defendants.

15  _____/

16

17         DEPOSITION OF PAUL W. HERRMANN, M.D.

18           (Pages 1 through 24, inclusive)

19          Taken before VALERIE L. PADILLA

20                 CSR No. 3081

21                January 12, 2017

22

            Aiken Welch Court Reporters
23          One Kaiser Plaza, Suite 250
            Oakland, California 94612
24        (510) 451-1580/(877) 451-1580
               Fax: (510) 451-3797
25             www.aikenwelch.com

1      Q.  And do you know offhand when it was updated or

2   last updated?

3      A.  Oh, I think it was around 2016.  It says revised

4   in 2008 but I think I've done it since then, but at least

5   by 2008.

6      Q.  Now, did you perform an autopsy on Yuvette

7   Mitchell Henderson, the decedent in this case?

8      A.  Yes, I did.

9      Q.  And do you have a sense of how it was that

10   you -- how you came to be asked to perform that autopsy?

11      A.  Well, I was at the coroner's office that day and

12   it's just one of the cases that came in so I did it.  I

13   don't think there was any particular reason I did it.

14      Q.  And what was the purpose of performing an

15   autopsy in this case?

16      A.  Well, to determine the cause of death and to

17   gather any evidence that might be present on the body.

18         MR. SIEGEL:  Let me mark as Exhibit 2 a copy of

19   what I believe to be the autopsy protocol and findings in

20   this case.

21         (Plaintiff's Exhibit No. 2 was marked for

22          identification.)

23         MR. ALLEN:  It's the one dated February 9th?

24         MR. SIEGEL:  Yes.  Do you need a copy?

25         MR. ALLEN:  If you have an extra, I'll just take

1    a quick look.

2    BY MR. SIEGEL:

3        Q.  Is Exhibit 2 a true copy of the autopsy report

4    in this case?

5        A.  I believe it is.

6        Q.  And was one of your reasons for performing the

7    autopsy in this case to determine the cause of death of

8    Ms. Henderson?

9        A.  Yes.

10       Q.  And did you make such a determination?

11       A.  Yes.

12       Q.  And what was your determination?

13       A.  She died of multiple bullet wounds.

14       Q.  Do you have an understanding as to how many

15   bullet wounds Ms. Henderson suffered?

16       A.  Well, let's see, she had -- she had six

17   different wounds, a passage into her body six times.

18           Actually, two of those are probably in and out,

19   so it's probably five times.  She had many, many wounds

20   that were caused by shrapnel.

21       Q.  Right.  I see.  So there was one instance of an

22   in and out --

23       A.  Well --

24       Q.  -- is that what you're saying?

25       A.  -- there was more than one in and out.  She was

1   shot in the head.  That bullet went in and came out, a

2   small fragment remained.

3            She was shot in her arm.  That went all the way

4   through her arm.

5            And she had two shots to the right side of her

6   chest, but those could very well be from the exit wound

7   in her arm so they may not be separate bullet wounds and

8   neither one of those penetrated very deeply into her

9   body.

10           And she had a definite bullet wound of her back.

11  And so there are three definite bullet wounds, entry

12  wounds, and then there are these other wounds that may or

13  may not be -- there may or may not be another entry

14  wound.  But I doubt it, I think they're probably the

15  result of a bullet passing through her arm.

16       Q.  Do you have an opinion as to the order, the

17  temporal order of the three bullet wounds?

18       A.  No, I don't.  No.

19       Q.  Is there any way that you could determine which

20  of those bullet wounds occurred first?

21       A.  Well, there isn't any way to really determine.

22  Obviously, the gunshot wound of her head would have

23  dropped her immediately, which may mean that that was not

24  the first shot because if she dropped immediately, there

25  may not have been further shots, but, you know, that's

1  pure speculation.

2      Q.  In the course of your autopsy, did you just, by

3  convention, label the bullet wounds with numbers?

4      A.  Yes.

5      Q.  And which bullet wound did you label as number

6  one?

7      A.  It's the bullet that entered her head right

8  below her ear.

9      Q.  And could you describe any more particular than

10  that, than the fact that it entered her head below her

11  ear?

12      A.  No.  The entry wound was a pretty standard small

13  entry wound.  This bullet passed into her head and caused

14  a great deal of damage to her skull, so there's other

15  wounds in her scalp and her head, but that was the entry

16  wound.

17      Q.  And I believe you mentioned earlier that there

18  was also an exit wound from that bullet?

19      A.  Yes.  Yes.  That bullet passed through her head.

20  There were very large wounds in her head, one of which is

21  probably where the bullet came out and another which is

22  probably where the fragments of bone came out of her

23  skull and tore the skin, but I believe the exit wound is

24  probably the lower one on the right side of her face.

25      Q.  Based upon the entry and exit wound from the

1   first bullet, how would you describe the trajectory of

2   that bullet after it entered Ms. Henderson's head?

3        A.   Well, it's going from her right to her left and

4   entered below her right ear.  It's going upward to some

5   degree.  I can't tell you exactly how much because the

6   wounds were very large in the side of her head and

7   they're not going very much toward the front or the back,

8   I would say it's primarily from right to left and upward.

9        Q.   And do you have an opinion, based on the

10  trajectory of that bullet wound, as to from what

11  direction the bullet was fired that caused that wound?

12       A.   Well, all I can tell you, it was coming from her

13  right, the right side of her head.  I don't know.  She

14  could have turned her head so the gunshot wound could be

15  nearly in front of her.  I can't tell you where it was

16  coming from, all I can tell you is the direction it took

17  in her head.

18       Q.   Can you tell us whether the bullet was fired

19  from above her head at the time it hit her?

20       A.   No, I can't tell you.

21       Q.   Can you tell whether she was on the ground at

22  the time that bullet hit her head?

23       A.   No, I can't tell you that, either.

24       Q.   Was there any debris at the entry point of that

25  bullet wound that would indicate that the bullet had

1   passed through any other substance or objects before

2   hitting her head?

3       A.   Not that I could tell.  As I said before, she

4   has a great deal of shrapnel which had struck her body,

5   but that bullet wound itself actually looked like a

6   pretty pristine bullet wound.  I doubt that that one

7   passed through anything first.

8       Q.   Do you have an opinion as to whether that bullet

9   wound, in and of itself, was sufficient to cause Ms.

10  Henderson's death?

11      A.   It was.

12      Q.   Assuming, for purposes of this question, that

13  the person who fired that bullet testified that Ms.

14  Henderson was actually lying down or was on the ground at

15  the time he fired that bullet at her, would that be

16  consistent with your findings regarding the bullet wound?

17      A.   It is, yes.  I couldn't rule that out as a

18  possibility.  Obviously the right side on her head would

19  have to be up or in a position where the bullet could

20  enter it.  She could be lying on her right side.

21      Q.   Got it.

22           Let's talk about the second bullet wound.

23      A.   The second bullet wound's on the outside of her

24  left upper arm.  I'm sorry, her right upper arm.  And

25  that bullet passed through her arm in front of the

1  humorous, in front of the bone, and it did not fracture

2  the bone but then it exited the skin on the inside of the

3  arm, a rather large exit wound.

4         That wound was also associated with a lot of

5  small wounds around it, suggesting to me that that bullet

6  may have passed through something before it struck her.

7      Q.  Is it possible that that bullet may have struck

8  the ground before it hit her?

9      A.  I don't -- I don't believe -- well, you'd have

10  to tell me how she's lying on the ground to answer the

11  question completely, but I don't think that that's

12  likely.

13      Q.  Was there any debris around the entry point of

14  that bullet wound that suggested the bullet may have hit

15  something or picked up anything?

16      A.  Yes, there were a lot of small shrapnel wounds

17  on the outside of the arm and the back of the arm had

18  some very large ones.  Something had struck the skin in

19  the back of her arm, as well.  These are all in the area

20  of that gunshot wound in the arm, so, for that reason, I

21  suspect that bullet passed through something before it

22  struck her.

23      Q.  Do you have any opinion as to what it may have

24  passed through?

25      A.  No.  I didn't find any material that I could

1    definitely identify, at least I don't think I did.  I was

2    given information that it may have passed through

3    automobile glass, but I don't believe I actually saw any

4    glass embedded in the skin.

5            No, I didn't find anything embedded there that I

6    could identify.

7        Q.  Were you able to make a determination as to

8    whether the weapon that discharged that bullet, in what

9    direction it was pointed; that is, up or down, with

10   respect to her body?

11       A.  It was going pretty much just right to left.

12       Q.  And is that consistent with Ms. Henderson being

13   in an upright position when that bullet hit her?

14       A.  She could have been.

15       Q.  Could she also have been on the ground?

16       A.  She could be on the ground if she's lying in

17   such a way that the bullet can enter there.

18       Q.  And was there debris associated with the entry

19   of that bullet or the exit or both?

20       A.  There's nothing around the exit.  The debris was

21   scattered all over her arm, whatever it was.  Bullet

22   fragments, fragments of something else that the bullet

23   passed through, I couldn't tell.  It's probably something

24   that the bullet passed through.

25       Q.  In your report you make reference to the fact

1    that there was broken automobile glass attached to Ms.

2    Henderson's shirt.

3          A.  I don't recall that.  Let me see that.

4          Q.  It's on page 2, lines 12 through 15.

5          A.  Oh, yeah.  Okay.  Yes.

6          Q.  So is that consistent with your opinion that the

7    bullet may have passed through glass before hitting Ms.

8    Henderson?

9          A.  Well, the glass could be there for another

10   reason.  I mean, a couple could have gone through the

11   glass and didn't strike her at all, but I think that the

12   shrapnel wounds on her are certainly consistent with

13   broken glass.

14         Q.  Do you have any opinions as to whether bullet

15   wounds one and two were caused by the same type of

16   bullet, same type of ordnance?

17         A.  The only thing I can say is that I believe that

18   both of them are quite consistent with a weapon with a

19   great deal of velocity, which would be a rifle, and they

20   both suggest rifle wounds.  Whether they're the same type

21   of rifle, I can't tell you.

22         Q.  Do you have an opinion as to whether the second

23   wound, in and of itself, could have been fatal in this

24   case?

25         A.  Well, it certainly could have been fatal because

1   it opened a very large wound in her arm from which she

2   would have bled a lot.  However, it is the kind of wound

3   that with proper treatment she could have survived in

4   contradistinction to the wound of her head, there's no

5   way she could survive that.

6       Q.  So you're saying with respect to the second

7   wound; that is, the wound to her arm, if she had received

8   prompt treatment, she could have survived that wound?

9       A.  It's possible.

10      Q.  Do you think it's just possible or probable or

11  likely?

12      A.  Well, I think that -- I think if someone had

13  applied a tourniquet to that arm, if that was all that

14  was wrong with her, to stem the bleeding, that she could

15  have gotten to the hospital and been treated.  I think it

16  was a survivable wound, but it's going to bleed a lot,

17  it's going to require a lot of treatment.

18      Q.  And do you have any opinion as to whether EMT

19  personnel would have the ability to apply a tourniquet of

20  that nature?

21      A.  Oh, they would have the ability, but I doubt

22  that they would do it in this case because of the wound

23  of the head.

24      Q.  Right.  But assuming there was no wound to the

25  head?

```
 1        A.  They would be able to do that.

 2        Q.  How about the third wound?

 3        A.  Well, there are -- there are two more bullet

 4   wounds on the right side of her chest which are in

 5   apposition to the wound in her arm and there's a track in

 6   the skin between these two wounds which are called wounds

 7   number three and four.  There's actually a track between

 8   bullet wound number four and bullet wound number three,

 9   so that I think that if a bullet fragment or the bullet

10   itself entered four and came out three just a few inches

11   away and involved only the skin, I suspect that those are

12   not from a pristine bullet but from a bullet fragment

13   because in further deep from bullet wound number four,

14   another fragment of bullet has passed deeper into the

15   tissues and I removed it from her chest just outside one

16   of her ribs.

17            I think that the likelihood is that the bullet

18   entered the arm, came out the arm, and then the bullet

19   was fragmented and a fragment hit her chest, a portion of

20   which came out, a portion of which went further into the

21   chest but did not enter the chest cavity.

22        Q.  And, in your opinion, are the entry wounds in

23   the chest consistent with their being made by fragments

24   of the bullet that went into her right arm?

25        A.  I think so.  They are also consistent with a
```

1    bullet that's been somewhat disrupted after passing

2    through the arm.  They do not really have the appearance

3    of a pristine bullet wound of the chest.  I think that

4    they probably came from the arm.

5        Q.  Do you believe that, standing alone, the wound

6    or wounds to Ms. Henderson's chest would have killed her?

7        A.  No, I don't believe they would.

8        Q.  So do you have an opinion, Dr. Herrmann, as to

9    whether had there not been the shot to her head, Ms.

10   Henderson could have survived her injuries?

11       A.  If she had gotten very prompt treatment, she

12   could have, yes.

13       Q.  And other than the head wound, is it your view

14   that the most severe wound she suffered was the wound to

15   her right arm?

16       A.  Yes.

17       Q.  And, as you said, with prompt and proper

18   treatment, she could have survived that?

19       A.  She could have.

20       Q.  So under these circumstances, would you concur

21   that it was the wound to Ms. Henderson's head that

22   assured that she would die as a result of these bullet

23   wounds?

24       A.  Yes, that would assure that she would die.

25           She also had another wound on her back,

1    incidentally, but it involved only the skin, the soft

2    tissue beneath it.

3        Q.  And what did you view -- what was your finding

4    with respect to that wound?

5        A.  Well, it's an entry wound in the skin that just

6    went just barely deep into the skin and came back out.

7    It has the appearance of a pristine bullet wound, a

8    bullet track rather than a bullet fragment, but I can't

9    be absolutely certain, it could be a bullet fragment.

10       Q.  And did that wound appear to be made by the same

11   type of weapon that made the earlier two wounds?

12       A.  I can't be sure.

13       Q.  So based on the entirety of your examination,

14   what is your best judgment as to the number of distinct

15   pristine bullets that actually hit Ms. Henderson?

16       A.  I would say it's three.  One to the head, one to

17   the arm, and one to the back.

18       Q.  And I take it from what you said, the wound to

19   the back would not have been fatal, in and of itself?

20       A.  Not at all.

21       Q.  Those are all the questions I have.

22           MR. ALLEN:  I have no questions.

23           MR. SIEGEL:  Short and sweet.  Okay.

24           THE WITNESS:  Very good.

25           (Time Noted:  11:29 a.m.)

```
1              REPORTER'S CERTIFICATE

2

3

4         I, VALERIE PADILLA, a Shorthand Reporter, State

5    of California, do hereby certify:

6         That PAUL W. HERRMANN, M.D., in the foregoing

7    deposition named, was present and by me sworn as a

8    witness in the above-entitled action at the time and

9    place therein specified;

10        That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and that

14   the foregoing transcript constitutes a full, true and

15   correct report of said deposition and of the proceedings

16   that took place;

17         IN WITNESS WHEREOF, I have hereunder subscribed

18   my hand this 15th day of January 2017.

19

20         _____
           VALERIE PADILLA, CSR NO. 3081
21         State of California

22

23

24

25
```

# EXHIBIT R

DALE L. ALLEN, JR., State Bar No. 145279
dallen@aghwlaw.com
KEVIN P. ALLEN, State Bar No. 252290
kallen@aghwlaw.com
ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:     (415) 697-2000
Facsimile:     (415) 813-2045

Attorneys for Defendants
CITY OF EMERYVILLE; MICHELLE SHEPHERD; and
WARREN WILLIAMS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.A. and C.S.,  the minor children of YUVETTE HENDERSON, deceased, by CRAIG SALMOND, as guardian ad litem, and DENISE HENDERSON,<br><br>                    Plaintiffs,<br><br>    v.<br><br>CITY OF EMERYVILLE; MICHELLE SHEPHERD, individually and in her official capacity as a police officer for the City of Emeryville; and WARREN WILLIAMS, individually and in his official capacity as a police officer for the City of Emeryville; JACORA HENDERSON,<br><br>                    Defendants. | Case No.: 4:15-cv-04973-DMR<br><br>**DEFENDANTS' CITY OF EMERYVILLE, MICHELLE SHEPHERD, AND WARREN WILLIAMS' DISCLOSURE OF EXPERT WITNESSES PURSUANT TO F.R.C.P. 26(a)(2)**<br><br>Hon. Donna M. Ryu<br><br>Trial:     May 15, 2017 |

Pursuant to *Federal Rule of Civil Procedure* 26(a)(2), Defendants CITY OF EMERYVILLE; OFFICER MICHELLE SHEPHERD; AND WARREN WILLIAMS (hereinafter collectively "Defendants"), hereby disclose the following retained and non-retained expert witness(es) they intend to call at trial, and the subjects about which they will testify:

///

///

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

EXPERT DISCLOSURE
4:15-CV-04973-DMR

141097.1

**Retained Experts**

1.      Steve Papenfuhs, Police Practices Expert, 3303 Palantino Way, San Jose, CA 95135; Telephone: (408) 621-3955.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

2.      Alex Jason, Forensic Criminologist, P.O. Box 375, Pinole, CA, 94564, Telephone: (510) 724-1003.

All documents required to be disclosed under FRCP 26(a)(2)(B) are attached.

3.      Defendants may also call any experts designated by plaintiffs I.A. and C.S.,  the minor children of YUVETTE HENDERSON, deceased, by CRAIG SALMOND, as guardian ad litem, and DENISE HENDERSON, and may designate other experts to rebut experts designated by Plaintiffs.

**Non-Retained Experts**

1.      Dr. Paul W. Herrmann, Alameda County Coroner's Pathologist, 480 4th Street, Oakland, CA, 94607-3829, Telephone: (510) 268-7300.

Pursuant to FRCP 26(a)(2)(C), Defendants provide the following information: Dr. Hermann is expected to testify as a pathologist, on the subject-matter of Plaintiff's death. A summary of his facts and opinions may be found in the coroner's report, previously provided as Bates-Stamp "COE (Henderson) 4011-4035."

2.      Sgt. Basa, # 7818, Primary Major Crimes Investigator for the Oakland Police Department, 455 7th Street, Oakland, CA, 94607; Telephone: (510) 238-3455

///

///

///

///

///

///

///

///

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

2

141097.1

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

1    Pursuant to FRCP 26(a)(2)(C), Defendants provide the following information: Sgt. Basa is

2    expected to testify as crime investigator, on the subject-matter of the shooting and his

3    investigation therein. He will testify to the shooting of Ms. Yuvette Henderson being a reasonable

4    and appropriate use-of-force.

5

6

7                                    Respectfully submitted,

8    Dated:  December 23, 2016        ALLEN, GLAESSNER,
                                      HAZELWOOD & WERTH, LLP

9

10   By: _____
                                      DALE L. ALLEN, JR.
11                                    KEVIN P. ALLEN
                                      Attorneys for Defendants
12                                    CITY OF EMERYVILLE; MICHELLE
                                      SHEPHERD; and WARREN WILLIAMS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        3                          EXPERT DISCLOSURE
                                                                   4:15-CV-04973-DMR

141097.1

1    I am a resident of the State of California, over 18 years of age and not a party to the

2    within action.  I am employed in the County of San Francisco; my business address is: 180

3    Montgomery Street, Suite 1200, San Francisco, California 94104.  On December 23, 2016, I

4    served the within: **DEFENDANTS' CITY OF EMERYVILLE, MICHELLE SHEPHERD,**

5    **AND WARREN WILLIAMS' DISCLOSURE OF EXPERT WITNESSES PURSUANT**

6    **TO F.R.C.P. 26(a)(2)** on all parties in this action, as addressed below, by causing a true copy

7    thereof to be distributed as follows:

8    SEE ATTACHED SERVICE LIST

9

10   ☒   **By United States Mail:**  I enclosed the document in a sealed envelope or package addressed to
         the persons at the addresses listed above and placed the envelope/package for collection and mailing,
11       following our ordinary business practices.  I am readily familiar with this business's practice for
         collecting and processing documents for mailing.  On the same day that the document is placed for
12       collection and mailing, it is deposited in the ordinary course of business with the United States Postal
         Service, in a sealed envelope with postage fully prepaid.  I am aware that on motion of the party served,
13       service is presumed invalid if postal cancellation date or postage meter date is more than one day after
         the date of deposit for mailing an affidavit.
14
         I am a resident or employed in the county where the mailing occurred.  The envelope or package was
15       placed in the mail at San Francisco, California.

16   ☐   **By Fax Transmission:**  Based on an agreement of the parties to accept service by fax
         transmission, I faxed the documents to the persons at the fax numbers listed above.  No error was
17       reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed
         out, is attached.
18
19   ☐   **By Overnight Delivery:**  I enclosed the document(s) in an envelope or package provided by an
         overnight delivery carrier and addressed to the persons listed above.  I placed the envelope or package
20       for collection and overnight delivery at an office or a regularly utilized drop box of the overnight
         delivery carrier.

21   ☐   **By E-Mail or Electronic Transmission:**  Based on a court order or an agreement of the
         parties to accept service by email or electronic transmission, I caused the documents to be sent to the
22       persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the
         transmission, any electronic message or other indication that the transmission was unsuccessful.
23
24   ☒   **_(FEDERAL)_**  I declare under the laws of the United States of America that I am
         employed in the office of a member of the Bar of this court at whose direction the
25       service was made and that the foregoing is true and correct.

26       Executed on December 23, 2016, at San Francisco, California.

27
                                    Danielle Costes
28                                  _____
                                    Danielle Costes

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

EXPERT DISCLOSURE
4:15-CV-04973-DMR

141097.1

1

## SERVICE LIST

2

3    Dan Siegel                          Attorneys for Plaintiff
      Siegel & Yee                        Telephone:  (510) 839-1200
3     499 14th Street, Suite 300          Facsimile:  (510) 444-6698
4     Oakland, CA 94612                   E-Mail:  dansiegel@siegelyee.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ALLEN, GLAESSNER, HAZELWOOD & WERTH, LLP
180 Montgomery Street, Suite 1200
San Francisco, California 94104

5

141097.1

# EXHIBIT S

Steve Papenfuhs
3303 Palantino Way
San Jose, CA. 95135
Phone:  (408) 621-3955
Pappysjpd@yahoo.com

December 20th, 2016

Mr. Dale Allen
Attorney at Law
Allen Glaessner Hazelwood Werth
180 Montgomery St., Suite 1200
San Francisco, CA. 94104

Re:  Henderson v. City of Emeryville case 4:15-CV-04973-DMR

Dear Mr. Allen,

In accordance with the Federal Rules of Civil Procedure 26(a)(2)(B), the following report presents my preliminary opinions in reference to the above cited case.  I understand that additional discovery may be made available to me for further review and analysis after which I will provide a supplement to this report as necessary.

Sincerely,

Steve Papenfuhs

1                  **Henderson v. City of Emeryville**
2                  **United States District Court**
3                  **Northern District of California**
4                  **Case # 4:15-CV-04973-DMR**

5
6                  **Expert Witness Report of Steve Papenfuhs**
7    */////*

8           My name is Steve Papenfuhs and I have been retained by Mr. Dale Allen to review the
9    material and information provided in this case, and offer objective opinions concerning the actions
10   of Officers Warren Williams and Michelle Shepherd of the City of Emeryville Police Department
11   which occurred on February 3rd, 2015.

12          Case documents and other materials considered in this case are listed in Attachments "A."
13   A summary of my qualifications are included in Attachment "C." A list of other cases in which I
14   have testified at trial or by deposition during the previous four years is included in Attachment
15   "D." My CV is included in Attachment "E." A list of my publications authored in the previous
16   ten years is included in Attachment "F." A statement of compensation to be paid for study and
17   testimony in this case is included in Attachment "G."
18   *////*

19   **Facts and Data Considered, and Methodology Used When Forming My Expert Opinion**

20          In forming my opinions in this case, I began with an objective and impartial review of, and
21   consideration for, the documents and materials that are specific to this case as listed in Attachment
22   "A". I then compared those facts against secondary sources representing standard law enforcement
23   training, practices, and procedures.  Where practicable, peer-reviewed literature and other
24   publications have been used as secondary sources. I have also drawn on the totality of the materials
25   I have read, studied, and examined, as well as the experiences and instruction I have had and/or
26   provided to law enforcement over the entire course of my career.  The materials listed herein are
27   the type upon which I and others in my profession rely when examining the events surrounding a
28   law enforcement response and in forming opinions and conclusions regarding the matters
29   addressed herein.

30          In order to stay current in the field of standard law enforcement training, practices, and
31   procedures, I maintain memberships in the International Association of Chiefs of Police, the
32   National Tactical Association, the California Association of Tactical Officers, the Illinois Tactical
33   Officers Association, the Peace Officers Research Association of California and the Human
34   Factors and Ergonomics Society.

35          I research and study law enforcement use of force and/or force response and other tactical
36   issues by accessing news reports on a regular basis.  When possible I engage in discussions and
37   debriefings with officers and trainers about law enforcement policy, procedure, practices, and
38   tactics.  I remain current in my field by providing California Commission on Peace Officer
39   Standards and Training (POST) certified Force Option Simulator Training, as well as having
40   served on POST committees and research projects.

41          This is a preliminary report as I understand discovery in this case continues, and I will
42   supplement my testimony (possibly even modify or amend my opinions) if I am requested to
43   consider new information by counsel or the court.
44   *////*

<div align="center">**Incident Overview**</div>

According to reports, statements and other case materials, on February 3rd, 2015 between approximately 1124 and 1128 hours, Ms. Yuvette Henderson (DOB 3/17/76, age 38) and Mr. Lee James Graham (DOB 3/17/83, age 31) entered the Home Depot store located at 3838 Hollis Street, Emeryville CA. 94608. After making a return they entered the main areas of the store. Home Depot loss prevention officers observed Henderson and Graham engage in activity that caused them to believe that they were planning on committing a theft of property.[1,2]

Upon departing the store at approximately 1232 hours with property concealed and unpaid for, Ms. Henderson and Mr. Graham were contacted by Home Depot loss prevention officers Jorge Figueroa, Antonio Gutierrez, and Todd Freeman.[3,4] Store security personnel attempted to detain and handcuff Ms. Henderson.[5] At that point she became resistive and ultimately fell to the ground claiming that she hit her head. At about that time she requested an ambulance. Mr. Graham assisted Ms. Henderson to her feet.

Loss prevention officer Jorge Figueroa called Emeryville Police Department at approximately 1235 hours and reported that he was attempting to detain an uncooperative female theft suspect in front of the Home Depot. Figueroa described the suspect as a black female adult and stated that she would not go back into the store with the security personnel.[6] The dispatch personnel assigned the call to Officer Shepherd (unit 351), and Officer Williams (unit 346) also advised that he was en-route.[7]

While Officers Shepherd and Williams were en-route to the call, Figueroa notified EPD dispatch that Ms. Henderson was requesting medical aid because she had struck her head. Dispatch advised Officer Shepherd of this new detail and she acknowledged that update by stating, "All right. Get that rolling then."[8,9]

*At approximately 12:40 hours, RTO Booze took over radio broadcast (from trainee Nelson) and broadcast that security reported that the suspect pulled a gun out and that she was running. Officer M. Shepherd requested a description of the suspect.[10]*

While Figueroa notified the dispatcher that Ms. Henderson was "combative," that information was not broadcast to Officers Shepherd or Williams. The initial information included only that she was "uncooperative," and then that she was requesting an ambulance.[11]

Officer Shepherd arrived in the area of the Home Depot store at approximately 1241 hours and observed Figueroa, whom she recognized as a loss prevention officer, standing on the east

---

[1] Emeryville PD narrative report #1502-0259, page 1 of 3; Bates 0010.
[2] Alameda County District Attorney Report pages 3-5; Bates 0549-0551.
[3] Emeryville PD narrative, page 1; Bates 0010.
[4] Alameda County DA page 5; Bates 0551.
[5] Oakland PD report #15-006467; Loss Prevention Officer Gutierrez written statement; Bates 0116.
[6] Emeryville PD Unusual Incident Report, page 2 of 5; Bates 0186.
[7] *Ibid.*
[8] Radio Dispatch, page 3 of 21, line 101; Bates 0156.
[9] Shepherd Deposition, page 25, lines 13-14.
[10] EPD Unusual Incident Report, page 2 of 5; Bates 0186.
[11] *Ibid,* Emeryville PD, page 4 of 5; Bates 188.

1   sidewalk of Hollis by the Home Depot[12]. Figueroa was pointing S/B on Hollis and saying, "She's
2   running."[13]
3
4       *12:41 hours, Officer M. Shepherd broadcast that the suspect was running southbound on*
5       *Hollis St., approaching the overpass, a female Black wearing a grey shirt, blue jeans and*
6       *hair in a ponytail. Officer W. Williams advised that he increased his response to Code 3.*
7       *RTO Booze broadcast that the suspect's gun was a black revolver.[14]*
8
9       Officer Shepherd observed Ms. Henderson running S/B on the east sidewalk of Hollis
10  Street.   She then observed Ms. Henderson run towards an AC Transit bus that was N/B in the
11  northbound lanes of Hollis St. and attempt to flag it down.  Although there is no stop sign, the
12  bus came to a stop, likely because the driver observed both Officer Shepherd and Ms. Henderson.
13  Officer Shepherd could see the gun in one of Ms. Henderson's hands as she approached the bus.[15]
14  Officer Shepherd crossed into the N/B lane and came to a stop in front of the bus.
15      Surveillance video on the AC Transit bus showed Ms. Henderson approach the bus from
16  an N/E direction and attempt to flag down the bus (Camera 5).  Video within the bus also indicated
17  that the driver of the bus noticed Ms. Henderson and gestured towards her (Cameras 1 and 9).
18  The forward looking camera (Camera 5) reflects Officer Shepherd's SUV driving S/B in the S/B
19  lane, then cross over and come to a stop at an angle in front of the bus facing generally S/E in the
20  N/B lane of Hollis St.  It was at this time that Officer Shepherd lost control of her pistol as it fell
21  to the right front floorboard of the vehicle.
22      Ms. Henderson continued past the transit bus on the east and right side of the vehicle
23  continuing S/B.  This action was captured by several of the cameras mounted in the bus (Cameras
24  1, 2, 3, 4, 6).  After reaching the rear of the bus, Ms. Henderson ran towards a green Nissan Versa
25  (Victim John Marlette) that was driving N/B in the northbound lane immediately behind the Transit
26  bus.  Mr. Marlette observed Ms. Henderson approaching his vehicle as he was yelling,
27  "Hey, hey" to Mr. Marlette.  Ms. Henderson crossed W/B in front of his vehicle and then
28  approached the driver's door.  As Ms. Henderson said something to Mr. Marlette (he is not sure
29  what was said), he noticed that she was pointing a dark short barrel revolver at him.[16,17,18]  Mr.
30  Marlette was in fear of his life at this moment.  Mr. Marlette then noticed Officer Shepherd's
31  SUV which he described as being within eight feet of his vehicle.  Immediately thereafter, Ms.
32  Henderson ran away S/B on Hollis St.  He observed Officer Shepherd's SUV also drive S/B.
33  (Video from camera 7 on the bus depicts the action of Ms. Henderson approaching Mr. Marlette's
34  vehicle).  Mr. Marlette then pulled his vehicle to the east side of the roadway and stopped.
35      Officer Shepherd observed Ms. Henderson approach Mr. Marlette in his vehicle with the
36  gun in her (Ms. Henderson's) hand as she yelled at him.  Officer Shepherd believed that Ms.
37  Henderson was attempting to carjack Mr. Marlette's vehicle.  Officer Shepherd then observed Ms.
38  Henderson flee and continue running S/B.
39      As Henderson created space from Officer Shepherd by her continued flight in a southbound

[12] Shepherd Deposition, page 22, lines 15-18.
[13] Ibid, page 24, lines 13-14.
[14] EPD Unusual Incident Report page, 2 of 5; Bates 0186
[15] Emeryville PD administrative investigation page 17, Bates 535
[16] Shepherd OIS interview, Bates 0203.
[17] Emeryville PD supplemental report, page 6 of 8, Bates 0020.
[18] Photo, Bates 0175 depicts Henderson at driver's door of Marlette's vehicle with possible handgun

1    direction, Officer Shepherd used that opportunity to stop at the west curb of S/B Hollis, exit her
2    car, move to the passenger side front door, and retrieve her firearm.[19]
3           Officer Williams arrived at Officer Shepherd's location driving C-3 S/B on Hollis St. with
4    his lights and siren activated.  He came to a stop next to Officer Shepherd's vehicle.  Via facial
5    expressions according to Officer Shepherd, Officer Williams was inquiring as to the location of
6    Ms. Henderson.
7
8           *Shepherd pointed southbound and used her handheld radio to put out that the woman was*
9           *running towards the storage units with a gun in hand.*[20]
10
11          Henderson continued running S/B on the east sidewalk of Hollis.  After their brief
12   interaction, Officers Shephard and Williams continued their pursuit of Ms. Henderson.  Officer
13   Williams was the lead vehicle S/B on Hollis with Officer Shephard following closely behind.[21]
14          Ms. Henderson went past the ExtraSpace Storage office and parking area located at 3406
15   Hollis St, Oakland, and then approached Mr. Clausen as he was in the driver's seat of his pickup
16   truck parked at the south end of the parking lot of the storage facility.  The vehicle was parked
17   facing generally N/E in a diagonal position across the east sidewalk of Hollis.  After approaching
18   him once, Ms. Henderson walked away S/B on Hollis only to return to his vehicle.  On her second
19   approach, Mr. Clausen noticed that she was armed with a revolver that she pointed at him.
20   Inclusive of the two approaches, Mr. Clausen described her as speaking rapidly, yelling at him,
21   and looking frantic.
22          Mr. Clausen noticed the two police vehicles approach and then observed Ms. Henderson
23   run towards a pillar where a silver or grey Ford Focus belonging to his friend, Russell Whitehead
24   was parked.  Mr. Clausen observed the two officers exit their vehicles with their weapons drawn
25   and he got out of his truck and moved behind it.  Mr. Clausen did not see the shooting although he
26   did hear gunshots.
27   ////
28   **Quoting from the Alameda County District Attorney's report regarding the particulars of**
29   **the Use of Force:**
30
31          Officer Sheppard drove her vehicle south on Hollis Street and parked her
32          vehicle near the suspect. She was south of the suspect. Officer Williams drove his
33          vehicle south on Hollis Street and parked his vehicle near the suspect north of Officer
34          Sheppard's location. Both officers exited their vehicles. Ms. Henderson ran from the
35          passenger side of Mr. Clausen's pick-up truck into the carport area of the storage
36          company, with the gun still in her hand. Officer Sheppard exited her vehicle with her
37          service handgun drawn. Officer Williams exited his vehicle with his service rifle
38          deployed.
39          Surveillance video footage from 3421 Hollis Street showed Mr. Clausen's pick-
40          up truck and the portion of Hollis Street near where the truck was parked.  The video
41          footage showed Ms. Henderson approaching the passenger side of Mr. Clausen's truck.
42          The video footage showed Officer Sheppard's EPD SUV patrol vehicle drive south
43          past Mr. Clausen's truck and stop on Hollis Street. Officer Williams's EPD patrol

---

[19] Observed by Wit John Reible, Alameda County DA report page 2, Bates 0572.
[20] *Ibid*, Emeryville PD Admin Invest. P. 17
[21] *Ibid*, Emeryville PD

vehicle was behind Officer Sheppard's vehicle. Officer Williams stopped on Hollis Street, north of Officer Sheppard's location. As the police vehicles stopped, the video footage showed Ms. Henderson travel north, away from the passenger side of Mr. Clausen's truck and out of camera view as she entered the carport area of the storage company. Officer Sheppard and Officer Williams exited their patrol vehicles and ran toward Ms. Henderson's location. The video footage appears to confirm that both officers had their weapons drawn. Officer Sheppard ran behind (or south of) Mr. Clausen's truck. Officer Williams ran in front of (or north of) Mr. Clausen's truck. Mr. Clausen can be observed in the video footage getting out of the driver's side of his truck and moving to the back of his truck.  Both Officer Sheppard and Officer Williams leave camera view. No part of the shooting is captured on the surveillance video footage from 3421 Hollis Street.

     Officer Sheppard radioed dispatch to advise that Ms. Henderson was in front of the storage unit on Hollis Street. Shortly thereafter, over dispatch, Officer Sheppard can be heard saying "drop the gun." Officer Sheppard's next contact with dispatch was to report "shots fired, shots fired." She then requested medical assistance.  "Shots fired" was reflected on the EPD dispatch record at "12:42:48" p.m.  Medical assistance was reflected on the EPD dispatch record at "12:42:56" p.m.

     As soon as he exited his patrol vehicle, Officer Williams commanded the suspect to "get on the ground, get on the ground." As soon as she exited her patrol vehicle, Officer Sheppard commanded the suspect to "drop the gun." Ms. Henderson ignored the commands of both officers.  She neither got on the ground nor dropped her gun. Instead she approached a four-door silver Ford Focus that was parked in a parking space in the carport of the storage facility.  The car belonged to Russell Whitehead and Mr. Whitehead was inside his car.

     According to Officer Sheppard, she approached the suspect at an angle and attempted to use a pillar in the carport area for cover. She said that the suspect's hands were moving.  She said that the suspect's focus appeared to be on Officer Williams, who Officer Sheppard knew was to her left. She said that despite the police commands, the woman was still holding the gun, up near her chest, and was moving her arms around and moving the gun around. Officer Sheppard stated that she heard a gunshot. She said she did not know if the shot was fired by the suspect or Officer Williams, but was afraid that the woman had just shot Officer Williams.

     Officer Sheppard stated that she feared for Officer Williams's safety as he was in front of the suspect. She said that the suspect was facing Officer Williams and that the suspect was pointing her gun toward Officer Williams. Although Officer Sheppard could not see Officer Williams directly, she knew Officer Williams was to her left and she could see him in her peripheral vision. Officer Sheppard fired a single shot at the suspect using her department-issued Smith & Wesson MMP .40 caliber semi-automatic handgun. She said she fired the gunshot "immediately" after hearing the first gunshot. She said she fired because she feared for Officer Williams' life. Officer Sheppard said she was scared, for both her safety and Officer Williams's safety.  She said that it did not appear that her [Officer Sheppard's] gunshot had any effect on the suspect other than it appeared the suspect moved closer to the parked vehicle. She said that the woman was still holding the gun.

Officer Sheppard said after she shot she saw movement in the parked car in front of her, and near where the suspect was located, and she could tell that there was someone in the driver's seat of the parked car. The person inside the vehicle was in between Officer Sheppard and the suspect. Officer Sheppard stated that she did not want to jeopardize the man's life and so she stopped shooting and went to the other side of the pillar. She said at this time she heard Officer Williams fire another shot or two. Officer Sheppard said that she was moving to the back side of the parked car and she could see that Officer Williams used a rifle to shoot.  She said that by time she moved to the back side of the car the suspect was on the ground. Officer Sheppard stated that she could tell the suspect was deceased. She saw the suspect's revolver on the ground near the suspect.

According to Officer Williams, as Ms. Henderson was going into the carport he observed Ms. Henderson holding a gun with her right hand. He saw that the gun was a revolver. He said that at first she was holding the gun with the barrel pointed up, as Officer Williams described the suspect's arm at about a 90 degree angle. He stated that as she walked to Mr. Whitehead's car, the woman's arm holding the gun moved as she started to level the gun at him. Officer Williams stated that as Ms. Henderson was moving around the car, facing him, he was afraid that Ms. Henderson was going to shoot him as she started to point the gun in his direction.   He said he was afraid that he would be killed. As a result, Officer Williams said that as the suspect came around the parked car toward him and lowered the gun toward him, he fired two or three shots using his department-issued Colt AR-15 .223 caliber semi-automatic rifle at the suspect in rapid succession. He said that he remembered hearing  a shot that was not  in sequence with his trigger  pull and the gunfire that he heard sounded  like it came from south of his location.  He said he did not see Officer Sheppard fire her gun, but the sound he heard was consistent with coming from where he believed Officer Sheppard was located.  He did not observe any of these shots having any effect on the suspect.   He believed that he had missed the suspect.

Officer Williams described that after he fired at the suspect, the suspect was still moving around the front of Mr. Whitehead's car toward the driver's side of the vehicle. He said that the woman did nothing to surrender. He stated that he saw a man inside the car start to get out of the car and then duck or dive back inside the car. As Ms. Henderson came west around the car, advancing toward him, he stated that he fired two or three more shots because the woman was coming toward him, had lowered her gun, and he was afraid that she would shoot and kill him or the man in the car or anyone else in the area. Officer Williams stated that after these shots the woman fell to the ground towards him and that her gun fell next to her. He said he stopped shooting because she had fallen. He estimated that the gun was within three to five feet of her.  He stated that she started to move, as if trying to get up, and still posed a threat.  He explained that he was afraid that she would grab the gun and shoot him or the man in the car or someone on Hollis Street so he fired one or two more shots. He said she stopped moving and he did not fire any additional shots.

**Summary of Officer's involvement, objective observations and actions:**

As all law enforcement use of force is examined through the eyes of a reasonable officer on the scene *at the time the force was applied* and not with the benefit of 20/20 hindsight[22], the following are the objective observations as reported by Officer Williams and Shepherd as well as their reported actions to the objectively imminent threats[23] posed by Ms. Henderson.

////

**Officer Williams:**

Officer Williams was on duty at the time of the event and was dressed in blue 511 BDU (Battle Dress Utility) uniform. The uniform has Emeryville Police Department patches on both shoulders, an "Emeryville Police" star-shaped cloth badge over the left breast pocket, and his name and badge number over her right breast pocket. Officer Shepherd was wearing a leather police duty belt which included a holster that held his firearm, a magazine case with two spare magazines, two handcuff cases with handcuffs, a baton case with an expandable baton, an OC case with OC spray, a Taser holster and yellow Taser, and a radio pouch with a radio.

Officer Williams was driving a fully marked Ford Crown Victoria sedan, black with white front doors. The vehicle was equipped with emergency lighting, spotlights, and siren. Emeryville Police Department shields were displayed on the front driver and passenger doors and the unit ID number 0926 was posted on both front fenders just forward of the front doors.

Officer Williams' firearm was a .40 caliber Smith and Wesson M&P pistol, serial number DWJ1371. Additionally, Officer Williams was assigned a Colt AR-15 patrol rifle, serial number LB17216.

Officer Williams' firearm was a .40 caliber Smith and Wesson M&P pistol, serial number DWJ1706. Officer Williams had three magazines on his person at the time of the shooting- one in the magazine well of the .40 caliber Smith and Wesson M&P pistol, and two in the spare magazine case. Each magazine held 15 rounds and Officer Williams started his shift with a round in the chamber of his pistol. As a result, Officer Williams had 46 rounds of ammunition on him at the time of the shooting. OPD Technician Potter collected Officer Williams' duty pistol and the two extra magazines from his duty belt. OPD Technician Potter collected 45 rounds of ammunition from Officer Williams (15 from each extra magazine, 14 from the magazine in Officer Williams' pistol, and one round from the chamber of Officer Williams' pistol) at EPD. This was consistent with Officer Williams not firing his pistol, as well as being consistent with the recovery of only a single expended .40 casing from the shooting scene.

Officer Williams' rifle magazine has a 30 round capacity. However, he loads it with a total of 28 rounds. OPD Technician Potter collected Officer Williams's duty rifle at EPD, and recovered 22 lives rounds from the magazine which had been removed from the rifle at the scene. This was consistent with Officer Williams have fired 6 rounds from his rifle, as well as being consistent with the recovery of a 6 expended .223 caliber casings from the shooting scene.

////

---

[22] California Commission of Peace Officer Standards and Training (POST), LD-20, page 4-2.

[23] A threat is a capability to do harm joined by hostile intent. Petrowski, Thomas D., "Use of Force Policies and Training: A Reasoned Approach (part 2)", FBI Law Enforcement Bulletin, U.S. Department of Justice, Washington, DC, November, 2002.

1      With the consideration that tense, uncertain, and rapidly evolving life-threatening
2  circumstances can subject participants and witnesses to perceptual and memory distortions, the
3  following is a summary of the objective observations and actions as reported by Officer Williams.

4    &bull;  Officer Williams was on duty and in uniform at the time of the event.
5    &bull;  Officer Williams was at the Emeryville Police Administration Building at the time of the
6        dispatch.
7    &bull;  Officer Williams heard Officer Shepherd dispatched to a shoplifting call at the Home
8        Depot.
9    &bull;  Officer Williams understood that the adult female shoplifting suspect was "uncooperative."
10    &bull;  Officer Williams advised dispatch that he was responding to the call.
11    &bull;  Officer Williams was driving a fully marked Emeryville PD Crown Victoria.
12    &bull;  While responding to the call, Officer Williams heard via dispatch that the suspect was
13        armed with a firearm described as a revolver.
14    &bull;  Officer Williams heard via dispatch that the suspect had fled from the Home Depot
15        personnel.
16    &bull;  Officer Williams upgraded his response to the event by driving "Code-3" using his
17        emergency lights and siren.
18    &bull;  Officer Williams notified the dispatcher of his "Code-3" response.[24]
19    &bull;  Officer Williams heard Officer Shepherd provide a radio update regarding the suspect's
20        description and direction of travel.
21    &bull;  Officer Williams observed two males on the center island of Hollis in the area of the Home
22        Depot pointing or gesturing S/B on Hollis St.
23    &bull;  Officer Williams was driving S/B on Hollis St. when he encountered Officer Shepherd.
24    &bull;  Officer Williams was advised by Officer Shepherd that the suspect was south of them
25        running S/B on Hollis.
26    &bull;  Officer Williams observed the suspect approx. 100-120 yards south of him in front of the
27        storage facility.
28    &bull;  Officer Williams drove S/B on Hollis in order to stop the suspect.
29    &bull;  Office Williams stopped his vehicle in the street, retrieved his rifle from the rack in the
30        passenger compartment, exited his vehicle, and gave commands to the suspect.
31    &bull;  Officer Williams commanded that the suspect, "Get on the ground.  Get on the ground."
32    &bull;  Officer Williams observed that the suspect failed to comply with his lawful commands but
33        rather fled E/B then N/B into the parking area of the storage facility.
34    &bull;  Officer Williams observed that the suspect was armed with a revolver with the barrel
35        pointed up.
36    &bull;  Officer Williams observed the suspect walk towards a gray car parked in a parking stall
37        under the building and facing E/B.
38    &bull;  Officer Williams observed the suspect lower the gun in his direction.
39    &bull;  Officer Williams observed the suspect maneuver around the front of a parked vehicle.
40    &bull;  Officer Williams observed the suspect point the gun in his direction.
41    &bull;  Officer Williams feared that he was going to be shot and killed.
42    &bull;  Officer Williams fired 2 or 3 shots at the suspect in self-defense.
43    &bull;  Officer Williams heard another firearm being discharged as he was shooting.

---

[24] Dispatch Audio Tape COE000580-1502-259 from 10:10 to 10:011.

- Officer Williams noted that the suspect's actions were not stopped by his shots, but rather she continued moving around the vehicle.
- Officer Williams believed that he had missed with his shot.
- Officer Williams observed the suspect, who was now to the north and on the driver's side of the vehicle, walk towards him with the weapon being lowered in his direction.
- Officer Williams observed the driver's door of the gray car open and the occupant begin to get out.
- Officer Williams likely dropped to a knee at this point.
- Officer Williams believed that the vehicle's occupant got back into the car.
- Officer Williams fired another 2 or 3 shots at the suspects in defense of his life.
- Officer Williams believed that one of his rounds may have struck the open driver's door.
- Officer Williams considered that the suspect may shoot or kill him, the man in the car, or others in the area, or may take the man hostage or carjack his vehicle.
- Officer Williams observed the suspect fall after these 2 or 3 shots.
- Officer Williams observed that the gun had fallen next to her within approximately 3 to 5 feet of her.
- Officer Williams observed the suspect start to move as if she were trying to get up and appeared to be looking for the gun.[25]
- Officer Williams feared that she would rearm herself and shoot him or the man in the car, so he fired 1 or 2 more shots at the suspect.
- Officer Williams stated that she could have reached the gun as she was on the ground.[26]
- Officer Williams observed that the suspect stopped moving after these last 1 or 2 shots.
- Officer Williams believed that he fired 7 or 8 shots in total.
- Officer Williams checked the pulse of the suspect, and after not feeling one he called for medical response stating, "46. Suspect down. We need Code 3 medical. She suffered from gunshot wounds- arm and head."[27,28]

////

**Officer Shepherd:**

Officer Shepherd was on duty at the time of the event and was dressed in blue 511 BDU (Battle Dress Utility) uniform. The uniform has Emeryville Police Department patches on both shoulders, an "Emeryville Police" star-shaped cloth badge over the left breast pocket, and her name and badge number over her right breast pocket. Officer Shepherd was wearing a leather police duty belt which included a holster that held her firearm, a magazine case with two spare magazines, a handcuff case with handcuffs, a baton case with an expandable baton, an OC case with OC spray, a flashlight ring, a handcuff-key case with key, and a radio pouch with a radio. She also had a Taser holster and yellow Taser on her left thigh.

Officer Shepherd was driving a fully marked Ford Explorer SUV, black with white front doors. The vehicle was equipped with emergency lighting, spotlights, and siren. Emeryville

---

[25] Office Williams OIS interview, page 50 of 86, Bates 338, lines 2208-2209: "... she seemed weak, but she was still able to move. It almost seemed like she was lookin' for it, the way she kinda popped up.

[26] *Ibid.* lines 2213-2219.

[27] Dispatch Audio Tape COE000580-1502-259 from 11:06 to 11:13.

[28] Medical request reflected at 12:42:56 per Alameda County DA report, page 12, Bates 0558.

1    Police Department shields were displayed on the front driver and passenger doors and the unit ID
2    number 1254 was posted on both front fenders just forward of the front doors.
3              Officer Shepherd's firearm was a .40 caliber Smith and Wesson M&P pistol, serial number
4    DWJ1706.  Officer Shepherd had three magazines on her person at the time of the shooting- one
5    in the magazine well of the .40 caliber Smith and Wesson M&P pistol, and two in the spare
6    magazine case.  Each magazine held 15 rounds and Officer Sheppard started her shift with a round
7    in the chamber of her pistol.  As a result, Officer Sheppard had 46 rounds of ammunition on her at
8    the time of the shooting. OPD Technician Potter collected Officer Sheppard's duty pistol and the
9    two extra magazines from her duty belt. OPD Technician Potter collected 45 rounds of ammunition
10   from Officer Sheppard (15 from each extra magazine, 14 from the magazine in Officer Sheppard's
11   pistol, and one round from the chamber of Officer Sheppard's pistol) at EPD. This was consistent
12   with Officer Sheppard firing one shot with her pistol, as well as being consistent with the recovery
13   of a single expended .40 casing from the shooting scene.
14   ////
15        With the consideration that tense, uncertain, and rapidly evolving life-threatening
16   circumstances can subject participants and witnesses to perceptual and memory distortions, the
17   following is a summary of the objective observations and actions as reported by Officer Shepherd.
18   • Officer Shepherd was on duty and in uniform at the time of the event.
19   • Officer Shepherd was operating a fully marked Emeryville Police Department Ford
20     Explorer SUV.
21   • Officer Shepherd was parked at the Black Bear Diner when she received a dispatch of an
22     uncooperative woman being detained at the Home Depot.
23   • Officer Shepherd was driving to the location when the dispatcher advised her that the
24     female was requesting a medical due to a fall.
25   • Officer Shepherd was advised by dispatch that the suspect had a gun and was running
26     away from security personnel.
27   • Officer Shepherd observed a loss prevention agent on Hollis St. in front of the Home
28     Depot.
29   • Officer Shepherd believed that the agent's name was Jorge.
30   • Officer Shepherd observed a woman south of her on Hollis St.
31   • Officer Shepherd rolled her window down and asked the agent if she was the suspect.
32   • Officer Shepherd received confirmation from the agent that she female was the suspect.
33   • Officer Shepherd observed the suspect running on the east sidewalk traveling S/B.
34   • Officer Shepherd did not observe any other person on the sidewalk or any other person
35     running.
36   • Officer Shepherd observed the suspect look back in her direction, after which the suspect
37     tried to run faster
38   • Officer Shepherd broadcast the suspect's description and location.[29]
39   • Officer Shepherd observed the suspect attempt to get the attention of the driver of an AC
40     Transit bus driving N/B on Hollis.
41   • Officer Shepherd observed the suspect holding a gun.
42   • Officer Shepherd drove to, and pulled in front of the bus in the N/B lane of Hollis.
43   • Officer Shepherd lost control of her pistol and it fell to the passenger side front floorboard.

---

[29] Dispatch Audio Tape COE000580-1502-259 from 09:29 to 10:06.

1   • Officer Shepherd observed that the bus driver did not allow the suspect to board the bus.
2   • Officer Shepherd observed that the suspect did not board the bus.
3   • Officer Shepherd observed the suspect run S/B to the rear of the bus along the right side
4     (east) of the bus.
5   • Officer Shepherd moved back into the S/B lane of Hollis.
6   • Officer Shepherd observed the suspect run towards a green car which was behind the bus.
7   • Officer Shepherd observed the suspect yelling at the driver of the green car.
8   • Officer Shepherd observed that the suspect still had the gun in her hand.
9   • Officer Shepherd recognized the gun as a black revolver.
10  • Officer Shepherd observed that the suspect also had a purse.
11  • Officer Shepherd remembers the suspect knocking on the window of the green car.
12  • Officer Shepherd observed the suspect pointing the handgun at the driver.
13  • Officer Shepherd believed the suspect attempted to carjack the vehicle.[30]
14  • Officer Shepherd observed the suspect continue to run S/B on the east sidewalk of Hollis.
15  • Officer Shepherd does not recall broadcasting any information regarding the interaction
16    between the suspect and the bus and green car as she was focused on retrieving her
17    handgun.
18  • Officer Shepherd observed Officer Williams arrive to her location driving S/B in the
19    southbound lane with his lights and siren activated.
20  • Officer Shepherd observed Officer Williams make a facial expression that she interpreted
21    as inquiring about the suspect's location.
22  • Officer Shepherd pointed towards the suspect.
23  • Officer Shepherd estimated that the suspect was approx. 40 yards from her at this moment.
24  • Officer Shepherd observed Officer Williams drive S/B in the southbound lane towards the
25    suspect.
26  • Officer Shepherd broadcast that the suspect was in front of the storage unit.[31]
27  • Officer Shepherd followed Officer Williams until he stopped his vehicle.  She then drove
28    past him.
29  • Officer Shepherd could still see the suspect and stopped her vehicle south of the suspect's
30    location in order to block her escape route.
31  • Officer Shepherd broadcast something to the effect of, "The gun's in her hands."[32]
32  • Officer Shepherd intended to make contact with the suspect in order to get her to stop and
33    to put the gun down.
34  • Officer Shepherd stepped from her vehicle with her gun in her hand.  At that moment the
35    suspect was to her left and slightly behind her.
36  • Officer Shepherd gave commands to the suspect:  "Drop the weapon."[33]
37  • Officer Shepherd intentionally broadcast the command per training in order to have the
38    record reflect that such a command was delivered.[34]

[30] "...she's got the gun in her hand, she's talking to the driver, she's aggressive in her hand motions, the gun's in her hands. I could tell she's aggravated, and she just committed a crime. She wants to get away from the scene.
[31] Dispatch Audio Tape COE000580-1502-259 from 10:34 to 10:36.
[32] *Ibid.* 10:38-10:39.
[33] *Ibid.* 10:44-10:46; Audio appears to depict Officer Shepherd stating, "… Drop the gun!"
[34] Officer Shepherd OIS interview, page 12 of 22, lines 513-523, Bates 275.

1    •    Shepherd recalls that she did not verbally identify herself as an officer or give a command
2         to the suspect to stop.
3    •    Officer Shepherd observed the suspect fail to comply with her commands and then run
4         into the carport of the storage facility.
5    •    Officer Shepherd saw that the suspect had the gun in her hand and was holding it in the
6         area of her chest.
7    •    Officer Shepherd used a pillar for cover as she held her firearm at a low ready position
8         and gave commands to the suspect.
9    •    Officer Shepherd observed the suspect move to the left front driver's corner of the parked
10        Ford Focus.
11   •    Officer Shepherd observed the suspect point her gun towards Officer Williams.
12   •    Officer Shepherd observed that the suspect was to the left (north) of the parked car at this
13        point.
14   •    Officer Shepherd heard Officer Williams yell, "Drop the weapon," or "Drop the gun."
15   •    Officer Shepherd heard one gunshot at that point.
16   •    Officer Shepherd was still using the pillar for cover, and in response to the gunshot she
17        fired one round at the suspect.
18   •    Officer Shepherd fired the one round around the right side of the pillar.
19   •    Officer Shepherd recalls that the time between exiting her vehicle and hearing the first
20        gunshot was between 6-7 seconds.
21   •    Officer Shepherd recalls that the suspect did not say anything.
22   •    Officer Shepherd did not see any reaction from the suspect due to her shot.
23   •    Officer Shepherd did not know if she hit the suspect.
24   •    Officer Shepherd observed the suspect move closer to the vehicle.
25   •    Officer Shepherd saw movement from the driver's seat of the vehicle immediately after
26        firing her shot.
27   •    Officer Shepherd stopped shooting due to the observed movement.
28   •    Officer Shepherd observed a male seated in the vehicle.
29   •    Officer Shepherd observed the suspect outside of the vehicle a couple of feet from the
30        occupant.
31   •    Officer Shepherd could see the suspect's shoulders and above over the roof of the parked
32        car.
33   •    Officer Shepherd noted that the occupant in the car was between her and the suspect.
34   •    Officer Shepherd heard another set of 1 or 2 gunshots after she fired her one round.
35   •    Officer Shepherd moved around the pillar on the left side.
36   •    Officer Shepherd then observed Officer Williams in a standing position firing towards the
37        suspect with his rifle.
38   •    Officer Shepherd believes that Officer Williams was near the trunk on the driver's side of
39        the parked vehicle.
40   •    Officer Shepherd could not see what effect these rounds had on the suspect.
41   •    Officer Shepherd broadcast, "Shot fired.  Shots fired."[35,36]
42   •    Officer Shepherd walked to the back of the parked car and could see that the suspect was

[35] Dispatch Audio Tape COE000580-1502-259 from 10:53 to 10:54.
[36] Shots occurred at 12:42:48 per Alameda County DA report, page 12, Bates 0558.

1    on the ground.

2    • Officer Shepherd broadcast a request for medical response.[37,38]

3    • Officer Shepherd could tell that the suspect was deceased.

4    • Officer Shepherd observed the suspect's revolver on the ground about 3 to 4 feet from her

5      right hand.

6    • Officer Shepherd recalls hearing only two volleys of shots.

7    • Officer Shepherd did not see Officer Williams shoot the suspect while she was on the

8      ground.

9    • Officer Shepherd observed Officer Williams check the suspect for a pulse and then say,

10      "She's got no pulse."

11   ////

## Summary of Opinions

13   ////

14    I offer the following opinions related to my areas of police practice and expertise, and in

15  response to the material reviewed, information considered, and conclusions drawn from this and

16  the totality of my knowledge, training, and experience.

17   ////

**Opinion #1:**

19    It is my opinion that reasonably trained officers following standard law enforcement

20  practices, procedures, and training would have concluded under the totality of the circumstances

21  that there was reasonable suspicion to stop and detain to investigate, and ultimately probable cause

22  to arrest Ms. Henderson for Shoplifting, Armed Robbery, Brandishing a Firearm, Attempted

23  Carjacking, Delaying, Resisting, and Obstructing a Peace Officer, Assault with a Deadly Weapon,

24  and Assault with a Deadly Weapon on a Peace Officer.

25   ////

**Opinion #2:**

27    It is my opinion that Officers Williams and Shephard considering the totality of the

28  circumstances, responded as would reasonably trained officers while comporting with applicable

29  state laws, and departmental policies. They also followed standard practices, procedures, and

30  training in the form of tactics and force responses. In addition, they were in compliance with

31  training mandates as promulgated by the Emeryville Police Department and the California

32  Commission on Peace Officer Standards and Training (POST).

33   ////

**Opinion #3:**

35    It is my opinion that reasonably trained peace officers following standard law enforcement

36  practices, procedures, and training would form a reasonable and objective belief under the totality

37  of the circumstances that Ms. Henderson posed a lethal threat to themselves and innocent

38  bystanders based upon her desperate attempt at flight, her pointing a firearm at an innocent driver

39  in an apparent carjacking attempt, her repeated refusal to comply with the officers' verbal

40  commands to get down on the ground and to drop the gun, and her pointing the gun towards a

41  uniformed police officer. Ms. Henderson purposefully arming herself with a (. 38 SPECIAL)

42  handgun in conjunction with her overt acts including pointing the firearm at Officer Williams,

43  were consistent with an assault on a police officer with a deadly weapon. Reasonably trained

---

[37] Dispatch Audio Tape COE000580-1502-259 from 10:58 to 11:01.

[38] Medical request reflected at 12:42:56 per Alameda County DA report, page 12, Bates 0558.

Page **14** of **49**

1  peace officers would, based upon the actions and movements of Ms. Henderson, form an objective
2  belief that he or she is in imminent danger[39] and immediate threat of serious bodily injury[40] or
3  death, and would defend themselves by responding with deadly force. [41]
4  ////

5  **<u>Basis and Reasons in Support of Opinions</u>**
6
7          In addition to the primary source documents and materials recording the facts specific to this
8  case as listed in Attachment "A," my opinions are informed and supplemented based upon my
9  experience as a Police Officer, Police Supervisor, Police Program Manager, and Police Trainer as
10  well as my studied observation of officer performance in both training scenarios and field
11  deployment situations.  Additionally, Attachment "B" provides a list of secondary source material
12  upon which I have considered and/or relied in forming my opinions in this case.
13          The circumstances summarized in this section are not intended to enumerate every single fact
14  concerning the events involving Officers Shepherd, Officer Williams, and Ms. Henderson.  I have
15  incorporated those facts and circumstances derived from the above-mentioned records which
16  significantly informed my opinions in this matter.  In reaching my opinions I have also considered
17  facts and details that suggest both confirmation and contradiction of the officer and witness
18  perceptions and memory regarding the event.
19          While reaching my opinions, I am mindful that officers involved in situations that are tense,
20  uncertain, rapidly evolving, and that call for rapid decision-making while under threat, are often
21  subject to perceptual[42] sensory[43] and memory[44] distortions.  Such distortions include but are not
22  limited to tunnel vision, auditory anomalies, time distortions, and when recalling spatial placement
23  or movement.[45] These dynamics are among those I have personally experienced both in training
24  and operationally, as well as having witnessed on the part of both new and experienced officers
25  while involved in training and in the field.
26          My opinions are not intended to usurp the judgment of the ultimate trier of fact as to the
27  reasonableness of the officers' use of force in this case.
28  ////
29

---

[39] **Imminent danger** means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.  (POST LD-20 Workbook, page 3-6)

[40] **Serious bodily harm or injury** means a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement. *(Penal Code Section 243(f)(4))* (POST LD-20 Workbook, page 3-5)

[41] **Deadly force** applied by a peace officer is force that creates a substantial risk of causing death or serious bodily injury.  (POST LD-20 Workbook, page 3-5)

[42] Blum, LN, PhD, *Force Under Pressure- How Cops Live and Why They Die*, Lantern Books, Booklight Inc., New York, NY 2000, page 5.

[43] *Ibid*. page 52.

[44] Artwohl, Alexis, PhD, "Perceptual and Memory Distortion During Officer-Involved Shootings," FBI Law Enforcement Bulletin, U.S. Department of Justice, Washington, DC, October 2002, pages 19-23.

[45] William J. Lewinski, Jennifer L. Dysterheft, Matthew M. Priem & Robert W. Pettitt (2014): Police officers' actual vs. recalled path of travel in response to a threatening traffic stop scenario, Police Practice and Research: An International Journal, DOI: 10.1080/15614263.2014.959950.

**Initial Response:**

Officer Shepherd was dispatched to a call of security attempting to detain a subject (Ms. Henderson) at the Home Depot on Hollis St. in Emeryville. Officer Williams assisted to the event. While they were en-route the dispatcher advised that the subject was requesting an ambulance because she claimed that she hit her head. They also knew via radio transmissions that the subject was being uncooperative.

Although originally dispatched as a misdemeanor shoplifting call, the event quickly evolved into one of an emergency nature when Ms. Anderson pulled a revolver from her purse and pointed it at the loss prevention officers. The officers then learned that Ms. Henderson was fleeing from security and running first towards Hollis, and then S/B on Hollis towards the rear of the store.

When Officers Shepherd and William learned of this new information, they both acted as would be expected of a reasonably trained officer by responding Code-3 (emergency lights and siren). Any reasonably trained officer would respond to a call of this nature with a heightened sense of concern for the safety of the public, as well as for the safety of responding law enforcement officers.

The greatest law enforcement priority when responding to a tactical event such as this is the safety of innocent lives. The key components to achieving this objective are to locate, contain, control, and apprehend the suspect in order to stop the ongoing threat to public safety. While so doing, officers will also utilize and rely upon information provided them by dispatch to verify the nature, progress, and location of suspects, witness, and vehicles as appropriate. These components are not static nor are they approached in a strictly linear manner; and are most often executed simultaneously in the midst of tense, uncertain, and rapidly evolving circumstances.

Officers often respond to ambiguous, changing, and outdated information. Officers know that there is always a time delay in the broadcast of the information they are receiving via the dispatcher and such delays often create uncertainty and confusion.

When a 911 call is made, it is answered by a dispatcher or call taker who enters the information into the electronic Computer Aided Dispatch (CAD) system. That information is then transmitted to the officers on the street. What the officers don't know with certainty is the accuracy in the information transmitted, or how much time delay there is between the receipt of the information from the caller and the broadcast of the details to the officers.

The information provided by the dispatcher is not always accurate or processed accurately as it has to be understood and entered by the call taker or dispatcher (often dealing with reporting parties who are under stress) who is multi-tasking by way of: trying to understand the details as recited by the caller, typing, sorting through priority information, validating which units to respond to the call, transmitting radio traffic, making notifications to supervisors, and listening to the units in the field.

The responding officers themselves are multi-tasking as well and attending to tasks such as: driving the vehicle, listening to the radio, reading event details on the in-car computer, watching for vehicular traffic, searching for the suspect, providing updates over the air, operating emergency equipment, being flagged down by witnesses, making contingency plans, reading maps, forming a mental picture of the landscape and environment, deciding upon an avenue of approach, and physically meeting with fellow law enforcement personnel in order to share information or to formulate tactical plans. During this time-pressured environment replete with task prioritization, response planning, diversions, distractions, and interruptions, it is not at all unusual that an officer, like any human being with human performance limitations, would fail to recall every detail with complete accuracy.

**Arrival:**

Officer Shepherd arrived on scene first and made brief contact with the reporting party-Jorge Figueroa, as he was on the east sidewalk of Hollis St. at the west end of the parking lot of the Home Depot. Mr. Figueroa pointed out the location of Ms. Henderson to Officer Shepherd. Officer Shepherd could see Ms. Henderson running S/B on the east sidewalk of Hollis St. Officer Shepherd drove S/B on Hollis in the direction of Ms. Henderson with the intent to stop and detain her.

<u>Detention:</u>

An investigative detention is a temporary seizure of a suspect for the purpose of determining whether (1) there is probable cause to arrest him, (2) further investigation is necessary, or (3) the officers' suspicions were unfounded.[46]

Peace officers may need to detain a person to investigate involvement in criminal activity. To be lawful, a detention must be based on reasonable suspicion that criminal activity has taken place, is taking place, or is about to take place, and that the person detained is connected to that activity.

A lawful **detention** requires reasonable suspicion of criminal activity. A temporary detention or stop is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer.[47]

<u>Reasonable Suspicion:</u>

Reasonable suspicion is when a peace officer has enough facts and circumstances present to make it reasonable to suspect that criminal activity is occurring and the person detained is connected to that activity

Reasonable suspicion of criminal activity must exist to make a detention lawful.

Reasonable suspicion may be based on observation, personal training and experience, or information from eyewitnesses, victims, or other officers (totality of the circumstances).

Reasonable suspicion cannot be based on a hunch or instinct. If reasonable suspicion is not properly established in a court of law, the case against the defendant may be dismissed or any evidence seized may be excluded from trial.

Some factors that *contribute* to establishing reasonable suspicion are:
- appearance or condition of a person (intoxicated, resemblance to wanted person)
- actions (hiding objects, furtive movements, running from a crime scene)
- driving behaviors
- knowledge of the person's "history" (criminal record or conduct)

---

[46] Alameda County District Attorney, http://le.alcoda.org/publications/cci/detentions/investigative_detentions, downloaded 12/20/16.

[47] California Commission of Peace Officer Standards and Training (POST), LD-15: Laws of Arrest, Jan 2016 3-3.

1   • demeanor (non-responsive, nervous)
2   • time of day (unusualness)
3   • location of the stop (near crime scene, known criminal activity in area)
4   • officer training and experience (modus operandi, expertise in certain area such as
5      narcotics or gang activity)
6
7   NOTE: Flight by itself does not establish (reasonable suspicion) and cannot justify a
8   detention. [48]
9

10      In this case, Officers Shepherd and Williams had ample reasonable suspicion to detain
11   Ms. Henderson to conduct an investigation into her criminal activity:

12   • The reporting party was known to the officers.
13   • The reporting party had detained and arrested parties for shoplifting previously.
14   • The reporting party had provided a description of Ms. Henderson.
15   • The reporting party gave particular details of the nature of the event while on the phone,
16      and these details (uncooperative, asking for medical, armed with a revolver, direction of
17      flight) were relayed to the officers.
18   • The reporting party remained on the phone with the dispatcher and continued to provide
19      updated information.
20   • Ms. Henderson was still in the area when the officers arrived.
21   • Ms. Henderson matched the description of the reported suspect.
22   • Ms. Henderson was running in the reported direction of flight.
23   • Ms. Henderson glanced back and observed Officer Shepherd and then attempted run
24      faster.
25   • Officer Shepherd observed that Ms. Henderson was in fact armed with a handgun.
26   • Ms. Henderson attempted to flag down a Transit Bus.
27   • Ms. Henderson approached a vehicle behind the bus and pointed the revolver at the
28      driver.
29   • Ms. Henderson continued her desperate attempt at flight by running S/B on Hollis away
30      from the officers.
31   • Ms. Henderson continued her flight despite the obvious identification of the officers in
32      full uniform and driving marked police vehicles with sirens and lights activated.

33

---
[48] *Ibid.* pp. 3-6 to 3-7

1  **Attempt to Arrest and Officer's Use of Force:**
2          A reasonable police officer following standard law enforcement practices, procedures, and
3  training, upon seeing Ms. Henderson's imminent threatening actions, crimes-in-progress, and
4  active attempts at escape and evasion would have probable cause to effect an arrest for Armed
5  Robbery, Brandishing a Firearm, Attempted Carjacking, and Resisting, Delaying, and Obstructing
6  a Peace Officer.
7  ////

8          Attempt to Arrest
9
10         An arrest is taking a person into custody, in a case and in the manner authorized by law.
11  *(Penal Code Section 834)* The arrest must be based on probable cause.  *Custody* is the key
12  word; it implies the person making the arrest has full control.[49]
13
14         Probable cause for an arrest is a set of facts that would cause a person of ordinary care and
15  prudence to entertain an honest and strong belief that the person to be arrested is guilty of
16  a crime. Probable cause is required before an arrest is made and is based on the totality of
17  the circumstances.[50]
18
19         Although Officers Shepherd and Williams were assigned to two separate police vehicles
20  and arrived at slightly separate times, they worked together as a coordinated team in an effort to
21  take Ms. Henderson into custody in as safe a manner as possible, and in as safe a manner as Ms.
22  Henderson would allow.
23         While brief, the two officers met at the side of the roadway when Officer Shepherd was
24  out of her vehicle.  The communication was more visual than verbal, however that is often the case
25  with trained law enforcement officers as facial expressions and hand signals and gestures are
26  common modes of relaying information in tactical environments.
27         Peace officers in the state of California are required to attend regular Continuing
28  Professional Training (CPT) as well as Perishable Skills Training (PSP).  Officers are required by
29  the California POST to attend 24 hours of CPT training every 24 months, and they are mandated
30  to attend 14 hours of the PSP training each 24 month cycle.  The PSP training consists of 4 hours
31  of Defense and Arrest Tactics skills, 4 hours of Firearms skills, 4 hours of Vehicle Operation skills,
32  and 2 hours of Communication skills.  Although the Communication skills class is delivered as a
33  stand-alone training course of either interpersonal or tactical communications, the Defense Tactics,
34  Firearms, and Vehicle Operation course all have a significant communications skill component to
35  them as well.
36         I have reviewed Officer Shepherd's and Officer Williams' training records and it appears
37  that they are in compliance with POST mandates.  I noted that they both also attended an Active
38  Shooter course.  The Active Shooter course would certainly cover individual and team tactics,
39  decision making, and communication skills.  When the officers attended the Police Academy they
40  would have had extensive training on tactics, decision making, and communications during their
41  Patrol Procedures, Crimes in Progress, Firearms, Emergency Vehicles, Defense Tactics, Use of
42  Force and Force Options, and Criminal Investigations classes.
43         Police officers most often also participate in roll call/ briefing trainings of either a formal
44  or informal nature.  Emeryville PD subscribes to Lexipol which provides regular training bulletins

---

[49] *Ibid*. p. 4-7
[50] *Ibid*. p. 4-4

1  for the officers to read.  Officers receive regular feedback and appraisal on both a formal and
2  informal basis from direct supervisors and command staff.  Sergeants often conduct debriefings of
3  calls for service which serve as training opportunities.  Finally, officers are trained that at the
4  conclusion of each "tactical" call they handle they should take a few minutes to conduct a briefing
5  with their fellow officers as to what went well and what improvements in performance, procedures,
6  or equipment could be made.
7          Therefore, it is my judgment that Officers Shepherd and Williams had probable cause to
8  arrest Ms. Henderson, and responded as would reasonably trained officers following standard law
9  enforcement practices, procedures, and training considering the totality of the circumstances, when
10  they tactically deployed in an effort to take Ms. Henderson into custody and stop her imminently
11  life-threatening actions.
12          Ms. Henderson presented an imminent danger to innocent lives by her criminal conduct.
13  Peace officers are trained that they have a duty to provide protection to the public:
14
15          Although officer safety is always a chief concern, there are circumstances where officers must
16          consider placing their safety in jeopardy to protect the innocent. The community has a right to
17          expect that peace officers will "step into harm's way" on behalf of those endangered by violent
18          crime. While officers should not sacrifice their safety merely to apprehend a suspect, their
19          ultimate duty is to protect others.[51]
20  ////
21          Ms. Henderson was an imminent threat to the loss prevention officers at Home Depot, to
22  employees and customers at Home Depot, to drivers and pedestrians on Hollis St., to individuals at the
23  nearby bus stop, to passengers on passing buses, to the employees and customers at the storage facility,
24  and to individuals occupying the businesses across the street from the storage facility.  In addition,
25  bullets fired from handguns have the potential to travel great distances and will certainly land
26  somewhere- perhaps in a city densely populated such as Oakland or Emeryville.
27          With this in mind, Officers Shepherd and Williams had a duty to stop and arrest Ms. Henderson
28  in order to protect innocent lives.  In order to do so, they needed to contain her movements.  They did
29  this by limiting her escape routes as Officer Shepherd stopped south of Ms. Anderson and Officer
30  Williams attempted to eliminate her movements to the north and west with the placement of his vehicle.
31          Officers are trained to contact, contain, communicate with, control, and take custody of
32  dangerous suspects.  The visual presence of the officers alone may very well have stopped Ms.
33  Henderson from victimizing another innocent person as she ran into a relatively contained area.
34          By parking their vehicles where they did, Officers Shepherd and Williams followed a tactical
35  concept of establishing an inner perimeter.  They then made attempts at de-escalation by giving Ms.
36  Henderson lawful commands to get down on the round and to drop the gun; and providing her an
37  opportunity to surrender.  Unfortunately, Ms. Henderson continued her active flight and continued to
38  remain an imminently deadly threat to the officers and others; and a reasonably trained officer would
39  recognize that a suspect armed with a deadly firearm and maneuvering around solid pillars and vehicles
40  could very likely be attempting to gain a tactically advantageous position from which to launch an
41  ambush and fire her weapon at them.  The imminent threat posed by Ms. Henderson was not only
42  towards the officers but to innocent civilians that were behind the officers as well.
43          Officers Shepherd and Williams used trained team maneuvers to contain Ms. Henderson's
44  movements as best as possible.  By approaching from two different directions they would have been
45  mitigating as much as possible the advantages of her position as she used movement, cover, barriers,

---

[51] California Commission of Peace Officer Standards and Training (POST), LD-23, "Crimes in Progress," Version 4.0, September 2010, p. 2-11

and the benefit of a darkened environment while the officers were at least momentarily, if not throughout the encounter exposed in the bright sunshine.  Approaching from two angles not only cut off her escape routes, but it had the benefit of each officer having a different perspective and ability to see threatening movements that the other may not be able to observe.  However, while moving into an "L-Shaped" containment position, they did not separate to a degree that they began to work autonomously from each other.  In other words, they remained in eyesight and earshot of each other so that each had a general knowledge of the positioning of the other.

////

Use of Force

By the time Ms. Henderson fled into the carport and approached the parked Ford Focus occupied by Mr. Whitehead, she had pointed a lethal weapon (revolver) at the Loss Prevention Officers at Home Depot[52] and Mr. Marlette[53] who was driving behind the AC Transit bus; she had brandished the firearm in the presence of Officer Shepherd; she had pointed the handgun at Mr. Clausen[54] as he sat in his truck while it was parked across the sidewalk at the south end of the storage facility.  Ms. Henderson had ample opportunity to peacefully surrender to the obviously identifiable Police Officers (marked police vehicles operating lights and sirens, uniformed police officers) while running the approximate 2/10[ths] of a mile (Source- google maps) from the Home Depot store at 3838 Hollis St. to the ExtraSpace storage facility at 3406 Hollis St., yet she did not do so.  Ms. Henderson's precipitating acts would cause any reasonable police officer following standard law enforcement practices, procedures, and training to objectively conclude, based under the totality of the circumstances, that Ms. Henderson was presenting an immediate and continuing lethal threat to the officers and innocent bystanders.

However, each use of force by a law enforcement officer is analyzed based upon the knowledge and perspective of the totality of the circumstance known by the officer at the time the officer employed force.

The **California POST LD-20** workbook provides training and guidance to Peace Officers by providing definitions and explanation as follows:

**Objective reasonableness standard:**

The reasonableness of an officer's use of force in the line of duty must be:

• judged from the *perspective of a reasonable officer.*

• examined through the eyes of a reasonable officer on the scene *at the time the force was applied.* Not 20/20 hindsight.

• based on the facts and circumstances confronting the officer *without regard to the officer's underlying intent or motivation.*

• based on the knowledge that the officer *acted properly under the established law at the time.*[55]

---

[52] Emeryville PD Narrative Report, page 2 of 3, Bates 0011.

[53] Alameda County District Attorney Report, page 10, Bates 0556.

[54] *Ibid*, page 11, Bates 0557.

[55] California Commission of Peace Officer Standards and Training (POST), LD-20, "Use of Force," Version 3.2, June 2013. p. 4-2.

**Reasonable officer definition and standard:**

The amount of force necessary for the situation is determined by the objective reasonableness as judged by a reasonable officer given the officer's training and experience.

A reasonable officer is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner.[56]

The **reasonable officer** standard:
• would another officer
• with like or similar training and experience,
• facing like or similar circumstance,
• act in the same way or use similar judgement?[57]

**Authority and criteria for the use of force:**

*Penal Code Section 835a states:*
"Any officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect an arrest, to prevent escape or to overcome resistance.

A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance."[58]

**Reasonable Force:**

Peace officers who make or attempt to make an arrest need not retreat or desist from their efforts because of resistance or threatened resistance from the person arrested. They are not considered the aggressor nor do they lose the right of self-defense when they use force to:
• effect an arrest
• prevent escape
• overcome resistance

Justification for the use of force is limited to what is known or perceived by the officer *at the time*. Facts discovered after the event, no matter how compelling, cannot be considered in determining whether the force was justified or not.[59]

---

[56] *Ibid.* at 1.4
[57] *Ibid.* at 1.5
[58] *Ibid.* at 1.7
[59] Ibid. at 6.3

**Imminent danger:**

Means a significant threat that peace officers reasonably believe will result in death or serious bodily injury to themselves or to other persons. Imminent danger is not limited to "immediate" or "instantaneous." A person may pose an imminent danger even if they are not at the *very moment* pointing a weapon at another person.[60]

**Sufficiency of Fear** (California Penal Code Section 198):

According to the law, fear alone does not justify the use of deadly force. There must be a *sufficiency of fear* for the use of deadly force to be justified. *(Penal Code Section 198)*

There are three elements needed to establish sufficiency of fear.
• The circumstances must be sufficient to excite the fears of a *reasonable person* in like circumstances.
• The person must not act *under the influence of fear alone.* There has to be some circumstance or overt act apart from the officer's fear.
• The decision to use deadly force must be made *to save one's self or another* from great bodily injury or death.[61]

The **United States Supreme Court** provides guidance to Peace Officers regarding the Use of Force as follows:

**Force Response Analysis (Graham Factors):**

Law enforcement officers in California and across the nation are trained in standard practices of force evaluation which includes what is known as the "Graham Factors":

*The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.  The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation.[62]*

**Fleeing Felon Rule (Garner Factors):**

Law enforcement officers in California and across the nation are trained in standard practices for evaluating when deadly force is appropriate for use against a fleeing subject (felon).  These include:

1.  If the subject threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction of serious bodily harm or death.

---

[60] *Ibid.* at 3.6
[61] *Ibid.* at 3.6
[62] Graham v Connor, 490 U.S. 386 (1989).

1       2.   Probable cause to believe that the subject poses a threat of death or serious physical harm,
2            either to the officers or others.
3       3.   Probable cause to believe that the use of deadly force is reasonably necessary to prevent
4            escape.
5       4.   Some warning be given prior to the use of deadly force where feasible.[63]
6
7 **Serious bodily harm or injury:**
8       Means a serious impairment of physical condition, including, but not limited to, the
9       following: loss of consciousness, concussion, bone fracture, protracted loss or impairment
10      of function of any bodily member or organ, a wound requiring extensive suturing, and
11      serious disfigurement. *(Penal Code Section 243(f)(4)).*[64]
12 ////

13 **Use of force by Officer Shepherd:**
14       According to police reports and statements, Officer Shepherd fired a single shot at Ms.
15 Anderson.  It was Officer Shepherd's belief and perception that Ms. Henderson posed an
16 immediate threat (intent and capability to cause harm) of death or great bodily injury to Officer
17 Williams, herself, and other innocent people at the time that she (Officer Shepherd) responded
18 with lethal force.
19       Reasonably trained peace officers following standard law enforcement practices,
20 procedures, and training facing the same or similar circumstances as Officer Shepherd, would form
21 a reasonable and objective belief under the totality of the circumstances that Ms. Henderson posed
22 a deadly threat to themselves as well as innocent bystanders.  In response to the lethal threat, a
23 reasonable officer would find it objectively reasonable and apparently necessary to deploy deadly
24 force based upon the knowledge and observations known by Officer Shepherd at the time she fired
25 her pistol.
26     •   Ms. Henderson had been detained by Home Depot store security for shoplifting.
27     •   Ms. Henderson was uncooperative with store security personnel.
28     •   Ms. Henderson "pulled a gun" on store security personnel.[65]
29     •   Ms. Henderson ran from store security personnel.
30     •   Ms. Henderson appeared to look at Officer Williams but continued her flight.
31     •   Ms. Henderson attempted to flag down a bus, perhaps in order to facilitate in her escape.
32     •   Ms. Henderson pointed her firearm at a motorist in an apparent carjacking attempt.
33     •   Ms. Henderson continued her desperate flight from uniformed officers.
34     •   Ms. Henderson ignored lawful orders to drop the gun and to get down on the ground.
35     •   Ms. Henderson moved into a covered and concealed position in an area of subdued lighting.
36     •   Ms. Henderson maneuvered around a parked vehicle.
37     •   Ms. Henderson endangered Officer Williams by pointing her revolver at him.
38     •   Ms. Henderson endangered innocent people by waving her gun around at the time she
39         pointed it in the direction of the street populated by passing pedestrians, private vehicles,
40         transit buses, and occupied businesses.
41

---

[63] *Ibid.* POST LD-20, p. 3-5.
[64] *Ibid.* at 3.5
[65] Radio Transmissions, Bates 0162.

Officer Shepherd was forced by Ms. Henderson's actions to make rapid, split-second life and death decisions under circumstances that were highly time-compressed, tense, uncertain, rapidly evolving, extremely dangerous, and tremendously stressful.

At the moment she used force, a reasonable officer following standard law enforcement practices, procedures, and training, and relying upon education and experience, would have probable cause to believe that Ms. Henderson was in the process of committing a crime involving the infliction of serious physical harm- namely Assault on a Peace Officer with a Firearm:

> 245(d) (1) Any person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years.

It is worthy to note that Officer Shepherd stated that had it not been for the presence of Mr. Whitehead being in her line of fire, she would have continued to shoot at Ms. Henderson as she perceived her to be a continuing lethal threat.  Ms. Henderson displayed the most extreme level of resistance- Life threatening:

> **Life-threatening Resistance:**
>
> > **POST Definition:**
> > Any action likely to result in serious injury or possibly the death of the officer or another person
> >
> > **POST- Possible Force Option:**
> > Utilizing firearms or any other available weapon or action in defense of self and others[66]

**Use of force by Officer Williams:**

According to police reports and statements, Officer Williams fired six shots from his rifle at Ms. Anderson.  It was Officer Williams' belief and perception that Ms. Henderson posed an immediate threat (intent and capability to cause harm) of death or great bodily injury to Officer Shepherd, herself, and other innocent people at the time that he (Officer Williams) responded with lethal force.

Reasonably trained peace officers following standard law enforcement practices, procedures, and training facing the same or similar circumstances as Officer Williams, would form a reasonable and objective belief under the totality of the circumstances that Ms. Henderson posed a deadly threat to themselves as well as innocent bystanders.  In response to the lethal threat, a reasonable officer would find it objectively reasonable and apparently necessary to deploy deadly force based upon the knowledge and observations known by Officer Williams at the time he fired his rifle:

- Ms. Henderson had been detained by Home Depot store security for shoplifting.
- Ms. Henderson was uncooperative with store security personnel.

---

[66] *Ibid.* POST LD-20, p. 2-7.

1   • Ms. Henderson "pulled a gun" on store security personnel.[67]
2   • Ms. Henderson ran from store security personnel.
3   • Ms. Henderson continued her desperate flight from uniformed officers.
4   • Ms. Henderson ignored lawful orders to drop the gun and to get down on the ground
5   • Ms. Henderson moved into a covered and concealed position in an area of subdued lighting.
6   • Ms. Henderson maneuvered around a parked vehicle.
7   • Ms. Henderson presented a lethal threat to Officer Williams when she pointed her revolver
8     at him.
9   • Ms. Henderson endangered Officer Shepherd and other innocent people by waving her gun
10    around and pointed it in the direction of the street populated by passing pedestrians, private
11    vehicles, transit buses, and occupied businesses.
12  • Ms. Henderson presented a lethal threat towards Officer Williams, Officer Shephard and
13    innocent people in the area when she attempted to rearm herself once she had fallen to the
14    ground and dropped her handgun.
15
16      Basing my opinion on the assumption that Officer Williams is accurate in his recounting of
17  Ms. Henderson's actions and his responses thereto, the question is whether a reasonably trained
18  peace officer following standard law enforcement practices, procedures, and training facing the
19  same or similar circumstances would respond in the same manner.  Officer Williams had to make
20  a rapid life and death decision under circumstances that were highly time-compressed, tense,
21  uncertain, rapidly evolving, extremely dangerous, tremendously stressful, and required split-
22  second decision making (according to records the duration of the shooting took place in span of
23  approximately 6.5 seconds[68]).
24
25      Officer Williams had exited his vehicle with his rifle deployed.  As Ms. Henderson ran into
26  the carport he saw that she was holding the revolver in her right hand.  Officer Williams gave Ms.
27  Henderson multiple commands to "get on the ground."  Ms. Henderson failed to follow the lawful
28  commands of Officer Williams and instead ran into the carport and around a parked vehicle.  Ms.
29  Henderson held the revolver with the barrel pointed upwards and as she lowered the firearm
30  towards him, he fired 2 or 3 shots.  In his estimation, the shots failed to strike Ms. Henderson as
31  she continued her movements.  As Ms. Henderson continued around the vehicle and was now
32  advancing towards him and pointing her gun at him, he dropped to a knee[69] and fired 2 or 3 more
33  shots.  At least one of his rounds likely penetrated the driver's side window of the parked Ford
34  Focus as the occupant, Mr. Whitehead, had opened the door at this moment.  Officer Williams
35  believes that at least one of these shot struck Ms. Henderson as she fell to the ground and dropped
36  the revolver.
37      This sequence of events is corroborated by witness Nicole Phavisith who was in the
38  office of the storage center.
39
40      Ms. Phavisith could see a female run into the carport parking area of the storage facility.
41      She said the female suspect ran between two parked cars and she could see that the

---

[67] Radio Transmissions, Bates 0162.
[68] *Ibid*. DA Report, p. 18, Bates 0564.
[69] *Ibid*. DA Report, p. 26, Bates 572.  "he observed the male officer kneel, point the rifle, and shoot into the carport area".

female had a black handgun. Ms. Phavisith saw the woman point the gun toward the male officer who had the rifle. Based on the way the suspect held the gun, Ms. Phavisith stated that she believed the suspect was going to shoot the gun at police. She then heard gunshots. She said based on the sound of the gunshots it appeared that different guns were fired.[70]

After Ms. Henderson fell to the ground, Officer Williams perceived that she was attempting to rearm herself with the revolver:

"She was getting up, and I thought she was reaching for the gun. She was tryin' to get up, and she was kinda tilting that way. I was worried she was gonna get the gun, and - and shoot me. Or - or try to shoot me and hit someone in the street. It- it seemed like she was tryin' to push herself up. Like - like she wasn't done"[71]

"It seemed like she was trying to pop her head up to look. It looked like she was looking for her gun, like she was trying to rearm herself."[72]

"It looked like she was popping her head up to look for where her gun fell, like she was still coming, she still -- she still was coming for me."[73]

"Urn, I - I watched her. And then it seemed like she was tryin' to push herself up. Uh, the gun was not far from her, maybe three to five feet. Urn, and I was worried she was still posing a threat and would reach for the gun."[74]

**See Attachment "B" for an inventory of statements regarding the relative position of the revolver in relation to Ms. Henderson.**

In analyzing whether Officers Shepherd and Williams had probable cause to believe that Ms. Henderson posed an imminent lethal threat to the officers or others, one must consider the action response-time gap. Officers are trained to understand that a suspect armed with a firearm is a deadly threat even if the weapon is not at that moment pointed at the officer or even in the suspect's hand.

Simply expressed, an action will always occur before an appropriate reaction can be initiated and implemented. Action always beats reaction. This is a reality that is a focus of training throughout law enforcement because law enforcement officers are always in the position of having to react to what somebody does. The practical effect in the field of deadly force usage is that no law enforcement officer is required to wait or can be expected to wait until he is absolutely certain what it is that a subject is going to do, or

---

[70] *Ibid.* DA report, p. 27, Bates 0573.
[71] Williams OIS Interview, Bates 340.
[72] Williams Depo 43/18-20.
[73] *Ibid.* 44/2-5.
[74] Williams OIS interview, lines 372-374, Bates 0357.

has in his hand... To wait for certainty is to ensure that no response can possibly prevent or avert the subsequent death or injury.[75]

Should Ms. Henderson had rearmed herself, it is likely she could have raised her gun and killed Officers Shepherd and Williams or an innocent victim before either of them could have reacted. Even if the officers could have fired before Ms. Henderson was able to discharge her weapon, there is no guarantee that the officers would have responded with accurate fire while under a lethal attack (in fact, the evidence appears to show that Officers Williams and Shepherd struck Ms. Henderson with only 3 of the 7 rounds discharged), or that Ms. Henderson would have been immediately incapacitated and therefore no longer posing an imminent deadly threat.

Peace Officers are trained that they have a right to defend their lives and the lives of others by acting on their objectively reasonable perception of the threat confronting them under the totality of the circumstances. Once a suspect points a firearm at an officer, there is no time to successfully stop the deadly attack, even if the officer is pointing his gun at the assailant at the time. Therefore, officers are trained to continually monitor a suspect's actions, motions, behavior, expressions, gestures, and statements in order to assess the lethal threat potential he or she poses to the officer and others.

Reaction time studies help explain how an objectively reasonable officer is trained to respond when facing, under the totality of the circumstances, a situation in which Officers Shepherd and Williams found themselves. The results of the research demonstrate the real threat of death or great bodily injury that officers face in these circumstances.

The axiom is that action always beats reaction, and an officer's response will always be slower than the action that prompted the response. An officer more frequently operates behind the reactionary curve, which places him or her at a significant disadvantage. [76]

Research published in 2011 examined if a subject holding a gun at his side could raise the gun and shoot an officer before the officer could react and shoot back:

The scenario that we have chosen to examine is one in which a police officer is confronting an armed suspect. The suspect does not have his or her gun pointed at the officer, but the officer has her or her weapon pointed at the suspect. The police officer issues commands to the suspect to put the gun down. The suspect either complies or attempts to shoot the police officer. The basic question is can the police officer shoot the suspect before the suspect shoots (assuming the suspect attempts to fire)?"[77]

The results of the research demonstrate that generally the officer would lose in this situation. Completing all of the steps necessary to interpret a situation, select, and then

---

[75] Urey W. Patrick & John C. Hall, In Defense of Self and Others . . . Issues, Facts & Fallacies – *The Realities of Law Enforcement's Use of Deadly Force* 135 (2d. ed. 2010).

[76] Ross, Darrell. *Assessing lethal force liability decisions and human factors research*, Law Enforcement Executive Forum, 2013, 13-2, p. 92.

[77] J. Pete Blair et al. Reasonableness and Reaction Time, 14 Police Q. 323, 330 (2011).

execute a response simply tends to take longer than it takes to execute an already decided-upon action.[78]

Officers are not justified in shooting a person merely because the person is armed. However, the study does show that an armed person is an extreme danger to an officer whether or not the person is pointing the gun at the officer. "Our results show that even well-trained officers, who are operating in nearly ideal circumstances, with their guns aimed at a suspect, cannot reasonably be expected to shoot before the suspect raises her or her gun and fires."[79]

Research conducted in 1996 by Thomas A. Hontz of the Scottsdale, Arizona Police Department was designed to determine how fast an officer can react with an accurate shot after a visual cue. The response time calculated was contrasted with the speed of typical movements by suspects that would trigger a response with a firearm by a police officer.

The results of this study show that waiting until the suspect begins to move the gun may be fatal to the officer. This does not give officers carte blanche to shoot anyone with a gun in his hand. But faced with an uncooperative armed subject, where the officer has little or no cover, waiting for the subject to make that movement endangers both the officer and innocent bystanders.[80]

A report published by the Force Science Institute (Force Science Newsline #40) demonstrates the speed at which a suspect can move his or her arm:

An average suspect can move his hand and forearm across his body to a 90-degree angle in 12/100 of a second. He can move his hand from his hip to shoulder height in 18/100 of a second.[81]

The evidence of response-time gaps demonstrated through research-based methodology reflect what I have observed regularly during Force Option Simulator, Scenario, and Force-on-Force training, both as a student, observer, and instructor. My experience informs me that a subject's threatening actions if allowed to develop, will always be faster than the response time of the officer.

Although Officers Shepherd and Williams had other law enforcement tools in their immediate possession, no other force option was feasible to stop the immediate deadly threat posed by Ms. Henderson. Both officers had OC spray, Tasers, and impact weapons with them. However, none of those tools was appropriate for the circumstances. OC spray most often has a delay time before it takes effect. OC spray does not incapacitate an offender, it is designed to be used as a less-lethal force option as more a pain compliance tool. Tasers are difficult to employ against a moving subject, and officers need a direct line of sight with no barriers present in order to ensure

---

[78] *Ibid*. p. 336.
[79] *Ibid*. p. 338.
[80] Thomas A. Hontz, Justifying the Deadly Force Response, 2 Police Q. 462, 474 (1999).
[81] Lewinski, William. *Why shooting to wound doesn't make sense scientifically, legally or tactically*. Force Science Institute, Newsline #40, 2006. http://www.forcescience.org/fsnews/40.html.

1   contact with the Taser darts.  Batons are strictly pain compliance close quarters impact weapons
2   and getting close enough to use a baton would place an officer in grave danger when dealing with
3   a suspect armed with a firearm.  It is my opinion that the only force option that a reasonably trained
4   officer following standard law enforcement practices, procedures, and training would deploy in
5   the circumstances facing Officers Shepherd and Williams is lethal force in order to defend their
6   lives and the lives of innocent people against the imminent deadly threat posed by Ms. Henderson.
7
8
9
10
11
12
13

14   *[signature]*
15   Steve Papenfuhs
16   December 20th, 2016

## ATTACHMENT "A"
### Material Reviewed

**Case Reports and Disclosures:**

1. Plaintiff's Complaint for Damages, Case # 4:15-cv-04973-DMR
2. Alameda County District Attorney's Report, dated 10/29/15, Bates 546-579
3. Emeryville Police Report, case #1502-0259, Bates 0003-0048
4. Emeryville Police Department Administrative Investigation, Bates 0516-0545
5. Emeryville Police Department Event Record, Bates 0149-0153
6. Emeryville Police Department Unusual Incident Report, Bates 0185-0189
7. Oakland Police Department Crime Report, Bates 0049-0148
8. Oakland Police Department COE Crime Report, 6 pages, Bates 3123-3128
9. Radio Transmission, Bates 154-174
10. Scene Photos, Bates 443-507
11. Autopsy Photos (51 photos), no Bates numbers
12. Officer Shepherd OIS Interview, Bates 0190-0258
13. Officer Williams deposition, no Bates numbers
14. Officer Williams OIS Interview, Bates 288-374
15. Dispatch audio recording

**Literature Review:**

1. Blum, LN, PhD, *Force Under Pressure- How Cops Live and Why They Die*, Lantern Books, Booklight Inc., New York, NY 2000, page 5.
2. Artwohl, Alexis, PhD, "Perceptual and Memory Distortion During Officer-Involved Shootings," FBI Law Enforcement Bulletin, U.S. Department of Justice, Washington, DC, October 2002, pages 19-23.
3. William J. Lewinski, Jennifer L. Dysterheft, Matthew M. Priem & Robert W. Pettitt (2014): Police officers' actual vs. recalled path of travel in response to a threatening traffic stop scenario, Police Practice and Research: An International Journal.
4. Police Executive Research Forum- Critical Issues in Policing Series, "Guiding Principles on Use of Force, Washington, DC., 2016
5. California Commission of Peace Officer Standards and Training (POST), LD-20, "Use of Force," Version 3.2, June 2013.
6. California Commission of Peace Officer Standards and Training (POST), LD-23, "Crimes in Progress," Version 4.0, September 2010.
7. California Commission of Peace Officer Standards and Training (POST), LD-00: Becoming an Exemplary Peace Officer, V-1.1, Jan. 2009.
8. California Commission of Peace Officer Standards and Training (POST), LD-15: Laws of Arrest, V-4.9, Jan. 2016.
9. Petrowski, Thomas D., "Use of Force Policies and Training: A Reasoned Approach (part 2)", FBI Law Enforcement Bulletin, U.S. Department of Justice, Washington, DC, November, 2002.
10. Ross, Darrell. *Assessing lethal force liability decisions and human factors research*, Law Enforcement Executive Forum, 2013, 13-2.

1     11. Lewinski, William. *Why shooting to wound doesn't make sense scientifically, legally or*
2        *tactically*. Force Science Institute, Newsline #40, 2006. www.forcescience.org/fsnews/40.

3

4

**List of Exhibits:**
5     At this time, I do not anticipate presenting any exhibits at trial.

6

7

8

## ATTACHMENT "B"
**Report Excerpts**

There was a black revolver with wood type grips lying about 2 feet from the right side of Henderson's body. (Bates 0044/ Mayorga supp)

...small framed revolver about 3-4 feet to the north of the suspect. (Bates 0070/ Robert Moore supplemental).

Where was the gun?
It was on the ground, ul1, near her right hand.
Mm-hm. How far away would you say the gun was from her?
Uh, four feet. (Shepherd interview/ Bates 0233).

Urn, when you saw the victim, where was the gun? When she was on the floor- I'm sorry. When you saw the s- the suspect, urn, when she was on the floor, where was the gun in proximity to her?
About three to four feet away from her right hand.
Did anybody ever touch the gun?
Not that I saw. Not that I can recall. (Shepherd interview/ Bates 0239).

The gun was, like, somewhere - like, right around here. Urn, I'd say within three to five feet (Williams interview/ Bates 0338).

I watched her. And then it seemed like she was tryin' to push herself up. Uh, the gun was not far from her, maybe three to five feet. Urn, and I was worried she was still posing a threat and would reach for the gun. (Williams interview/ Bates 0357).

The gun laid only a couple feet to her right. (Emeryville admin invest. 5of 27/ Bates 0523)

The revolver was on the ground near Henderson's right hand about four feet from her body. She didn't see anyone touch the revolver once the shooting was over. (Emeryville admin invest 18 of 27/ Bates 0536).

She dropped her gun, which fell within a few feet of her. (Emeryville invest. 21 of 27; Bates 539).

He estimated that the gun was within three to five feet of her. (DA report p. 13/ Bates 0559).

A loaded six-shot Rohm GMBH Model RG40 .38 caliber revolver was found about six feet north of Ms. Henderson "about in line with her torso." (DA report p. 15/ Bates 561).

He estimated that the gun was within three to five feet of her. (DA report p. 20/ Bates 556).

...her gun fell three to five feet from her. (Williams depo p. 35).

1   It was on the ground, I believe by her right hand, I think.  A few feet away from her hand.
2   Maybe four feet. (Shepherd depo p. 67).
3
4   As Henderson fell to the ground she dropped the revolver. The gun laid only a couple feet to her
5   right. Williams then saw Henderson rise up and lean in the direction of the revolver. Officer
6   Williams feared that she was going to reach for the gun and so he fired his rifle again. Henderson
7   fell back to the ground and stopped moving. (Bates 523).
8
9   Shepherd walked around the rear of the car and then saw that the woman was down on the
10  ground. The revolver was on the ground near Henderson's right hand about four feet from her
11  body. (Bates 536).
12
13  I saw EPD Officer Costello standing over what appeared to be a small framed revolver about 3-4
14  feet to the north of the suspect. (Bates 70).
15
16

### ATTACHMENT "C"

I retired from the San Jose, California Police Department with the rank of sergeant in January, 2010. Prior to that, I had been a full-time peace officer since 1981. I was promoted to sergeant in 1994 and had been assigned to the Patrol Division, the Administrative Unit of the Bureau of Field Operations as the Training Coordinator, the Bureau of Investigations as a supervisor in the Family Violence Unit and the Narcotics and Covert Investigations Unit, the Field Training Unit (FTO), and the Bureau of Administration Training Division. As a police sergeant, I supervised, investigated, and documented numerous criminal investigations, detentions, arrests, and force responses by officers, whether as a matter of routine or due to citizen complaints and/or inquiries.

Prior to 1994 I was a police officer and my assignments included patrol, Special Operations:  Street Crimes, Mobile Emergency Response Unit and Equipment (MERGE), and Bureau of Investigations:  Auto Theft, and Sexual Assaults Investigations- Child Exploitations.

While working as a supervisor in the Training Division (2005-2009), I supervised the in-service training team and the California Peace Officers Standards and Training (P.O.S.T.) Force-options Simulator (FOS) program, which was implemented in 1999 in order to fulfill P.O.S.T. "perishable skills" requirements. In this program, my staff and I delivered training to the sworn members of the San Jose Police Department as well as other peace officers within Santa Clara County. Additionally, our facility was designated as a "regional skills training center" and we also provided the instructor training to other police agencies throughout the State of California. The FOS program concentrates on teaching the state and constitutional laws regarding the use of force by peace officers, as well as decision making involved in employing various types of force, up to and including deadly force.

I developed the Defense and Arrest Tactics program that was adopted by and is currently in use at the San Jose Police Department's police academy and in-service training program; and at the police academies at Evergreen Community College in San Jose, Gavilan Community College in Gilroy, and Monterey Peninsula College in Monterey, California. I have also designed and delivered the 80-Hour Arrest and Control and Baton Instructor course as mandated by California P.O.S.T. and in such capacity have provided certification to Instructors.

I served as the lead instructor and supervisor for the San Jose Police Department's Officer Safety and Survival, Firearms and Arrest and Control (perishable skills program), and Immediate Action and Rapid Deployment tactics programs. I have instructed and supervised staff for the in-service and Basic Academy TASER program. I have served as an instructor and scenario evaluator in Learning Domain 19- Vehicle Operations, Learning Domain 20- Use of Force, Learning Domain 21- Patrol Techniques, Learning Domain 22- Car Stops, Learning Domain 23- Crimes in Progress, Learning Domain 33- Arrest and Control and Baton, and LD 35- Firearms.

In my role as Training Unit supervisor and law enforcement instructor, I have had the opportunity to design, develop, deliver, supervise, and evaluate POST certified training courses; and in such roles have had contact with POST regional managers and POST executive staff. I have served on committees and contributed to the LD-33 Arrest and Control and Baton Learning Domain and the LD-19 Vehicle Operations Learning Domain. In addition, I contributed to the development of the San Jose Police Department's policies for Pursuits, Force Response Reporting, and Excited Delirium.

Since 1998 I have served as an adjunct instructor for the South Bay Regional Public Safety Training Consortium. In this capacity, I have trained officers in Santa Clara, Monterey, Santa

Cruz, and San Mateo Counties in a variety of topics including:   Force Options Simulator (perishable skills program), Search and Seizure, Use of Force Law, Vehicle Stops, Defense and Arrest Tactics, Baton, Emergency Vehicle Operations, Special Operations, Patrol Techniques, Crimes in Progress, Building Searches, and Active Shooter Response.

I have served as a consultant to local SWAT teams with regards to Rapid Deployment and Building Clearing tactics. I am a member of the International Association of Law Enforcement Firearms Instructors, the International Law Enforcement Educators and Trainers Association, the Illinois Tactical Officers Association, the California Association of Tactical Officers, and the National Tactical Officers Association.

During my law enforcement career, I have been trained in, have trained and supervised others in the use of, and have personally used various tactics, tools and techniques in order to control subjects in field situations.   This has included uses of batons, chemical agents (both CS and OC sprays), the TASER, extended-range impact munitions, and various weaponless measures. I have also controlled or supervised the control of numerous violent subjects in the field and have used total-appendage restraint methods including the "hobble" and "The Wrap®."

I am a graduate of the Force Science Research Center's "*Force Analyst Certification*," and the California Training Institute's "*Human Factors:  Threat and Error Management*," and "*Force Encounters Analysis: Understanding Human Performance During Critical Incidents*" courses.  I have studied, been trained in, researched, and have delivered training to officers, the instructors of officers, and attorneys in physical skills learning theory, attention, perception and reaction times, decision making, memory, and physiological and psychological reactions that manifest during force encounters.

I am a certified defensive tactics instructor through the FBI, and have designed and delivered training, supervised, and certified other instructors in POST accredited Defense and Arrest Tactics and Baton training.  I am extremely familiar with the methods of restraint, takedown, and defense currently taught and applied by U.S. law enforcement.  I have been certified as a TASER instructor for both the M26 and X26 TASERS.   I have also completed TASER International's Evidence Collection and Analysis Certification, and Taser Technician Certification Courses.

1       **ATTACHMENT "D"**
2
3       **STEVE PAPENFUHS**
4       **Four Year Testimony History**
5
6       2016    Joanne Blight v. City of Manteca, et.al., United States District Court-
7               Eastern District of CA. No. 2:15-CV-02513-WBS-CKD
8               (Defense) (Expert Report)
9               Reasonableness of SWAT Tactics;
10              Philip Downs, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200,
11              San Francisco, CA. 95104
12      2016    Tan Lam vs. City of Los Banos.  United States District Court-
13              Eastern District of CA. No. 2:15-CV-00531-MCE-KJN
14              (Defense) (Expert Report) (Deposition)
15              Reasonableness of deadly force; Tactics;
16              Philip Downs, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200,
17              San Francisco, CA. 95104
18      2016    Estate of Charles Salinas vs. County of Fresno, et al., United States District Court-
19              Eastern District of CA. No. 1:13-CV-00586-AWI-SAB
20              (Defense) (Expert Report) (Deposition) (Trial)
21              Reasonableness of deadly force; Tactics;
22              Dale Allen, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San
23              Francisco, CA. 95104
24      2015    Kong Meng Xiong v City of Merced, et al.  United States District Court- Eastern District
25              of CA.
26              No. 1:13-cv-00083-LJO-SKO
27              (Defense) (Expert Report) (Deposition) (Trial)
28              Reasonableness of deadly force, Tactics
29              Dale Allen, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San
30              Francisco, CA. 95104
31      2015    Meeker v Life Care Centers of America, et al.  United States District Court- District of
32              Colorado.
33              No. 14-cv-02101-WYD-BNB
34              (Plaintiff) (Expert Report) (Deposition)
35              Law Enforcement Scenario training protocols and practices
36              Christina Habas, Keating Wagner Polidori Free, P.C.  1290 Broadway, Suite 600,
37              Denver, CO. 80203
38      2014    Hampton v. City of Oakland and City of Emeryvile.  United States District Court.
39              Northern District of Ca. No. C-13-3094 SBA
40              (Defense) (Expert Report)
41              Reasonableness of detentions
42              Dale Allen, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San
43              Francisco, CA. 95104
44      2014    Warren v. City of Richmond, et al.  United States District Court. Northern District of Ca.
45              Civil Action No.  C 13 -4 4 6 4  DMR
46              (Defense) (Expert Report)

Reasonableness of deadly force
Dale Allen, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2014   Thao, et al. v. City of Merced, et al.  Superior Court of California, County of Merced. No. CV002599.
(Defense) (Deposition)
Reasonableness of deadly force
Dale Allen, Allen, Glaessner, Hazelwood, Werth. 180 Montgomery St, Suite 1200, San Francisco, CA. 95104

2014   Nicole McKinney v. Village of Robbins, et al. Circuit Court of Cook County, Ill. No. 08 L 6025
(Defense) (Deposition)
Reasonableness of deadly force, Off-duty tactics
John J. Walsh III, Pretzel & Stouffer, Chartered. One South Wacker Dr., Suite 2500, Chicago, Il. 60606

2012   Garabedian v. Bart, et al. Alameda County Superior Court No. RG 11575882
(Defense) (Consultation)
Police academy Defense and Arrest Tactics training; POST scenario testing
Janice Armenta, Contra Costa County, Office of the County Counsel
651 Pine St., 9th floor, Martinez, CA. 94553

2012   Confidential Case regarding Officer #12-21, San Jose, CA.  Civil Service disciplinary hearing.
(Defense) (Testimony-Civil Service Hearing)
Tactics during premises checks; Off-duty officer safety; Compliance with department policy.
Jeff Martin, Berry Wilkinson Law Group, 4040 Civic Center Dr. Suite 200, San Rafael, CA. 94903

## ATTACHMENT "E"

## CURRICULUM VITAE
December 15th, 2016

Steve Papenfuhs

3303 Palantino Way
San Jose, CA 95135
Telephone (408) 621-3955
E-mail: PappySJPD@yahoo.com

## EMPLOYMENT

2016-Present:  President- Insight Training Strategies

2014- Present:  Director- Battalion Defense, LLC.

1999 – Present: Instructor for South Bay Regional Public Safety Training Consortium.

1981 - 2010:    San Jose Police Department, California.

2000-2003:    Contract Executive Protection agent, Oracle Corporation.

2000-2002:    Consultant to Valley Medical Center, Security Department.

2000-2002:    Instructor for Cabrillo College Administration of Justice courses.

1994-1996:    Security Director for Greystone Distributing.  Duties included executive protection, transportation and route security, training, scheduling, and supervision of subordinate personnel.

### Police Sergeant
1994-2010

**Bureau of Field Operations**: Field Training Unit Supervisor; Patrol Supervisor; Administrative Unit Supervisor (Training Coordinator)

**Bureau of Administration**:  Training Division Supervisor

**Bureau of Investigations**:  Family Violence Unit - Domestic Violence Team Supervisor; Narcotics and Covert Investigations Unit - Undercover Team Supervisor

### Police Officer
1981-1994

**Bureau of Field Operations**:  Patrol; Special Operations:  SWAT, Street Crimes Unit

**Bureau of Investigations**:  Sexual Assaults Unit, Auto Theft Unit

### EDUCATION

Bachelor of Science Degree- Criminal Justice Management (Feb, 2012)
Union Institute and University

Associates of Arts Degree (Dec, 1998)
Evergreen Valley-San Jose City College

"Techniques of Teaching" (Aug, 1986)
University of California Extension- Teaching Credential

### TRAINING/EVALUATION PROVIDED

September 2012: Presenter, "Applying Human Factors Research to Instructional Design." California Commission on Peace Officers Standards and Training (POST) Basic Course Consortium meeting.

March 2012:  Pilot program evaluator for California Peace Officer Standards and Training (EVOC)

Jan. 26th, 2012:  Active Shooter training for Los Altos, Ca. Police Department

Jan. 11th, 2012:  Defense and Arrest Tactics training for Santa Cruz, Ca. Police Department.

April 8th and April 12th, 2011:  Active Shooter training for Sunnyvale, Ca. Department of Public Safety's Patrol Division.

Mar. 25th, 2011:  Active Shooter training for Sunnyvale, Ca. Department of Public Safety's SWAT team.

January 2011:  Presenter, "The Science of Human Factors Research and Its Application to Force Encounters."  Defense Research Institute:  *Civil Rights and Governmental Tort Liability Seminar*.  New Orleans, Louisiana

2004:  Presenter at the *Defensive Tactics Newsletter* Instructors Conference on the topic "Principle-Based Weapons Disarms."

### INSTRUCTIONAL SPECIALITIES

- California P.O.S.T. Commission:  Learning Domain 15- Laws of Arrest
- California P.O.S.T. Commission:  Learning Domain 16- Search and Seizure
- California P.O.S.T. Commission:  Learning Domain 19- Vehicle Operations
- California P.O.S.T. Commission:  Learning Domain 20- Use of Force
- California P.O.S.T. Commission:  Learning Domain 21- Patrol Techniques
- California P.O.S.T. Commission:  Learning Domain 22- Vehicle Stops
- California P.O.S.T. Commission:  Learning Domain 23- Crimes in Progress
- California P.O.S.T. Commission:  Learning Domain 24- Handling Disputes/Crowd Control
- California P.O.S.T. Commission:  Learning Domain 33- Arrest Methods/Defensive Tactics/Baton
- California P.O.S.T. Commission:  Learning Domain 35- Firearms

## PROGRAM DEVELOPMENT, MANAGEMENT, AND CONTRIBUTION

- December 2nd to December 3rd, 2015:  Subject Matter Expert participant in the California Commission on Peace Officer Standards and Training (POST) Force Option Simulator Instructor meeting.
- August 26th, 2015: One of eleven state-wide Subject Matter Experts Interviewed for California Commission on Peace Officer Standards and Training (POST) Cognitive Task Analysis Interview: Bridging the Gap: Cognitive Requirements for First Responders.
- Jan-June 2015: Committee member for California Commission on Peace Officer Standards and Training (POST) Active Shooter Response telecourse.
- August 2014: Award of Appreciation: California Reserve Peace Officers Association.
- 2005-2010:  San Jose Police Department's Defense and Arrest Tactics Program:  Developed and managed program, and trained all department instructors.  This program was adopted by the South Bay Regional Public Safety Training Consortium for the police academy sites located in San Jose and Monterey.
- 2005-2009: Contributed to the development of the San Jose Police Department's policies for Pursuits, Force Response Reporting, and Excited Delirium.
- 2005-2009: San Jose Police Department's Immediate Action/Rapid Deployment (Active Shooter) Program:  Developed and managed program; delivered training to over 1,500 officers of the San Jose PD and surrounding agencies.
- 2008: San Jose Police Department's Civilian Police Academy:  Developed and managed program; delivered training to the members of the Independent Police Auditor's office, the Santa Clara County Civil Grand Jury, and the City of San Jose Human Rights Commission.
- 2005-2009: Managed the California P.O.S.T. Commission's mandated Continuous Professional Training (CPT) program for San Jose PD providing instruction in First Aid/CPR, Active Shooter, Human Factors and Human Performance Dimensions in high-stress encounters, Tactical Field Exercises, Building Searches, Communications Skills, Domestic Violence, Search and Seizure, and Use of Force Law update.
- 2005-2009: Managed the California P.O.S.T. Commission's mandated Perishable Skills Program (PSP) for San Jose PD providing instruction in Arrest and Control Tactics, Firearms, and Emergency Vehicle Operations.
- 2000: Consulted with the California Peace Officer Standards and Training Commission as a subject matter expert for Defensive Tactics, Arrest and Control, and Baton.
- 2000: Lectured at Stanford University on *Domestic Violence and the Law Enforcement Response*.
- 1998-2000: Contributed to the Santa Clara County Domestic Violence Protocol.
- Developed and delivered P.O.S.T. certified Impact Suit Instructor Course at Cabrillo College, Aptos, CA.

## INSTRUCTOR CERTIFICATES

**Defensive Tactics:**
- California P.O.S.T. Certified: Defensive Tactics/Baton Instructor- Federal Bureau of Investigations (June, 1997- 80 hours)
- California P.O.S.T. Certified: Arrest and Control Instructor Course- Los Angeles Police Department (April, 1998- 80 hours)
- California P.O.S.T. Certified: Defensive Tactics Instructor Update- San Francisco Police Department (September, 2002- 8 hours)
- TASER International: TASER Instructor (2009, 2005, 2001- 48 hours)
- National Law Enforcement Training Center: Lateral Vascular Neck Restraint Instructor (February, 2006- 16 hours)
- Law Enforcement and Security Trainers: Master CLAMP Instructor (June, 1999- 24 hours)

- Law Enforcement and Security Trainers: GRASP Instructor (June, 2002- 16 hours)
- Law Enforcement and Security Trainers, Inc: CLAMP Advanced Instructor (July, 1997- 16 hours)
- Armament Systems and Procedures: ASP Tactical Baton Instructor (August, 1997- 16 hours)
- Rape Aggression Defense Systems, Inc: R.A.D Instructor (September, 1997- 24 hours)
- CQC Service Group: Tactical Folding Knife Instructor (16 hours)
- Gavilan Police Academy: Side Handle Baton Instructor Update (January, 1988- 8 hours)
- Monadnock Lifetime Products: PR-24 Baton Instructor (September, 1986- 40 hours)

**Special Tactics:**
- Viking Tactics: Shoothouse Instructor (January, 2010- 24 hours)
- United States Department of Homeland Security: WMD Awareness Instructor- (April, 2007- 24 hours)
- California Office Of Emergency Services: L.E. Response to Terrorism Instructor (June, 2005- 32 hours)
- San Jose Police Department:  Active Shooter Train the Trainer (August, 2001- 20 hours)
- International Tactical Training Seminars: Low-Light Tactics Instructor (May, 2004- 24 hours)

**Emergency Vehicle Operations:**
- California P.O.S.T. Certified: Driver Awareness Instructor (October, 2000- 24 hours)
- California P.O.S.T. Certified: Emergency Vehicle Operations Instructor (October, 2000- 40 hours)
- Bobby Ore Motorsports: Advanced Law Enforcement Instructor Driving Course (December, 2000- 40 hours)

**Firearms:**
- California P.O.S.T. Certified: Firearms Instructor- San Jose PD (June, 2008- 40 hours)

**Other:**
- Institute for the Prevention of In-Custody Deaths: Excited Delirium and Sudden In-Custody Deaths Instructor (August, 2010- 16 hours)
- California P.O.S.T. Certified: Force Options Simulator Instructor (FOSI)- (June, 2009- 40 hours)
- California P.O.S.T. Certified: Academy Instructor Certification Course (December, 2006- 40 hours)
- California P.O.S.T. Certified: Basic Course Instructor (February, 2003- 40 hours)
- American Health and Safety Institute: Instructor Development Course (September, 2009- 24 hours)
- American Health and Safety Institute: First Aid/CPR Instructor Development Course (June, 2008- 24 hours)

## SPECIALIZED FIREARMS TRAINING

- California P.O.S.T. Certified: Force Option Simulator Course (January, 2001- 4 hours)
- Viking Tactics: Advanced Pistol Course (March, 2009- 24 hours)
- Viking Tactics: Carbine 1.5 Course (March, 2008- 24 hours)
- Viking Tactics: Streetfighter Course (August, 2008- 24 hours)
- Viking Tactics: Level I Tactical Carbine (December, 2004- 24 hours)
- Yavapi Firearms Academy: Glock 17 Police Pistol (January, 2003- 24 hours)
- International Tactical Training Seminars: Tactical AR Rifle (August, 2001- 24 hours)
- National Tactical Officers Association: Tactical Shotgun Course (October, 1996- 8 hours)
- Heckler and Koch International: Advanced Firearms and CQB (September, 1994- 8 hours)
- International Training Consultants: Heckler and Koch MP-5 Certified Operator Program (November, 1989- 24 hours)
- Yavapi Firearms Academy: Police Shotgun (May, 1988- 24 hours)

- Los Angeles Police Department: Handgun Survival (January, 1985- 8 hours)

**SPECIALIZED DEFENSIVE TACTICS TRAINING**

- California P.O.S.T. Certified:  Chemical Agents (June, 1981- 8 hours)
- Krav Maga Association of America:  Handgun/Shotgun/Long Gun Defenses (November, 1997- 7 hours)
- Cutting Edge Training: Duty Knife: Use and Defense by Officers (June, 2007- 8 hours)
- Cutting Edge Training: Police Close Defense (June, 1995- 8 hours)
- Muay Thai Academy: Advanced Combat Training (February, 1994- 8 hours)
- National Law Enforcement Training Center: Lateral Vascular Neck Restraint (LVNR) (February, 2006- 16 hours)

**SPECIALIZED VEHICLE OPERATIONS TRAINING**

- California P.O.S.T. Certified:  Driving Simulator Course- San Jose Police Department (January, 2001- 4 hours)
- Oakland Police Department: Pursuit Immobilization Technique (PIT) course (April, 2005- 8 hours)
- San Bernardino County Sheriff's Department: Executive Protection Driving (October, 1993- 16 hours)

**SPECIALIZED TACTICAL TRAINING**

- California Association of Tactical Officers: Training Safety Officer (20 hours, June 15-16, 2015)
- FEMA: IS-00907 Active Shooter: What You Can Do (May, 2011- On-line training)
- California Association of Tactical Officers: Tactical Operations Liability Course (August, 2011- 16 hours)
- California P.O.S.T. Certified: Tactical Response to School/Community Violence-SJPD (September, 2001- 10 hours)
- Viking Tactics: Active Shooter Deployment Course (December, 2008- 32 hours)
- Viking Tactics: Assault Team Leader Course (March, 2008- 40 hours)
- South Bay Regional Public Safety Training Consortium: Advanced SWAT Course (March, 1990- 40 hours)
- San Jose Police Department: Active Shooter (January, 2008- 4 hours)
- FTF Tactics/ Los Angeles Sheriff's Department: Active Shooter/ First Responder (June, 2007- 24 hours)
- Los Angeles Police Department SWAT: Hostage Rescue Tactics (July, 2002- 24 hours)
- California Criminal Justice Training:  Special Weapons and Tactics (Nov, 1982- 40 hours)
- Code 4 Public Safety Education Association: Virginia Tech Terror: Tragic Lessons (February, 2008- 8 hours)
- International Law Enforcement Training and Consulting: Officer Survival and Tactics (April, 1995- 8 hours)
- Scotti School for Defensive Driving: VIP Protection Seminar (September, 1994- 4 hours)
- California State Police: Protection of Public Officials (June, 1987- 40 hours)
- International Association of Chiefs of Police: Executive and Dignitary Protection (November, 1987- 24 hours)
- United States Secret Service: Protective Operations Briefing (March, 1986- 24 hours)
- State of California Department of Justice: Executive Protection (November, 1984- 36 hours)
- Crime Prevention and Control: L.A. Riots Case Study- Chief Daryl Gates (September, 1994- 4 hours)

- Tactical Response Association: International Conference on Tactical Response and Security (March, 1993- 24 hours)
- Calibre Press, Inc:  Street Survival II-The Tactical Edge Seminar (December, 1986- 16 hours)
- Calibre Press, Inc: Street Survival Seminar (January, 1982- 16 hours)
- San Jose Police Department: Planning for Mass Casualty Incidents (February, 2005- 24 hours)
- Department of Homeland Security: Enhanced Threat and Risk Assessment (May, 2010- 16 hours)
- National Domestic Preparedness Coalition:  OpValTRVA (May, 2010- 32 hours)
- United States Department of Homeland Security:  National WMD Standardized Awareness (April, 2005- 8 hours)

**HUMAN FACTORS, USE OF FORCE, CIVIL LIABILITY, TECHNICAL TRAINING**

- Institute for the Prevention of In-Custody Deaths, Inc: Excited Delirium, Agitated Chaotic Events™, Arrest-Related and In-Custody Deaths Conference (November, 2016- 20 hours)
- South Bay Police Training Committee: Use of Force- Formulating a Plan (November, 2015- 8 hours)
- Institute for the Prevention of In-Custody Deaths, Inc:  Law Enforcement Camera Based Systems (June, 2015- 20 hours)
- Institute for the Prevention of In-Custody Deaths, Inc: Developing Defendable Psychomotor Learning Domain Assessments (2013- 8 hours)
- California POST Certified: Deadly Force in the Digital Era, (Rains, Lucia, Stern) (2013- 8 hours)
- Public Agency Training Council: Defending Law Enforcement Litigation (December, 2011-16 hours)
- California Association of Tactical Officers:  Tactical Operations Liability Course (August, 2011-16 hours)
- Taser International & FBI National Academy: TASER Use of Force, Risk Management and Legal Strategies Seminar (2011-8 hours)
- Public Agency Training Council: TASER and Electronic Control Devices Legal Update and Best Practices (2011-1 hour)
- California Peace Officer Association: Officer Involved Shootings, California P.O.S.T. Certified, (February, 2011-16 hours)
- Americans for Effective Law Enforcement: Discipline and Internal Investigations (December, 2011-20 hours)
- Public Agency Training Council: Electronic Weapons Best Practices: (March, 2011- 1 hour)
- Institute for the Prevention of In-Custody Deaths, Inc: 2010 Arrest Related Death Conference (November 2010- 20 hours)
- California Training Institute:  Force Encounters; (August, 2010-24 hours)
- Americans for Effective Law Enforcement: Arrest-Related, Excited Delirium, In-Custody Death Conference (November, 2010-20 hours)
- California Peace Officers Standards and Training: Scenario Management Workshop (October, 2009-28 hours)
- San Jose Police Department: Driving/ Force Option Simulator Course (April, 2004- 8 hours)
- California Training Institute: Human Factors: Threat and Error Management (2003, 2010-48 hours)
- PPCT Management Systems:  Use of Force Human Factors Conference (October, 2002-24 hours)
- Force Science Research Center:  Certified Force Science Analyst (2008,2010-80 hours)
- Americans for Effective Law Enforcement: Lethal and Less Lethal Force (March, 2008-16 hours)
- Illinois Law Enforcement Training and Standards Board Certified: Use of Force Conference (April, 2003-24 hours)
- International Law Enforcement Training and Consulting: Tactical Incident/Civil Liability Update (March, 1997-24 hours)

- A.B.L.E. Law Enforcement Seminars: Civil Liability: The Law Enforcement Challenge (December, 1995-24 hours)
- California Peace Officers Association: Supervisor Use of Force Investigation  (March, 1995-8 hours)
- American Society of Law Enforcement Trainers: Use of Force Training Seminar (July, 1995-24 hours)
- California Peace Officers' Association: Use of Force Seminar (March, 1995- 8 hours)

**ADVANCED OFFICER TRAINING**

- California P.O.S.T. Certified: Police Supervisor Course (October, 1994- 80 hours)
- California P.O.S.T. Certified: Field Training and Evaluation Program (September, 2009- 40 hours)
- California P.O.S.T. Certified: Scenario Manager Course (October, 2009- 24 hours)
- California P.O.S.T. Certified: Communications Skills Training (April, 2006- 2 hours)
- California P.O.S.T. Certified: Law Enforcement Officers Killed and Assaulted (8 hours)
- California P.O.S.T. Certified: Officer Safety and Field Tactics Update (10 hours)
- CareerTrack: Conflict Resolution and Confrontation Skills (August, 1995- 8 hours)
- Federal Bureau of Investigations: Law Enforcement Officers Killed and Assaulted (May, 2006- 8 hours)

**LAW ENFORCEMENT INVESTIGATIONS TRAINING**

- Americans for Effective Law Enforcement: Discipline and Internal Investigations (2011-16 hours)
- TASER International: Evidence Collection and Analysis Certification Course (8 hours)
- TASER International: Taser Technician Certification (16 hours)
- South Bay Regional Public Safety Training: Background Investigations (June, 2010- 36 hours)
- California Highway Patrol: Vehicle Theft Investigations (November, 1992- 40 hours)
- P.O.S.T. Certified: Investigations of Traffic Accidents California (June, 1981- 8 hours-approx.)
- Drug Enforcement Administration: Narcotics Investigations (March, 1983- 80 hours)
- San Jose Police Department: Narcotic and Covert Investigations (April, 1996- 40 hours)
- San Jose Police Department: Domestic Violence (January, 1987- 8 hours)
- California Department of Justice: Heroin Influence (February, 1983- 20 hours)
- Crime Prevention and Control: Managing Street Level Drug Enforcement Ops (September, 1994- 4 hours)
- International Associations of Chiefs of Police: Responding to Alien Crimes (July, 1996- 16 hours)
- San Jose Police Intelligence Unit: Eco-Terrorism, Extremists and Anarchists  (8 hours)
- South Bay Regional Public Safety Training Center: Terrorism Update (8 hours)
- San Francisco Police Department: Surveillance Threat Awareness (8 hours)
- Institution on Terrorism and Subnational Conflict (Neil Livingstone): (4 hours)
- United States Postal Service: Package Bombs: Terror by Mail (4 hours)
- Tactical Response Association: International Conference on Terrorism-Violence-Drugs (August, 1992- 8 hours)
- California Department of Justice: Urban Terrorist Activity (36 hours)
- National Law Enforcement Institute: Terrorism- The Police Response  (24 hours)
- Law Enforcement Legal Reporter: Interrogations and Vehicle Searches (July, 1982- 8 hours)
- Law Enforcement Legal Reporter: Ramey Arrests, Informants, and Detentions (July, 1982- 8 hours)
- Law Enforcement Legal Reporter: Searches of Persons, Dwellings, Probation and Parole, and Search Warrants (July, 1982- 8 hours)
- Law Enforcement Legal Reporter: Legal Aspects of Patrol Activities (March, 1984- 8 hours)

- California Peace Officers' Association: Legal Update (November, 1985- 8 hours)
- San Jose Police Department: Criminal Investigators Training Course (January, 1992- 40 hours)
- San Jose Police Department: Principles of Interview and Interrogations (January, 1996- 16 hours)
- San Jose Police Department: Oral Interview Techniques (May, 1993- 8 hours)
- Sonoma County Sheriff's Department: Domestic Violence Training (February, 1997- 8 hours)

## CALIFORNIA COMMISSION ON PEACE OFFICERS STANDARDS AND TRAINING (P.O.S.T.) CERTIFICATES

- Course Administrator Seminar (2005- 16 hours)
- Supervisory Certificate awarded April 10, 2001
- Advanced Certificate awarded February 23, 1990
- Intermediate Certificate awarded February 23, 1985
- Basic Certificate awarded May 28, 1982

## TEACHING EXPERIENCE

1999-Present:  South Bay Regional Public Safety Training Consortium:  Force Options Simulator Instructor;  Academy Instructor and Evaluator in the following domains:  POST LD-19 (Vehicle Operations); POST LD-20 (Use of Force); POST LD-21 (Patrol Procedures); POST LD-22 (Vehicle Stops); POST LD-23 (Crimes in Progress).

2005 – 2010:  San Jose Police Basic Academy POST LD-33 (Defense and Arrest Tactics) Lead Instructor; POST LD-19 (Vehicle Operations) Instructor; POST LD-20 (Use of Force) Scenario Evaluator; POST LD-22 (Vehicle Stops) Scenario Evaluator.

2005 – 2009:  Supervisor in San Jose PD Training Unit, overseeing and teaching: Force Options Simulator; Officer Safety Update; First Aid; Defensive Tactics; Tactical Field Exercises; Firearms; Domestic Violence updates; Force Law; Laws of Arrest, Search, and Seizure; Human Factors: Attention, Cognition, and Decision Making; Building Searches; Active Shooter/Immediate Action Rapid Deployment; Vehicle Combat Tactics; Force on Force Exercises.

## PROFESSIONAL MEMBERSHIPS

- Human Factors and Ergonomics Society
- National Tactical Officers Association
- California Association of Tactical Officers
- Illinois Tactical Officers Association
- International Law Enforcement Educators and Trainers Association

1
2
3
4

<div align="center">

**ATTACHMENT "F"**
**STEVE PAPENFUHS**
**Publications**

</div>

5
6
7
8

- "3 Alternative Ways of Considering Tactical Thinking," article, PoliceOne.com. July 31, 2015. http://www.policeone.com/Officer-Safety/articles/8693800-3-alternative-ways-of-considering-tactical-thinking/
(Edited by PoliceOne editor Doug Wylie from original submission: "A Tactical Refresher")

9
10
11
12

- "Be Dangerous- Maintaining street smarts off duty," article, PoliceOne.com. January 3, 2014. http://www.policeone.com/off-duty/articles/6709801-Be-dangerous-Maintaining-street-smarts-off-duty/

13
14
15

- "The OODA loop, reaction time, and decision making," article, PoliceOne.com. February 23 2012. http://www.policeone.com/columnists/Steve-Papenfuhs/

16
17
18
19

- "Addressing cops confusion over the public duty doctrine," article, PoliceOne.com. January 5, 2012.  http://www.policeone.com/legal/articles/4913117-Addressing-cops-confusion-over-the-public-duty-doctrine/

20
21
22
23

- "Training recruits the tactical M&M's," article, PoliceOne.com. November 30, 2011. http://www.policeone.com/close-quarters-combat/articles/4776634-Training-recruits-the-tactical-M-Ms/

24
25
26
27

- "Wired to kill: Are we innate murderers?" article, PoliceOne.com. October 26, 2011. http://www.policeone.com/health-fitness/articles/4557499-Wired-to-kill-Are-we-innate-murderers/

28
29
30
31

- "Teaching Recruits Real World Survival Skills," article, PoliceOne.com. September 28, 2011. http://www.policeone.com/Officer-Safety/articles/4414740-Teaching-recruits-real-world-survival-skills/

32
33
34
35

- "SWAT Tactics: Formations Don't Win Football Games or Fights," article, PoliceOne.com. August 2nd, 2011. http://www.policeone.com/police-trainers/articles/3873578-SWAT-tactics-Formations-dont-win-football-games-or-fights/

36
37
38
39

- "Tactical Cornering During Foot Pursuits," article, PoliceOne.com. June 16th, 2011 http://www.policeone.com/suspect-pursuit/articles/3774527-Tactical-cornering-during-foot-pursuits/

- "Understanding the Dynamics of Stress, Memory, and Decision Making," article, PoliceOne.com. May 5th, 2011 http://www.policeone.com/police-trainers/articles/3648840-Understanding-the-dynamics-of-stress-memory-and-decision-making/

- "Ethical Dilemmas Cops Face Daily," article, PoliceOne.com. April 6th, 2011. http://www.policeone.com/legal/articles/3467115-Ethical-dilemmas-cops-face-daily/

- "Using "MAPS" to Describe the Threat," article, PoliceOne.com. Feb. 24th, 2011. http://www.policeone.com/Officer-Safety/articles/3377955-Using-MAPS-to-describe-the-threat/

- "Safety in Law Enforcement Training is an Attitude, Not an Action," article, PoliceOne.com. Feb. 3rd, 2011. http://www.policeone.com/Officer-Safety/articles/3294377-Safety-in-LE-training-is-an-attitude-not-an-action/

- "Defeating the 'Tactical Error Defense,'" article, PoliceOne.com. January 13th, 2011. http://www.policeone.com/legal/articles/3198586-Defeating-the-Tactical-Error-Defense/

- "Policy, Procedure, and the Prosecutor," article, LawOfficer.com.  January 7th, 2011. http://www.lawofficer.com/article/policy-procedure-prosecutor

- "Ask-Tell-Taser: A Review of a Recently Released Video," article, PoliceOne.com. November 18th, 2010. http://www.policeone.com/less-lethal/articles/2920425-Ask-tell-TASER-A-review-of-a-recently-released-video/

- "Want to be a Leader?  Do a gut-check first," article, PoliceOne.com. October 21, 2010. http://www.policeone.com/chiefs-sheriffs/articles/2832337-Want-to-be-a-Leader-Do-a-gut-check-first/

- "Search First or Handcuff First?  Neither!" article, PoliceOne.com. September 23rd, 2010. http://www.policeone.com/police-products/duty-gear/restraints/articles/2717262-Search-first-or-handcuff-first-Neither/

- "Are You Training Your Recruits How to Think?" article, PoliceOne.com. August 19th, 2010. http://www.policeone.com/law-enforcement-newsletter/Calibre-Press-Newsline-08-19-10

- "Lessons Learned: Dissecting a Dangerously Close Call," PoliceOne.com. June 23rd, 2010. http://www.policeone.com/patrol-issues/articles/2086570-Lessons-learned-Dissecting-a-dangerously-close-call/

**ATTACHMENT "G"**
**FEE SCHEDULE**
July, 2015

**RETAINER** – In advance to begin work on a case
- $1,500.00 (credited toward final invoice).

**DEPOSITION/TESTIFYING**
- $300.00 per hour. (Four-hour minimum for deposition and court testimony)

**READING, CONSULTATION, RESEARCH & REPORTS**
- $200.00 per hour.

**SITE VISIT**
- $1,600.00

**TRAVEL (Does not include travel expenses)**
- $100 per hour.

**TESTIMONY STANDBY TIME**
- $200.00 per hour.

**FILING/BILLING/OFFICE SUPPLY FEE (One-time fee per case)**
- $150.00

**CASE-RELATED RESEARCH OR OTHER EXPENSES**

- **To be paid for/reimbursed by client (any amount over $100.00 requires prior authorization by client or representative).  Receipts will be provided for any amount spent for case-related research.**

---

Mileage will be charged at the current IRS rate.
After 45 days a 10 percent late fee will be charged.
Expenses will be billed as incurred.
Invoices may be issued every 30 days when the case is active.
The hiring firm/organization is responsible for ensuring that all fees are paid in full and in a timely manner.

**Payment to be made within 45 days of receipt of invoice to:**    **Steve Papenfuhs**
                                                                  **EIN: 45-3791587**

---

# EXHIBIT T

```
┌─────────────────────────────────────────────────────┐
│              Alexander Jason                          │
│         ───────────────────────                      │
│       Certified Senior Crime Scene Analyst           │
│        Shooting Incident Analysis & Reconstruction   │
│     P.O. Box 375, Pinole, CA 94564 • 510 724 1003 • Fax: 724 0733 │
│               www.alexanderjason.com                 │
└─────────────────────────────────────────────────────┘
```

Mr. Dale L. Allen, Jr. ATTORNEY AT LAW
180 Montgomery Street, Suite 1200
San Francisco, CA 94104


December 23, 2016

Re: Henderson v City of Emeryville, et al.
No. 4:15-cv-04973-DMR

## Shooting Incident Analysis

Summary of Background.

- I am Board Certified in:

    **Crime Scene Analysis**
    **Force Science Analysis**
    **Forensic Photography & Digital Imaging**

- I have been accepted as an expert in state and federal courts in California and 11 other states to provide expert testimony in crime scene reconstruction, wound ballistics, and force science (the human dynamics related to the use of force.)

- I have performed analysis and reconstructions on more than 500 criminal and/or shooting incidents and I have been retained by U.S. Attorneys, U.S. Army Judge Advocate General, United States Department of State, and many other agencies to perform analyses of a variety of incidents.

- I have comprehensive training in the analysis and reconstruction of shooting incidents and have participated in training others (nationally and internationally) in these subjects.

- I have performed substantial research on the time and movement of persons involved in shooting incidents, the neuropsychological factors related the decisions to shoot, and the time dynamics relating to firearm operation and bullet travel.

- I have had training in neuroscience relating to human action and perception and in cognitive neuroscience of sensory and motor control systems integration; taught by the Duke University School of Medicine and by the Duke University Department of Psychology & Neuroscience.

- I am currently appointed to the U.S. Department of Justice's Standing Review Board performing reviews and providing recommendations on federal funding of grants for new forensic science and crime scene investigation technologies and programs.

- I am a Fellow of the American Academy of Forensic Sciences, a member of the International Association for Identification, and a Technical Advisor on Wound Ballistics to the Association of Firearm and Toolmark Examiners.

- I have made over 100 presentations to forensic science, law enforcement, prosecutor, and defense counsel groups and I have also been published in the F.B.I.'s forensic science journal and other peer-reviewed publications. My qualifications, memberships, education, experience, and training is fully described in the attached C.V.

**I have reviewed the following documents and evidence items:**

- Alameda County Coroner Autopsy Report & Photos
- Crime scene & evidence photos
- OPD scene video
- OPD Crime Reports & Diagrams
- Deposition of Officer Warren Williams
- Deposition of Officer Michele Sheperd
- Interviews of Officer William Williams & Michele Sheperd
- Alameda County District Attorney Report

**Introduction**

The purpose of my analysis and reconstruction of this shooting incident is to determine if the physical evidence is consistent with Emeryville Police Department Officers Warren Williams and  Michelle Sheperd's description of the shooting incident and to perform a force science analysis of the incident.

**Summary (based on Officers Williams and Sheperd's description.)**

Officers Williams and Sheperd were attempting to detain an armed suspect (Yvonne Henderson) who had pulled and pointed a revolver at store security personnel after being detained for shoplifting, attempted to use her revolver to carjack several drivers and then fled on foot. Henderson ran into the loading portal of a public storage building. Both officers had issued commands to "get on the ground" and were approaching the suspect with their weapons ready. Suspect Henderson was behind a parked car holding her revolver. When both Officers saw that she was pointing her gun at Officer Williams, they fired. Officer Sheperd fired one shot from her pistol. Officer Williams fired six round from his AR-15 rifle, fatally wounding the suspect.

**Opinion 1**

**The location of the fired cartridge casings are consistent with Officer Williams' and Officer Sheperd's description of the incident.**

**Basis:**

Officer Williams fired six round from his .223 rifle. Six rounds were recovered and were identified to his rifle. Significantly, there were two general location groupings which are consistent with his description of initially firing while standing and then moving northward to a new (nearby) location and dropping to one knee while firing the last of his rounds.

Officer Williams deposition, pgs, 36-37:

> 14 ·   A. ·  *After the first volley, I could see some kind*
> 15 · · *of movement. ·  I didn't know what it was, but when she*
> 16 · · *came around the corner of the driver's side of the*
> 17 · · *vehicle, she was drawing down on me like this, and I*
> 18 · · *was getting back on my sights (indicating) . . .*
> 24 · · *the guy inside popped out, and he was in my line of*
> 25 · · *fire. ·  I lowered my gun and looked, and she was still*
> Page 37
> ·1· · *drawn down. ·  I couldn't fire. ·  I couldn't do anything.*

Henderson v City of Emeryville - Shooting Incident Analysis – Alexander Jason, CSCSA Page **4** of **8**

·2· · So I just kind of dove to a knee to get out of the way
·3· · of her fire. ·  It seemed like forever, but I think it
·4· · was just a half a second. ·  And he went back in the car,
·5· · and then that's when I shot my second volley, and
·6· · that's when she fell.

Officer Sheperd described firing one round from her .40 cal S&W pistol while located on the right side of the second pillar (from the south side of the portal). One .40 caliber casing was recovered from a location consistent with her firing location.



Figure 1 -  Green = Ofc Sheperd casings; Blue = Ofc Williams (one is not visible in this photo). Green arrow indicates Ofc Sheperd's shooting location. Blue box = Ofc Williams general locations.

**Opinion 2**

**The physical evidence in the form of the gunshot wounds are consistent with the decedent being in a rising (from prone) position when shot fatally.**

**Basis:**

Two of the three gunshot wounds sustained by the decedent are consistent with her rising up after falling to the ground, as described by Officer Williams.

Officer Williams deposition, pages 43-44

> Q. · And do you recall what she looked like when she
> 17 · · was attempting to get up?
> 18 · · · · A. · It seemed like she was trying to pop her head
> 19 · · up to look. · It looked like she was looking for her
> 20 · · gun, like she was trying to rearm herself.
> 21 · · · · Q. · Did you see what part of her body, if any, got
> 22 · · up off the ground besides her head?
> 23 · · · · A. · No. · I kind of remember -- I think maybe it was
> 24 · · her left arm. · I think her right arm was still
> 25 · · stretched out, but it seemed like she kind of popped
> Page 44
> ·1· · her head up and maybe put her -- she may have put her
> ·2· · left hand down, but it looked like she was popping her
> ·3· · head up to look for where her gun fell, like she was
> ·4· · still coming. ·

A. The trajectory of the fatal gunshot wound to the decedent's head was front to back, not upward. This gunshot entered just below the junction where the right earlobe touches the cheek. The bullet then struck the thick section of the temporal bone and fragmented, projecting bone and bullet fragments radially. This projection of fragments and the resulting intercranial pressure cause massive fractures in the cranium. However, the largest bullet fragments along with the bullet jacket continued to a location in her posterior neck, just below the posterior cranium.

This wound path is essentially front to back and somewhat downward and is consistent with Officer Williams firing while on one knee at the decedent whose head was up and facing directly towards him.

Henderson v City of Emeryville - Shooting Incident Analysis – Alexander Jason, CSCSA Page **6** of **8**



Figure 2 – Arrow points to largest bullet fragments.

B.  The grazing gunshot wound on the decedent's right rear shoulder/back is also consistent with the decedent being in a "rising up" position when shot. The wound path is very shallow grazing wound. The wound path could not have been produced while the decedent was standing erect nor could it have been produced while the decedent was flat, prone on the ground. The wound path is consistent with the torso being raised off the ground.

The penetrating bullet defect "I" in the rolling door behind the decedent's location at a low location (approximately 10" above ground) is consistent with being the secondary bullet impact location after causing the decedent's graze wound.



Figure 3 - Bullet defect "I" in rolling door.

## Opinion 3

**After falling to the ground, the decedent still presented an immediate threat when she rose up and reached for her revolver.**

**Basis:**

Research experiments performed by this analyst with prone subjects and firearms establish that a person on the ground with a firearm nearby can acquire, point, and fire in a very short time period. Officer Williams was completely exposed at his location in the parking area and at a distance which would not allow him to rise up from his kneeling stance and run to the decedent without immediate danger of being shot.

---

**Summary Opinion**

**The physical evidence is consistent with Officer Williams and Officer Sheperd's description of the incident. Specifically, the evidence is consistent with Officer Williams' description of firing his last shots while the decedent was rising up from a prone position.**

**I intend to provide a supplemental report with additional graphics and findings.**

Alexander Jason, CSCSA,  CFSA
Certified Senior Crime Scene Analyst
Certified Force Science Analyst

# Alexander Jason

**Certified Senior Crime Scene Analyst**
**Certified Force Science Analyst**

PO Box 375 Pinole, CA 94564 • 510-724-1003 /  ajason@alexanderjason.com

# CURRICULUM VITAE

**Board Certified Senior Crime Scene Analyst**: Certified by the *International Association for Identification* (IAI); the oldest professional forensic science organization.

**Certified Force Science Analyst**:  Force Science Institute; Human Dynamics in Shooting Incidents

**Board Certified in Forensic Photography and Digital Imaging** by the Intl Association for Identification

**Qualified Expert Witness in:**

- **Crime Scene Reconstruction**
- **Shooting Incident Reconstruction**
- **Wound Ballistics**
- **Force Science Analysis**
- **Bloodspatter Interpretation**
- **Forensic Photography & Digital Imaging**
- **Forensic Computer Animation**

Federal and State Courts (Alaska, California, Colorado, Florida, Kansas, Maryland, Missouri, New Jersey, New York, Texas, Washington, and West Virginia.)

## PROFESSIONAL DESCRIPTION & EXPERIENCE

The focus of my professional work is crime scene analysis, shooting incident reconstruction and wound ballistics research. My primary interest is in the reconstruction and analysis of shooting incidents, the human and mechanical dynamics of shooting and the science of wound ballistics which relates to the use of firearms against humans and specifically to the interaction of projectiles and the human body.

## PROFESSIONAL MEMBERSHIPS

**Fellow** of the American Academy of Forensic Sciences
**Member**: International Association of Bloodstain Pattern Analysts
**Member**: International Association for Identification
**Technical Advisor**: Association of Firearm and Toolmark Examiners
**Co-Founder**: International Wound Ballistics Association

## CURRENT POSITIONS

**Member of the National Institute of Justice's Standing Review Panel.** Appointed by the NIJ Director as a consultant to review & evaluate forensic science & crime scene investigation technology research and project proposals.

**Forensic Analyst / Photographer** for homicide and other coroner cases involving organ transplant for the California Transplant Donor Network.

**Peer Reviewer** for: American Academy of Forensic Science *Journal of Forensic Sciences*; *Investigative Sciences Journal.*

**Consultant on Shooting Incidents, Firearms and Ballistics** to the United States Army, federal agencies, major corporations, law enforcement agencies as well as to the "Mythbusters," "CSI," & "Law & Order" TV shows, NBC, CBS, ABC, PBS/NOVA and several major film studios. I have also consulted on bullet design and performance parameters for ammunition manufacturers. I have appeared numerous times on CNN, Fox News, NBC, MSNBC and other news shows while interviewed on current shooting incidents.

## PRIOR PROFESSIONAL POSITIONS

**Past President, Fellow, & Distinguished Member:** Association for Crime Scene Reconstruction

**Shooting Reconstruction Instructor:** Selected by the U.S. State Department to teach a 3 day course on Shooting Reconstruction to members of the PGR (Attorney General of Mexico's Investigative and Crime Scene personnel -- equivalent to our FBI) at the PGR Academy in Mexico City, Mexico (October, 2000).

**U.S. Congress' Office of Technology Assessment Advisory Panel** (1990-1992): Appointment to study and evaluate the effects of police officers being shot and to develop ballistic impact and penetration standards for police body armor.

**Managing Editor of the *Wound Ballistics Review*:** *The Journal of the International Wound Ballistics Association*; 1990-1995. (Most IWBA Full Members are physicians; many others are engineers, scientists, and law enforcement members engaged in the study of wound ballistics.)

**Writer, Producer, & Director** of six instructional video programs on firearms, wound ballistics, the use of deadly force by civilians, and forensic firearms evidence:

> *Deadly Weapons: Firearms & Firepower* (1 hour and 45 minutes);
> *Deadly Effects: Wound Ballistics* (1 hour and twenty minutes);
> *Deadly Force: Firearms, Self Defense, & The Law* (1 hour and 40 minutes);
> *Forensic Firearms Evidence: Elements of Shooting Incident Investigation* (3 hours)
> *Gunshot Wounds: Examination, Interpretation, Documentation* (Producer)
> *Blunt Force, Sharp Force, Pattern Injury: Examination, Interpretation,* (Producer)

*All the above video programs are utilized for training by law enforcement agencies (including the FBI), crime labs, universities, medical schools, and many other institutions throughout the world.*

**Editor** of the *Forensic Firearms Evidence: Elements of Shooting Incident Investigation* handbook and the co-author of a forensic firearms evidence written examination both of which are used by law enforcement agencies and crime laboratories in the U.S. and many other countries.

**Awards:**

Association of Firearm & Toolmark Examiners "**Most Outstanding Paper**" (*Firearm Recoil Dynamics*) 2008

American Film Institute's 1990 AVC Award for "Best Instructional Video" for *Deadly Force: Firearms, Self Defense, & The Law.*

## WORK HISTORY

**San Francisco Police Department** 1970-74;
Principle duty was as an investigator working in the Intelligence Unit performing special investigations, threat assessment, vulnerability evaluations, and protective operations. Received Letter of Commendation for assisting in homicide investigation

**Second Chance Body Armor**, Inc., Executive Vice President, 1975-1976;
Supervised research, development, and testing of body armor for law enforcement.

**Research West, Inc**. 1976 -1978;
Senior Analyst performing research, analysis, and supervising investigations.

**Letterman Army Institute of Research**
Informally studied and performed research for three years at the U.S. Army's Wound Ballistics Laboratory w/ Dr. Martin L. Fackler, MD -- which was an internationally recognized wound ballistics research facility (1987-90.)

**Center for Ballistic Analysis**, Director, 1987-1992: Research and consulting in wound ballistics, body armor performance, and bullet performance dynamics.

**Shooting Incident Reconstruction / Crime Scene Analyst:** Self-employed 1990 - present;

## EDUCATION & PROFESSIONAL DEVELOPMENT

**Duke University School of Medicine**: *Foundational Neuroscience for Action and Perception.*– Same course taught to medical students but without clinical aspects. (Taught by Dr. Leonard White, Ph.D thru Coursera)

**Duke University School of Medicine**: *The Brain and Space: Neuroscience of Spatial Abilities* (Taught by Dr. Jennifer M. Groh, Ph.D thru Coursera). Course completed "*With Distinction*"

**San Francisco State University**, B.A., Journalism, 1973. (Honor graduate: *Cum Laude*)

**Pepperdine University Graduate School of Management, 1975** (Non-Degree)
Completed Master's program in Operations Research and Management. (Operations Research involves constructing mathematical and statistical models to describe complex mechanical and human operations.)

## TRAINING

**Basic Peace Officer Training**: San Francisco Police Academy, 1971
Firearms, Criminal Law, Crime Scene Investigation, etc.
**Pathology of Gunshot Wounds & Blunt and Sharp Force Injuries Seminars**
Dr. Patrick Besant-Matthews, MD, Forensic Pathologist. 1992, 1993, 1994, 1996, 1997. 1999.
**Crime Scene Investigation Training Seminar**,
International Assoc for Identification Sep, 1993, 2002
**Crime Scene Reconstruction Training**
Assoc of Crime Scene Reconstruciton, Oct 1994
**Shooting Incident Reconstruction Seminar**,
AFTE Conference, San Diego, CA, 1995
**Advanced Field Evidence Technician Seminar**
California State University, Long Beach, 1996
**Firearms Trajectory Interpretation (Instructor)**
Calif Dept of Justice, January, 1996
**Shooting Reconstruction: Ballistic Trajectory Analysis**
California Department of Justice, California Criminalistics Institute., February, 1996.
**Institute on the Physical Significance of Bloodstain Evidence**
Laboratory of Forensic Science, May, 1996.
**National Seminar on Forensic Medicine,**
Institute of Forensic Medicine, Panama Dept of Justice, Panama City, July, 1996
**Shooting Reconstruction Workshop**
California Assoc of Criminalists, May 1997
**Shooting Incident Reconstruction Workshop**
Assoc of Crime Scene Reconstruction, Oct, 2001
**Mathematics of Shooting Scene Reconstruction**
AFTE Training Seminar, May, 2003
**Evidence Photography Training**
Evidence Photographers Intl, Nov 2003
**Shooting Scene Reconstruction Workshop** (FBI-Philadephia PD)
AFTE Training Seminar, May, 2003
**Investigation of Long Range Shooting Cases,**
AFTE Conference, San Francisco, 2007
**Forensic Shooting Scene Reconstruction Course**
Forensic Science Consultants; Luke & Mike Haag, Paulden, AZ, September, 2008
**Force Science Certification Training**:
San Jose P.D., June, 2009
**Gunshot Wounds: Theory & Practice Seminar**
Dr. Vincent J. DiMaio, MD, author of "*Gunshot Wounds*," Feb, 2010
**Shooting Reconstruction: Elements of Trajectory Analysis,**
RTI, 2013
**Forensic Image Comparison Workshop**
IAI – FBI, August 2015

## FIREARMS EXPERIENCE

Formally National Rated Competitive Shooter; U.S. Army "Expert" rating in Rifle and Pistol. SFPD Academy Combat Pistol and Shotgun Training. Served for 14 years as Rangemaster at one of the major law enforcement shooting competitions. Duties included design of shooting courses and events, evaluating marksmanship skills and proficiency with handguns, rifles, and/or shotguns

## CERTIFICATIONS, MEMBERSHIPS, & LICENSES

California Department of Justice Certified Firearms Instructor

California Private Investigator's License

NRA Certified Range Safety Officer

## Membership

MENSA (restricted to those with an IQ in the 98th percentile.)

## Patent

Inventor of advanced crime scene evidence collection tool currently being tested by law enforcement agencies. (Patent Issued.)

# PRESENTATIONS

Phoenix Law Enforcement Association
*Wound Ballistics*
Phoenix, AZ; February, 1989

The National Judicial College
*Demonstrative Evidence: Forensic Computer Animation*
Reno, NV; December, 1992

Assoc of Firearm & Toolmark Examiners Training Seminar
*Forensic Animation: Shooting Incident Reconstruction*
Miami, FL; April, 1992

San Francisco Barrister's Club
*Demonstrative Evidence: Forensic Animation*
San Francisco, CA; August, 1992

Detroit Police Department / American Society for Industrial Security
*Shooting Incident Reconstructions & Computer Animation*
Detroit, MI; March, 1993

California Association of Criminalists
*Forensic Animation for Criminal and Civil Trials*
Berkeley, CA; March, 1993

Assoc of Firearm & Toolmark Examiners Training Seminar
*Forensic Computer Animation*
Raleigh, NC; May, 1993

Tulare County Trial Lawyers Association
*Forensic Animation: Shooting Incident Reconstruction*
Visalia, CA: September, 1993

International Association for Identification
*Shooting Incident Reconstruction with Computer Animation*
Caspar, WY: September, 1993

American Academy of Forensic Sciences
*Forensic Animation & Shooting Incident Reconstruction*
San Antonio, TX; February, 1994

California Public Defender's Association
*Computer Animation in the Courtroom*
Long Beach, CA: February, 1994

International Wound Ballistics Association
*Shooting Incident Reconstruction & Computer Animation*
Sacramento, CA; March, 1994

International Wound Ballistics Association
*A Method for Determining Graze Wound Direction*
Sacramento, CA; March, 1994

California District Attorney's Association
*Forensic Animation and Graphics: Bringing Your Case to Life*
San Rafael, CA; April, 1994

Northwest Association of Forensic Scientists
*Forensic Animation & Shooting Incident Reconstruction*
Concord, CA; April, 1994

National College of District Attorneys
*Showing the Shooting: Developments in Forensic Ballistics*
South Lake Tahoe, CA; April, 1994

Assoc of Firearm & Toolmark Examiners Training Seminar
*Computer Animation and Shooting Reconstruction*
Indianapolis, IN; June, 1994

High Technology Crime Investigators Association
*Using Computers for Shooting Reconstruction*
Monterey, CA; June, 1994

Assoc for Crime Scene Reconstruction Training Conference
*Computer Animation for Crime Scene Reconstruction*
Oklahoma City, OK; September, 1994

American Academy of Forensic Sciences
General Section
*The Virtual Crime Scene*
Seattle, WA; February, 1995

American Academy of Forensic Sciences
Criminalistics Section
*Forensic Computer Animation: Illustration of Shooting Incidents*
Seattle, WA; February, 1995

Hastings Law School
Advanced Evidence Seminar
*Computer Animation as Demonstrative Evidence*
San Francisco, CA; March, 1995

American Inn of Court
*Crime Scene Reconstruction & Computer Animation*
San Francisco, CA; May, 1995

Assoc of Firearm & Toolmark Examiners Training Seminar
*Computer Animation and Shooting Reconstruction*
San Diego, CA; June, 1995

American Inn of Court
*Forensic Computer Animation: Uses & Abuses*
Lake Charles, LA; September, 1995

International Bloodstain Pattern Analysts & Association of Crime Scene Reconstruction Joint Training
Conference
*Shooting Incident Reconstruction*
Oklahoma City, OK; October, 1995

American Inn of Court
*Forensic Computer Animation*
University of San Francisco Law School
San Francisco, CA; October, 1995

American Academy of Forensic Sciences
*Computer Animation: It's Use in Crime Scene Reconstruction*
Nashville, TN; February, 1996

National Seminar on Forensic Medicine Panama Dept of Justice / Intl Criminal Investigative Training &
Assistance Program
(U.S. Dept. of Justice)
*Shooting Incident Reconstruction / Wound Ballistics*
Institute of Forensic Medicine,
Panama Dept of Justice, Panama City; July 1996

Defense Investigator's Association
*Shooting Incident Reconstruction*
Oakland, CA; October, 1996

Scientific Assembly of Forensic Nurses
*Crime Scene Reconstruction*
Kansas City, MO; November, 1996

Association for Crime Scene Reconstruction /
Int'l Association of Bloodstain Pattern Analysts
*Shooting Incident Reconstruction*
Albuquerque, NM; November, 1996

American Academy of Forensic Sciences
Criminalistics Section
*Blood on the Bullet: The Detection of Blood on Fired Bullets*
New York, NY; February, 1997

American Academy of Forensic Sciences
*Crime Scene Reconstruction: Applying Computer Technology*
New York, NY; February, 1997

Association for Crime Scene Reconstruction / Int'l Assoc of Bloodstain Pattern Analysts Joint Training Conference
*Reconstruction of Shooting Incidents*
Seattle, WA; November, 1997

Association for Crime Scene Reconstruction / Int'l Assoc of Bloodstain Pattern Analysts Joint Training Conference
*Workshop: Shooting Incident Reconstruction*
Seattle, WA; November, 1997

American Association of Law Schools Section on Evidence
*Crime Scene Reconstruction & Computer Animation*
 San Francisco, CA; January, 1998

American Academy of Forensic Sciences
Criminalistics Section
*Blood on the Bullet: The Detection of Blood on Fired Bullets, Part II*
San Francisco, 1998

University of California, Hastings College of The Law
*Advanced Evidence Seminar* / Prof. Roger Park
San Francisco, CA; April, 1998

Utah Assoc of Crime Scene Analysts Principal Instructor
*Shooting Incident Reconstruction Training Class*
(2 days) Ogden, UT; June, 1998

Association for Crime Scene Reconstruction Workshop:
*Shooting Incident Reconstruction on Vehicles*
Oklahoma City, OK; November, 1998

Association for Crime Scene Reconstruction
*"He Didn't Fall for Her" -- A Shooting Reconstruction*
Oklahoma City, OK; November, 1998, CA, 1998

American Academy of Forensic Sciences General Section
*Shooting Incident Reconstruction*
Orlando, FL, 1999

University of California, Hastings College of The Law
*Forensic Computer Animation: Admission and Use*
San Francisco, CA; April, 1999

Richmond Police Department Evidence Technicians
*Shooting Incident Reconstruction Techniques*
 Richmond, CA; May, 1999

Association for Crime Scene Reconstruction
*Shooting Reconstruction: 16 Bullets, One Dresser, One Decedent*
Kansas City, MO, Sept; 1999

Association for Crime Scene Reconstruction
*Shooting Reconstruction Workshop (Instructor)*
 Kansas City, MO, Sept; 1999

American Academy of Forensic Sciences
*The Gallardo Case: A Shooting Reconstruction*
Reno, NV; February, 2000

University of California Hastings School of Law
*Advanced Evidence Seminar / Prof. Roger Parks*
San Francisco, CA; April, 2000

National Defense Investigators Association
*Crime Scene Reconstruction*
Las Vegas, NV; Oct, 2000

Procuraduria General de la Republica
(Office of the Attorney General of Mexico)
*Forensic Ballistics Course (3 Days)*
Mexico City, Mexico, Oct  2000

American Academy of Forensic Sciences
*The Effect of Hair Upon the Deposition of Gunshot Residue*
Seattle, WA, Feb 2001

University of California Hastings School of Law
*Guest Speaker Advanced Evidence Seminar / Prof. Roger Park*
San Francisco, CA; April, 2001

California Judges Association
Guest Speaker: *Digital Evidence Seminar*, Palm Springs, CA, May, 2001

Association of Firearm & Toolmark Examiners
*Shooting Reconstruction: Putting It Together*
Newport Beach, CA, July, 2001

Association of Firearm & Toolmark Examiners
*The Effect of Hair Upon the Deposition of Gunshot Residue*
Newport Beach, CA, July, 2001

Association for Crime Scene Reconstruction
*The Effect of Hair Upon the Deposition of Gunshot Residue*
Las Vegas, NV, October, 2001

Santa Clara University Law School
Guest Speaker
*Advanced Evidence Seminar* / Prof. Kandis Scott,
Santa Clara, CA, February, 2002

University of California Hastings School of Law
Guest Speaker *Advanced Evidence Seminar* / Prof. Roger Park
San Francisco, CA; April, 2002

International Association for Identification
*Homicide or Suicide: The Cameron Reconstruction*
Las Vegas, NV; March, 2002

Association for Crime Scene Reconstruction
*The Penetration of Automotive Windshields by .223 Ammunition*
Denver, CO, October, 2002

Santa Clara University Law School
Guest Speaker
*Advanced Evidence Seminar* / Prof. Kandis Scott
Santa Clara, CA, March, 2003

Association of Firearm & Toolmark Examiners
*The Penetration of Automotive Windshields by .223 Ammunition*
Philadelphia, PA, May, 2003

Association of Firearm & Toolmark Examiners
*Through The Door: A Shooting Reconstruction*
Philadelphia, PA, May, 2003

Association of Firearm & Toolmark Examiners
*The Cameron Case: Shooting Reconstruction*
Vancouver, BC Canada; May, 2004

Forensic Science Educator's Conference
St. Louis University School Of Medicine
*Crime Scene Reconstruction: What It Is & Isn't*
St. Louis, MO, July, 2004

*Forensic Digital Photography*
University Medical Center
Sexual Assault Response Team
Principal Instructor – 2 Day Seminar
San Diego, CA, September 2004

*Forensic Digital Photography & Documentation of Evidence*
Principal Instructor – 2 Day Seminar
South San Francisco, CA; March, 2005

University of California Hastings School of Law
Guest Speaker *Advanced Evidence Seminar* / Prof. Roger Park
San Francisco, CA; April, 2005

San Francisco MENSA Regional Meeting
"Brilliance by the Bay"
Invited Speaker: "
*CSI: Bullets, Bodies, & B.S."*
San Francisco, CA; November, 2005

American Academy of Forensic Sciences
*Shooting Reconstruction: The Value of Evidence & Analysis  in a Double Homicide*
Seattle, WA, Feb 2006

University of California Hastings School of Law
Guest Speaker *Advanced Evidence Seminar* / Prof. Roger Park
San Francisco, CA; April, 2006

University Health Center
*Forensic Digital Photography Seminar*
Instructor:  (2 Days)
San Diego, CA; April, 2006

California Association of Criminalists
Workshop Presenter: *Forensic Digital Photography*
Concord, CA; May, 2006

California Association of Criminalists
*Shooting Reconstruction: The Value of Evidence & Analysis*
Concord, CA; May, 2006

Office of the San Francisco Medical Examiner
Invited Speaker
*Shooting Incident Analysis & Reconstruction*
San Francisco, CA; February, 2007

San Francisco District Attorney's Office
Invited Speaker
*Shooting Incident Analysis & Reconstruction*
San Francisco, CA; March, 2007

California Association of Criminalists
*Muzzle Flash: Why Many See It and a Few Do Not* (Co-Author)
Garden Grove, CA; March, 2007

University of California Hastings School of Law
*Guest Speaker Advanced Evidence Seminar / Prof. Roger Park*
San Francisco, CA; April, 2007

Association of Firearm & Toolmark Examiners
*The Effect of Gripping Upon Firearm Recoil*
San Francisco, CA, May, 2007

Association of Firearm & Toolmark Examiners
*Drive By Shooting: To Dream the Impossible Crime*
San Francisco, CA, May, 2007

St Louis University School of Medicine
Dept of Forensic Science
Masters Death Investigation Training Conference
*Crime Scene Reconstruction: The Elements Of Investigation, Analysis & Determinations*
St. Louis, MO; July 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Harrisburg, PA: Nov, 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Altoona, PA, Nov, 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Pittsburg, PA, Nov, 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Portland, ME, Dec, 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Concord, NH, Dec, 2007

Professional Education Seminars, Inc
*Crime Scene Investigation & Advanced Technology*
Burlington, VT Dec, 2007

Evidence Photographers International Council
*Forensic Photography*
Orlando, FL; Jan 2008

American Academy of Forensic Sciences
*Shooting Reconstruction: The Boyd Case*
Washington, DC, Feb 2008

Association of Firearm & Toolmark Examiners
*City Shooting: The Sean Bell Case: A Complex Shooting Reconstruction*
Honolulu, HI, May, 2008

Association of Firearm & Toolmark Examiners
*Firearm Recoil Dynamics: The Inside Story*
"Most Outstanding Paper" 2008 Award
Honolulu, HI, May, 2008

California International Association for Identification
"A Complex Shooting Reconstruction"
San Jose, CA, May 2009

American Academy of Forensic Sciences
*Shooting Dynamics: Elements of Time & Movement in Shooting Incidents*
Seattle, WA, Feb 2010

American Academy of Forensic Sciences
*The Rosario Case (NYPD): A Complex Shooting Incident Reconstruction*
Seattle, WA, Feb 2010

LeadAmerica Law & Justice Conference
*Crime Scene Reconstruction*
Stanford University, Palo Alto, CA
July, 2010

Utah Medical Examiner Shooting Death Investigation Conference
Special Invited Guest
*Investigation of Shooting Incidents*
Salt Lake City, UT, Oct, 2010

University of California Hastings School of Law
*Guest Speaker Advanced Evidence Seminar / Prof. Roger Park*
San Francisco, CA; Nov, 2010

St. Mary's College High School
Invited Speaker
Shooting Incident Reconstruction
Albany, CA, Nov 2010

Critical Incidents: A New Look at Officer Involved Shootings Seminar
*Forensic Analysis of Officer Involved Shootings*
Featured Speaker
Oakland, CA, Mar 2011

Association of Firearm & Toolmark Examiners
*Shooting Dynamics: Elements of Time and Movement in Shooting Incidents*
*Chicago, IL, May 2011*

California Association of Criminalists
*Critical Issues in Shooting Incident Analysis*
Sacramento, CA, July 2011

American Academy of Forensic Sciences
*Critical Issues in Shooting Incident Analysis*
Atlanta, GA, Feb 2012

Rains Lucia Stern, PC
Invited Speaker
*Deadly Force in the Digital Age*
Concord, CA, May 2013

Association of Firearm & Toolmark Examiners
*Shooting Reconstruction: Combining Audio, Video, & Movement*
Albuquerque, NM, June, 2013

Association of Firearm & Toolmark Examiners
*Determining Bullet Direction from Clothing Fibers*
Albuquerque, NM, June, 2013

California Association of Criminalists
*Shot in the Yard: Complex Ballistics Analysis*
California Criminalistics Institute, Sacramento, CA, Dec, 2013

California Criminalistics Institute Firearms Academy
Instructor
*Advanced Techniques in Shooting Incident Reconstruction*
CCI, Sacramento, CA; March, 2014

Los Angeles County Coroner West Coast Training Seminar
Invited Speaker
*Shooting Incident Analysis: Methods and Results*
Los, Angeles, CA May, 2014

Association of Firearm & Toolmark Examiners
*A Shot in the Yard: A Complex Shooting Reconstruction*
Seattle, WA, May, 2014

California Association of Criminalists
*A Momentous & Moving Case*
Ventura, CA, May 2015

# Publications

*Bullet Entry Holes in Fabric: Fibers, Facts, and Fallacies*
**Journal of the Assoc of Firearm & Toomark Examiners**
Volume 46, Number 2, Summer 2014

*Where Are The Bullets?*
*The Explanation for the Lack of Recognizable Bullets or*
*Significant Bullet Fragments at Certain Shooting Scenes (co-author)*
**Journal of the Assoc of Firearm & Toomark Examiners**
Volume 44, Number 3, Summer 2012

*Drywall: Terminal Ballistic Properties of Forensic Interest (co-author)*
**Journal of the Assoc of Firearm & Toomark Examiners**
Volume 42, Number 3, Summer 2010

*Shooting Dynamics: Elements of Time & Movement in Shooting Incidents*
**Investigative Sciences Journal**
Volume 2, Number 1, January 2010

*Muzzle Flash: One Witness Sees It, the Other Does Not (co-author)*
**California Association of Criminalists News Journal**
Third Quarter, 2007

*The Effect of Hair Upon the Deposition of Gunshot Residue*
**Forensic Science Communication – Federal Bureau of Investigation**
April, 2004

*The Art and Science of Crime Scene Reconstruction*
**Forensic Nurse Journal** – May/June, 2004

*Courtroom Computer Animation and Simulation*
**The Champion: National Association of Criminal Defense Lawyers**
Vol XX No. 1, Jan/Feb 1996

*The "Rhino" Bullet*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol 2. No. 1, 1995

*Ammunition Performance: Testing Data & Acceptance Criteria*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol 1, No. 4, 1993

*The Body Armor Standards Controversy*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol 1, No 3., 1992

*The Roots of Bad Data: The Relative Incapacitation Revisited*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol1, No. 2, 1992

*The Twilight Zone of Wound Ballistics*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol 1, No. 1, 1991


*Body Armor Standards: A Review and Analysis*
**Wound Ballistics Review: Journal of the International Wound Ballistics Association**
Vol 1, No. 1, 1991

*Wounding Effects of the AK-47 Rifle*
**American Journal of Forensic Medicine and Pathology**
(Co-author) 11(3), 185-189, 1990

*Forensic Animation*
**The Docket**, Jan 1993

*Computer Animation Training Tapes*
**CADalyst**, June 1993

*Evidence Set in Motion: The Mitchell Homicide*
**Police Journal**, June 1992

*A New Era in Combat Handguns*
**Police Marksman**, May 1989

*The Omni-Shock Bullet*
**Journal of the Association of Firearm & Toolmark Examiners** (Co-author)
January, 1989

# Alexander Jason

**Certified Senior Crime Scene Analyst**
**Certified Force Science Analyst**

PO Box 375, Pinole, CA 94564 • 510-724-1003  / ajason@alexanderjason.com

Tax ID 68-0152575

**Fee Schedule**

Consulting & Analysis:

$300 per hour. Additional charges may be required for equipment rental and/or other professional assistance. Statements are to be paid within 30 days of receipt.

A 10% surcharge will be applied for each month thereafter.

**Payment is the responsibility of the law firm, not the client.**


**Minimum Retainer:**

Minimum fee for preliminary case review is $5,000; This fee is non-refundable after initial case materials are received.

**Depositions:**
$ 400 per hour; four hour minimum.

**Testimony:**
$ 2,500 per day (half-day minimum).

**Air Travel:** Beyond 500 miles: First or Business Class Only

**Travel Billing** (beyond 50 miles):

$ 3,000 per day or fragment thereof. Actual travel time: $ 150 per hour -- (half-day minimum) plus reasonable expenses which include airfare or mileage, auto rental, food, lodging, and professional support requirements which will be billed at actual cost.

# Alexander Jason

**Certified Senior Crime Scene Analyst**
**Certified Force Science Analyst**

**www.alexanderjason.com**

Cases in which I testified and/or was deposed or produced a Rule 26 report for the past 4 years: (as of 1 Oct 2016)

People v Kiskiyou County, Yreka, CA, February, 2012 (OIS criminal/civil)

State of Nevada v Garcia, Reno, NV, June, 2012; Case CR11-1841 (Criminal Homicide Defense)

Canas v Sunnyvale, et al Case No. C08-05771 TEH, September, 2012 (OIS Civil)

Tara Ferguson, et al vs City of Modesto, et al, November, 2012 (OIS Civil)

Del Castillo v City of Santa Ana, et al, CA Superior Court, March, 2013 (OIS Civil)

Amesquita v City of Long Beach Case No. CV12=3113 PA (FFMx), April, 2013 (OIS Civil)

Martinez et. al v. City of Avondale USDC Case No.: CV 12-01837-PHX-LOA, May 2013 (OIS Civil)

Valderrama v City of Miami, Case No. 11-CIV-24637-COOK/TURNOFF, June 2013, (OIS civil - Trial)

Dorger v City of Napa, Case No. CV12-0440 YGR, September, 2013 (OIS Civil)

Landeros v City of Tustin, Case No. SACV12-01547 JST (RNBx), September, 2013 (OIS Civil)

Minter v City of San Pablo, et al; Case No. C12-02905 JSC; October, 2013 (OIS Civil)

Sams v City of Los Angeles, et al. Case No: CV 12-1795-PLA; October, 2013 (OIS Civil)

Diaz v City of Anaheim, et al. Case No: SACV 12-01897 JVS (RNBX), October 2013 (OIS Civil)

Rodriguez v City of Miami, et all. Case No: 08-58903 CA 21, November, 2013 (OIS Civil)

Perez v Fremont, Case No. RG11579660, December, 2013 (OIS Civil)

Bui v City of San Francisco, et al. Case No: USDC Case No. CV 11-4189 LB, Feb 2014 (OIS Civil)

Weeks v City of Huntington Park, Case No. EDCV12-1257, May 2014 (OIS Civil)

Othman v City of Chicago, Case No 11CV5777, June, 2014 (OIS Civil)

Espinosa v. CCSF, U.S. District Court No. C06-4686 JSW, October, 2014 (OIS Civil)

Mitchell v City of Vallejo, U.S. District Court Case No.: 2:13-CV-01072-JAM-KJN, Nov, 2014 (OIS Civil)

Padilla v. City of Anaheim, USDC – Central, No. SACV12-622 JVS (JPRx), Nov 2014 (OIS Civil)

Barrett v City of Vallejo, USDC No. East 2:13-CV-00846-JAM-CKD, Jan, 2015 (OIS Civil)

Wann v County of San Bernardino, USDC – East, No. EDCV 12-1422 JGB (DTBx)

Felarca, et al v Birgeneau, USDC, No. 3:2011cv05719, Jan 2015 (Ex Force Issues – Civil)

People v Cooper, San Francisco Superior Court, Case 12020205, March, 2015 (Criminal)

People v Doyle, Placer County Superior Court, Placer Co. D.A., March, 2015 (Criminal)

Tonegay v City of Anaheim, USDC – Central, May, 2015, (OIS Civil)

Rosales v City of Chico, USDC – Eastern District, CV-02152-WBS (CMK) June, 2015

Devillena v City of Palm Springs, USDC – Central District, CV-13-00610 VAP, July, 2015 (OIS Civil)

Kaur v City of Lodi, USDC – Eastern District of CA, CV- 0 082 8 -GEB-AC, Sep, 2015 (OIS Civil)

Jordan v City of Hawthorne, USDC, Eastern Dist of CA, CV14-07554 ODW (JPRx), Nov, 2015 (OIS Civil)

Alvarez v Karabelas, USDC – Southern District of NY - 14-CV-01000 (NSR), Nov, 2015 (OIS Civil)

Henry vs Hess, et al, USDC – Southern District of NY - 11 CIV 2707 (KMK) (GAY), Dec, 2015 (OIS Civil)

J.A.L. v Santos, et al; USDC -  CV 15-00355-LHK, Northern District of CA, Feb 2016 (OIS Civil)

Rivas v City of Los Angeles, USDC – Central District of CA – 2:15-CV-00456-JFW-JEM, Feb 2016 (OIS Civil)

SAMS v City of Los Angeles, USDC – Central District of CA - CV 12-01795 PLA, Feb 2015 (OIS Civil – Trial)

Banta v City of Walnut Creek, USDC – Northern Dist of CA - C13-00342 CRB, March, 2016 (OIS civil - Trial)

Sheehan v BART, et al, USDC – Northern District of CA - C14-03156 LB (Use of force video analysis)

Jackson v City of San Bernardino, USDC – Central Dist. of CA - 13-cv-01650-JGB-DTB, April 2016 (OIS Trial civil)

McClain v City of Eureka, USDC – Northern District of CA - 15-CV-02070-WHO, May 2016 (OIS civil, Trial)

Lam v City of Los Banos, et al, USDC – Northern Dist. of CA - CV-00531-MCE-KJN, May 2016 (OIS civil - Rebuttal)

Hines v County of Alameda, et al. Northern Dist. of CA - 4:15-cv-02490-DMR, July 2016 (OIS civil)

State of Ohio v Taylor, State Court, Case No. 14-CR-788R, September, 2016 (Homicide – trial)

Hendley vs. City of Los Angeles, Case No. CV15-08200 CAS (PLAx), USDC, C.D. CA, October, 2016 (OIS civil)