UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I.A., et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>CITY OF EMERYVILLE, et al.,<br><br>        Defendants. | Case No. 15-cv-04973-DMR<br><br>**ORDER RE DEFENDANT CITY OF EMERYVILLE'S MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 63 |

This is a civil rights case arising out of the death of Yuvette Henderson, who was shot and killed during an incident on February 3, 2015. Plaintiffs I.A. and C.S., who are Henderson's minor children, and Denise Henderson, who is Henderson's adult daughter, bring this survival and wrongful death action against the City of Emeryville, and Emeryville Police Officers Warren Williams and Michelle Shepherd (collectively "Defendants"). Defendants now move for summary judgment, or, in the alternative, partial summary judgment on all of Plaintiffs' claims. [Docket No. 63]. The court heard oral argument on February 23, 2017. Having considered the parties' oral argument and written submissions, the court denies Defendants' motion in part and grants it in part.

**I.     BACKGROUND**

    **A.     Facts**

The facts are undisputed unless otherwise indicated.

On the afternoon of February 3, 2015, Home Depot employees Jorge Figueroa and Antonio Gutierrez detained Henderson as she was leaving the store because they suspected her of shoplifting. The Home Depot store is located at 3838 Hollis Street in Emeryville, California. Figueroa called the Emeryville Police Department to request assistance with an uncooperative female shoplifter, who was later identified as Henderson. While on the call with the police

1  dispatcher, Figueroa requested an ambulance on Henderson's behalf because Henderson had hit
2  her head when she fell outside of the store.  Minutes later, Figueroa reported to the dispatcher that
3  Henderson had pulled out a gun, and was running on Hollis Street toward the 580 freeway
4  overpass.

5        Officer Shepherd was parked in a patrol car on Christie Street approximately a half mile
6  away when she heard that a woman was in custody for a theft at Home Depot.  Shepherd
7  responded to the dispatch and proceeded to Home Depot.  As Shepherd was turning southbound
8  on Hollis, she heard over the dispatch that the suspect had a gun and was running.  Upon learning
9  this information, Shepherd continued southbound on Hollis.

10       Williams was at the Emeryville Police Department when he heard over the dispatch that
11 there was an uncooperative suspect at Home Depot.  Williams responded as the cover unit, and
12 drove toward Home Depot.  While on route, Williams heard over the dispatch that the suspect was
13 armed with a revolver.

14       As Shepherd approached Home Depot, she saw Figueroa, whom she recognized from
15 responding to prior calls for thefts at the store.  Figueroa was on the sidewalk on Hollis next to the
16 store.  Shepherd slowed her vehicle.  She saw Figueroa pointing southbound on Hollis, and heard
17 him say that Henderson was running.  Shepherd reported this information to dispatch, along with a
18 description of Henderson.  She continued southbound on Hollis.

19       Shortly thereafter, Williams drove up to Home Depot.  Williams saw two Home Depot
20 employees standing on the traffic median on Hollis in front of the store, gesturing southbound on
21 Hollis.  He proceeded southbound on Hollis.  Williams heard Shepherd's update to dispatch,
22 which included a description of what Henderson looked like, what she was wearing, where she
23 was, and that she was running southbound on Hollis.  Williams drove southbound on Hollis,
24 following Shepherd.

25       Shepherd spotted Henderson running on the sidewalk on the opposite side of Hollis.
26 Henderson ran toward a bus that was idling northbound on Hollis.  Shepherd stopped her vehicle
27 about 20 feet away from the bus.  From this vantage point, Shepherd could see that Henderson was
28 carrying a gun in one hand and a purse in the other.  Shepherd saw Henderson unsuccessfully try

to board the bus, and then run to a taxi which was behind the bus.

According to Shepherd, Henderson was "frantically pounding" on the driver's side window of the taxi, "aggressively shaking" the gun in front of the driver, and pointing the gun in different directions, but more in the direction of the driver. *See* Shepherd Depo. at 36:6-23 [Ex. A to Allen Decl.]. However, video footage from the bus shows Henderson approach the driver's side of the green taxi without pounding on the window, quickly wave around a gun in different directions for a few seconds at most, and then run past the taxi. *See* Bus Video at 12:41:24 - 32 [Ex. E to Allen Decl.]. Since Shepherd did not relay the bus or taxi incident to dispatch, Williams was unaware of either incident. Once Henderson passed the taxi, she continued to run southbound on Hollis and then underneath the 580 overpass.

When Shepherd stopped her vehicle upon seeing Henderson at the bus, her handgun slipped out of her hand and landed on the passenger-side floorboard. Shepherd parked just before the 580 overpass and got out to retrieve her gun from the other side. While Shepherd was re-holstering her gun, she saw Henderson continue to run southbound on Hollis with a gun in her hand. Shepherd updated the dispatch with Henderson's direction. Shepherd was about to get back into her vehicle when Williams drove up. Shepherd gestured toward Henderson and told Williams that Henderson was running southbound. Williams then continued southbound on Hollis, passing Shepherd's car. Shepherd got back into her vehicle and drove behind Williams.

Williams and Shepherd followed Henderson to the Extra Space Storage facility located on Hollis. The facility has a main building with a covered parking area that contains parking spaces separated by concrete pillars. Williams and Shepherd parked their vehicles on the street in front of the covered parking area. Williams parked closer to the office building; Shepherd parked further south of Williams in order to stop Henderson from continuing to run south.

When Shepherd parked her vehicle, she saw Henderson run back into the parking stalls in the covered parking area. After Shepherd exited her vehicle, she commanded Henderson to drop her gun, but Henderson did not comply. Shepherd then saw Henderson run toward the rear of the covered parking area to try to get into a door, which was locked. She observed Henderson look around for another way to exit. At this point, Henderson was positioned at the front end of a silver

3

1   or gray vehicle that was parked front-side-in in the covered parking area. Henderson was standing
2   by the driver's side wheel well, and Shepherd was positioned behind a pillar that was next to the
3   vehicle. Shepherd could see that Henderson still had the gun and purse. Shepherd then heard
4   Williams yelling. Williams testified that he exited his vehicle, and yelled at Henderson: "Get on
5   the ground. Get on the ground," as he was prepping his rifle. *See* Williams Depo. at 22:8-11;
6   25:5-9 [Ex. G to Allen Decl.]. Neither Shepherd nor eye witness Lesea Benitez heard exactly
7   what Williams said, but both recalled hearing Williams yell. At the hearing, Defendant confirmed
8   that neither Williams nor Shepherd gave any further verbal warnings to Henderson after this point.
9       Williams and Shepherd then fired three volleys of shots at Henderson. The parties agree
10  that the total elapsed time between the first shot in the first volley and the last shot in the third
11  volley was less than seven seconds. *See* Event Record [Ex. B to Allen Decl.]. Since each of the
12  three volleys is discussed at greater length below, the court will summarize the three volleys here:

        1.    *First Volley*

During the first volley, both Williams and Shepherd fired their weapons. Shepherd fired a single round because she heard a shot, and believed that Henderson had shot Williams. After the first volley but before the second one, Williams and Shepherd became aware that a person was in the silver or gray vehicle. Shepherd relocated to the rear of that vehicle to avoid putting that person in jeopardy.

        2.    *Second Volley*

Williams then fired a second volley. One of them hit Henderson in the right arm. Henderson fell to the ground and dropped the gun. Williams and Shepherd testified that Henderson's gun landed on the ground approximately three to five feet from her. *See* Williams Depo. at 34:20-35:1 [Ex. G to Allen Decl.]; Shepherd Depo. at 67:20-25 [Ex. A to Allen Decl.]. However, according to the post-incident investigation performed by the Oakland Police Department, the gun was approximately 6 feet from Henderson. *See* Incident Report at 4 [Ex. B to Johns Decl.]. A picture of Henderson's body shows Henderson laying on her right side. She is turned away from the position of the gun. *See* Photographs at bates-numbered pages COE (Henderson) 003621 and 006326 [Ex. C to Johns Decl.]

4

3. *Third Volley*

Williams testified that when Henderson was on the ground after the second volley, "it looked like she was trying to get up or look around to find her weapon." *See* Williams Depo. at 34:23-25 (Ex. G to Allen Decl.). Specifically, according to Williams, it seemed like Henderson was "trying to pop her head up" to look for her gun. *See* Williams Depo. at 43:16-44:7 (Ex. G to Allen Decl.). He fired the third volley at Henderson from approximately 20 to 36 feet away. One of these shots struck Henderson in the head and killed her.

### B. Procedural History

Plaintiffs filed the operative complaint on August 8, 2016 alleging the following claims for relief: 1) 42 U.S.C. § 1983 ("Section 1983") claim for excessive force, based on the Fourth Amendment; 2) Section 1983 claim for violation of a child's right to familial relationship, based on the Fourteenth Amendment; 3) Section 1983 claim for municipal liability (the "*Monell* claim") for failure to train; 4) violation of California's Bane Act, California Civil Code section 52.1; 5) battery; and 6) wrongful death. *See* First Amended Complaint ("FAC") [Docket No. 55].

## II. LEGAL STANDARDS

A court shall grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light most favorable to the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted). A genuine factual issue exists if, taking into account the burdens of production and proof that would be required at trial, sufficient evidence favors the non-movant such that a reasonable jury could return a verdict in that party's favor. *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 248. The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact. *See id.* at 249.

To defeat summary judgment once the moving party has met its burden, the nonmoving party may not simply rely on the pleadings, but must produce significant probative evidence, by affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that

5

1  a genuine issue of material fact exists. *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809
2  F.2d 626, 630 (9th Cir. 1987) (citations omitted).  In other words, there must exist more than "a
3  scintilla of evidence" to support the non-moving party's claims, *Anderson*, 477 U.S. at 252;
4  conclusory assertions will not suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738
5  (9th Cir. 1979).  Similarly, "[w]hen opposing parties tell two different stories, one of which is
6  blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not
7  adopt that version of the facts" when ruling on the motion.  *Scott*, 550 U.S. at 380.

## III.   CLAIMS NO LONGER AT ISSUE

The parties stipulated to dismiss the *Monell* claim, and any claims against Defendant Jacora Henderson.[1]  In addition, in Plaintiff's opposition to Defendants' motion, Plaintiffs conceded their claims against Shepherd, and did not address Defendants' arguments regarding punitive damages.  Accordingly, the court grants summary judgment on all claims against Shepherd, as well as the punitive damages claim.  The court also dismisses with prejudice all claims against Jacora Henderson, as well Plaintiffs' claim for municipal liability.  The remaining claims are the Section 1983 claims for excessive force and familial relationship, and the state law claims for battery, wrongful death, and violation of the Bane Act.

## IV.   OBJECTIONS TO EVIDENCE

Plaintiffs introduced video recordings of the police interviews of eye witnesses Lesea Benitez and John Reible.  *See* Benitez and Reible Recorded Interviews [Ex. K to Johns Decl.]. Defendants object to these recorded interviews on the grounds of hearsay and lack of personal knowledge.  *See* Reply at 1 [Docket No. 74].  Plaintiffs respond that the court may consider hearsay evidence at the summary judgment stage as long as the evidence can be provided in an admissible form at trial, such as live testimony.  At the hearing, Plaintiffs' counsel represented that they are not aware of any impediments to procuring Benitez's and Reible's live testimony at trial.

---

[1] Jacora Henderson is an adult child of Yuvette Henderson.  Plaintiffs named her as a Defendant in the Bane Act and wrongful death claims because they could not locate her despite diligent efforts. In their February 21, 2017 Joint Case Management Statement, the parties agreed that "Jacora Henderson has not appeared before the court in the statutory period in which to assert her rights in this action and can be dismissed." [Docket No. 76 at p.6].

The Ninth Circuit has held that a district court may consider hearsay evidence in adjudicating a summary judgment motion if the underlying evidence can be presented in an admissible form at trial. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) (citing *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003)); *Fraser*, 342 F.3d at 1036 ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *see also Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). The court therefore overrules Defendants' objections, and will consider Benitez's and Reible's recorded police interviews for the purposes of this summary judgment motion.

## V.  DISCUSSION

### A.  Excessive Force

Defendants move for summary judgment on the excessive force claim, arguing that Williams acted reasonably in using deadly force during each of the three volleys, as well as collectively during the entire incident, because Henderson posed an immediate threat to his safety. Plaintiffs assert that there are genuine disputes of material fact as to whether Williams used reasonable force during the first two volleys. Even assuming that he did, Plaintiffs argue that Williams did not act reasonably when he used lethal force on Henderson during the third volley while Henderson lay on the ground, wounded and unarmed.

#### 1.  Legal Principles

A claim of excessive force in the context of an arrest or investigatory stop implicates the Fourth Amendment right to be free from "unreasonable . . . seizures." U.S. Const. amend. IV; *see Graham v. Connor*, 490 U.S. 386, 394 (1989). Courts analyze claims of excessive force under an "objective reasonableness" standard by asking whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting the officer, without regard to underlying intent or motivation and without the "20/20 vision of hindsight." *Graham*, 490 U.S. at 396, 398; *Bryan v. MacPherson*, 630 F.3d 805, 817 (9th Cir. 2010) (citing *Graham*).

"Determining whether the force used to effect a particular seizure is reasonable under the

Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. (citations and internal quotation marks omitted). Because the reasonableness standard "is not capable of precise definition or mechanical application, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citation and internal quotation marks omitted). The "most important single element" is whether there is an immediate threat to safety. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). These factors "are not exclusive. Rather, [the court] examine[s] the totality of the circumstances and consider [s] 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (citing *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

When the challenged force is deadly force, it "satisfies Fourth Amendment standards '[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Blanford v. Sacramento Cty*., 406 F.3d 1110, 1115 (9th Cir. 2005) (quoting *Tenn. v. Garner*, 471 U.S. 1, 11 (1985)). "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations and citations omitted). However, if the court concludes, "after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances," defendants can still prevail on summary judgment. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

The Ninth Circuit has cautioned that in excessive force cases resulting in a death, the trial

court must be "wary of self-serving accounts by police officers when the only non-police eyewitness is dead." *Long v. City and Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (citing *Scott*, 39 F.3d at 915). Accordingly, a court "must carefully examine all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with other known facts." *Scott*, 39 F.3d at 915 (citations omitted).

### 2.    Analysis

Applying these principles, the court must consider the totality of the circumstances in evaluating whether Williams's use of lethal force was reasonable. *See Bryan*, 630 F.3d at 826. The court will examine each volley on its own as well as collectively, because Defendants concede that the reasonableness of Williams's use of lethal force during the third and final volley depends upon the reasonableness of his use of force during the first two volleys. Since the key non-police eyewitness to the entire incident is dead, the court must also carefully consider all the evidence including forensic evidence to determine whether Williams's account of the event is internally consistent as well as consistent with the other facts.

#### a.    First Volley

The first volley occurred within seconds after Williams and Shepherd arrived at the Extra Space Storage facility and issued their only verbal warnings to Henderson. According Williams, after he issued his commands, Henderson turned around and "drew her gun down" on him as she moved eastbound into the covered parking area. *See* Williams Depo. at 22:8-15; 25:5-11, 16-22; 27:25-28:7; 41:19-42:11 [Ex. G to Allen Decl.]. Williams described Henderson as turning and drawing her gun down from a 90 degree position over her left shoulder with the gun in her right hand, as she ran into the carport. According to Williams, Henderson appeared to be looking at him while she was running into the carport. Williams testified that he fired two to three rounds at Henderson because she was lowering her gun down to aim at him.

Having reviewed the record as whole, the court finds that there are genuine disputes of material fact about what occurred during the first volley. Construing all inferences in Plaintiffs'

favor, a reasonable juror could conclude that Williams's account that Henderson aimed his gun at him is not credible, and that he did not act reasonably when he fired at her. For example, Benitez's account materially conflicts with Williams's testimony. Benitez, an employee of Extra Space Storage, was working in the office at the time of the incident. *See* Benitez Written Statement at bates-numbered page COE (Henderson) 000135 [Ex. J to Johns Decl.]. Benitez was standing behind the counter in the front office and observed the entire incident. *Id.* In her videotaped interview with police officers, she stated that she heard a male officer, (later identified as Williams) yell commands at Henderson, at which point Henderson turn around in the direction of Williams. *See* Benitez Videotaped Interview at 4:39:38-4:40:06 [Ex. K to Johns Decl.]. Benitez then saw Williams shoot Henderson. *Id.* at 4:40:12-4:40:18. Benitez told the police that she never saw a gun in Henderson's hands because Henderson's hands were down, and Benitez could not see below Henderson's torso because the view was partially blocked by the rear of a car. Indeed, Benitez said she never knew that Henderson was armed until she learned about it after the shooting. *Id.* at 4:40:21-4:40:41; 4:48:39-4:49:01. This contradicts Williams's testimony that Henderson held her gun up over her left shoulder and "drew it down" to aim at him.

    Shepherd's testimony about Henderson's position and actions in the first volley also conflict somewhat with Williams's account. Defendants argue that Shepherd's testimony is not inconsistent with Williams's testimony, because Shepherd could have simply been observing Henderson at a different point in time. Given that all three volleys were fired within 6.5 seconds, a reasonable juror could conclude that the moment Shepherd observed Henderson during the first volley was virtually indistinguishable from the moment when Williams fired at Henderson. The juror could conclude as a result that Williams's statement that Henderson aimed her gun at him is not credible.

    A reasonable juror could also question Williams's credibility and discount his version of events for other reasons. For instance, Williams testified that when he first arrived at the Extra Space Storage facility, he parked his vehicle at a 45 degree angle from the covered carport/parking area, facing southeast, in order to provide cover for himself. According to Williams, as Henderson moved east toward the silver or gray vehicle in the covered carport, she drew him out of his cover,

10

exposing him on the driver's side of his vehicle. However, a reasonable juror could decide that surveillance video taken from across the street contradicts Williams's account. *See* Surveillance Video [Ex. M to Johns Decl.]. The video shows two police cars pulling up to the front of the storage facility. One car (later identified as belonging to Williams) parked straight on the street parallel to the carport, not at an angle. The second car parked just further down. A reasonable juror could interpret the video as showing that uniformed police officers (later identified as Williams and Shepherd), immediately got out of their vehicles with their guns drawn, and ran toward the covered carport. *Id.* at 3:20-3:26. The video does not appear to show Williams parking at an angle and using his car as cover, as he testified. Nor does it show him being drawn out from his cover by Henderson's movements.

Williams' account is also contradicted by the statements of Reible, the other eye-witness. Reible stated that he was traveling behind a police SUV on Hollis and followed the SUV to the Extra Space Storage facility where he was stopped. *See* Reible Videotaped Interview at 4:11:00-4:11:20; 4:17:54-4:18:00 [Ex. K to Johns Decl.]. Reible saw a male officer, later identified as Williams, get out of his vehicle, grab his rifle, run across the street, kneel, and shoot. *See* Reible Videotaped Interview at 4:13:58-4:14:11 [Ex. K to Johns Decl.]. Reible saw other police units arrive as Officer Williams was shooting. *Id.* at 4:14:22-4:14-47. Construing all evidence in Plaintiffs' favor, a reasonable juror could find that Williams is not fully credible because he did not accurately testify about a basic fact, namely, how he arrived at the Extra Space Storage facility and what he did immediately upon arrival. *See Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (noting reasons for the jury to doubt the credibility of the defendant officers, and reversing summary judgment on an excessive force claim).

It is the role of the jury as the fact-finder to decide which interpretation of the evidence is more credible, particularly in excessive force cases. *See Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). Construing all reasonable inferences in Plaintiffs' favor, a reasonable juror could conclude that Henderson did not aim her gun at Williams, which is the only reason Williams gave for firing the first volley.

//

### b. Second Volley

The second volley occurred approximately three seconds after the first. According to Williams, after the first volley, Henderson ran in front of the front end of the silver or gray vehicle. When Henderson came around the driver's side of that vehicle, Henderson saw him and once again drew her gun down on him as she was coming toward him. Williams said that he observed Henderson move her hand toward him from a position above her head. Williams testified that at this point, he had moved in a northwest direction and was unable to use a pillar as cover because the nearest pillar was just north of Henderson. Williams asserts that he fired a second volley at Henderson because she was moving toward him while drawing her gun down on him again, and he lacked cover. One of these shot hit Henderson in the right arm, and Williams saw Henderson fall to the ground.

The court finds that there are genuine disputes of material fact as to what occurred during the second volley such that a reasonable juror could conclude that Williams's second use of lethal force was unreasonable. For example, according to the doctor who performed the autopsy, Henderson sustained a bullet wound to the right arm. The bullet entered her right arm from the right, traveled through her right arm, fragmented when it exited her right arm, and hit but did not enter her chest cavity. Given the angle of the bullet, a reasonable juror could conclude that Henderson was not facing Williams or coming toward him, as Williams testified, and that Henderson's right side was exposed to Williams. A reasonable juror could also conclude that the forensic evidence supports that Henderson had her right arm next to her body, which contradicts Williams's account that she was lowering her gun from a higher angle in order to aim at him.

Defendants do not dispute that this interpretation of the forensic evidence is possible. Instead, they argue that it is also possible that the forensic evidence shows only where Henderson was at the precise moment she was shot, which occurred at a different or later moment than when she drew her gun down on Williams. As discussed above, the fact that the forensic evidence is susceptible to another reasonable interpretation underscores the presence of a triable factual dispute. Given how quickly this incident evolved, a reasonable juror could find that the moment Henderson was shot was virtually the same moment that Williams first perceived Henderson

12

before he fired the second volley. Thus, a reasonable juror may determine that contrary to Williams's testimony, Henderson was not facing him or positioning her gun to aim at him when he fired the second volley. *See J.L.D. v. City of Los Angeles*, 555 F. App'x 670, 671 (9th Cir. 2014) (reversing summary judgment where the officer's testimony as to the number of shots and the location of the shots was directly contradicted by the medical evidence and the report of the plaintiff's expert).

At the hearing, counsel for Defendants argued that Home Depot employee Jorge Figueroa corroborated Williams's account that Henderson drew her gun down on him. Defendants directed the court to portions of the dispatch audio. Figueroa is heard telling the police dispatcher that it "looks like [Henderson] pulled a gun" on the officers. *See*, *e.g.*, Dispatch Audio at 6:52-53 [Ex. D to Allen Decl.]. However, it is unclear from the dispatch audio exactly where Figueroa was in relation to the events occurring at the Extra Space Storage facility. There is no record evidence that suggests he was at or near the facility when the volleys unfolded in rapid succession. Furthermore, even assuming that Figueroa corroborates Williams's account, it is the job of the jury, not the court, to weigh this evidence against all the other evidence in the record to determine whose version of events is more credible.

### 3. Third Volley

At the hearing, counsel for Defendants conceded that if the court concluded (as it has) that there are genuine disputes of material fact regarding the first two volleys, the court must also find that there are material factual disputes regarding the third. Given this concession, the court need go no further. In the interest of completeness, the court will nevertheless analyze the final volley.

After the second volley, Henderson lay on the ground on her right side, with a bullet wound in her right arm. There is no evidence that Williams knew that Henderson had been wounded in her right arm. The gun lay approximately 6 feet from her, with her back turned to it. *See* Incident Report at 4 [Ex. B to Johns Decl.]; Photographs at bates-numbered pages COE (Henderson) 003621 and 006326 [Ex. C to Johns Decl.].

Williams testified that Henderson looked like she was popping her head up in order to search for her gun. According to Williams, given that Henderson had already tried to kill him

13

twice by drawing a gun on him, and because she looked like she was trying to get up from the ground and rearm herself, he fired a third volley. Williams did not identify any reason for firing this third volley at Henderson other than his own safety, i.e., that Henderson was trying to kill him a third time. One bullet struck Henderson in the head and killed her. According to Defendants' forensic criminologist, "the trajectory of the fatal gunshot wound" to Henderson's head "was front to back, not upward" and thus is "consistent with Officer Williams firing while on one knee at [Henderson] whose head was up and facing directly towards him." *See* Jason Expert Report at 5-6 [Ex. M to Allen Decl.].

It is undisputed that Henderson never fired her gun during the entire incident. It is also undisputed that at the time of the third volley, Henderson was wounded and unarmed, and did not make any motion toward her gun. Finally, it is undisputed that when Henderson fell to the ground, she came to rest on her right side with her right arm under her. Construing the evidence in Plaintiffs' favor, the gun lay six feet away from Henderson, who was lying on right her side with her back toward the gun. It also appears to be undisputed that backup officers were arriving or had arrived by the third volley.

As to Williams's statement that he fired the third volley because Henderson had aimed her gun at him and had tried to kill him twice before, a reasonable juror could disbelieve Williams due to the conflicting evidence discussed above. A reasonable juror could thus determine that Henderson did not pose an immediate threat to Williams because she was unarmed and wounded, and because although she had carried a gun, she had not previously fired or aimed it at him. Such a juror could conclude that Williams's use of lethal force in the third volley was therefore an unreasonable and excessive use of force under the circumstances. *See*, *e.g.*, *Hopkins v. Andaya*, 958 F.2d 881, 886-87 (9th Cir. 1992) (finding officer's second use of lethal force excessive and unreasonable where the suspect was wounded and unarmed and the officer had several reasonable alternatives to using lethal force, and reversing summary judgment on the excessive force claim); *Ting v. United States*, 927 F.2d 1504, 1510 (9th Cir. 1991) (finding use of lethal force against the suspect was unreasonable where the suspect, who was previously armed, was shot at close range while in a prone position or on his hands and knees and unarmed, and reversing summary

14

judgment on the excessive force claim); *Tubar v. Clift*, 453 F. Supp. 2d 1252, 1257 (W.D. Wash. 2006) (denying summary judgment due to triable disputes regarding whether the officer acted reasonably in firing his gun a third time where there was no longer an immediate threat to his safety after the second shot).

Additionally, a reasonable juror could find that it was feasible for Williams to have issued warnings to Henderson before firing the third volley, given that she was unarmed, wounded, and lying on the ground, and not moving toward her gun. The juror could thus conclude that the absence of such a warning is a factor weighing against the reasonableness of the use of force. *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001) (explaining a warning "should be given, when feasible, if the use of force may result in serious injury"); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) (finding a triable dispute as to whether a warning was practicable prior to the fatal shot because the car was moving slowly at the time, and thus alternatives other than deadly force could have been used).

### B. Fourteenth Amendment Claims

Plaintiffs allege a Fourteenth Amendment familial association claim for the loss of the society, companionship, and association of Henderson as their mother. It is well-established in the Ninth Circuit that "[t]he standard of culpability for a due process right to familial association claim" is whether the officer's conduct "shocks the conscience." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (citation and internal quotation marks omitted); *Gonzalez*, 747 F.3d at 797 (same and citing *Porter*). To show that an officer's conduct 'shocks the conscience," a plaintiff must demonstrate that the officer "acted with deliberate indifference," or with a "purpose to harm . . . that was unrelated to legitimate law enforcement objectives," which is a "more demanding showing." *Porter*, 546 F.3d at 1137.

The deliberate indifference standard, "[a]s the very term 'deliberate indifference' implies," applies "only when actual deliberation is practical." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson v.*

15

*Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also Lewis*, 523 U.S. at 854 ("Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case. Accordingly, we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment . . . .").

"A court may determine at summary judgment whether the officer had time to deliberate (such that the "deliberate indifference" standard applies) or instead had to make a snap judgment because he found himself in a quickly escalating situation (such that the "purpose to harm" standard applies), 'so long as the undisputed facts point to one standard or the other.'" *C.E.W. v. City of Hayward*, No. 13-CV-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015) (quoting *Duenez v. City of Manteca*, No. CIV. S–11–1820 LKK/KJN, 2013 WL 6816375, at *14 (E.D. Cal. Dec. 23, 2013). "By its nature, though, the determination of which situation [the officer] actually found himself in is a question of fact for the jury, so long as there is sufficient evidence to support both standards." *C.E.W.*, 2015 WL 1926289, at *13 (citation and internal quotation marks omitted).

Defendants argue that Plaintiffs must show that Williams acted with a purpose to harm, because the situation evolved in a matter of seconds. Plaintiffs conceded at the hearing that they could not meet the purpose to harm standard. Therefore, summary judgment is granted on the Fourteenth Amendment claim under the purpose to harm standard. However, Plaintiffs argue that the deliberate indifference standard applies, because although the situation unfolded rapidly, Williams nevertheless had time to deliberate before the third volley because Henderson was on the ground and unarmed, and Shepherd was close by.

The court finds that there are genuine disputes of material fact as to whether Williams had adequate time to deliberate, and whether he acted with deliberate indifference when he fired his third volley and killed Henderson. Construing all the evidence in Plaintiffs' favor, a reasonable juror could find that as soon as Henderson no longer became an immediate threat to Williams's safety, i.e., when she lay wounded and unarmed on the ground, that Williams had time to take alternative action, such as issuing a verbal warning, or getting assistance from Shepherd or the

16

back-up units that were arriving on scene. *See Tatum v. Moody*, 768 F.3d 806, 821 (9th Cir. 2014) (explaining that deliberate indifference is "'the conscious or reckless disregard of the consequence of one's acts or omissions" and "entails something more than negligence but is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result'") (quoting *Gantt v. City of Los Angeles*, 717 F.3d 702, 703 (9th Cir. 2013)).

While *Gonzalez* and *Wilkinson* concern uses of force that occurred within a matter of seconds, both cases involve instrumentalities, i.e., moving vehicles, which had the potential to cause harm not only to the defendant officers, but also to the surrounding public. Under such circumstances, the Ninth Circuit found that actual deliberation was not practicable. *See Gonzalez*, 747 F.3d 795-96, 798 (the minivan was moving at the time the defendant officer, who was in the minivan, shot the decedent in the head; the decedent did not obey the defendant officer's commands to stop the minivan); *Wilkinson*, 610 F.3d at 554-55 (the minivan was accelerating in close proximity to other officers). By contrast here, it is undisputed that Henderson was lying wounded on the ground, and the gun was approximately 6 feet away from her behind her back. Henderson made no movement toward her gun. Under this set of facts, a reasonable juror could conclude that because Henderson presented no immediate threat to Williams's safety, (which is the only reason Williams testified that he fired his third volley), "actual deliberation was practical." *Lewis*, 523 U.S. at 851.

Therefore, the court denies Defendants' motion for summary judgment as to Plaintiffs' Fourteenth Amendment claim.

### C. Qualified Immunity

Since there are triable disputes underlying the question of whether Williams's use of lethal force was excessive, the court denies Defendants' motion for summary judgment on the grounds of qualified immunity. *See Chan-Sosa v. Jorgensen*, No. 15-CV-00008-SI, 2016 WL 845292, at *5 (N.D. Cal. Mar. 4, 2016) (denying qualified immunity due to presence of triable disputes on the underlying excessive force claim).

### D. Bane Act (California Civil Code section 52.1)

Plaintiffs state a claim under California Civil Code section 52.1 (Bane Act) based on

Williams's alleged use of excessive force. The Bane Act gives rise to a claim where "a person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." Cal. Civ. Code § 52.1(a). To prevail on a Bane Act claim, a plaintiff must demonstrate, inter alia, "intimidation, threats or coercion." *Jones v. Kmart Corp.*, 17 Cal. 4th 329, 334 (1998).

The parties dispute whether section 52.1 requires a showing of "threat, intimidation, or coercion" distinct from the excessive force itself. The Ninth Circuit has not yet spoken on this precise issue. In *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015), its most recent opinion on section 52.1, the Ninth Circuit explained that a plaintiff in a search-and-seizure case is required to show threats, intimidation, or coercion "beyond the coercion inherent in a detention in a detention or search in order to recover under the Bane Act." District courts generally are split on whether *Lyall* should apply to excessive force claims. *See Bordegaray v. Cty. of Santa Barbara*, No. 2:14-CV-08610-CAS-JPR, 2016 WL 7223254, at *14–15 (C.D. Cal. Dec. 12, 2016) (discussing post-*Lyall* split of authority between the Northern and Eastern District of California on the one hand, and the Central District of California on the other).

Several courts in this district, including this one, have held post-*Lyall* that a section 52.1 claim does not require threats, coercion, or intimidation independent from that which is inherent in the alleged use of excessive force. *See Littler v. Bay Area Rapid Transit Dist. (Bart)*, No. 14-CV-05072-DMR, 2016 WL 1734095, at *12 (N.D. Cal. Apr. 29, 2016) (denying summary judgment on a section 52.1 claim based on excessive force and explaining that this "court has previously held, consistent with the weight of authority in this district, that a section 52.1 claim does not require threats, coercion, or intimidation independent from the threats, coercion, or intimidation inherent in the alleged constitutional or statutory violation"); *Barragan v. City of Eureka*, No. 15-CV-02070-WHO, 2016 WL 4549130, at *7-8 (N.D. Cal. Sept. 1, 2016) (same); *see also Jones v. Cnty. of Contra Costa*, No. 13-CV-05552-TEH, 2016 WL 1569974, at *6 (N.D. Cal. Apr. 19, 2016) (finding that a plaintiff "need not allege a showing of threats, intimidation or coercion

18

1   independent from the coercion inherent in the use of force" because the plaintiff alleged
2   intentional conduct by the defendants in the form of excessive force); *Stubblefield v. City of*
3   *Novato*, Case No. 15-cv-03372-JCS, 2016 WL 192539, at *11 (N.D. Cal. Jan. 15, 2016) (holding
4   the plaintiff's allegation of excessive force by the defendant officers were sufficient to state a
5   claim under section 52.1).

6   Given the lack of clear guidance from the Ninth Circuit or the California Supreme Court,
7   this court continues to conclude that Plaintiffs need not establish threats, intimidation, or coercion
8   independent from the acts inherent in the alleged excessive use of force in order to bring a section
9   52.1 claim. Accordingly, since there are triable disputes regarding Plaintiffs' underlying excessive
10  force claim, the court denies Defendants' motion for summary judgment as to Plaintiffs' Bane Act
11  claim.

### E. Battery

Plaintiffs allege a claim for battery based on the intentional use of unreasonable force against Henderson. "A battery is any intentional, unlawful and harmful contact by one person with the person of another." *Ashcroft* v. *King*, 228 Cal. App. 3d 604, 611 (1991) (internal citations omitted). "The law governing a [California] state law claim for battery is the same as that used to analyze a claim for excessive force under the Fourth Amendment." *See Warren v. Marcus*, 78 F. Supp. 3d 1228, 1248 (N.D. Cal. 2015); *see also Barragan*, 2016 WL 4549130, at *6 (explaining that "battery claims brought under California law are analyzed under the reasonableness standard used to evaluate Fourth Amendment claims" and denying summary judgment on the state law battery claim on the same grounds as the federal excessive force claim) (citing *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1274-75 (1998) and *Saman v. Robbins*, 173 F.3d 1150, 1157 n.6 (9th Cir. 1999)). For the same reasons discussed above with respect to Plaintiffs' excessive force claim, the court denies summary judgment as to Plaintiffs' battery claim.

### F. Wrongful Death

Plaintiffs allege a wrongful death claim pursuant to Cal. Civ. Proc. Code § 377.60. Under California law, "[t]he elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered

19

by the heirs." *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1264 (2006) (citation and internal quotation marks omitted). "[A]n officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin*, 24 Cal. 3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 587 (1970)). In order to prove wrongful death, "a plaintiff must show that the officer violated his 'duty to use reasonable force under the totality of the circumstances.'" *C.E.W.*, 2015 WL 1926289, at *14 (quoting *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 526 n.10 (2009)). "Moreover, where the officer's preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the officer's preshooting conduct is properly 'included in the totality of circumstances surrounding [his] use of deadly force.'" *C.E.W*, 2015 WL 1926289, at *14 (quoting *Hayes v. County of San Diego*, 57 Cal. 4th 622, 632 (2013)).

For the same reasons discussed above with respect to Plaintiffs' excessive force claim, the court denies summary judgment as to Plaintiffs' wrongful death claim. *See C.E.W.*, 2015 WL 1926289, at *14 (denying summary judgment on state law wrongful death claim on the same grounds as the federal excessive force claim). In addition, Defendants conceded at the hearing that any alleged errors in Williams's tactical decision-making, such as the placement of his vehicle upon arriving at the Extra Space Storage facility, would be relevant to a negligence claim.

## VI. CONCLUSION

For the above reasons, the court denies in part and grants in part Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: March 13, 2017



Donna M. Ryu
United States Magistrate Judge